**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**JOHN DOE #1, JANE DOE #1**
**JOHN DOE #1M,** *et al.*,                          *
                                                    *
         Plaintiffs,                                *
                                                    *
                                                    *          Civil No. **21-0356 PJM**
v.                                                  *          Civil No. **21-0360 PJM**
                                                    *
**MONTGOMERY COUNTY**                               *
**BOARD OF EDUCATION,** *et al.*,                   *
                                                    *
         Defendants.

**MEMORANDUM OPINION**

This case arises from student-on-student assaults that allegedly occurred in a locker room at Damascus High School ("DHS"), located in Damascus, Maryland. Plaintiffs[1], student victims ("Minor-Plaintiffs") and their parents ("Parent-Plaintiffs") bring this civil action against Defendants Montgomery County Board of Education ("Board") and Jeffrey Sullivan, Casey Crouse, Vincent Colbert, Eric Wallich, and Joseph Doody, in their official and individual capacities (collectively, "Defendants")[2] based on their purported failure to implement appropriate supervisory policies and properly investigate claims of abuse while the Minor-Plaintiffs were members of the DHS junior varsity football team.

Plaintiffs Does #1 through 3 jointly and Plaintiffs Does #4 originally filed separate cases in Montgomery County Circuit Court, both of which were subsequently removed to this Court.

---

[1] Plaintiffs include John and Jane Doe #1, parents of John Doe #1M; John Doe #1M; Jane Doe #2, parent of John Doe #2M; minor John Doe #2M; John and Jane Doe #3, parents of John Doe #3M; minor John Doe #3; John and Jane Doe #4, parents of John Doe #4M; and John Doe #4M (collectively, "Plaintiffs"). John Doe #1M, John Doe #2M, John Doe #3M, and John Doe #4M ("Minor-Plaintiffs") were all students at Damascus High School during the relevant time period. John Doe #1M is now an adult. John and Jane Doe #1, Jane Doe #2, John and Jane Doe #3, and John and Jane Doe #4, are parents of the Minor-Plaintiffs ("Parent-Plaintiffs") and sue in their individual capacities as well as in their representative capacities as parents and next friends of the Minor-Plaintiffs.

[2] During the relevant time period, Jeffrey Sullivan was the Director of Systemwide Athletics for Montgomery County Public Schools; Casey Crouse was the DHS principal; Vincent Colbert was the DHS Junior Varsity Football Coach; Eric Wallich was DHS Varsity Football Head Coach; and Joseph Doody was the DHS Athletic Director.

On February 16, 2021, Defendants filed a motion to consolidate the Does #1 through 3 cases (Civil No. 21-356) and the Does #4 case (Civil No. 21-360).  ECF No. 12.  On March 10, 2021, the Court the Court granted Defendants' motion to consolidate all Plaintiffs' cases.  ECF No. 33.  On February 17, 2021, Plaintiffs Does #1 through 3 filed an amended complaint, setting forth ten causes of action, ECF No. 16 (Doe #1–3 Amended Complaint).  On March 10, 2021, Plaintiffs Does #4 also filed an amended complaint, setting forth the same factual allegations as Plaintiffs Does #1 through 3 and raising the same ten causes of action, ECF No. 34 (Doe #4 Amended Complaint) (together, the "Amended Complaints").

Defendant Doody, former Athletic Director at DHS, moved to dismiss Count IV of the Amended Complaints.  ECF No. 36. The other Defendants moved jointly to dismiss all counts except Count I of the Amended Complaints.  ECF No. 38.  After briefing on those motions concluded, the Court held oral argument on July 1, 2021.  In an oral opinion rendered at the end of the argument, the Court denied the motions to dismiss as to all counts except Counts VIII through X, which are civil rights claims brought pursuant to 42 U.S.C. § 1983.  The Court deferred decision on the § 1983 counts.  On August 12, 2021, the Defendants moved to stay all proceedings pending the Court's ruling on the § 1983 counts.  ECF No. 85.  The Court now considers the § 1983 claims and the Motion to Stay.  For the following reasons, the Motion to Dismiss Counts VIII through X will be **GRANTED IN PART AND DENIED IN PART**.  The Motion to Stay will be **DENIED**.

### I. Factual Background

According to the Amended Complaints, over several years football players at Damascus High School ("DHS") battered, assaulted, sexually assaulted, and raped members of the junior varsity ("JV") football team in the school's locker room as a part of a hazing ritual known as

"brooming" (i.e., anally raping by forcibly inserting a pole or broom handle).  *See* Am. Compls.
Plaintiffs sue the Board and five individuals: Jeffrey Sullivan, as Director of Systemwide Athletics
for Montgomery County Public Schools; Casey Crouse, as former DHS principal; Vincent Colbert,
as former DHS Junior Varsity Football Coach; Eric Wallich, as former DHS Varsity Head Coach;
and Joseph Doody, as former DHS Athletic Director.

Plaintiffs describe the JV football locker room used by student-athletes as totally lacking
in supervision, an "unchecked breeding ground for sexual assault" by team members.  They allege
that, as a result of Defendants' negligent supervision and failure to adequately act on reports of
abuse, Minor-Plaintiffs and other students suffered several assaults resulting in physical injuries
and permanent emotional and psychological damage.

Minor-Plaintiffs include Doe #1M, a then-freshman member of the JV team, who was
allegedly sexually assaulted by his teammates with a broom in August 2017, and Does #2M, 3M,
4M, three then-freshman members of the JV team, who were allegedly sexually assaulted by
teammates with a broom on October 31, 2018.  Plaintiffs submit that Defendants facilitated the
assaults by allowing certain student-athletes to have "free reign" in the locker room, despite
complaints from teachers and parents about the abusive environment that existed there.  One player
responsible for the October 2018 attack, known as "JCA", was known to have a lengthy
disciplinary history, which included physical assaults against teachers and students at other
Montgomery County schools, causing him to be suspended from those schools based on his violent
acts.  Plaintiffs further aver that after the October 2018 attack, Defendants, with knowledge of the
incidents, downplayed their significance, failed to investigate them fully, failed to promptly notify
parents of the incidents, neglected to ensure that victims received appropriate medical attention,

instructed players not to speak to investigators about the brooming tradition, and all the while continued to promote the school's nationally recognized football program.

### A. Allegations Regarding Montgomery County Public Schools

According to Plaintiffs, prior to 2017, certain incidents of hazing took place in high school locker rooms at Montgomery County Public Schools ("MCPS") other than DHS.  Does #1–3 Am. Compl. ¶ 13.[3]  Following those incidents, MCPS circulated written documentation to school administrators and coaches regarding such assaults.  *Id.* ¶¶ 19–20.  Despite this written notice, students at two different MCPS high schools (neither DHS) were subsequently assaulted in similar fashion.  *Id.* ¶¶ 13, 16.  At that point, in July 2018, Defendant Sullivan issued a memorandum to Montgomery County athletic directors and coaches, stressing the MCPS student-athlete supervision policy, which specifically addressed the matter of hazing.  *Id.* ¶ 22.  That same summer, at a meeting of MCPS athletic directors, MCPS emphasized the importance of adequate supervision of school locker rooms.  *Id.* ¶ 23.  MCPS not only sent articles regarding hazing to county athletic directors and coaches; it required mandatory anti-hazing training for those individuals. *Id.* ¶¶ 28–30.  Defendants Doody, Wallich, and Colbert, it is said, never completed— if they even undertook at all—this required training.  ¶ 32–34.  Their failure to do so was allegedly well known to Defendants Crouse and Sullivan.  *Id.*

In 2018, MCPS also issued a document entitled "A Student's Guide to Rights and Responsibilities in Montgomery County Public Schools."  *Id.* ¶ 35.  The document stated in pertinent part:  "Sexual harassment committed by students, staff members, or others is inappropriate and violates MCPS rules.  Sexual harassment complaints should be reported to school staff or the principal, according to the procedures set forth in MCPS Regulation ACF-RA,

---

[3] Does #4 Amended Complaint contains the same background factual allegations as the Does #1 through 3 Amended Complaint.  The Court's citations are to ECF No. 16, the Does #1 through 3 Amended Complaint.

Sexual Harassment, using MCPS Form 230-35, Bullying, Harassment, or Intimidation Reporting Form." *Id.* The relevant regulation indicated that reports of sexual harassment could be made verbally or in writing to any staff member. *Id. ¶* 36.

## B. Allegations Regarding Incidents at Damascus High School

Damascus High School's football program has had a storied history of success, winning 11 state varsity football titles, over 15 regional titles, and over 21 divisional titles. *Id.* ¶ 39. In 2017 and 2018, Defendant Wallich was the head coach of the varsity football program and Defendant Colbert was the head coach of the JV football program. *Id.* ¶¶ 40–41.

Plaintiffs make numerous allegations of sexual abuse committed in the DHS locker room, none of which, they submit, were adequately addressed by authority figures at the school. They cite at least one incident occurring in 2016, in which "Victim 1," a freshman member of the JV football team, fought off sophomores who attempted to rape, sexually assault, and batter him. *Id.* ¶ 45. The 2017 football season purportedly brought more incidents of abuse of victims, including brooming incidents with at least six freshman victims, including Doe #1M. *Id.* ¶¶ 46–47. Allegedly, a report of sexual misconduct in the locker room was made directly to Defendant Crouse, then principal of DHS, by a parent, identified as F.H. *Id.* ¶ 48. Plaintiffs submit that all other Defendants were also notified of the claim following F.H.'s report to Defendant Crouse. *Id.*

Following F.H.'s direct report to Defendant Crouse, on or about August 1, 2017 Plaintiff Doe #1M was allegedly attacked inside the freshman locker room at DHS when no school personnel were present. *Id.* ¶ 55–60. His assailants, he claimed, slammed him against the lockers, attempted to pull his pants down, and, through his pants, poked the end of a broomstick into his buttocks and rectum. *Id.* By fighting back, he eventually freed himself. *Id.* A few days later, Doe #1M's mother, Plaintiff Jane Doe #1, phoned Defendant Colbert, the JV coach, to report the attack.

*Id.* ¶ 65.  Defendant Colbert then notified Defendant Wallich, the varsity coach, and other DHS administrators.  *Id.* ¶ 66.  The following month, Plaintiff Doe #1M was interviewed by a school resource officer and a MCPS security officer, informed them of the assault he sustained, and filled out a written report.  *Id.* ¶ 68.

In November 2017, Defendant Crouse finally contacted the Montgomery County Special Victims Unit regarding F.H.'s report (but not Doe #1M's report), in accordance with the Board's policy requiring that MCPS personnel immediately notify the appropriate law enforcement agency of all critical incidents.  *Id.* ¶¶ 51.  A county detective soon after informed Defendant Crouse that the unit could not conduct an investigation without knowing the victim's name.  *Id.*  Following that conversation, Defendant Crouse instructed a DHS School Resource Officer to interview the alleged victim who, as it happened, denied that the assault had occurred.  *Id.* ¶ 52.  Even so, according to Plaintiffs, Defendants continued to allow students to wander in and out of the locker room unsupervised.

Plaintiffs contend that the unsavory locker room incidents continued during the 2018 football season, specifically while students were in the locker room during the hour between the end of the school day and the start of JV football practice.  *Id.* ¶ 106.  Plaintiffs allege at least three instances of assault occurring prior to October 2018.  *Id.* ¶¶ 108–10.  Then, on October 31, 2018, five members of the JV football team, including JCA, are said to have attempted and/or to have succeeded, while in the locker room, in raping, assaulting, and battering Plaintiffs Does #2M, #3M, and #4M and Victim 3 (not a Plaintiff), all with a broom handle.  *Id.* ¶¶ 119–162.  That night, Doe #3M reported the attack to his father, John Doe #3, who called and informed Defendant Colbert of what had taken place.  *Id.* ¶ 165.  Defendant Colbert spoke with Doe #3 and Doe #3M and with alleged assailant, W.S., who admitted to the attack.  *Id.* ¶¶ 165–68.  Defendant Colbert reported

the incident to Defendants Wallich and Doody later the same evening. *Id.* Defendant Doody then informed Defendant Crouse via text message. *Id.*

No coaches, athletic directors, or administrators, as of that time, immediately contacted law enforcement. *Id.* ¶¶ 169–179. Instead, Defendant Colbert asked other JV players to investigate the report. *Id.* ¶ 170. Additionally, Defendant Crouse and her administration undertook an internal investigation into the incident, which in fact revealed that there had been multiple victims and multiple perpetrators. *Id.* ¶ 179. A school resource officer, however, instructed Defendant Crouse to terminate her investigation and contacted the Special Victims Unit of the Montgomery County Police Department. *Id.* ¶¶ 179–80. Despite this instruction, Defendant Crouse and the DHS administration continued investigating the incident reports on their own, including conducting interviews with multiple students. *Id.*

Plaintiffs allege that Defendants took no corrective measures in response to Plaintiff Doe #1M's written report, and that he was attacked by teammates in the locker room a second time in September 2019 and yet again in the school's weight room in November 2019. *Id.* ¶ 70–73. His assailants allegedly punched him and slammed his face into the metal portion of a weightlifting bench. *Id.*

According to Plaintiffs, during the course of these attacks, several school employees, including Defendants Crouse, Doody, Wallich, Colbert, and Sullivan, received complaints regarding the conduct of the DHS football team from parents and other school employees, including the DHS Security Team Leader, Security Assistant, building services workers, and at least one teacher. *Id.* ¶¶ 107, 111–16. Plaintiffs further allege that neither the coaching staff nor the school administration made any effort to implement the supervision plan mandated by MCPS, nor did they require any suspected perpetrators to attend mandatory study hall sessions. *Id.* ¶ 106.

This lack of supervision purportedly gave rise to a uniquely hostile environment at DHS, both inside and outside the locker room, which, Plaintiffs allege, negatively affected Minor-Plaintiffs' ability to participate in school and school activities, damaging their psychological wellbeing. *Id.* ¶¶ 179–80.

### C. Allegations Regarding Assailant JCA

Plaintiffs set forth numerous specific allegations regarding JCA, one of the assailants in some if not all of these cases. *Id.* ¶¶ 80–105. JCA was known to have an extraordinary disciplinary history at Montgomery County schools before he arrived at DHS, including fighting, bullying, and sexual harassment, which resulted in his being suspended numerous times. *Id.* ¶¶ 80–31. Plaintiffs assert that Defendants Board, Crouse, Wallich, and Colbert were all clearly informed of JCA's disruptive behavior as of the time he enrolled at DHS, and that in fact the DHS administration was given a copy of JCA's disciplinary file, which included a determination by at least one previous school that JCA could not "handle unsupervised time." *Id.* ¶¶ 96–97. Plaintiffs allege that the DHS administration, and more particularly Defendant Crouse, implemented no interventions or safeguards in respect of JCA's known misconduct other than to have him monitored by teachers in between classes. *Id.* ¶ 97. Plaintiffs state that Defendant Crouse not only ignored warnings about JCA, but also that she testified at a grand jury hearing that she never reviewed JCA's file to determine if safeguards were necessary. *Id.* Almost immediately following his arrival at DHS, DHS personnel complained to Defendant Crouse and to the DHS football staff that JCA was exhibiting disruptive, inappropriate, and violent behavior. *Id.* ¶ 100. Plaintiffs state further that Defendant Colbert knew, prior to October 2018, that JCA would routinely assault and bully other students. *Id.* ¶ 98. One of these incidents, involving a physical assault, resulted in Defendant Colbert allegedly demoting JCA from the varsity football team to the JV football team in August

2018.  *Id.* ¶¶ 96–99.  Nonetheless, JCA apparently received no suspensions, no referrals, and no

other interventions.  *Id.* ¶ 101.  Defendants purportedly also continued to allow him to remain a

member of the JV football team at all relevant times, which gave him continuous unsupervised

access to the DHS locker room without restriction.  *Id.* ¶ 101.

## II. Causes of Action

In their Amended Complaints, ECF Nos. 16 and 34, Plaintiffs bring ten claims against

Defendants, as follows:

**Count I**:  Defendants acted with negligence in their failure to supervise the locker room with due care, directly and proximately causing Plaintiffs harm;

**Count II**: Defendant Sullivan acted with gross negligence in his actions and inactions, directly and proximately causing Plaintiffs harm;

**Count III**: Defendant Crouse acted with gross negligence in her actions and inactions, directly and proximately causing Plaintiffs harm;

**Count IV**: Defendant Doody acted with gross negligence in his actions and inactions, directly and proximately causing Plaintiffs harm;

**Count V**: Defendant Wallich acted with gross negligence in his actions and inactions, directly and proximately causing Plaintiffs harm;

**Count VI**: Defendant Colbert acted with gross negligence in his actions and inactions, directly and proximately causing Plaintiffs harm;

**Count VII**: Defendant Board discriminated against Plaintiffs on the basis of sex, in violation of 20 U.S.C. § 1681;

**Count VIII**: Defendant Board violated Plaintiffs' clearly established rights to bodily integrity and personal security, their rights to be free from sexual abuse and/or sexual exploitation, and their rights to be free from a deprivation of liberty without due process, in violation of 42 U.S.C. § 1983;

**Count IX**: Defendant Sullivan violated Plaintiffs' clearly established rights to bodily integrity and personal security, their rights to be free from sexual abuse and/or sexual exploitation, and their rights to be free from a deprivation of liberty without due process, in violation of 42 U.S.C. § 1983;

**Count X**: Defendant Crouse violated Plaintiffs' clearly established rights to bodily integrity and personal security, their rights to be free from sexual abuse and/or sexual exploitation, and their rights to be free from a deprivation of liberty without due process, in violation of 42 U.S.C. § 1983.

Defendant Doody moved to dismiss Count IV. *See* ECF No. 36. Defendants Board, Crouse, Colbert, Wallich, and Sullivan jointly moved to dismiss all counts except Count I. *See* Defs. Mot. to Dismiss & Mem. in Supp. Thereof, ECF No. 38. By oral opinion following oral argument, the Court **DENIED** the motions to dismiss as to Counts II through VII. ECF No. 65. The Court reserved ruling on Counts VIII, IX, and X.

On August 12, 2021, Defendants moved to stay the proceedings pending the Court's ruling on the § 1983 counts. ECF No. 85. On August 19, 2021, Plaintiffs responded in opposition to the Motion to Stay, ECF No. 86, and on September 2, 2021, Defendants replied, ECF No. 87.

The Court now rules on the § 1983 claims and the outstanding portions of the Motion to Dismiss, ECF No. 38.

### III. Standard of Review

Federal Rule of Civil Procedure 8(a) prescribes "liberal pleading standards," requiring only that a plaintiff submit a "short and plain statement of the claim showing that [he or she] is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Federal Rule of Civil Procedure 12(b)(6) governs dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal citations omitted). To survive Rule 12(b)(6) scrutiny, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In evaluating a Rule 12(b)(6) motion to dismiss, a court must assume all well-pleaded factual allegations as true to determine whether the content of a complaint "plausibly give[s] rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 678–79.

## IV. Discussion

Under 42 U.S.C. § 1983, an individual may pursue a private right of action if a person, acting under color of state law, deprives the individual of rights, privileges, or immunities secured by the Constitution.  *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009).  In the instant case, Plaintiffs bring § 1983 claims against Defendants Board, Crouse, and Sullivan, alleging that their actions deprived the Minor-Plaintiffs of their constitutional right to bodily integrity.   Defendants seek dismissal of the § 1983 claims, arguing that the Parent-Plaintiffs lack standing to assert these types of claims and that Plaintiffs otherwise fail to state § 1983 claims upon which relief can be granted.  *See* Defs. Mem. in Supp. of Mot. to Dismiss, ECF No. 38-1, ("Defs. Mem.") at 43–66.  They also argue that Defendants Crouse and Sullivan are entitled to qualified immunity from suit under § 1983.  *Id.* at 61–64.

### A.  Standing of Parent-Plaintiffs

Defendants submit that the Parent-Plaintiffs lack standing to bring § 1983 claims in their individual capacities because they have not alleged that their own individual constitutional rights were infringed, only that their children's constitutional rights were violated. Defs. Mem. at 24. They further contend that John and Jane Doe #1 lack standing to bring a § 1983 claim in any capacity because, since their suit was filed, John Doe #1M has reached the age of majority and is able to conduct suit in his own name.  *Id.*

To meet Article III's constitutional standing requirement, plaintiffs must show that (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the challenged action of the

defendant, and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs generally must assert their own legal rights and interests and cannot rest their claim to relief on the legal rights or interests of third parties. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 499 (1975)). An exception to this rule exists for situations in which the plaintiff has a close relation to the third party and there is an obstacle to the third party's ability to protect their own interests. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 629 (1991). Parents, for example, typically have standing to assert the claims of their minor children. *See Smith v. Org. of Foster Fams. For Equality & Reform*, 431 U.S. 816, 841 n. 44 (1977). *See also* Fed. R. Civ. P. 17(c).

Here, there is no question that Parent-Plaintiffs have standing to bring claims in a representative capacity on behalf of their minor children for alleged constitutional violations injuries sustained by Minor-Plaintiffs as a result of Defendants' purported actions. *See* 431 U.S. 816 at 841 n.44. However, Parent-Plaintiffs also bring claims in their individual capacities, asserting that they have standing to sue to recover out-of-pocket expenses for costs made necessary by Defendants' conduct, such as medical bills and treatments for the Minor-Plaintiffs. This, however, does not establish standing for Parent-Plaintiffs to pursue their own claims separately from those on behalf of their minor children. Assuming the Minor-Plaintiffs' alleged injuries were fairly traceable to the Defendants' conduct, the Parent-Plaintiffs have failed to assert that they personally suffered any constitutional injury pursuant to § 1983. As Defendants point out, Parent-Plaintiffs may recover any expenditures occasioned by injuries sustained by the Minor-Plaintiffs through a claim on behalf of the Minor-Plaintiffs. *See Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 716 (4th Cir. 2007) (citing *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 76 (1992)). But

because Parent-Plaintiffs have suffered no cognizable individual injury of their own under § 1983, the Court will dismiss their individual § 1983 claims.

Defendants further assert that Plaintiffs John Doe #1 and Jane Doe #1 lack standing to bring claims on behalf of John Doe #1M inasmuch he has reached the age of majority. The Court agrees. Because John Doe #1M now has standing to bring his claims himself, his parents no longer have standing to proceed as his next friends. Therefore, the Court will dismiss the claims of John Doe #1 and Jane Doe #1 brought on behalf of John Doe #1M and substitute John Doe #1M as Plaintiff in his own right.

**B. Section 1983 Claim Against the Montgomery County Board of Education**

Plaintiffs' § 1983 claim against Defendant Board is that the Board was responsible for the injuries to Minor-Plaintiffs because it failed to adequately address and respond to a clear pattern of sexual abuse at Montgomery County schools, specifically with respect to the supervision of locker rooms.

To plausibly state a claim under § 1983, a plaintiff must allege that: 1) a right secured by the Constitution or laws of the United States was violated and 2) the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Therefore, in order to state a claim against the Board under § 1983, Plaintiffs must first establish that the Board is a "person" within the meaning of the statute. Defendants maintain that the Board cannot be a "person" for § 1983 purposes because the Board is an arm of the state. Plaintiffs oppose this argument. The Court agrees that Defendants have the better part of this argument.

In Maryland, public schools are organized by county, and each county's public school system is managed by a county board of education. *Brown v. Prince George's Cty. Bd. of Educ.*, No. GJH-18-2723, 2019 WL 3944983, at *3 (D. Md. Aug. 20, 2019) (citing Md. Code Ann., Educ.

13

§§ 3-103, 4-101, 4-108).  Plaintiffs have named the Montgomery County Board of Education as a Defendant, characterizing the Board as "the governing body for the Montgomery County Public Schools system."  *See* Am. Compl. ¶ 4.

That said, state agencies have been held not to be "persons" within the meaning of § 1983, *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), whereas local government units may be held liable under the statute, *Monell v. Department of Social Services*.  Relying heavily on *Donlon v. Montgomery County Public Schools*, 460 Md. 62, 79, 188 A.3d 949 (Md. 2018), Plaintiffs assert that Maryland county school boards share both local and state characteristics, so they are not always considered state actors within the meaning of § 1983 and may be liable under the statute.  Opp'n at 57–58.

In *Donlon*, the Court of Appeals of Maryland, facing the question of whether county school boards are state agencies, noted that although it had referred to county school boards as state entities in prior decisions, "[t]hose expressions appeared only in dictum."  460 Md. at 79.  Although the *Donlon* court stated that, for some purposes, boards of education might be designated as local agencies, it also made clear that in certain other contexts, boards are in fact arms of the State.  *Id.* at 80–82.  The *Donlon* court did not determine whether county boards of education are immune from suit under § 1983.  *Id.* at 88 ("In the context of a sovereign immunity analysis, we held that the local budgetary character of county boards of education 'appears insufficient to overcome the overwhelming support in our case law for the notion that county boards of education are' State agencies") (citing *Beka Indus., Inc. v. Worcester Cty. Bd. of Educ.*, 419 Md. 194, 214, 18 A.3d 890, 904 (2011)).

Even so, Defendants correctly point out that members of this Court have consistently held that county boards of education in Maryland, including the Board at bar, are state agencies and

14

thus immune from suit under § 1983. *See, e.g.*, *J.G. by & through Gusman v. Prince George's Cty. Bd. of Educ.*, No. PWG-16-1008, 2017 WL 930130, at *4 (D. Md. Mar. 8, 2017) (holding that Maryland school boards are state agencies and not "persons" under §1983); *Wood v. Bd. of Educ. of Charles Cty.*, No. GJH-16-00239, 2016 WL 8669913, at *5 (D. Md. Sept. 30, 2016) (same); *Schiffbauer v. Schmidt*, 95 F. Supp. 3d 846, 851–52 (D. Md. 2015) (same); *Mayo v. Bd. of Educ. of Prince George's Cty.*, 797 F. Supp. 2d 685, 689 (D. Md. 2011) (same), *aff'd* 713 F.3d 735 (4th Cir. 2013); *Lewis v. Bd. of Educ. of Talbot Cty.*, 262 F. Supp. 2d 608, 613 (D. Md. 2003) (same). *See also Zimmer-Rubert v. Bd. of Educ. of Balt. Cty.*, 179 Md. App. 5589, 600 947 A.2d 135, 141 (Md. 2008) ("The [Maryland] Court of Appeals undoubtedly considers county school boards instrumentalities of the State rather than independent, local bodies."), *aff'd* 409 Md. 200, 973 A.3d 233 (2009). As discussed in these decisions, county school boards in Maryland are created by the state legislature, are part of the state program of public education, and may not buy, sell, or hold property without state approval. *Lewis*, 262 F. Supp. 2d at 613–14 (citing Md. Code Ann., Educ. §§ 3-108, 4-109, 4-115). Additionally, the state of Maryland controls the form of contract for county board employees, defines and enforces teacher certification requirements, and may reduce programming, order a reorganization, or reconstitute schools that are not performing to state standards. 262 F. Supp. 2d at 613–14 (citing Md. Code Regs. 13A.01.04.08, 07.02.01). The Court agrees with the reasoning in the opinions holding that county school boards in Maryland are controlled by the state and therefore are not "persons" within the meaning of the § 1983. In consequence, Count VIII against the Board is **DISMISSED**.

### C.  Section 1983 Claims against Defendants Crouse and Sullivan

In addition to the § 1983 claim against the Board, Plaintiffs bring § 1983 claims against Defendants Crouse and Sullivan in their official capacities, alleging that they deprived Minor-

Plaintiffs of their constitutional rights to bodily integrity.  To the extent that Defendants Crouse and Sullivan are sued in their official capacities as "Director of Systemwide Athletics for MCPS" and "principal of Damascus High School," respectively, they are also immune from suit.  That is because state officials acting in their <u>official</u> capacities are not deemed to be "persons" under 42 U.S.C. § 1983.  *See, e.g.*, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  *See also Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 650 (D. Md. 2004) (school officials acting in their official capacities are acting as the state and therefore not "persons" under the statute).

But Plaintiffs also sue Defendants Crouse and Sullivan in their individual capacities.

Personal-capacity suits are typically brought as a fiction to impose individual liability on a state actor for actions taken under color of state law.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  "[T]o establish personal liability, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."  *Id.*

Defendants counter that Plaintiffs cannot bring their § 1983 claims against Defendants Crouse and Sullivan, even in their individual capacities, for four reasons: (1) Plaintiffs may not bring a pattern and practice or *Monell* type of claim against an individual defendant in his or her individual capacity; (2) state actors may only be held liable for private actor conduct in limited circumstances, which are not present here; (3) Plaintiffs fail to state a claim for relief under a supervisory liability theory; and (4) Defendants Crouse and Sullivan are entitled to qualified immunity.  Having considered these arguments, the Court concludes that Plaintiffs have stated viable § 1983 claims against Defendants Crouse and Sullivan in their individual capacities, and that these Defendants are not entitled to qualified immunity, such that, as of now, the claims should go forward.  The Court explains.

### 1. Pattern and Practice Claim

Plaintiffs' § 1983 claims include allegations that Defendants Crouse and Sullivan "established customs and/or policies that failed to implement County supervision policies that resulted in that resulted in the failure to supervise students in locker rooms, and that they failed to thoroughly investigate claims of abuse." Defendants characterize this crafting as an attempt by Plaintiffs to bring a § 1983 claim under *Monell*, arguing that a *Monell* claim cannot be brought against an individual defendant in his or her individual capacity. Defs. Mem. at 45; *see, e.g.*, *Whitley v. Prince George's Cty.*, No. PWG-12-3428, 2013 U.S. Dist. LEXIS 96724, at *27–28 n.7 (D. Md. July 11, 2013). As to this particular argument, the Court agrees with Defendants.

A *Monell* claim is an action that holds a municipality liable under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). For liability under *Monell* to apply, a municipal custom or policy typically must be a moving force behind the violation. *See id.* But suits against individuals in their personal capacities seek to impose liability on the individual, not the government employer. *Kentucky v. Graham*, 473 U.S. 159, 166–168 (1985). Because *Monell* suits are ultimately intended to hold municipal entities liable, they cannot be brought against individuals in their personal capacities. *Grim v. Baltimore Police Dep't*, No. CV ELH-18-3864, 2019 WL 5865561, at *16 (D. Md. Nov. 8, 2019) (citing *Devi v. Prince George's Cty.*, DKC-16-3790, 2017 WL 3592452 at *2 n.3 (D. Md. Aug. 21, 2017) ("Plaintiff cannot state a *Monell* claim against an officer in his individual capacity."); *Harasz v. Katz*, 239 F. Supp. 3d 461, 505 (D. Conn. 2017) ("'*Monell* does not apply to state officials or individuals sued in their individual capacity.'" (citation omitted)); Martin A. Schwartz, *Sec. 1983 Litig. Claims & Defenses* § 7.01 (4th Ed. 2016) (explaining that *Monell* applies to municipal liability)). *See also Whitley*, at *27–28 n.7. Accordingly, insofar as Plaintiffs are attempting to state a § 1983 claim under *Monell* against

Defendants Crouse and Sullivan in their individual capacities, they have failed to do so. But there is more.

### 2.   Liability for Private Actor Conduct

It is well established that the Fourteenth Amendment includes a "substantive due process right against state actor conduct that deprives an individual of bodily integrity." *Doe v. Rosa*, 795 F.3d 429, 436–37 (4th Cir. 2015). As a rule, state actor liability is limited and generally does not ordinarily attach in instances of private conduct, such as where there are student-on-student attacks more or less of the type at issue here. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means"). On the other hand, the Supreme Court has recognized at least two exceptions to this general rule: the special relationship doctrine and the state-created danger doctrine. *Id.* at 195–96, 199–200. Defendants argue that Plaintiffs cannot demonstrate that either of these exceptions apply. The Court analyzes both exceptions and finds, based on the acts alleged, that the state created danger exception applies.

### a.   The Special Relationship Doctrine

The first exception to the general rule of nonliability for private actor conduct is the special relationship doctrine, which arises when the state and the aggrieved individual have a special relationship whereby the state has an affirmative duty to protect the individual from harm inflicted by third parties. *DeShaney*, 489 U.S. at 200–01; *see also Waybright v. Frederick Cty., MD*, 528 F.3d 199, 207 (4th Cir. 2008) ("As *DeShaney* indicates and our case law specifies, a "special relationship" is all but synonymous with a custodial relationship."). In *DeShaney*, the Supreme Court explained that the special relationship exception applies in custodial situations "when the

18

State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." 489 U.S. at 200. Typically, such restraint is rendered by "some sort of confinement . . . such as incarceration, institutionalization, or the like." *Waybright*, 528 F.3d at 207 (4th Cir. 2008) (citing *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995)).

The Fourth Circuit, albeit in an unpublished decision, joined other circuits in finding that a relationship between school and student is not a "special relationship" sufficient to trigger due process protections. *Stevenson ex rel. Stevenson v. Martin Cty. Bd. of Educ.*, 3 F. App'x 25, 31 (4th Cir. 2001) ("Following the lead of our sister circuits, we hold that the Martin County School officials did not have a "special relationship" with [the student] that triggered the protections of the Due Process Clause in this case. When a student attends public school, his liberty is not restrained to the extent contemplated in *DeShaney*. Attending school is not the equivalent of incarceration or institutionalization . . . the state, simply by virtue of its maintenance of a public school system, does not become constitutionally liable for failing to prevent all student-on-student violence.").

Following the Fourth Circuit's reasoning in *Stevenson*, the Court holds that Defendants Crouse and Sullivan did not have a "special relationship" with the Minor-Plaintiffs here such as would trigger constitutional protections in this case. Plaintiff-Minors were not subject to the type of confinement or incarceration that "so restrains an individual's liberty that it renders him unable to care for himself." *DeShaney*, 489 U.S. at 200. Defendants Crouse and Sullivan cannot become liable under the special relationship doctrine simply by reason of being employed by the public school system.

### b.   The State-Created Danger Doctrine

The second exception to the general non-availability of a substantive due process claim for deprivation of bodily integrity is the state-created danger doctrine, which Plaintiffs submit applies to both Defendants Crouse and Sullivan.  "[T]o establish § 1983 liability under the state-created danger doctrine, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015).  *See also DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that [the child] faced ... it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").  The state-created danger exception is narrow; the bar for what constitutes an "affirmative act" is high.  *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995) ("It cannot be that the state commits an affirmative act or creates a danger every time it does anything that makes injury at the hands of a third party more likely."). *See also Doe v. Rosa*, 795 F.3d at 439.  In *Doe v. Rosa*, for example, a college president failed to act after learning that a counselor at the college's summer camp sexually abused campers over several years.  *Id.* at 431.  One of the counselor's victims and the victim's family brought suit against the college president, but the Fourth Circuit held that the state-created doctrine did not apply because the complaint did not allege sufficient affirmative actions.  *Id.* at 434–35. Specifically, the court emphasized that the claims "lack[ed] the nexus necessary for any of Rosa's alleged conduct to be 'affirmative acts'" that created or enhanced the danger to the Does, specifically, because Rosa "did not meet or speak with the Does, and by all accounts, was not even aware [they] existed."  *Id.*

The context in which the alleged constitutional injury occurs is critically important in this analysis.  The Supreme Court has recognized that in an educational setting, a school may exercise

20

substantial control over a harasser.  *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646 (1999).  Similarly, in a case analyzing privacy expectations in the context of school sports, the Supreme Court has described the state's power over schoolchildren as "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults."  Although the setting by itself does not trigger a constitutional duty to protect nor a special relationship, the specific factual circumstances of a claim arising in a school setting may be instructive in determining whether a claim under the state-created doctrine will survive a motion to dismiss.  *See D.J. by & through Hughes v. Sch. Bd. of Henrico Cty.*, 488 F. Supp. 3d 307, 325–26 (E.D. Va. 2020) (citing *Rosa*, 795 F.3d at 439).

Regardless of the allegedly hazardous school environment present in this case, Defendants maintain that Plaintiffs have not stated plausible § 1983 claims against Defendants Crouse and Sullivan because Plaintiffs' injuries were inflicted by third parties.  Plaintiffs, they say, have failed to plead affirmative acts on Defendants' part that created or enhanced the danger that Minor-Plaintiffs would be assaulted.  Defs. Mem. 46–53.  The Court parts company with Defendants on this point.  Taking the allegations in the Amended Complaints as true as to Defendants Crouse and Sullivan, although it is a close call, Plaintiffs do appear to have satisfactorily set forth the elements of a substantive due process claim based on their constitutional right to bodily integrity under the state-created danger doctrine.  They have alleged that Defendants Crouse and Sullivan's were aware of and their actions increased the risk of danger to Minor-Plaintiffs because, after being specifically directed to act by superior authorities, they failed to provide adequate adult supervision in the locker room despite on notice that similar incidents of assault had occurred there, and they failed to assure required sensitivity training on the part of their coaches.

In arguing that the state-created danger doctrine does not apply, Defendants cite *Rosa* and insist that Defendants Crouse and Sullivan took no affirmative acts that created or enhanced the danger that the Minor-Plaintiffs would be sexually assaulted or battered by third parties.  Defs. Mem. at 49–50.  The Court disagrees.  Despite Defendant Crouse's attempt to characterize her behavior otherwise, Plaintiffs do allege that she took acts that enhanced the risk of private danger by, among other things, knowing she should assure appropriate oversight and discipline of JCA, a known troublemaker, but failing to act; by eliminating a previously required study hall for bullies; by failing to implement supervision of the football locker rooms, despite being directed by higher ups that she should do so; and by ignoring the fact that coaches had failed to take mandatory sensitivity training.  Plaintiffs also allege that Defendant Crouse tried to cover up fact of prior assaults and failed to follow obligatory MCPS policy for reporting and investigating the types of incidents at issue here.  One can debate philosophically whether actions such as those present here are mere failures to act as opposed to "affirmative" acts.  But, in marked contrast to neutral failure-to-act cases, where a defendant does nothing at all after notice of an assault, the allegations in the present case, certainly as to Defendant Crouse, involve steps, purposefully taken, that arguably enhanced the dangerous situations that resulted in the injuries to the Minor-Plaintiffs.

With respect to Defendant Sullivan, Plaintiffs argue that the Amended Complaints contain sufficient allegations that he, too, increased the risk that students would suffer the types of assaults perpetrated against Minor-Plaintiffs.  Again, the Court finds these allegations distinguishable from allegations of mere failures to act.  The Amended Complaints allege that Defendant Sullivan was aware of the locker room assaults at DHS as early as 2017 and indeed that he may have participated in the subsequent investigation of such assaults.  And importantly, Plaintiffs allege that Defendant Sullivan was not only the individual responsible for issuing a reminder memorandum to all athletic

directors and coaches emphasizing MCPS's established student-athlete supervision policy which highlighted the problem of hazing; he was also responsible for ensuring that each MCPS principal, including Defendant Crouse, monitored their coaching staff's compliance with mandatory training requirements.  Plaintiffs further allege that Defendant Sullivan knew that Defendants Doody, Wallich and Colbert had failed to complete mandatory training, yet ignored their noncompliance and took no efforts to ensure that the supervision policy was implemented as required by Montgomery County Public Schools.  At the least, Plaintiffs ask, not unreasonably, for an opportunity to engage in further discovery in support of this allegation.  Opp'n at 69.  The Court is disposed to let them do so.

The Court recognizes that the exception created by the state-created danger doctrine is a narrow one.  Even so, based on the allegations in the Amended Complaints—which include details regarding Defendants Crouse and Sullivan's conduct and deliberate indifference—the Court concludes that further factual development is appropriate to determine whether their acts or omissions may suffice to impose liability upon them under § 1983.  *See D.J. by & through Hughes v. Sch. Bd. of Henrico Cty.*, 488 F. Supp. 3d 307, 328–329 (E.D. Va. 2020) (holding that discovery was required to determine whether a principal could be held liable for her acts and omissions under § 1983 when she was aware of instances of race-based attacks in a high school locker room and failed to implement supervision).  Given the present posture of the case, therefore, the Court will allow the § 1983 claims against Defendants Crouse and Sullivan to proceed based on the state-created danger doctrine.  Accordingly, Defendants' Motion to Dismiss Counts VIII and IX is **DENIED**.

### 3. Supervisory Liability

Separate and apart from the *Monell* claim and the third-party exceptions discussed *supra*, Plaintiffs also allege that Defendants Crouse and Sullivan are directly liable under an independent theory of supervisory liability. While the doctrine of respondeat superior is not applicable to § 1983 claims, an individual defendant may still be subject to supervisory liability. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001). To prevail on a theory of supervisory liability, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). A plaintiff must show: 1) that "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff," (2) that the supervisor's response to that knowledge was sufficiently inadequate so as to show "deliberate indifference to, or tacit authorization of, the alleged offensive practices," and (3) that "an affirmative causal link [existed] between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

The first element requires a plaintiff to show that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." 751 F.3d at 226. The second element requires a plaintiff to show deliberate indifference or tacit authorization on a defendant's part and may be established by showing "a supervisor's continued inaction in the face of documented widespread abuses." Establishing deliberate indifference involves a heavy burden of proof because plaintiffs must show more than a single incident or isolated incidents, *id.*; establishing tacit authorization requires allegations supporting the inference that a supervisor "fail[ed] to take

action in response to a known pattern of comparable conduct occurring before the incident at issue took place," *Danser v. Stansberry*, 772 F.3d 340, 350 (4th Cir. 2014).  The third element for supervisory liability encompasses the usual tort principle of proximate cause, requiring a plaintiff to demonstrate that, more likely than not, the supervisor's conduct logically and rationally caused the injury.  *Shaw*, 13 F.3d at 799.

With these principles in mind, the Court considers the allegations in the present case. Plaintiffs argue that Defendants Crouse and Sullivan are liable because of their own actions and inactions in failing to adequately supervise the DHS locker rooms, in adopting and maintaining an attitude of reckless indifference to instances of known sexual abuse of students by other students, in concealing complaints of abuse and in failing to follow MCPS policy in supervising the locker rooms, in reporting instances of abuse, and failing to assure that DHS coaches were pursuing sensitivity training.  Plaintiffs argue that, taken together, these actions created an environment which facilitated the sexual abuse Plaintiff-Minors were subject to.

The Court finds that Plaintiffs' claim of supervisory liability passes muster at this preliminary stage.

With respect to the first element, Plaintiffs aver that Defendants Crouse and Sullivan had actual or constructive knowledge of widespread sexual abuse in MCPS athletic programs and knew that their subordinates, including DHS coaches, were not properly supervising, nor were they purposely undertaking training for supervising, the locker room.  According to Plaintiffs, both Defendants Crouse and Sullivan were aware of multiple instances of misconduct in locker rooms at DHS and other MCPS high schools as early as 2017.  Defendant Crouse was likewise made aware of complaints made by DHS staff members regarding the lack of locker room supervision. Additionally, Plaintiffs describe emails and other communications warning Defendant Crouse of

JCA's concerning disciplinary history and poor behavior at DHS.  The Court has no difficulty concluding that Plaintiffs have adequately alleged Defendant Crouse's knowledge of the baleful incidents in question.  The first element of a supervisory liability claim as to Defendant Crouse is thus established.

Although Plaintiffs allege that Defendant Sullivan had notice of the abuse occurring at DHS, their allegations with respect to his knowledge are somewhat less persuasive compared to those regarding Defendant Crouse's knowledge.  Defendants suggest that the Amended Complaints do not contain allegations that Defendant Sullivan was personally consulted nor otherwise made aware of incidents at DHS.  Defs. Mem. at 57.  That is not exactly the case. Plaintiffs have alleged that Defendant Sullivan was made aware of at least one claim of sexual abuse at DHS as well as instances of abuse at two other schools.  At this juncture, the claim against Defendant Sullivan based on supervisory liability is another close call.  Still, taking the factual allegations against him as true, they do tend to establish actual knowledge on his part of widespread abuse in MCPS school locker rooms.  Further discovery on the matter may well fortify Plaintiffs' claim in this regard.  For now, the Court finds that Plaintiffs have satisfied the first element of supervisory liability in their claim against Defendant Sullivan.

Regarding the second element for supervisory liability, Defendants argue that Defendants Crouse and Sullivan responded reasonably to reports of misconduct and did not act with deliberate indifference or tacit authorization.  But again, Plaintiffs have alleged that, despite having actual knowledge of reports of sexual assault and other misconduct, Defendants Crouse and Sullivan, among other things, failed to ensure adult supervision of the DHS locker room.  Even after receiving complaints from the DHS Security Team Leader and other school officials about the lack of supervision in the locker room, Defendant Crouse supposedly continued to allow students to

engage in abusive behavior.  Plaintiffs further claim that both Defendants Crouse and Sullivan knew that Defendants Colbert, Doody, and Wallich had failed to take mandatory training with respect to sexual assault prevention but that Defendants Crouse and Sullivan failed to act in response to those failures as well.  Then, too, despite being aware of JCA's serious disciplinary history, including the bullying and harassment of other students, Defendant Crouse is alleged to have failed to even read the reports of JCA's misconduct from other schools much less to have implemented appropriate interventions deemed necessary by personnel at JCA's previous schools. Defendant Crouse is also said to have been well aware of JCA's misconduct at DHS.  Without further factual development, the Court is unable to conclude as a matter of law at this stage that either Defendant Crouse or Defendant Sullivan acted diligently in response to reports of sexual assault or reports of misconduct by JCA.  The Court finds therefore that Plaintiffs have satisfied the second element of supervisory liability against Defendants Crouse and Sullivan.

With respect to the third element for a claim of supervisory liability—causation—Plaintiffs allege that Defendant Crouse's failure to ensure that locker rooms were adequately supervised created an environment which facilitated the sexual assault and other physical abuse Plaintiff-Minors were subjected to.  Given Plaintiffs' allegations regarding MCPS policy regarding obligatory supervision, Defendants' receipt of prior reports of sexual assault, the brief time lapse between reports of the assaults, and the resulting harm from the assaults Minor-Plaintiffs were allegedly subjected to in the unsupervised DHS locker room, the Court finds, as to Defendant Crouse, that Plaintiffs have satisfied the causation element.

The supervisory liability claim against Defendant Sullivan once again stands on shakier ground.  To be sure, further discovery may well show that he responded reasonably to any reports of incidents of assaults that he received or that his response or non-response was or was not

causative. However, the Court finds that reading Plaintiffs' claim against Defendant Sullivan in a light most favorable to Plaintiffs creates a fair inference that Defendant Sullivan did fail to ensure that his subordinates were properly trained or were following the mandatory supervision policy, all of which could plausibly have resulted in the Minor-Plaintiffs being subject to the locker room attacks. As such, the Court will err, if at all, on the side of caution at this juncture. Discovery as to Defendant Sullivan's actual involvement on this theory may be revealing. The matter can, of course, be revisited on summary judgment.

Because Plaintiffs have adequately plead all three elements of supervisory liability as to both Defendants Crouse and Sullivan, at this stage of the litigation the Court will also allow Plaintiffs to proceed on Counts VIII and IX, in addition to their state-created danger theory.

### 4. Qualified Immunity

The doctrine of qualified immunity protects state officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The purpose of qualified immunity is to protect officials from suit when the state of the law is such that they would not have known that their conduct violates statutory or constitutional rights, but it does not protect officials when they have acted incompetently or knowingly violated the law. *Owen v. Balt. City State's Attys. Office,* 767 F.3d 379 (4th Cir. 2014) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine whether an official is entitled to qualified immunity, courts use a flexible two-step inquiry: (1) whether the plaintiff alleges facts that show a violation of a constitutional right; and (2) if so, whether that constitutional right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Courts need not strictly adhere to this two-step test, particularly at the pleadings stage, because the precise factual basis for claims may be hard to identify. *Id.* at 238–39 ("The lower courts sometimes encounter cases in which the briefing of constitutional questions is woefully inadequate."). *See also Owen*, 767 F.3d at 396 ("A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but, as the Second Circuit has noted, when asserted at this early stage in the proceedings, 'the defense faces a formidable hurdle' and 'is usually not successful.'").

Nonetheless, Defendants argue that Defendants Crouse and Sullivan are protected by qualified immunity because, they say, Plaintiffs fail to allege any facts that they personally violated their constitutional rights and because the "right to be free from student-on-student sexual harassment was not clearly established" at the time of the alleged violations. Defs. Mem. at 61–65. Defendants characterize Plaintiffs' claims as equal protection claims seeking to impose liability based on a failure to act or to protect. But Plaintiffs in fact assert a substantive due process claim, identifying the constitutional right at issue as the right to bodily integrity. In support of this claim, Plaintiffs assert, in part, that Defendants Crouse and Sullivan knowingly placed the Minor-Plaintiffs in sexually abusive situations by, among other things, contributing to a pattern of failing to supervise the locker room in violation of MCPS policy and by failing to investigate claims of abuse. *See* Am. Compl., ECF No. 16, ¶¶ 312–13, 335–36. Defendants counter, however, that Defendants Crouse and Sullivan were not required to provide safeguards against the "unexpected criminal conduct of student perpetrators." Defs. Mot. at 61–62.

The Amended Complaints obviously paint a disturbing picture of the locker room environment at DHS in 2017, 2018, and 2019. As already discussed at length, Defendants Crouse and Sullivan are said to have been made aware of appalling sexual assaults that had occurred at other MCPS high schools, of similar assaults at DHS itself, and of JCA's violent history, yet in the face of that, failed to ensure that the DHS locker rooms were supervised by adults. Unsurprisingly, almost immediately upon transferring to DHS, JCA engaged in the very sort of violent conduct that had characterized his behavior at other schools, while Defendant Crouse allegedly ignored (even failed to read) the warnings about JCA by other MCPS personnel. In addition, Defendants Crouse and Sullivan failed to ensure that their subordinates had completed mandatory training aimed at preventing the very type of misconduct alleged in this case. It is, then, a hard sell for Defendants to call the locker room attacks "unexpected criminal conduct." In the Court's view, the allegations against Defendants Crouse and Sullivan, and the reasonable inferences drawn therefrom more than suffice to show, at least at the pleadings stage, that Minor-Plaintiffs were subjected to situations in which they were deprived of their right to bodily integrity. Thus, the allegations underlying Minor-Plaintiffs' due process claims as to both Defendants Crouse and Sullivan satisfy the first prong of defeating qualified immunity for these Defendants.

As to the second prong of the qualified immunity inquiry, the Court considers whether the constitutional right Defendants Crouse and Sullivan allegedly violated was a "clearly established" right "of which a reasonable person would have known" in 2017 and 2018, both before and during the locker-room attacks. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006). "A constitutional right is clearly established when "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal citation omitted). The unlawfulness must be apparent in light of pre-existing law, but the specific

conduct in question need not have been held previously unlawful.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Thus, the salient question is whether Defendant Crouse had fair warning that their alleged treatment of the Plaintiff-Minors was unconstitutional.

Defendants contend that the Fourth Circuit recently held that the right to be free from student-on student sexual harassment was not clearly established in 2014 and 2015.  *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 706 (4th Cir. 2018).  In that case, the right at stake was defined as "the equal protection right to be free from a university administrator's deliberate indifference to student-on-student sexual harassment."  *Id.*  Plaintiffs assert that the right at stake in the present case is different, i.e., "the substantive due process right of bodily integrity," and the right to be free from sexual abuse, which is "a logical extension of the right to bodily security."  Taking all factual allegations as true, the conduct alleged here clearly goes beyond the mere indifference to verbal sexual harassment present in *Feminist Majority*.

The Supreme Court has held that individuals have a right to be free from unjustified intrusions on personal security.  *Ingraham v. Wright*, 430 U.S. 651, 673 n.41 (1977) (students due process rights implicated in corporal punishment by teachers).  This Court believes that reasonable school officials would have understood that a student's due process right to personal security and bodily integrity would encompass a student's right to be free from a school environment in which physical harm was known to be likely to occur and which could be enhanced if they failed to take action they were supposed to take.  *See Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987) ("[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").

The Court finds the discussion in *L.R. v. School District of Philadelphia* instructive.  In that case, the Third Circuit found a clearly established right based on a state-created danger

31

doctrine when a student was sexually assaulted after a teacher allowed her to leave the classroom with an unidentified adult, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  836 F.3d 235, 248 (3d Cir. 2016).  The court analogized the case before it to other circumstances in which state actors abandoned private citizens in dangerous situations to determine that the right was clearly established.  *Id.* at 249–50 (citing *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004) ("state actors may not abandon a private citizen in a dangerous situation, provided that the state actors are aware of the risk of serious harm and are partly responsible for creating the opportunity for that harm to happen"); *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (police officers who "abandon children and leave them in health-endangering situations after having arrested their custodian and thereby deprived them of adult protection" violate the children's "right to be free from unjustified intrusions upon physical and emotional well-being"); *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001) (denying qualified immunity to state social workers who failed to investigate allegations of child abuse and recommended that the children's abusive father be granted legal custody).

While this is yet another a close call, the Court concludes that neither Defendant Crouse nor Defendant Sullivan is entitled to qualified immunity at this stage of the litigation.  The determination of whether it was objectively reasonable to conclude that as school officials, knowing what they knew, and failing to do what they were specifically supposed to do, they were not required to provide protection against sexual assault by one or more students against the students on school property requires a closer examination of the knowledge Defendants Crouse and Sullivan actually possessed in 2017 and 2018.  *See Anderson*, 483 U.S. at 641.  The question of whether Defendants Crouse and Sullivan are entitled to qualified immunity, therefore, is not

ripe for decision at this stage of the proceedings.  The Court believes it would more properly be addressed on summary judgment.

## V. Motion to Stay

Defendants have asked the Court to stay the issuance of a scheduling order in the entire case, pending resolution of their Motion to Dismiss Counts VIII through X.  Defs. Mot. to Stay, ECF No. 85 at 1.   Defendants do so, suggesting that, if the Court denies dismissal of the § 1983 Counts against them on qualified immunity (which the Court has done), Defendants may immediately note an appeal to the Fourth Circuit under the collateral order doctrine.  *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  Defendants suggest that if, on appeal, the Fourth Circuit determines that Defendants Crouse and Sullivan are in fact entitled to qualified immunity, it is highly likely that the extent of discovery in the case would be less.  Additionally, say Defendants, a stay of discovery would facilitate opportunities to engage in meaningful settlement negotiations. Defs. Mot. to Stay ¶¶ 4–6, 9.

Plaintiffs oppose a stay of discovery and accuse the Defendants of using all means at hand to delay the litigation.  Opp'n to Mot. to Stay, ECF No. 86, ¶ 1.  More to the point, they argue that a stay of discovery would interfere with development of the remaining claims other than the § 1983 claims and would jeopardize evidence-gathering activities.  *Id.* ¶ 5.   The Court agrees with Plaintiffs.

The power of a district court to stay trial proceedings is discretionary and "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.,* 299 U.S. 248, 254 (1936); *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 375 (4th Cir. 2013).  A party seeking a stay must demonstrate a pressing need for

one.  *Id.*  Three factors should be considered in weighing a motion to stay: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party."

Regardless of whether Defendants ultimately appeal the issue of § 1983 qualified immunity with respect to Defendants Crouse and Sullivan, the Court sees no reason why discovery cannot go forward on Plaintiffs' other claims.  Even if Defendant Crouse and/or Defendant Sullivan are found to be entitled to qualified immunity, the factual basis of the other remaining claims would not be affected.  Those claims involve facts, witnesses, and circumstances virtually identical with those relevant to the § 1983 claims.  Judicial economy would be served by the case going forward on the non-§ 1983 claims right away; there would be no hardship or inequity to Defendants if it does; and the potential prejudice to Plaintiffs is that their much broader case will be prejudiced until any appeal by Defendants is decided, presumably several months from now.

Accordingly, the Motion to Stay is **DENIED**.

### VI. Conclusion

For the foregoing reasons, the Court finds that Plaintiffs have not asserted a plausible § 1983 claim against Defendant Montgomery County Board of Education.  Therefore, the Court **GRANTS** Defendants' Motion to Dismiss Count VIII.

The Court **GRANTS** the Motion to Dismiss as to Counts IX and Count X against Defendants Crouse and Sullivan in their official capacities but **DENIES** the Motion to Dismiss them in their individual capacities.

The Court **DISMISSES** the § 1983 claims of Plaintiff-Parents (Counts VIII, IX, and X) insofar as they are brought by the Plaintiff-Parents' in their individual capacities.

The Court also **DISMISSES** the § 1983 claim of Plaintiffs John Doe #1 and Jane Doe #1 as parents and next friends of John Doe #1M because John Doe #1M has reached the age of majority during the pendency of this suit. The Clerk will be directed to list John Doe #1M as Plaintiff in his own right in lieu of John and Jane Doe #1.

The Court **DENIES** Defendants' Motion to Stay and **DIRECTS** the parties, within thirty (30) days, to submit a joint proposed scheduling order as to discovery, the filing of dispositive motions and such.

**December 23, 2021**

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE