IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

JOHN DOE 1 et al., ) CIVIL ACTION
) NO. PJM-21-356
Plaintiffs, )
)
v. )
)
MONTGOMERY COUNTY BOARD OF )
EDUCATION et al., )
)
Defendants. )

TRANSCRIPT OF MOTIONS HEARING PROCEEDINGS
BEFORE THE HONORABLE PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE
THURSDAY, APRIL 27, 2023; 11:01 A.M.
GREENBELT, MARYLAND

APPEARANCES:

FOR THE PLAINTIFFS DOE FAMILY 4:

JOSEPH, GREENWALD & LAAKE, P.A.
BY: TIMOTHY F. MALONEY, ESQUIRE
BY: MATTHEW M. BRYANT, ESQUIRE
BY: ALYSE L. PRAWDE, ESQUIRE
6404 Ivy Lane
Suite 400
Greenbelt, Maryland 20770
(240) 553-1185

FOR THE PLAINTIFFS DOE FAMILIES 1 AND 2:

MURPHY, FALCON & MURPHY, P.A.
BY: MALCOLM P. RUFF, ESQUIRE
One South Street
30th Floor
Baltimore, Maryland 21202
(410) 951-8744

OFFICIAL COURT REPORTER:
Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

APPEARANCES (Continued):

FOR THE PLAINTIFFS DOE FAMILY 3:

ETHERIDGE, QUINN, KEMP, ROWAN & HARTINGER
BY: THOMAS M. DeGONIA, II, ESQUIRE
33 Wood Lane
Rockville, Maryland 20850
(301) 762-1696
-and-
LAW OFFICE OF JERRY W. HYATT
BY: JERRY W. HYATT, ESQUIRE
27 Wood Lane
Rockville, Maryland 20850
(301) 272-9955

FOR THE DEFENDANT MONTGOMERY COUNTY BOARD OF EDUCATION, CASEY CROUSE, VINCENT COLBERT, ERIC WALLICH, JEFFREY SULLIVAN:

MONTGOMERY COUNTY OFFICE OF THE COUNTY ATTORNEY
BY: JACQUELYN ALLEN, ESQUIRE
BY: MARGARET E. TURLINGTON, ESQUIRE
BY: PATRICIA L. KANE, ESQUIRE
101 Monroe Street
3rd Floor
Rockville, Maryland 20850
(240) 777-6746

FOR THE DEFENDANT JOSEPH DOODY:

KARPINSKI, CORNBROOKS & KARP, P.A.
BY: KEVIN B. KARPINSKI, ESQUIRE
120 East Baltimore Street
Suite 1850
Baltimore, Maryland 21202
(410) 727-5000

(Call to order of the Court.)

THE COURT: Good morning, folks. Have a seat, please.

THE DEPUTY CLERK: The matter now pending before the Court is Civil Action No. PJM-21-356, Doe 1 et al. v. Montgomery County Board of Education et al. The matter now comes before the Court for a motions hearing.

THE COURT: All right. Let's identify counsel first, and let's start with plaintiffs' counsel. We have different counsel I think -- well, depending on who argues. Who is going to speak first?

MR. MALONEY: Good morning, Your Honor. Timothy Maloney on behalf of the John Doe Plaintiffs, and we did submit, at 10:00, a revised speaking schedule for all parties.

THE COURT: All right. I have that.

Anyone else to identify for plaintiffs' counsel?

MR. RUFF: Yes, Your Honor. Good morning, Your Honor. Malcolm Ruff, R-U-F-"F," as in "Frank," on behalf of John Doe Plaintiffs 1 and 2.

MR. DeGONIA: And good morning, Your Honor. Tom DeGonia and Jerry Hyatt on behalf of John Doe No. 3. I will be doing the arguing for our party today.

THE COURT: Any other plaintiffs' counsel to be identified? Are some in the gallery?

MR. MALONEY: Yes, Your Honor. In the gallery, we

have Alyse Prawde and Matthew M. Bryant, who are also my co-counsel for the John Doe No. 4 Plaintiffs.

MR. DeGONIA: And co-counsel for John Doe No. 3, Your Honor, Jerry Hyatt as well.

MR. RUFF: And Your Honor, Mr. Murphy sends his regards.

THE COURT: For defendants, starting with the Board of Education and others?

MS. KANE: Good morning, Your Honor. Patty Kane on behalf of the Board of Education, Jeffrey Sullivan, Eric Wallich, Casey Crouse, and Vinny Colbert. With me at counsel table is my colleague, Jacquelyn Allen. And we also have Counsel Margaret Turlington in the courtroom who is in the gallery --

THE COURT: All right.

MS. KANE: -- on behalf of the same defendants.

Would you like me to identify my clients here as well, or not at this time?

THE COURT: Well, who are they, the parties?

MS. KANE: Yes. We have representatives here from Montgomery County Public Schools, the Board of Education.

THE COURT: Any other defendants?

MR. KARPINSKI: Your Honor, good morning. Kevin Karpinski on behalf of Defendant Joseph Doody.

THE COURT: Right. Ms. Kane, did you say you wanted

to identify any of the parties that were here?

MS. KANE: Yes. I didn't know if you wanted that.

THE COURT: Well, you can. I didn't ask -- well, I don't know who is here on plaintiffs' side. I assume all Doe Plaintiffs are here?

MR. MALONEY: The John Doe parents of John Doe No. 4 are here present in the gallery.

THE COURT: No other John Doe Plaintiffs are here?

MR. RUFF: They are, Your Honor. John Doe Plaintiff No. 2 is here, along with his mother. John Doe Plaintiff No. 1 is not here, but his parents are here with us.

THE COURT: All right.

MR. DeGONIA: And John Doe Plaintiff No. 3 is present, Your Honor.

THE COURT: All right. And then to go back to you, Ms. Kane -- thank you -- did you want to identify the individuals who are here who are your clients?

MS. KANE: Yes. I have Stephanie Williams, who is general counsel for Montgomery County Public Schools, and Jody Malmstrom, who is the legal director for Montgomery County Public Schools.

THE COURT: Is that it?

MS. KANE: Yes, Your Honor.

THE COURT: Okay. Good. All right. Thank you. Have a seat, if you would.

There are a couple of preliminary matters I need to clear up. First of all, I have a David Felsen on the docket yet. I don't know who David Felson is as a party, not just counsel. Why is he -- is he in the case?

MR. DeGONIA: I'm sorry, Your Honor. Tom DeGonia. Your Honor, my understanding is he represented one of the juvenile original plaintiffs -- or defendants in the criminal matter, and there were motions back and forth about subpoenaing and compelling the testimony of that witness, so he represented a witness in this matter.

THE COURT: He is not a party?

MR. DeGONIA: That's correct.

THE COURT: Fair enough. Let's be clear, because he's carried, I think, as a party in the case, and I want to be clear.

MR. DeGONIA: Yes, Your Honor.

THE COURT: Now, with regard to the issue of the parents of adult plaintiffs being separate plaintiffs in the case, I thought I addressed that earlier in my opinion, that their claims for medical expenses, insofar as the different causes of action allow, can be recovered by the individual plaintiffs, so we don't need them as separate plaintiffs in the case. The Doe Plaintiffs are in the case. They don't need to be represented by parents unless they are minors, and I assume now they are all adults. Is that correct?

MR. MALONEY: They are, Your Honor. Our nervousness on that is this: There is some Maryland appellate court decisions that we have cited that says that pre-majority economic claims belong to parents and the post majority belong --

THE COURT: Oh, the claims as opposed to who the parties should be?

MR. MALONEY: Correct. And there is an issue of standing otherwise. I mean, if there is a stipulation with the defendants that they can do it, perhaps, but we are very concerned about the standing.

THE COURT: I was not aware of that decision.

Ms. Kane, what's your thought?

MS. KANE: The thought is we would agree that the plaintiffs who have now -- the former minor plaintiffs who have now attained their majority can make the claim for pre-majority medical expenses to the extent they are relevant and admissible.

THE COURT: In that case, then we don't need the adult plaintiffs.

MR. MALONEY: I suspect we don't. What I would ask, because I don't think it's important for today's purposes, is that we be able to talk to our clients just to make sure we are fine on that, but I want to make sure we don't step into the standing issue in view of the appellate decision.

THE COURT: Well, we have got the stipulation for Ms. Kane speaking for the County. I -- I think what I'd like to do, and we need to do this pretty quickly if we don't do it today, clear the record out about who the plaintiffs are in a matter of a few days. Let us know by letter so we can clean that up.

MR. MALONEY: We can do that by early next week, Your Honor. Thank you.

THE COURT: And then the further issue is I did require about using initials of not just parties but individuals who are associated with the case in one way or another, and the Court will continue to use initials here with regard to any parties that are concerned about it, so I don't think we need to spend more time on that.

Okay. Well, that said, I think those are my preliminary matters. Unless somebody has something, we are ready to jump right into this, are we not? We have a schedule from you. We are going to try to stay fairly close to it so we can hear from everyone.

So the first item up is Count One, negligence, and I have Ms. Kane, you speaking first for 30 minutes.

MS. KANE: Thank you, Your Honor. Did you want counsel to argue from the podium?

THE COURT: Your convenience. Whatever works for you is good.

MS. KANE: If it pleases the Court, I will stay here in the event I need to grab something out of my box.

THE COURT: Very good.

MS. KANE: Thank you.

THE COURT: Go ahead.

MS. KANE: Thank you, Your Honor. May it please the Court.

As the Court is aware, this suit involves four plaintiffs' and six defendants' various theories of alleged legal liability, which are identified in the joint chart that the parties previously submitted at the Court's request. The Court has ordered the hearing today to proceed by count, and the parties have prepared a -- an agenda based on the Court order, which the Court has just referenced.

In compliance with that Court order, this hearing begins with Count One, negligence, which was filed by all plaintiffs against all defendants. While all four plaintiffs have filed negligence claims against all of the defendants, the negligence count arises out of two separate and distinct incidents. One involved Doe 1 and occurred first in time on August 1, 2017. It is described in the Plaintiffs' Joint Second Amended Complaint at paragraphs 56 to 63.

It's important for purposes of this hearing to understand that the defendants have filed a separate motion for summary judgment on all counts as to Doe 1 because of the difference in

the events which are the basis of his claims.

So the motion I will be arguing at this time, Your Honor, is on behalf of the Board of Education, Sullivan, Crouse, Wallich, and Colbert with respect to Doe 1's negligence claim against them.

Mr. Doody also has a claim against Doe 1 on his negligence claim against Mr. Doody, and that would be argued by Mr. Karpinski. Mr. Karpinski's prior motion for summary judgment on the negligence claims of 2, 3, and 4, which does appear in the Court's chart, was withdrawn. I understand the Court was notified, but I didn't want there to be any confusion and wanted to make sure that was clear before we began argument.

THE COURT: Okay.

MS. KANE: So what's relevant for purposes of this argument is the facts and circumstances as they existed at or before the time of Doe 1's criminal assault, and applying the framework -- applying the facts and the law to this framework, there is no material dispute of fact, and the defendants are entitled to judgment as a matter of law.

Doe 1's suit arises out of an incident in which he was criminally assaulted by his football teammates in the Damascus High School locker room during the preseason on or about August 1, 2017. He did not sue his teammate perpetrators for this unexpected or unforeseeable criminal assault. Instead, he sued

the Board of Education and the system-wide athletic director, Jeffrey Sullivan, the principal at that time, Casey Crouse. And when I refer to the individual defendants, Your Honor, I am going to refer to them with the position that they held at the time of the occurrences which are the subject before this Court. So, in addition, he sued -- sued Sullivan and Crouse, he sued the varsity head coach, Eric Wallich, the JV coach, Vinny Colbert, and the athletic director, Mr. Doody, Joseph Doody.

The allegations with respect to the -- excuse me. When we look at the allegations in the complaint -- and I will come back to them because there are some incorrect allegations that have been developed in the record -- going to the facts first, there is no notice to any defendant that there was a tradition of brooming, sexual assault, or hazing within the Damascus High School locker room at any time prior to Doe 1's assault on August 1, 2017.

Jennifer Webster was the principal at Damascus High School from 2013 to 2017. She testified -- and if the Court wants me to give citations in the record, I can provide them, where these facts are coming from, or if you just want the facts, I will give the facts, and if you need a citation --

THE COURT: Well, if you have a reference handy -- don't spend a lot of time digging. We have a lot of things to talk about.

MS. KANE: I do have it handy.

THE COURT: You can cite it.

MS. KANE: Jennifer Webster knew of no incident of hazing, sexual harassment, or sexual assault occurring on the Damascus High School football program. That's Defendants' Exhibit 29, pages 13 and 71.

Mr. Doody had been involved --

THE COURT: Sorry. She had no notice; is that what you are saying?

MS. KANE: Yes, sir. She had no notice that there was -- there -- there is no evidence that anything had happened. But I will go through --

THE COURT: Okay. Well, the different arguments I understand.

So there is no evidence that any principal had notice of any of these or only as to Doe 1?

MS. KANE: As to anybody.

THE COURT: Okay. Fair enough.

MS. KANE: As to anybody. We are trying to set the stage, Your Honor, for what happened on August 1, 2017. And at that time -- I am going to go through a list of the defendants and people at the Board of Ed -- nobody, nobody had any knowledge that there had been, or there is no evidence that there had been hazing, sexual assault, or criminal assault in the Damascus High School locker room.

Mr. Doody had been involved as the athletic director for decades and knew of no incident of hazing, sexual harassment, or sexual assault prior to August 1, 2017. Defendants' Exhibit 3, pages 177, 178.

Wallich, football coach at Damascus High School -- excuse me. Mr. Wallich had been the coach at Damascus High School since 2006. He knew of no incident of hazing, sexual harassment, or sexual assault in the Damascus High School football team prior to August 1, 2017. Defendant Exhibit 4, page 14.

Mr. Colbert was the JV football coach at Damascus High School and had been so since 2006. He was a stipend coach. He knew of no incident of hazing, sexual harassment, or sexual assault in the Damascus High School football team prior to August 1, 2017. Defendants' Exhibit 40, Colbert depo, page 263.

Sullivan did not know of any incident of hazing, sexual harassment, or sexual assault occurring on the Damascus High School football team prior to August 1, 2017. Defendant Exhibit 7, page 111.

Crouse had been the principal for one month at the time of Doe 1's assault. She did not know of any incident of hazing, sexual harassment, or sexual assault occurring on the Damascus High School football team program prior to her tenure. Defendants' Exhibit 2, pages 51, 33 to 36. All of these were

at ECF 227.

The Board of Education had not received a single complaint of hazing, brooming, sexual harassment, or sexual assault among the Damascus High School football program prior to August 1, 2017, nor was the Board of Ed otherwise aware of any such conduct.

Brian Scriven, the director of school support and improvement from July 2014 to June 2018, testified that he had no such knowledge at Defendants' Exhibit 28, pages 15 to 16.

Michael Hancock, the Damascus High School security team lead at Damascus since 2015, testified in Defendants' Exhibit 31, pages 90 and 197, that he had no knowledge of any hazing, brooming, sexual assault, sexual harassment.

Therefore, the record is clear and undisputed, Your Honor, that there is no evidence of the existence or reporting or knowledge of any complaint regarding the lack of supervision of football players prior to August 1, 2017. No facts exist to support Doe 1's opinion that the Damascus High School football team purposely strove to win at all costs at the expense of student safety. That's simply not true.

There was -- the students were trained in their health body safety class on sexual harassment, bullying, and intimidation. That comes from Morris -- Defendant Exhibit 17, Morris, page 175. She was one of the Board's corporate designees.

The Board of Education regulations include one against bullying, harassment, and intimidation. Hazing and behavioral expectations were addressed in the football team's annual preseason meeting with student athletes. Exhibit 5, Colbert, page 68. The deposition of Doe 1, he admitted that he knew there was a zero tolerance for hazing. The athletes were told hazing is not tolerated and would result in serious consequences. His mother testified on page 123 that Wallich, Colbert, and Doody -- that was Exhibit 26 -- had all mentioned no bullying at the parent meeting.

With this background, Your Honor, we come then to the August 1, 2017 incident. It was preseason. School was not yet in session. It was practice before school started. Doe 1's father dropped him off before practice. There is no evidence in the record that the coaches were not there or that the coaches were late. Doe 1 has testified that he was in the locker room getting ready for practice. He was criminally assaulted by his football teammates in the locker room. The student assailants were not state actors. There is no evidence that his assailants have ever committed any sexual assault against anyone else. There is no evidence of how many seconds or minutes Doe 1 was in the locker room before this happened. There is no evidence regarding how many seconds or minutes it had been since the last coach had been in the locker room.

Doe 1 went to practice after the incident. He did not

seek medical treatment. He did not report the incident to any employee at Montgomery County Public Schools in 2017 or in 2018. He did not identify his assailants to any Montgomery County employee -- Montgomery County Public Schools employee.

Those are the facts. The law is best set forth in the case of *Segerman*, which is in the binder that we have provided to the Court, *Segerman vs. Jones*. In that case, a teacher left the room while young children were doing exercises. I believe it was push-ups. Another student did the exercise incorrectly, and one student hit another in the back of the head which resulted in her chipping two teeth. In that case, the Court determined that the probable cause of the incident was not the teacher leaving the room, it was the intervening and unforeseen action of the other pupil who did not do the exercises as instructed.

Even if the teacher was negligent to leave the room, it was speculative to assume that the lack of supervision caused the injury because it would not have prevented the incident. Speculation -- it says, The teacher is not an insurer of safety of students, but, rather, he or she is held only to the standard of reasonable care exercised by a person of ordinary prudence.

Based on *Segerman* and the record before the Court, we can look at the allegations in the amended complaint, the theories against the defendants, all of whom are entitled to summary

judgment on this count.

The second amended complaint alleges that all of the defendants were *in loco parentis* and owed a duty of reasonable care to the plaintiff. They alleged that JV Coach Colbert breached his duty -- had a duty to supervise the locker room. They alleged that Wallich had a duty to supervise the locker room or ensure that others did. They allege that Crouse, the principal for one month, had the duty to ensure that the coaches followed MCPS protocols and that protocols were in place if a coach was not present so that the locker room was supervised.

They allege that Doody supervised -- he was the athletic director -- had to either supervise the locker room or ensure that others did. They made allegations as to the system-wide Athletic Director Sullivan, that he had a duty to ensure Montgomery County Public School policies and guidelines were implemented and enforced so students in after school programs were appropriately supervised and to ensure that his staff -- and I say "his" because he didn't supervise anybody. That's another fact. He didn't supervise anybody at Damascus High School. And they allege that he had a duty to make sure that people completed their training. The complaint alleges all of these duties were breached and that the plaintiffs had injury.

With respect to each defendant, they are entitled to summary judgment because there is no evidence they breached any

standard of care, or even if there was a breach, it in any way proximately caused Doe 1's criminal -- unforeseeable criminal assault by his teammates.

Casey Crouse had been in the position of principal for one month. She had delegated supervision of the football program to Athletic Director Doody. In that month, there is no evidence she had any complaints about Mr. Doody. There is no evidence she had any complaints about Mr. Wallich, the varsity coach. There is no evidence that she had any complaints about Mr. Colbert, the JV coach. She had not received any complaints about hazing, sexual assault, or assault by students in the football program.

Given that knowledge and *Segerman*, there is no breach of any duty of care on her part, she's entitled to summary judgment on Doe 1's negligence count.

With respect to Mr. Colbert, he had been an employee -- not -- well, he had been a stipend coach since 2006, so almost 11 -- I guess about 11 years.

THE COURT: Are we still on Doe 1 here?

MS. KANE: We are on Doe 1. All of this is Doe 1.

THE COURT: You are not making any motion with respect to the other Does, are you?

MS. KANE: No, sir, not on negligence.

THE COURT: That's where we are.

MS. KANE: That's why separate motions were filed,

Your Honor, because there is two incidents, and the landscape is different between Doe 1's incident and Does 2, 3, and 4.

THE COURT: There is no motion pending as to Does 2, 3, and 4?

MS. KANE: Not on negligence, so that's why the record only counts for what happened up to and at the time of Doe 1's assault.

THE COURT: Let's finish up with Doe 1.

MS. KANE: Okay. With respect to Colbert, he had received no complaints regarding hazing, sexual assault, and there is no evidence that he did anything wrong on August 1, 2017.

With respect to Mr. Wallich, he had not received any complaints about Mr. Colbert. He had not received any complaints about hazing or sexual assault in the football program. Nobody had -- there was no evidence that anything had occurred, and nobody had any reports of it. Mr. Wallich, the varsity coach, had not received or observed any problems with Mr. Colbert in the supervision of the locker room.

Mr. Sullivan was the system-wide athletic director. He had no knowledge of any incident of hazing, sexual harassment, or sexual assault occurring on the DHS football team prior to August 1, 2017. He had no subordinate employees at Damascus High School. He did not supervise Crouse. His general duties are to oversee the Montgomery County Public Schools athletic

programs for the operations perspective with respect to scheduling, budgeting, logistical operations. He does provide -- distributes athletic policies and guidance to the athletic directors and principals. He offers guidance to the athletic directors, coaches, and principals, and he can direct a team to forfeit a game if need be, but he does not supervise principals, athletic directors, or coaches. He does not hire, fire, promote, discipline, or evaluate coaches or assist with the day-to-day operations of the schools such as how is the locker room being supervised.

So, for these reasons, there is no evidence that Mr. Sullivan breached any duty of care that he had with respect to Doe 1. He had -- and summary judgment on the negligence count against him should also be granted.

With respect to the Board of Ed, it appears to be a vicarious liability claim and which rises and falls with the claims, I guess, of the individuals, and the Board of Ed should be entitled to summary judgment on the negligence claim as well.

There is no evidence that there was any negligence by any defendant, and even if the Court somehow finds there was, that it proximately caused Doe 1's unforeseeable criminal assault by his football teammates.

THE COURT: All right. Mr. Karpinski.

MR. KARPINSKI: Thank you, Your Honor. May it please

the Court, Your Honor, Kevin Karpinski on behalf of Mr. Joseph Doody.

I am going to adopt Ms. Kane's arguments, and my argument is also limited to Count One, Doe 1, as it relates to the August 1, 2017 incident.

Mr. Doody was the athletic director and oversaw approximately 44 of the athletic programs offered at Damascus High School.

THE COURT: You are not making a motion as to any other counts, then; is that correct, involving your client?

MR. KARPINSKI: That's correct, Your Honor. I have withdrawn my motion for summary judgment as to the negligence counts related to the October 31, 2018 incident involving Does 2, 3, and 4.

THE COURT: Very good. Go ahead.

MR. KARPINSKI: Okay. So the -- the incidents -- the assault involving Doe 1 occurred on August 1, the school year began on September 5, so this was an incident where this was not even before the school year had begun.

As Ms. Kane has pointed out, there is no testimony that anyone -- there were any incidents of hazings or assaults before August 1. In fact, the sworn testimony from the former principal, Ms. Webster, as well as the head coach, Mr. Wallich, and Mr. Colbert as the JV coach, Mr. Doody, as well as a number of other individuals that were deposed in this case, have all

testified that there were no incidents that preceded August 1 of 2017. And the opposition that was filed by Doe 1, quite frankly, Your Honor, attempts to bootstrap incidents that occurred after August 1 of 2017. There simply is no notice that any of the defendants were aware of prior assaults occurring at the Damascus locker room -- the Damascus locker room or within the Damascus school.

Plaintiff has alluded to a lack of training, but as Ms. Kane has pointed out, Doe 1 has conceded that there was a preseason meeting that was held by the coaches for the Damascus varsity and JV team. They presented a PowerPoint presentation. They emphasized that they had a no hazing policy. It wouldn't be tolerated. It would result in anyone being kicked off the team. So there was training. The policies were in place to prevent any hazing or harassment. There is no notice of any incidents that occurred before August 1 --

THE COURT: No notice of any incidents at Damascus, but why is there a policy in place? Where does that come from?

MR. KARPINSKI: Excuse me.

THE COURT: Why would there be a policy in place as of that first incident? Why? Were there not incidents in other high schools? There was an issue, wasn't there, floating around out there in Montgomery County?

MR. KARPINSKI: Not as of August 1, Your Honor.

THE COURT: At Damascus. I am talking about the

county generally. No prior incidents anywhere else?

MR. KARPINSKI: Not as of August 1, Your Honor.

THE COURT: Okay.

MR. KARPINSKI: And certainly my client, Mr. Doody, as the athletic director, would not be involved in those issues. Certainly the record has not been developed to suggest that either he or anyone else had knowledge of other incidents occurring.

THE COURT: You didn't answer my first question, though, which would be: Why would there be a policy about no hazing and so on? Why would there have been a directive to the students about that?

MR. KARPINSKI: I think best practices in any jurisdictions. I mean, you don't necessarily need to have a sexual harassment complaint in your workplace to have an effective sexual harassment complaint policy because that's just good practices to have.

Obviously, in a school system, you know, going back to the beginning of time, school systems should discourage any sort of abuse, hazing, intimidation of students, and so a policy would be in place to go ahead and notify students, have teachers on notice that that type of behavior would not be acceptable.

So, in sum, Your Honor, there simply is no notice with regard to the August 1, 2017 incident. The negligence claim

should fail. The defendants are entitled to summary judgment on that count.

And unless the Court has any questions, I would respectfully submit.

THE COURT: Let me hear from Mr. Ruff.

MR. RUFF: Good morning, Your Honor. This is Malcolm Ruff, R-U-F-F.

On behalf of Doe Plaintiff 1 and his parents, we whole-heartedly are in disagreement with the assertions that have been put forth today that these allegations that we put forth are incorrect.

First I want to just address the -- the date that this incident occurred. I don't believe that there is anywhere in the record where this date was solidified to a particular day. What I recall from the record is that this was something that happened during the preseason, in early August of 2017. And there is a lot of red herrings that are being thrown out. The fact that school wasn't in session yet does not mean that MCPS was not operating under their policies, was not operating in -- in the capacity still, even though the classes weren't in session, of standing in the shoes of the parents of this young man.

Surprisingly, we have been told today that none of the defendants or adults involved in this case are going to admit that they have ever heard of brooming in Montgomery County

before August 1st. So, yes, there is no direct evidence on the record that anybody -- any official or any teacher or staff member at Damascus High School allegedly knew that this brooming was going on, but the record is replete with testimony from the young men who were on this football team who -- one of whom had not even come to Damascus before he heard about what was happening in the locker rooms.

So there is plenty --

THE COURT: Well, what was that? Are you talking about just the plaintiffs, or are you talking about other students?

MR. RUFF: I am talking about actually one of the assailants, one of the worst assailants, he was identified as J.C.A. in the case, he testified that before he even came to Damascus, he knew exactly what was going on and that this was going to be happening, and, ultimately, he ended up assaulting and sexually assaulting Doe Plaintiffs -- being involved in the sexual assault of Doe Plaintiffs 2, 3, and 4.

So let's talk about the negligence standard. It's very low in Maryland. It's defined in the civil jury pattern instruction as not doing something that a person using reasonable care would do. Reasonable care is the caution, attention, or skill a reasonable person would use under similar circumstances. It's normally and very frequently, and especially in Maryland, a question of fact for the jury. And I

have cases that I meant to include in the --

THE COURT: No need to talk about cases. I am mostly interested in your factual evidence at this point. I know what the law is.

MR. RUFF: It's *Giant Food, Inc. vs. Scherry*, straight out of the jury instruction.

THE COURT: Don't need to spend a lot of time citing cases. I need to hear what you think the factual evidence is that fulfills those elements.

MR. RUFF: Thank you, Your Honor.

Meager evidence of negligence is sufficient to carry the case to the jury.

I also want to dispel this notion that there is no evidence that the coaches were not -- were not present -- were potentially present when Doe Plaintiff No. 1, as has been stated, was sexually assaulted by his teammates by having been thrown face first into a locker, pinned down, had his pants nearly pulled down, and was rammed in his anus with a broomstick. That is preposterous for the defendants to assert that there is no evidence that the coaches were not present when this happened. They were not present long enough for Doe Plaintiff No. 1 to be victimized by his own teammates, and there is plenty of evidence on the record from these young men that that was the normal course of business on this football team.

Elements of negligence. There is duty to protect the plaintiff from injury. This is the *Gambrill* case. Defendant breached that duty, plaintiff suffered an actual loss or injury, and the breach of that duty proximately caused the plaintiff's injuries.

Well, *Gambrill* also went further to state that a public school and its employees have a duty to provide supervision to ensure the safety of its students and is liable for foreseeable injuries proximately caused by the absence of adequate supervision. Each of these defendants owed John Doe Plaintiff No. 1 a duty that is recognized by law requiring them to conform to a certain standard of conduct for his protection against unreasonable risks. Each of them failed to meet that duty. As a result of their failure, he was sexually assaulted.

There is more than a reasonably close causal connection between their failure to meet that duty and his injuries because but for their failure to be present to supervise these young men and to stop this sexual assault, this young man would never have been victimized.

The --

THE COURT: Let me stop you, though. I seldom have too much substance from you on their notice of prior incidents. You have talked about rumors. That's one thing. Now you are talking about, I think, they should have been present, what, at all times whether or not they had notice, and since they

weren't there at the occasion of this particular event, that's a different kind of a breach?

MR. RUFF: I am getting there, Your Honor. And you asked a very good question: Why would be there be a supervision policy and what is that supervision policy? Well, if we go with the reality that the coaches were not actually in the locker room when this young man was victimized, there was a violation that happened there of MCPS policy because the policy is very clear that these students were to be supervised at all times while they were in the locker room, while they were at games, while they were at practice. There was no point, and the record is completely clear that coaches must supervise student athletes at all times before and after practices and at both home and away games. That was a clear directive and --

THE COURT: Directive from whom?

MR. RUFF: From MCPS, the Board of Education. That was a system-wide directive that everyone actually knew because that summer, right before the summer athletics started, there was a memo issued by Defendant Sullivan which stated that very policy and made it very clear that what happened to Doe Plaintiff No. 1 should never have happened because these young men should have been supervised.

THE COURT: Were there incidents similar in nature at other high schools in the county prior to the events?

MR. RUFF: There is nothing on the record about prior

incidents, but there is plenty on the record about some other incidents that occurred intermittent between this incident and the October 31st, 2018 incident, Your Honor.

But what really gives notice is an additional policy, which was a training policy, a training module that was required of all coaches, all athletic directors from the National Federation of High Schools -- High School Sports, which was a training on bullying, hazing, and it instructed all of these coaches that when you do not supervise young men, young high school boys, that this very type of situation would occur, that this type of victimization, sexual assaults would occur.

And, specifically, it quoted an example of a high school football camp in New Mexico where five young men were actually charged criminally for brooming another player during football camp, and it was a cautionary tale, Your Honor, to tell all of the coaches in the MPS -- excuse me, MCPS system that if you do not supervise your players per our policy, this is what can happen. This is why you need to be in the locker room at all times when your players are in the locker room, you need to be supervising them when they are at their games, and you need to be supervising them when they are at away sites.

There was plenty of notice. And what's more egregious is that these defendants had a duty to ensure that the coaches, Wallich and Colbert, had taken this training. Well, the record

shows that they didn't ensure that. Athletic Director Doody did not ensure that Mr. Colbert and Mr. Wallich took this training. He admitted that he took the training, but he actually stated that he couldn't even remember --

THE COURT: Well, what did the training consist of?

MR. RUFF: It consisted of PowerPoints. I believe it was a video of directives and best practices, as was stated. And I wanted to just quote what Mr. Karpinski said. You know, the reason why there is a policy is not just best practices. He stated it's to put people on notice. He said teachers on notice. Well, not just the teachers, the coaches to be put on notice that if you are unable to follow the policy, bad things will happen. And that's exactly what Principal Crouse stated in her deposition is that when -- and she knew that when young men, football players, are unsupervised, bad things can happen.

THE COURT: About another minute. But let me ask you: Did the policy have a particular athletic reference, that is, to the way that young men might act in athletic situations?

MR. RUFF: This was -- this was a athletic -- athletic department -- system-wide athletic department training, and the example was about football, coincidently, and about brooming, and it was -- it was supposed to be taken by every single coach in the system.

THE COURT: And Doody took it, but the others did not?

MR. RUFF: Doody had taken it some years before as an athletic director, but there is evidence that -- and in Mr. Sullivan's deposition, he testified that the course is required for coaches to complete before they are even eligible to coach. So that's why Mr. Sullivan is also -- has violated his standard of care. I understand that Ms. Kane has said that Mr. Sullivan did not supervise anybody, but that's not what I remember from his testimony.

If I could just get one second, Your Honor?

THE COURT: Well, was it his policy? Did he sign off on these policies?

MR. RUFF: Yes. He validated these policies, as Ms. Kane said. It was his job to provide these trainings to all of the athletic directors. What he said was he oversaw operations of athletic programs, including athletic directors and the administration of the program as a whole. He was involved in the enforcement of rules; yet, he thoughtlessly disregarded his duty to only permit coaches in the MCPS program who had complied with these mandatory trainings.

THE COURT: Let me ask you just a quick question. Then you need to wind up. What was the follow on to determine whether or not someone had complied? Any follow up at all?

MR. RUFF: So I think there is a difference between the years as to how the -- the -- how this was monitored, but the long and short was the principal, Ms. Crouse, had a duty to

ensure that Mr. Doody made sure that all of the coaches had taken these trainings.

THE COURT: So his omission would be not determining that they had, and their omission, in part, was not having done it?

MR. RUFF: Not just that, Your Honor. Also not implementing the supervision policy. Right? So, like I said --

THE COURT: All right. Very good.

MR. RUFF: And they were not in the locker room when my client was victimized.

THE COURT: Well, that, I understand.

MR. RUFF: That was in direct violation of the policy, Your Honor.

THE COURT: Fair enough.

Let me hear back from you, Ms. Kane, in rebuttal.

MS. KANE: Your Honor, I did not hear one thing from Mr. Ruff as to an incident that had occurred prior to August 1, 2017.

THE COURT: An incident at Damascus?

MS. KANE: Yes, sir. This -- Mr. -- Doe 1 was the first incident. There is no evidence in the record that anything happened prior to him. No evidence. And Mr. Ruff did not point out anything. He referenced some incidents that happened after he admitted there was no direct evidence. This

was the first.

THE COURT: But are you saying that it could not be notice that there was, A, a policy in place, B, with examples specific to football that people in the Damascus athletic organization should have known and didn't comply with? Why would you need actual notice of an incident at Damascus to be on notice that this kind of thing is a problem?

MS. KANE: There is no evidence not only that nothing happened at Damascus but any other school either. There is no evidence that there had been any brooming at any school at any time prior to Doe 1. The Court had asked about other incidents. Zippo. Nothing in the record.

With respect to why was the training -- why was there a policy on bullying, intimidation -- bullying, hazing, and intimidation, because Montgomery County Public Schools goes above and beyond the legal requirements. They had that policy in place for years because they want to do the best that they can. It's not the only policy they have. There is one against sexual harassment. There are other policies. And there is sexual harassment training as well to the staff.

These were long-term coaches. Mr. Wallich had been coaching since 2006, Mr. Colbert since 2008, and just because there is an allegation that they missed -- and let me back up. With respect to the training that Mr. Ruff mentioned that included one slide that mentioned a brooming incident in

Tennessee or New Mexico, that there is no evidence in the record that Mr. Wallich did not take that training.

THE COURT: Does he contend that he did? Or are you just saying --

MS. KANE: I am just saying there is no evidence in the record, Your Honor, because I looked at it, and I could find nothing to show that Mr. Wallich missed that training.

With respect to -- I don't think that it really matters, but the J.C.A. cite that he mentioned of somebody else having hearsay about brooming, number one, that was referenced in the opposition. It wasn't included in the exhibit that Doe 1 referenced. That wasn't in there. And even what they cited about that was hearsay, and there was no timing on it. So that would not in any way impact summary -- summary judgment on the negligence counts against anybody.

The record is clear that there was no negligence on the part of the Board. There were policies in place. There was training in place to the students regarding sexual harassment. Doe 1 went, his parents went to the parent meeting, and the school also had no notice that there was any violations of that policy going on. And then Doe 1's incident happened. There is no proximate cause here if there was one miss of one training by one of the coaches.

THE COURT: Let me zero in on one particular -- if there is a policy that says you got to supervise, essentially,

boys in an athletic setting to make sure that there isn't hazing, why isn't it sufficient to say they didn't do it, they weren't there when this happened, there wasn't anybody on site? Isn't that enough? Why do you need actual notice?

MS. KANE: No, Your Honor. It's not enough because the mere fact that somebody was not in the locker room, an adult was not in there at the moment in time when Doe 1 was assaulted does not mean they were negligent. There is no evidence of how long nobody -- no adult was in that locker room. Was it seconds? Was it minutes? There is no evidence that it had been an extended period of time that would raise a jury question of whether or not there was negligence. There is nothing, nothing in the record that would support that they were derelict in their duties.

And what the testimony is with respect to supervising the locker room at all times is it means you are in earshot. You don't have to watch every kid every second in the locker room, but you can be within earshot to be called if -- or make your rounds if something happens.

There is no evidence that there was any breach of that. Doe 1 did not report this, and there is nothing in the record --

THE COURT: Well, it's not what Doe 1 reported. It's what they knew before.

MS. KANE: Yeah. It's what they knew before.

THE COURT: Or should have known. Should have known. What they knew or should have known.

MS. KANE: Right. Right.

THE COURT: Okay. Quickly, Mr. Karpinski, do you want to add a word or two by way of rebuttal?

MR. KARPINSKI: I do not.

THE COURT: Anything more on negligence, then?

Let's move on to Count Two. In fact, I am going to try and --

MR. RUFF: I will cover it under gross negligence.

THE COURT: We are going to try and break around 12:30 so that we have a clean break in the argument so we don't get in the middle of one and then break for lunch.

So let's go on to gross negligence. Who -- again, Ms. Kane, you start, I believe. Right? Are you with me, Ms. Kane?

MS. KANE: I am with you, Your Honor.

Gross negligence, Count Two, defendants move -- I'm sorry, Mr. Sullivan moves for summary judgment on that count, and I am going to incorporate first --

THE COURT: I have only -- let's see. It's only Sullivan that is -- it's only against Sullivan, that count. Is that right?

MS. KANE: Yes.

THE COURT: All right.

MS. KANE: Yes. So on behalf of Mr. Sullivan, the system-wide athletic director, there is no evidence of gross negligence on his part, and summary judgment would be appropriate.

Excuse me one second.

The standard on gross negligence is a high one, Your Honor, and there is no evidence in the record that would support summary judgment -- gross negligence requires a -- it's more than vague negligence. It requires a -- an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

THE COURT: Well, I don't think there is a contention that Mr. Sullivan acted intentionally. They are saying it was wanton and reckless. That's what they are saying.

MS. KANE: They are saying he's wanton and reckless. The policies are in place, and there is -- his job duties did not require implementation of those policies. He helped disseminate the policies. He was not the one to implement them. That was done at the school level, not from his

position. And there is no evidence that he was utterly -- had an utter disregard for the safety of others with respect to the way that he was handling the -- the policies.

The *Stracke vs. The Estate of Butler* case also sets forth the standard, Your Honor -- I think I read the one from the *Barbre v. Pope* -- and there is simply no notice here to show a wanton and reckless disregard for the safety of the students. He has the policies in place. He's the system-wide director of athletics. He's responsible for basically the logistical operations, such as budgeting and scheduling. There is -- with respect to the training, that would be monitored at the school level, not by him, whether or not somebody took the training, and there is no evidence from which --

THE COURT: He would not be responsible for seeing to the implementation of the overall policy?

MS. KANE: It's not his obligation as the system-wide director of athletics to see whether any specific coach took any specific training. They would be monitored by --

THE COURT: You mean it wasn't written into his job description --

MS. KANE: Yes.

THE COURT: -- or it shouldn't be arguable that it was something that he should have done?

MS. KANE: No.

THE COURT: It wasn't written into his job

description. If you say, as the overall supervisor, well, now you, as a lower-level person, implement this, you are then exonerated from any responsibility?

MS. KANE: I'm sorry, sir. I missed that.

THE COURT: I want to follow your argument. You say he wasn't responsible. The school level was responsible. But he's the overall supervisor. Right?

MS. KANE: No. He does not supervise the principals. He does not supervise the athletic directors. He does not supervise the coaches.

THE COURT: Well, is it his policy? Is he the one who implements the policy?

MS. KANE: They are not arguing that there is a problem with the policy. They are claiming it wasn't properly implemented.

THE COURT: Right. And you are saying he had no responsibility to implement it?

MS. KANE: That's right.

THE COURT: Well, that's your argument.

MS. KANE: Yes.

THE COURT: You are losing me a little bit on that. I am not sure why he would not be. Just because he designated somebody at the school level to implement it, Here is my policy, now you implement it, I am off the hook, that's what I understand you --

MS. KANE: It wasn't his designation. It was because -- say if the principal delegates something to the athletic director, then -- at the school level, then she's still responsible for what he does.

THE COURT: Is he responsible to find out what's going on?

MS. KANE: No.

THE COURT: He can be ignorant about what's happening, whether a plan is being implemented or not? Here is my plan, you implement it, but don't come back to me and tell me whether it's being enforced or not; is that a fair statement?

MS. KANE: Well, Your Honor, I think that the Board certainly cares about implementation of the policies. It cares about the students. And he certainly cares about whether things are being done. But there is a hierarchy of who is responsible for what. It's not his policy, per se. He disseminates it. The Board creates the policy. He simply passes it out to make sure that the athletic directors --

THE COURT: Well, I understand your argument. I need you to wind up because we are going to jump over to Mr. Ruff for a minute.

MS. KANE: For those reasons, Your Honor, there is no evidence of wanton or willful or utter disregard for the safety of others, and he's entitled to summary judgment.

THE COURT: Very good.

Mr. Ruff.

MR. RUFF: Your Honor, there is plenty of material in dispute of fact as to whether or not a reasonable juror could find that Mr. Sullivan recklessly disregarded his duty and disregarded the consequences to these young men without, you know, making any effort and despite his duty to do so, which then led to Doe 1 being a victim of sexual assault.

I want to talk about the policies that were in place. Mr. Sullivan -- it's being argued that Mr. Sullivan wasn't supposed to be implementing the policies, but first, he stated himself he oversaw the operations of the athletic programs for the entire system. He was the system-wide director of athletics, and he had just started right before this incident happened, and he promulgated this policy as he came into the door. Right?

And so we are supposed to say that as a matter of law, he had no duty to make sure that this policy was being followed? When Mr. DeGonia asked, I believe it was Ms. Crouse -- or Mr. Sullivan, Dr. Sullivan shared his expectation was that each school should have a supervision plan, but MCPS left the creation of the plan to the individuals who were athletic directors and administrators. Right?

So he had an expectation --

THE COURT: That's what Sullivan said?

MR. RUFF: That's what Sullivan said from his deposition. That's page 96 of his deposition, line 7 through 10.

THE COURT: All right.

MR. RUFF: And he said that's a fair statement, that at the time prior to this incident, and I believe that was the '17 incident, each individual school was left to come up with their own supervision plan, but he had an expectation that the plan be implemented. So for the -- the defendants to argue that Mr. Sullivan had no duty for implementation, to oversee that, is -- is disingenuous.

He also stated he was involved in the enforcement of rules. He disregarded his duty because he also talked about the fact that only coaches that -- in the MCPS system who had complied with the trainings that were required were allowed to remain as coaches. Right? And at the Damascus High School level, the -- the athletic director didn't even know that. He testified in his deposition that he thought that if the coaches hadn't finished their training, the mandatory training that taught them that they needed to supervise these young men to make sure they didn't get rammed in the anus, that they can still coach.

Well, Mr. Sullivan said specifically, You cannot be a coach in this system if you have not finished the mandatory training, and he didn't ensure that the mandatory training was

taken. He didn't ensure that the supervision policy was taken because my client was not supervised, and because of that, he was violated.

So what we are talking about here is a reckless disregard straight out of the -- the pattern jury instruction that is a question of fact, and it is for the jury to determine whether Mr. Sullivan, because he did not follow through on his implementation of these policies and the trainings and ensure that only coaches that had submitted to this mandatory training were actually coaching these young men and -- *in loco parentis*, standing in the -- the shows of these fine people in the galley, and taking care of these young men who were vulnerable based on a training that they knew about. They had a direct example right on point of what happened to this young man, Doe No. 1.

If I could just have one second, Your Honor.

So he failed to track whether Coach Wallich, Coach Colbert had undertaken these trainings. He admittedly knew that there was a failure of the Montgomery County Public School system staff to follow the supervision policy creating an unacceptable risk to the safety of students; yet, he didn't ensure that the supervision policy was followed.

He had a -- he stated he had a clear responsibility to ensure that the coaches received the required trainings in order to be a coach in the system. He knew that -- the

consequences that could happen to a student if supervision didn't occur. He further -- this is all from his deposition -- he further knew that -- the consequences that could happen to a student if they became the victim of a sexual assault. So he understood these consequences, and recklessly, per our argument, and, clearly, a reasonable juror could see that our way.

THE COURT: All right.

MR. RUFF: He disregarded that.

THE COURT: All right. Very good. Thank you, sir. That's all for Sullivan.

I will hear you now about Count Three, Defendant Crouse, Ms. Kane. Are you going to argue this, Ms. Kane?

MS. KANE: Yes, Your Honor.

With respect to Casey Crouse, she had been the principal one month at the time of this occurrence. Jennifer Webster had been the principal prior to that time, and there had been no evidence of any problems in the football program with respect to any sexual assault, sexual harassment, hazing, or any other evidence in the locker room.

Ms. Crouse -- there is no evidence in the one month that she was there, that she came in -- Mr. Doody had been the athletic director for decades. Mr. Wallich had been the varsity coach since 2006, so for 11 years. Mr. Colbert had been the JV coach since 2008, so nine years. There was no

indication to her that there were any problems in the program.

There is no evidence of, first, no negligence, as has already been argued, but clearly none of gross negligence and utter disregard or reckless disregard for the safety of the students. No evidence whatsoever to her that she was grossly negligent in her duties as principal at Damascus High School.

THE COURT: All right.

MS. KANE: The Court's indulgence.

THE COURT: That's fine.

MS. KANE: And unless there is questions from the Court, she should be entitled to summary judgment.

THE COURT: No. That's fine. You don't need to use all your minutes. That's fine. Whenever we can get --

MS. KANE: I will advocate them elsewhere, Your Honor, if I don't use them.

THE COURT: Very good.

Mr. Ruff.

MR. RUFF: Thank you, Your Honor.

Ms. Crouse admitted in her deposition that she knew the purpose of requiring supervision in the locker room at all times when students were there was, in part, to make sure that hazing did not happen and to support student safety. She admitted that if students are not supervised, bad things can happen.

Despite this knowledge, she admitted that during her time

 as the principal, and in that first moment, she never asked the athletic director to make sure that the students were always supervised in the locker room because, according to her, she didn't have a reason to, as they have stated. Defendant Crouse never even read the directive, the memo that Mr. Sullivan issued in July when she started in 2017, so she had no idea what the actual policy was being sent to her own athletic department.

She thoughtlessly delegated the supervision of athletics to Mr. Doody, and she admitted that she did not check to see if Defendant Doody was actually doing his job because he was experienced, but guess what, he wasn't. She admitted that she did not even tell Mr. Doody that he had to ensure the supervision of these players because there was a standing expectation, but she also had to admit that she was the one that was responsible for ensuring that Defendant Doody properly oversaw the JV football players and their supervision.

She had to admit that she was required by the department -- excuse me, by the system not to just delegate. She said this from her own mouth, so I am not certain why an argument would be made that she delegated the duty and that's all she had to do. From her own mouth, she was required by the system not to just delegate supervision duty, but to observe and monitor the athletic program, checking the progress and quality of the athletic program. Right?

She admitted that she knew that when a student becomes the victim of a student-on-student sexual assault, the student will very likely suffer -- and I am talking -- this is straight from her deposition -- will suffer serious negative consequences as a result. She admitted that she had an obligation to ensure that there was an individualized supervision plan for each team in the system at Damascus High School.

She admitted that unsupervised students sodomizing their teammates was a foreseeable issue and that the system safety trainings like the bullying and hazing -- and I forget -- what kind of behaviors was it called? -- bullying, hazing and dangerous -- or some kind of -- dangerous behaviors were designed to equip her staff members with methods to minimize and prevent foreseeable risks that were likely to arise.

She admitted that she was responsible for ensuring coaches completed their mandatory student safety trainings; however, she also admitted that she had no idea that Coach Wallich and Coach Colbert had not completed the required bullying and training modules. She had to admit specifically on the record she had not done her job.

She also admitted that the MCPS supervision policy was the bare minimum requirements. I am not certain why defendants are saying that this was above and beyond when the principal of the school said out of her own mouth, This supervision policy

was the bare minimum requirements to minimize the potential risks to the Damascus High School students.

Ultimately, she had to admit that the failure of the Damascus High School staff -- of a Damascus High School staff member to follow the supervision policy creates an unreasonable risk of harm to Damascus High School students.

THE COURT: I need to just ask one question. Then I am going to have to move on. What do you answer to the argument that she had only been on the job a month?

MR. RUFF: That in that month, she was grossly negligent, that she did not do her job. And she admitted to that. She did not monitor. She did not observe. She delegated, and had to admit that delegating a duty, even if the classes aren't in session, there is at least a genuine dispute of fact as to whether or not she should have been, as she stated from her own mouth, monitoring, observing, and ensuring that the supervision policy was being followed, and not creating, as she said, an unreasonable risk to these young men, which, surprise, surprise, ultimately happened because Mr. John Doe No. 1 was sexually assaulted.

THE COURT: What do you say to her argument that she had so many things on her plate -- I was trying to get to so many things at once, maybe I didn't have a chance to verify whether there was appropriate monitoring of the anti-hazing policy?

MR. RUFF: Well, I am not certain that the Board has asserted that argument.

THE COURT: Maybe they haven't.

MR. RUFF: But I would say that, you know, as you take the helm of any leadership position, it's important to prioritize. And if you are standing in the shoes of parents, the number one priority at a school is going to be safety, and if you cannot take safety as the number one priority and ensure that the number one -- you know, at least when you get off the ground, that you are on solid ground as far as your safety policies are concerned, then you have your priorities mixed up.

THE COURT: All right. Very good. All right.

We are next up with regard to Defendant Doody, and that is you, Mr. Karpinski.

MR. KARPINSKI: Thank you, Your Honor.

I have moved for summary judgment as to all four of the Doe Defendants. As to Doe 1, I am going to incorporate what I have already said, which is there was no notice of any problems at the school. There were policies and procedures in place, and there is no evidence of any willful or wanton behavior by Defendant Doody that would give rise to a claim for gross negligence.

As to all of the -- the Doe Plaintiffs, Your Honor, Defendant Doody is entitled to summary judgment on the negligence claim. He's not a coach, Your Honor. He's the

athletic director. He oversees a variety of programs within Damascus. He was not the one tasked with supervising the locker rooms. In fact, by policy, the coaches were required to supervise the locker rooms and were paid by stipend to do so. MCPS had a number of policies in place addressing bullying and hazing by students within MCPS, and that information was disseminated by Mr. Doody to the coaches of the varsity and JV football teams. Mr. Wallich and Mr. Colbert had been coaches at Damascus for a number of years.

I think there has been a lot of emphasis put on the lack of training of this one incident. When you look at it -- I think when you look at it, the big -- you know, you look at the overall picture, there is no question that these coaches had received training with regard to hazing and bullying with regard -- as it relates to the football team, and that information had been conveyed to all of the players.

So to say, Well, you didn't get this training, this particular training, well -- but it's undisputed that in the larger grand scheme of things, training had -- the information had been conveyed to not only the -- the plaintiffs and the perpetrators, but it was to everyone on the varsity football team.

So to say, Well, a coach could have seen this one slide and this would have made a difference, that's highly speculative when the coaches would have a preseason meeting,

and they would say, Listen, hazing is not tolerated; we have a zero tolerance policy for it; you are not to intimidate; you are not to ridicule; you are not to physically assault; you are not supposed to do any of those things; none of that is acceptable. And so that information was conveyed by Defendant Doody to the coaches, and that information was conveyed to the players.

THE COURT: Give me some timeline here. When is it conveyed to the coaches? When is it conveyed to the players?

MR. KARPINSKI: So, generally, Mr. Sullivan would have a meeting with the athletic directors before the school year began, and the coaches, themselves, each year would have a preseason --

THE COURT: So there would have been a meeting with who? With -- with Doody?

MR. KARPINSKI: Mr. Sullivan would have met with the athletic directors; then Mr. Doody would have met with the coaches. The coaches then --

THE COURT: But Doody is the director. He meets with Sullivan. Right?

MR. KARPINSKI: Correct.

THE COURT: And then Doody is supposedly meeting with the coaches?

MR. KARPINSKI: Correct. And the coaches, it's undisputed, Your Honor, did have preseason meetings where they

laid out their expectations with regard to Code of Conduct by the players. The parents signed a contract that basically said that they agreed that there would be no hazing that would be permitted to occur. And so that information was conveyed by Mr. Doody to the coaches, and the coaches then did convey that information to the students. And Mr. Doody --

THE COURT: So we are talking about Wallich and Colbert then. Right?

MR. KARPINSKI: Correct.

THE COURT: All right.

MR. KARPINSKI: And in terms of expectations, Mr. Doody testified that it was his expectation that, quote, when you enter a locker room to unlock it, you supervise the students while they are there, and when you are ready to leave, you need to go ahead and sweep the locker room and make sure that everyone is out, and then you have to lock it behind you.

Mr. Wallich basically testified that it was his responsibility to go ahead and supervise the locker room. It was supervision -- it was the responsibility of the coaches to go ahead and supervise the locker room, and that it should be locked if, in fact, there was no one in there.

Mr. Doody, as the athletic director, is attending to a variety of things. He's not necessarily attending to the supervision of the locker room at any given time.

THE COURT: Well, it sounds like the argument I am

hearing about Sullivan, his -- his oversight is as to these things, someone else is supposed to actually implement, so if they don't do it, he's off the hook. Is that right? They are supposed to be there when the students come in -- or the football players, and then sweep the locker room when practice is over. Because he's not the guy who does that, one of the coaches is, he can't be responsible?

MR. KARPINSKI: I think that Mr. Sullivan is, as the athletic -- as the supervisor of athletics, conveys what the policy is of MCPS. Mr. Doody then is responsible for conveying it to the coaches, and that -- that, in fact, did occur.

Now, that's why we did not move for summary judgment on the negligence claim because, obviously, there was a break down in terms of the supervision, but, you know, gross negligence is not big negligence, Your Honor. It is gross negligence. It's willful and wanton conduct.

And it's not as if information wasn't passed along. On the day that this incident happened, Mr. Doody wasn't at the school. He didn't know that Mr. Colbert's car had broken down and was running late and that there were no other coaches or other individuals that were in the -- in the locker room. He didn't know that -- that the players were permitted to remain in the locker room notwithstanding the fact that there -- that there was not a coach present.

And, in fact, I think what you are going to hear in

rebuttal is, well, there were these incidents that occurred between August of 2017, and there were no -- nothing that predates it, that's why summary judgment as to Doe 1 is appropriate as to all of the -- all of the claims, but between August of '17 and October 31 of 2018, there were reports made by certain adults. But most importantly, Your Honor, one of the reports was by -- I will just use her initials -- C.V. and J.V. reported an incident of an assault, but there is nothing in the record that suggests that that was reported to anyone other than Mr. Colbert. It wasn't reported to Mr. Doody that, in fact, that had occurred.

And there was a separate report by an individual by the name, just her initials, F.H., that was reported to Ms. Crouse in November of 2017, again, after Doe 1, but by the time Mr. Doody was informed of any such allegations, he didn't know the identity of the student, didn't know any of the particulars, the matter had already been reported to -- by Ms. Crouse to the student resource officers and to Montgomery County Police Department Special Victims Unit.

The record is devoid of any fact that Mr. Doody knew of the full scope of what the allegations were, other than Brian Scriven asking whether there was a conversation with Mr. Wallich and Mr. Doody to see whether they knew of any evidence or they knew of any knowledge of any inappropriate behavior occurring in the locker room, to which Mr. Doody said

he did not.

So, again, while the -- the plaintiffs, and we concede, and that's why we -- I withdrew the motion for summary judgment on negligence because there was an issue in terms of the training that was done, notwithstanding the fact that these were long-standing coaches. Mr. Wallich, he is a teacher, so he was not only a coach, he actually received MCPS training as a teacher on harassment, bullying, intimidation in the workplace, but there is no evidence of gross negligence. There is no reason that Doody knew that the locker room was not being supervised on the day of this incident.

Now, what the plaintiffs have been able to point to as it relates to Mr. Doody and what he knew -- and I don't condone it, Your Honor, but let's be realistic -- the allegations to what Mr. Doody knew about was horseplay in the hallways, which, unfortunately, happens in almost every high school in the country, there was some vandalism to locker rooms and things of that nature, but he was not aware of issues with regard to sexual assaults. And certainly --

THE COURT: Well, let's maybe not put such a fine point on it. You talk a lot about sexual assaults, even, I suppose, sexual harassment. This is a physical assault, isn't it? That's really what it is.

MR. KARPINSKI: Well, yes, any physical assault --

THE COURT: Well, it may make it more acute and more

offensive that it's sexual, but if you were beating somebody with a stick instead of putting it up his anus, it would be the same issue, wouldn't it? You are allowing an assault to occur. Right?

MR. KARPINSKI: I don't disagree, Your Honor, and to that end, Mr. Doody was not aware of any physical assaults that were occurring at all.

What he was aware of was kids running up and down the hallways and teachers complaining about it. He was aware of some vandalism that was occurring inside the locker room. But none of that was tied to physical assaults that would give rise --

THE COURT: I need you to wind up. Sorry. We are kind of moving along.

MR. KARPINSKI: Sure. So unless the Court has any questions, I would respectfully submit there is insufficient evidence of gross negligence, and Defendant Doody is entitled to summary judgment on Count Four as to all four plaintiffs.

THE COURT: All right. Mr. DeGonia.

MR. DeGONIA: Yes, Your Honor. And my comments are addressed to Does 2 through 4.

THE COURT: Okay.

MR. DeGONIA: And --

THE COURT: I don't know that I need to hear Mr. -- I have Mr. Ruff as well I guess. Okay. Go ahead.

MR. DeGONIA: And so it -- it may be slightly different. And, so, the Court has heard a lot about what Mr. Doody didn't know and what he didn't do, and precisely to that point, this is about, for gross negligence -- and I am not going to belabor the law because I know the Court knows the standard of care, and we are talking about gross negligence, it's negligence plus -- is the complete and utter indifference that Mr. Doody performed, or lack of a performance of his duties, his obligations.

He was the athletic director. We have heard coaches were coaches for a long time. He was an athletic director for a long time. We haven't heard from the defendants that this was a great winning program and nobody wanted to rock the boat so nobody really cared what was going on, which is exactly the role that Mr. Doody was in.

I don't think there is a question that there was a legal duty, obligation that was owed under *Gambrill* by the athletic director, as defined by his role, to manage and implement. The Board and the County want to talk about their robust policies, and you heard a lot about what it is to involve the policy student to student, but what you haven't heard, and what we are going to elucidate, is the information about what was done to the employees, the administrators, the coaches when they didn't follow the policies.

And that's what we are talking about here is we are not

talking about explaining this to the students. The students aren't responsible. It's the adults. And it is disputed -- and we are at that motion for summary judgment where we take the facts most favorable to us and the inferences therefrom -- it's disputed -- Mr. Doody contends he didn't breach any standard of care. It's disputed by the coaches. Wallich testified that he was never told by Doody about any need for a supervision plan, and none was created. That's Exhibit 23, Wallich deposition, 351 to 352.

Likewise, Coach Colbert testified that he was never informed about a supervision in the locker room plan. That's Colbert's deposition at 368-69. I think he goes on to say in his deposition, Colbert, that is, that, well, if I had been told about one, I would have followed that plan. That is the athletic director's responsibility, to implement the policies that are promulgated by both the Board, that are disseminated by the system-wide athletic director. It is his responsibility and the principal's responsibility to implement those policies. You can have all the robust policies you want, but unless there is actual implementation...

And why is this complete indifference? Doody breached his standard of care in ensuring the supervision even after he knew the coaches weren't supervising in 2018. He didn't have a plan. In his deposition: I didn't have a plan. I am not sure if there was a plan or if the coaches did that. I just let

them do whatever they were going to do.

The Board of Education, through its designee, Mr. Sullivan, states that Doody was required to have a plan in place, and I think the Court heard some of his deposition before, and that's his deposition, Mr. Sullivan, at page 96. And, again, it's uncontested that no plan ever existed or was created.

The internal investigation that was conducted by the school system and was attached both to our pleadings as Exhibit 46, as well as defendants' motion for summary judgment, provides further evidence of the chronic lack of supervision. And we are not talking about simple horseplay. We are not just talking about vandalism. A chronic lack of supervision and Doody's complete and utter indifference to those actions.

Judith Baggett-Stone, a teacher at the school, complained to Doody multiple times about the lack of supervision to him. They are unsupervised. Something is going on. They need to be down here. And two -- at least one time -- Mr. Doody admits to two times -- at least one time, he had to go down and personally supervise.

Mr. Hancock, who was the operation -- at the operations meeting -- this is the team meeting of school administrators, including Mr. Doody and the principal in 2017 and 2018 -- who is the director of supervision and security, states that he repeatedly expressed security and supervision concerns in those

operation meetings with both Crouse and Doody, and that they were unsupervised before athletic practice, and he didn't feel that he was being taken seriously. This is the school security officer.

The assistant principal, Maniya Jules, expressed her concern when she received complaints from staff and other referrals regarding students about a lack of supervision in the JV football team, which she reported to Doody, but was ignored. Doody ignored them.

Ken Howard, the building services worker -- so this wasn't one isolated complaint, one isolated incident. This was -- and this wasn't just somebody leaving trash on the ground or knocking something over. This is what was going on in the locker room that Mr. Doody was aware of, and keep in mind he has responsibilities for the administration of these programs and primarily the safety of the students who participate in those programs.

In the shower -- directly from -- this is directly from his deposition, that is, the Howard deposition -- In the shower, the waterproof ceiling tile had been knocked down and cracked all over the floor. Benches ripped up off the pedestal and out from the floor. Ceiling tiles in the main locker room are gone, missing. The lockers, itself -- the doors on the lockers, itself, smashed in, twisted. Can't close them. Can't open them. The locks, the handles, the lockers had been broken

off. Can't open the door. In the bathrooms, the stall panel is ripped off, toilets jammed.

THE COURT: Wind up with a couple more minutes, if you would.

MR. DeGONIA: I'm sorry, Your Honor.

So the fact is they knew not just about that. Mr. Doody had taken the training, the National High School training, and he was required to ensure that his coaches had taken that training. He took that training. In that training, it gives a specific example -- this is a New Mexico case -- of young men being sodomized when they were left unsupervised.

He received a directive, completely failed to implement that, and, more importantly, ensure that any of his coaches had taken that training and had completed it. And, in fact, the school's own internal investigation goes on to say that he completely failed in fulfilling that duty.

And just a couple of other points I want to make, Your Honor.

He was also aware that one player in particular, J.C.A., was a danger to his fellow students. Now, the County points out and Mr. Doody points out the *Stracke* case, as well as others, but in those cases, some action was taken, and it may have fallen short, but in this case, Mr. Doody received these things and did nothing about it.

Likewise, he denies, that is, Mr. Doody denies any

knowledge of this prior event in 2017, which, upon questioning, Ms. Crouse says, Well, maybe he was there; maybe he wasn't. Oh, now that you mention it, I do remember that he was at that meeting where a prior, very specific --

THE COURT: Who is Ms. Crouse? I'm sorry.

MR. DeGONIA: The principal, Your Honor.

THE COURT: Oh, I'm sorry. I was thinking of somebody else.

MR. DeGONIA: She was present at the meeting, Mr. Doody was present at the meeting when this prior event -- this is prior to the October 31st event -- was discussed, specifically brought up an allegation about brooming in the locker room a year prior.

Dr. Scriven, who worked in the central office, was there, and his recollection was much more clear that Mr. Doody was there. So not only did he have notice --

THE COURT: Does Doody deny that he was there?

MR. DeGONIA: Doody denies -- he denies any knowledge of any prior allegations of sexual assault in a locker room, let alone assaults. There is -- the record is replete with the level of -- I mean, it was a veritable "Lord of the Flies" in this locker room that he completely ignored, and the -- and treaties from multiple staff, administrators to him to take some action, to which Maniya Jules, in her deposition, responds, Well, when you asked to increase the supervision,

were you given an explanation for why it wasn't done?, and she was given no explanation by Mr. Doody as to why it wasn't done.

THE COURT: You need to wind up.

MR. DeGONIA: I will, Your Honor.

It is not often that you are in a situation where you can hear from someone as to what your complete and utter disregard, your complete indifference to the safety is.

In this particular case with this particular defendant, you actually know that he was completely indifferent to it, and we know that he was completely indifferent at the time and even afterwards because after this rape occurs, these rapes occur in the locker room on October 31st, one of his duties, one of his responsibilities is to perform an evaluation on the coaches and their performance. It's weeks after the event, the rape has occurred, and he is required to fill out a form that rates satisfactory, unsatisfactory performance. And on Mr. Colbert, who was not in the -- in the room, didn't perform his duties, didn't perform the training -- the record is replete with omissions by Mr. Doody about completing that -- he checks the box and says that Frank -- Mr. Colbert's supervision on that day was satisfactory.

THE COURT: I need you to -- I'm sorry.

MR. DeGONIA: And, so, if that doesn't tell us that this is gross and wanton and reckless indifference, I don't know what does, Your Honor.

THE COURT: All right. Mr. Ruff, briefly.

MR. RUFF: I will try to be very brief.

There was argument that there, as to the August 2017 incident, that there was no reason that Mr. Doody knew that the locker room was unsupervised. Absolutely there was reason for him to know because that was his job. That was his charge as the athletic director: to monitor, observe, ensure that supervision was occurring so that both sexual and -- and/or physical assaults would not occur to the students at Damascus High School.

There was talk about the fact that, you know, okay, maybe they didn't get this training, but they got enough training. Mandatory is mandatory. And Mr. Doody did not ensure that his staff members who were supposed to be ensuring the safety of these young men, Doe Plaintiff No. 1 specifically in this case, was being -- other students around him were being supervised along with him.

And so if they took the training or if they didn't take the bullying and hazing training, they either had notice of the -- the possible harms that were going to happen if they didn't follow the policy, or they should have known what the -- what was going to happen, and with deliberate indifference, they didn't care to do what they were -- what they were charged to do, what they were required to do.

And Mr. Doody thoughtlessly disregarded his obligation,

disregarding the consequences to the young men that he had under his stead, and did nothing. Right? He did not make sure that Mr. Wallich was supervising. In fact, Mr. Wallich testified, the varsity coach testified that he thought it was his duty only to supervise the varsity and that it wasn't a problem for him -- and this is after the August 1st. I will go back to August 1st.

But as far as Mr. Doody is concerned, he was in charge of the athletic program. It is clear that when Doe Plaintiff No. 1 was assaulted, sexually assaulted in the locker room, there was no supervision being conducted. And despite the trainings that put these coaches and Mr. Doody on notice, he did not do his job. He thoughtlessly disregarded his job. And contrary to Defendant Sullivan's testimony, he was under the impression that coaches -- again, I said this earlier -- didn't even have to be in compliance with the trainings that were mandatory by the system in order to remain in action.

He had coaches that were not even sanctioned by the system looking over these young men, and it is no coincidence that this is the result that comes. So, certainly, even as to the August 1st -- excuse me, August 1st, now I am espousing it -- the August 2017 incident, there was gross negligence, at least a genuine dispute of material fact as to Mr. Doody.

THE COURT: Let's go on to Count Five, gross negligence against Mr. Wallich, who is the head -- the head

 football coach.

MS. KANE: Thank you, Your Honor.

On behalf of Mr. Wallich, we would incorporate first the arguments that were made on Count One in the negligence count. And as the Court knows, he was the varsity coach. It's clear that -- I just want to make sure the Court understands that Mr. DeGonia, in the prior argument, was referencing what happened as a result of Does 2, 3, and 4, the second incident, and that was the focus of his argument, versus Mr. Ruff was dealing with Doe 1. Our motion as to Coach Wallich is just as to Doe 1.

THE COURT: Okay. Very good.

MS. KANE: Okay?

THE COURT: I understand. I understand.

MS. KANE: With respect to Doe 1 and August 1st, 2017, at or prior to that time, again, no evidence that Coach Wallich had seen, been told, heard, knew anything about hazing, sexual assault, assault in the locker room. Doe 1's incident was preseason. School had not even started. Doe 1's dad dropped him off right before practice. He was getting dressed when the criminal assault happened.

There is no evidence of what Coach Wallich did on that day that rose to a level of an utter disregard for the safety of his students. What happened to Doe 1 is -- was not foreseeable. It was a criminal sexual assault.

So for those reasons, the evidence does not meet the high standard required for an utter and reckless disregard for the safety of others, and, therefore, summary judgment is appropriate for Coach Wallich.

THE COURT: All right. Mr. Ruff again.

MR. RUFF: The Court's indulgence, Your Honor. I just need to find one piece.

I strongly disagree that the assault -- the sexual assault that happened to Doe Plaintiff No. 1 in August of 2017 was not foreseeable. As we have already mentioned, there are policies in place for a reason: to prevent the very harm that occurred. So Coach Wallich either knew or should have known that, based on the supervision policy to supervise at all times, which is very clear, at least a genuine dispute of material fact that there was no supervision occurring while Doe Plaintiff No. 1 was being assaulted, that he did not meet his duty. He disregarded that duty. There is evidence that afterwards -- which would allow a reasonable juror to infer that this supervision -- this lack of supervision was an ongoing, continuous occurrence that went from the '17 incident all the way through October of 2018.

We talked about some of the staff members who complained about the lack of supervision. Mr. Ken Howard, I believe -- I don't know if you quoted the year -- but he stated that he had been complaining to the Damascus -- he had been complaining to

his supervisor about the lack of supervision in the JV locker room twice a month for 13 years. So there was a clear directive, there was a clear duty, and clearly, as to Doe Plaintiff No. 1, in August of 2017, that duty was disregarded, and the evidence that follows that backs it up and solidifies that Coach Wallich was -- was supposed to be providing supervision.

He testified that he had never been advised of his obligation by his supervisors that he was required to ensure supervision of the JV team, just the varsity team. He knew or should have known that failing to ensure the supervision would create a risk of unreasonable harm, yet, he thoughtlessly failed to act upon that duty.

And with all the inferences in the favor of Plaintiff Doe 1, this motion for summary judgment should be denied.

THE COURT: Let me ask you a question. I don't know whether the record gets into this or not, but often in athletic locker rooms, the athletic coach, athletic director have offices that are pertinent to that.

Is anything in the record about where these defendants were physically located relative to the locker room?

MR. RUFF: Yes, Your Honor. The defendants were actually kind enough to let us visit the locker room, and so we have been able to see that Coach Wallich's office was probably -- if I was in his office, the JV locker room would just be on

the other side of the wall behind you.

THE COURT: So you are saying about 15, 20 feet?

MR. RUFF: I'd say maybe 25.

THE COURT: All right.

MR. RUFF: So, yeah, in earshot, nearby, able to provide reasonable assistance, able to understand if there was a -- a -- something going on, able know what was going on. But based on what my client said happened to him, and, you know, I don't want to belabor this point, but this was not seconds. Right? This was a sexual assault.

THE COURT: You are talking about Wallich's office is close by there? Is that who we were just talking about? Wallich's office was close by?

MR. RUFF: Wallich's office was within the actual locker room. So the makeup of the locker room --

THE COURT: Who is 25 feet away? Was that Wallich or somebody else?

MR. RUFF: His office was no more than 25, 30 feet away from the JV locker room, which had its own room. So there is a door. You got to go into the JV locker room. You can come in and out. So there is a window that you can see, but you can hear if you were in Coach Wallich's office, I think, from when I remember visiting the locker room. But at the end of the day, there was no way that Coach Wallich was in his office while this young man was being rammed in the anus.

THE COURT: Let me put the question this way as well: I assume what's happening with regard to all these incidents is that they are before the school year opens, football team practicing. Were there hours that the players were supposed to arrive for the training?

MR. RUFF: So this was in between two -- so you have got the morning practice and the afternoon practice.

THE COURT: What time in the morning are they supposed to arrive?

MR. RUFF: I couldn't be accurate, but I would assume, if I am remembering when I played, you know, 8 or 9:00 at the latest. So this was midday before the afternoon practice.

THE COURT: The assumption being that, presumably, there would be a coach on site at that time?

MR. RUFF: It's not just the presumption, Your Honor. That was the policy. Right? It was supposed to be clear to everyone, and either Coach Wallich knew or he should have known, but what he said was he halfway knew. He knew he was supposed to supervise the varsity, but he threw his hands up when it came to the JV.

Well, the JV coach, and I can kind of incorporate my argument as to Mr. Colbert, you know, he said in his deposition, Well, Mr. Wallich was in charge of the whole program, so, you know, it was his thing, you know? So a lot of

the finger pointing in this case I think is going to continue.

And, furthermore, there is testimony from at least ten players, I think five in '17, and others, including our clients, over -- between August 1st -- excuse me, August of '17 until the October 31st incident who eventually testified in this case that they had been victims of brooming in the JV locker room. This is a course of conduct. This was extremely gross negligence.

THE COURT: Sorry to push you along. We are trying to keep within a timeline. I have enough. Thank you very much, Mr. Ruff.

Let's go on to Mr. Colbert. Ms. Kane again.

MS. KANE: Your Honor, with respect to Mr. Colbert, he was the JV coach.

And I would mention just very briefly that Mr. Ruff's last reference to incidents after August 1, 2017, again, he's talking about things that happened after Doe 1's incident, nothing prior.

With respect to Mr. Colbert, there is no evidence that he knew of any assault, sexual assault, hazing in the locker room at any time. There were no prior complaints about the supervision. Again, those complaints that had been mentioned were with respect to the second incident. We need to confine the record to Doe 1, on the negligence and gross negligence counts, to what had happened on or prior to August 1, 2017, and

there is nothing. There is no indication, there is no evidence, there is no fact from which a Court could find that there was an utter disregard for the safety of the student through Mr. Colbert at that time.

Again, we don't know how long that locker room -- when Mr. Doe 1's assault occurred, we don't know how many seconds or minutes it had been since an adult was in that locker room. We know it was preseason. We don't know the exact time. It's not in the exact record.

THE COURT: Let me ask you a question, though. At some point -- and these incidents all occurred on the junior varsity, didn't they?

MR. MALONEY: Correct.

THE COURT: They were not varsity players?

MS. KANE: Yes.

THE COURT: But at some point, the players are on the field. Right? They are practicing. At another point, they are getting ready to practice and they are in the locker room, and at the end of the practice, they are back in the locker room or for the break. Right?

So would it not be a plausible argument to say that in those key times when they are back in the locker room, that's when the supervision is needed? I mean, this is not a case about somebody being injured on the field who wasn't being supervised. There are supposedly key, potentially hot areas

that would require supervision.

Would that not be a plausible argument here, that if there wasn't somebody there pretty much all the time in those two key segments, you have got potentially a negligent, or, arguably, a grossly negligent action?

MS. KANE: Well, Your Honor, I think that you have to look at the facts of each particular time. And one thing that's important is notice, and has there been any issue, has there been any problem? And the coaches have an obligation for supervision of the students on and off the field before and after practice.

This was, again, Doe 1, preseason, right before practice is what I read in the record, and he was getting dressed in the locker room when this unforeseeable criminal assault occurred.

What the Court is asking about doesn't go to an utter and reckless disregard for the safety of students. If anything, it's a negligence question the Court asks, but there is certainly -- I think with respect to the alleged breach of the duty of reasonable care and the utter and willful disregard, you have to look at the landscape and what was known at the time. What had the experience been of those that were involved with the program? And there had been no prior incidents, nothing to put them on notice that they -- there was a problem with the way that things were being done. We don't know anything prior to August 1, 2017.

So, in answer to the Court's question, I don't think that would go to an utter and reckless disregard for the safety of students.

THE COURT: All right.

MS. KANE: People would be within earshot and in and out was the way that the program was directed to work.

THE COURT: Okay. Mr. Ruff.

MR. RUFF: Your Honor, what we do know before August of 2017 was there was a policy, there was training that was required. And when we talk about what's reasonably foreseeable, we are talking about --

THE COURT: Do we know that Wallich did not do -- is there evidence that he did not do the training?

MR. RUFF: That's the point I was making earlier, Your Honor, is that if he did it or if he didn't do it, either he had notice that this was a, you know, a likely result of lack of supervision, or if he didn't take the training, he was completely absolving his duty to even be informed, and he should have known. So I think it's, again, another red herring to argue that Coach Wallich took the training or not.

What I remember is that there was evidence in the record from at least I believe -- I am not even going to try and quote who it was, but I believe that there is evidence in the record that Coach Wallich didn't take the training.

But let's assume he took the training. That means he was

advised: No supervision of students, that could lead to sodomization of your players. And when we talk about what's reasonably foreseeable, we talk about foreseeability exists where the actual harm falls within a general field of danger. It's not required that he knew that this particular player was going to be sodomized by these particular players.

What he knew was that it was likely that if he didn't do his job, that very bad things, like what was in the example of this training, could very well occur. He thoughtlessly disregarded that to the detriment of these people's children. And it's disingenuous to say that there was no notice simply because -- are we supposed to wait for someone to be raped in order for a school system to have the responsibility to stop the next one?

THE COURT: All right. Understood. Anything further?

All right. We are a little behind time, but not much. So it's ten of one. Let's reconvene at -- what are you telling me? We will break now for an hour, from ten of one to ten of two, and we will start at that time.

Thank you, folks.

(Recess taken from 12:50 p.m. until 1:59 p.m.)

THE COURT: Be seated.

All right. We are, I think, at Title -- sorry, at Count Seven, which is Title IX, and Ms. Kane, you are up first.

MS. KANE: Thank you, Your Honor.

With respect to Count Seven, the Title IX count, I'd like to begin argument with the damages allegation. Damages -- and this law will apply equally to Doe 1 and to Does 2, 3, and 4, so in both motions. All plaintiffs have pled in paragraph 227 of the second amended complaint, although it's couched in the terms of the minor plaintiff and it talks about Doe 4, they have all argued that -- seem to argue that it applies to them.

With respect to the relief sought, they seek monetary damages, punitive damages, injunctive relief. And there is important Supreme Court law which indicates that there -- punitive damages are not available under Title IX, and neither are emotional distress damages and neither are the injunctive relief damages based on the factual record before the Court.

I am going to take them one at a time -- sorry -- starting with punitive damages. Summary judgment must be granted to the extent that the plaintiffs seek punitive damages because they are not recoverable. Title IX is one of four anti-discrimination legislation birthed out of the spending clause. The federal government grants funding to the recipient conditioned on certain anti-discrimination behavior of the funding recipient.

So the four statutes that are considered as spending clause legislation that have anti-discrimination goals are Title VI of the Civil Rights Act, the Vocational Rehabilitation

Act, Title IX, and the Affordable Care Act.  Congress has the power to dictate the terms with which the federal funds recipients must comply, but these obligations must be clearly stated and unambiguous so that a recipient has notice of its obligations before accepting the federal funding.

The Supreme Court has regularly applied a contract law analogy in trying to determine the scope of conduct for which a funding recipient may be held liable in a private lawsuit seeking money damages based on alleged violation of the anti-discrimination statute.

So under *Barnes*, which is in our binder and cited in the pleadings, the Supreme Court has held that punitive damages cannot be awarded in a private action against a municipality for discrimination under the ADA or the Rehabilitation Act, two of the four acts that I have previously mentioned.

The plaintiff in *Barnes* was a paraplegic who had suffered serious injuries when he was arrested and transported in a police van and -- that did not have the accommodations for his disability.  He brought his ADA and Rehab Act claims for discrimination.  The jury awarded compensatory and punitive damages.  The district court vacated the award for punitive damages.  The Eighth Circuit reversed, and the Eighth Circuit reversed because they said that punitive damages were an integral part of the common law, and that Congress had done nothing to disturb the tradition and prevent the award of

punitive damages.

It went to the Supreme Court -- wait. Before we get to the Supreme Court, the Eighth Circuit had been relying on the, quote, *Franklin* general rule. And I mention that only because plaintiffs have relied on the, quote, *Franklin* general rule in this case, and that said -- the *Franklin* general rule said, Absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

Well, the Supreme Court reversed and overruled the *Franklin* rule and held the following: The Supreme Court found that remedies which are coextensive with those -- it -- it used a contract law framework, and said that the spending clause legislation, under all four of these acts, although the case there was focused on Voc. Rehab and ADA, it said that -- or the Rehabilitation Act and the ADA, it said that, Like Title VI -- Title VI, like other spending clause legislation, is in the nature of a contract. Punitive damages are generally not available for breach of contract, nor could an implied punitive damages provision reasonably be found in Title VI.

Punitive damages may not be awarded in private suits brought under Section 202 of the ADA and 504 of the Rehabilitation Act. Remedies for those are consistent with Title VI of the Civil Rights Act. A remedy is appropriate

relief only if the recipient is on notice that by accepting the federal funds, it exposes itself to that liability.

Title VI mentions no remedies, and punitive damages are generally not available for breach of contract, nor could it be said that Title VI funding recipients have merely, by accepting funds, implicitly consented to the indeterminant magnitude of which could produce liability exceeding the level of federal funding. Because punitive damages may not be awarded in private suits under Title VI, the Supreme Court said, it follows that they may not be awarded in suits under Section 202 of the ADA and Section 504 of the Rehab Act.

The Fourth Circuit, in *Mercer v. Duke*, interpreted this in *Barnes* because it's spending clause legislation. They applied the punitive damages argument -- ruling under *Barnes* to Title IX in *Mercer v. Duke*. And in *Mercer v. Duke*, that was a female kicker on a football team at Duke, and she had a Title IX discrimination suit against Duke. At trial, the jury returned a verdict in favor of Mercer. The jury awarded her one dollar in compensatory damages and two million in punitives.

The Fourth Circuit had the case on appeal, and the Fourth Circuit wrote, Duke appealed, arguing, inter alia, that punitive damages were not available under Title IX. We held the appeal in abeyance pending the Supreme Court's decision in *Barnes v. Gorman*. In *Barnes*, the Supreme Court held that

punitive damages are not available for private actions brought under Title VI. Because Title IX is interpreted consistently with Title VI, the Supreme Court's decision in *Barnes* compelled us to vacate Mercer's punitive damages award.

So for those reasons, punitive damages are not available to Does 1, 2, 3, or 4, and summary judgment should be granted.

The next case is *Cummings*. *Cummings* holds -- it's a very recent Supreme Court case, 2022 -- *Cummings* holds that plaintiffs cannot recover emotional distress damages under Title IX and relies very heavily on the same arguments that were made in *Barnes*.

In *Cummings*, the plaintiff, who was deaf and legally blind, requested a sign language interpreter during her physical therapy appointments, and the defendant refused. Plaintiff sued under the anti-discrimination provisions of the Rehabilitation Act and the Affordable Care Act seeking damages for her humiliation, frustration, emotional distress. The district court dismissed on the ground that emotional distress damages were not available. The Fifth Circuit affirmed. The Supreme Court granted cert. to determine whether emotional damages could be recovered in a private action arising out of the spending clause. Relying on *Barnes*, the Court said they could not.

The Court reasoned that spending clause legislation operates based on consent, and the available remedies analysis

turns on whether the recipient had notice of what sort of penalties might be on the table in return for accepting the relevant finding.

The Supreme Court presumed a funding recipient is aware that for breaching its spending clause contract with the federal government, it will be subject to the usual contract remedies in private suit.

And then the Supreme Court wrote, Because it is hornbook law that emotional distress is generally not compensable in contract, the Court concluded that, quote, we, therefore, cannot treat federal funding recipients as having consented to be subject to damages for emotional distress. It follows that such damages are not recoverable under the spending clause statutes we consider here.

So based on *Cummings*, Your Honor, and that has been -- recently, in the *Doe v. Fairfax* Fourth Circuit case in a ruling on the motion in limine to exclude evidence of emotional distress damages, the Eastern District of Virginia wrote, Having reviewed *Cummings* and its progeny, the Court finds that its holding cannot be distinguished and applies to claims brought under Title IX as an anti-discrimination spending clause statute, and the plaintiff in the *Doe v. Fairfax* has been precluded from seeking emotional distress damages in that case. And that was a case that has been cited by the parties. It's back on remand. And while it was on remand, the *Cummings*

case came out, and the ruling on emotional distress damages was sought and obtained.

Other district courts have consistently applied *Cummings*, and we cited to *Doe v. Liberty*. There was another one, *Doe v. Moravian College*, where -- I believe it's in our binder -- where the plaintiff was sexually assaulted and sued under Title IX. They applied the contract law analogy and looked at *Barnes* and *Cummings*, and said, in her second amended complaint, she had only listed damages for emotional distress, so summary judgment was granted in her favor.

Plaintiffs cited to *Doe v. Purdue* and said that emotional distress damages could be allowed, that *Cummings* was under the Rehab Act, which we know that the Fourth Circuit said, in *Mercer v. Duke*, even though *Barnes* was not under Title IX, it was spending clause legislation, and, therefore, it applied to Title IX, so the Fourth Circuit would do the same thing here.

And *Purdue*, interestingly enough, cited by the plaintiffs, was researched, and, apparently, they changed their opinion because, in the record, there is a final jury instruction which -- with respect to emotional damages, which was docketed on 9/23/22, which includes this sentence: You are not permitted to award damages against Defendant Purdue University for any emotional harm that Plaintiff Hayes asserts.

THE COURT: Let me stop you for a moment, and let's think down the road about how this case gets tried to a jury.

In the end, there is only going to be one verdict. Correct? No defendant, I think we have in mind, is going to be assessed more or less than any other defendant. If there is liability on one theory or another -- leave aside punitive damages for a moment -- there is still going to be compensation for monetary damages. Correct?

MS. KANE: Well, Your Honor, that's a very good question, and I think that based on the status of the law, there would have to be a special verdict form.

THE COURT: Oh, sure. I am with you on that. But allow that there is a special verdict as to each count, each defendant, do you find them liable? You go down that list. Then you get to really at the end, and there may be more than one possible item here, but, basically, you are going to get one judgment in the end per plaintiff for compensation -- for compensation, monetary damages. Would you accept that? Medical damages, for example, medical expenses or whatever.

MS. KANE: Your Honor, I think it's premature to make that determination at this moment in time. I think that we have certainly multiple theories brought by the plaintiffs: negligence, gross negligence, Title IX, and 1983.

THE COURT: No. I am not talking about punitive or anything else. The damage component for the, at least the impact, you are not arguing that *Cummings* doesn't allow any recovery, are you? You are saying for emotional damages?

MS. KANE: For emotional distress damages. There could be a loss of an educational opportunity --

THE COURT: Well, leave that aside for a moment, though. There is an impact at the time, there is a degradation at the time of the incident which presumably would be compensable? Maybe not in future, but beyond that, that component would be compensable. Right?

When you write down in a, at least according to a State of Maryland form what the damages are, you put down the compensatory number, and then usually pain and suffering, which I think we agree means emotional damages, is a separate component.

And in the end, I am saying it seems to me that if there is a -- if the -- a given plaintiff prevails on an issue against -- a count against any one defendant, there is still only one number that they are entitled to at the end even if it's joint and several.

Do you disagree with that proposition?

MS. KANE: Typically, Your Honor, there would be one number for damages. However -- and in this case, we have -- the damages that have been claimed by the plaintiffs are emotional distress damages, with the exception, really, of Doe 4, who also has a private school expense, a loss of an educational opportunity. The others' emotional distress damages, if they -- since that's all that's been pled and

claimed, this could dispose of their Title IX claim.

THE COURT: I see your point, and I assume I will hear an answer on this, about whether the impact alone is compensable, the degradation alone, as opposed to the suffering that -- in consequence of that. I leave that for future argument.

What I am really getting to, though, is the issue of emotional damages would be compensable under a negligence or gross negligence theory, wouldn't it? That's not precluded under those common law theories?

MS. KANE: Well, you know, no. No. They couldn't --

THE COURT: They aren't?

MS. KANE: -- claim their emotional distress damages under negligence or 1983 or gross negligence to the extent --

THE COURT: Negligence, gross negligence, 1983?

MS. KANE: Yes.

THE COURT: Emotional -- and, presumably, the emotional damages are the same. Right? I mean, you are not going to get different numbers for any one plaintiff against one or more defendant. There is still going to be a single number for emotional damages where it's allowable, assuming it's not allowable under Title IX. Right?

MS. KANE: Right. But the record -- from the defense perspective, Your Honor, the record needs to be protected as to which counts they are allowed and which counts they aren't.

And the -- and with respect to granting the motion on emotional distress and punitive damages, it disposes of that element.

THE COURT: We are not talking about punitive damages. I am not talking about that right now. I am talking about emotional damages. What I am thinking is -- I am looking at the verdict sheet right now, and I see emotional damages, one number per plaintiff. Now, it's going -- it may come in if they prevail on negligence, gross negligence, 1983, and maybe it doesn't come in on Title IX, but as far as the computation, the consideration, it's still in the case one way or another, right, if they prevail?

MS. KANE: It's in the case, Your Honor, but it could have an impact on payment.

THE COURT: On what?

MS. KANE: Payment.

THE COURT: On payment. Well, maybe you can get to that at some point. I am not quite sure what that is. Board of Education is a defendant in these other counts, is it not? And if you -- if you don't -- with regard to negligence, gross negligence, and 1983, any one of the three, if you are -- the Board of Education is a defendant, is it not?

MS. KANE: Not in 1983, Your Honor, because the Board of Education is a state entity. It's not a person for --

THE COURT: Leave that aside. Let me go back just to the negligence and gross negligence counts. They are

defendants?

MS. KANE: Yes.

THE COURT: Emotional damages could be proved --

MS. KANE: No, not in gross negligence. There is no gross negligence claim against the Board of Ed. Only negligence.

THE COURT: Stay with negligence for a moment. Emotional damages are compensable there, are they not?

MS. KANE: Yes.

THE COURT: And they would be the same wherever they might appear; isn't that correct? You are not going to get different emotional damages under negligence versus, let's say, Title IX if I disagree with you? It's still the same component, isn't it?

MS. KANE: It's the same component, Your Honor, that there would be one amount of emotional distress damages whatever the legal theory may be, but with respect to what the legal theory may be, it impacts on whether or not they can recover that amount.

THE COURT: I am not sure what you are saying. If you get emotional damages under negligence, what is it that blocks recovery for emotional damages if the Board is liable?

MS. KANE: There may be limits for liability, Your Honor, with respect to some of the other claims.

THE COURT: But there would be no limits under Title

IX? You will have to look at that.

MS. KANE: Yes.

THE COURT: Well, I wonder. I haven't heard that. It's possible, but -- okay.

MS. KANE: So the motion should properly be granted so there is not -- that issue does not arise.

THE COURT: Well, perhaps I will hear the response on that. All right. Go ahead. I was just trying to see how you would frame this, though, on the special verdict sheet. But I wanted to be clear that there is certainly emotional damages that are compensable under at least one count, maybe two?

MS. KANE: Yeah, one amount, and they can recover them under their other counts, but if they are not available under Title IX, then summary judgment should be granted. And the Supreme Court has said --

THE COURT: So summary judgment, but for what I am talking about, the impact itself, the event of the -- this is something I don't know that *Cummings* gets into -- there is an impact at the very moment that the assault occurs. There is sequelae, emotional and otherwise, afterwards, but there is an un-permitted touching. It's like the basic law school question: Do you get something? Do you get a dollar? You get something for that, don't you? I mean, it could be nominal. It could be more than nominal. Not for the emotional component.

And if you broke it out, and this -- well, I am not going to argue plaintiffs' case for them, but that's just sort of speculating a bit on how you would deal with that.

But go ahead, finish your argument. I have had that thought in my mind, and perhaps I will hear from Mr. Maloney and Mr. Ruff on that later.

MS. KANE: Your Honor, for the reasons stated, we would request that the Court enter summary judgment pursuant to *Barnes* and *Cummings* and the other district court -- and cases that have heard and agreed with followed comments.

THE COURT: And you mentioned injunctive relief. Are the plaintiffs seeking injunctive relief of any sort here?

MR. MALONEY: We are.

MS. KANE: Your Honor --

THE COURT: Did you argue that that's not available either? Have you argued that injunctive relief is not --

MS. KANE: No. There is no standing for injunctive relief here, Your Honor, absent any showing of any real or immediate threat that the plaintiffs will be wronged again. They have all graduated from Montgomery County Public High School. The individuals are not in the same positions anymore with respect to Crouse, Wallich, Colbert, and Doody, and what they seek is something that would be not the appropriate thing for a Court to provide. It's trying to interfere -- I am trying to look here for -- I apologize, Judge. I will look in

a moment and see exactly what the claim was and I will come back to that on rebuttal.

But with respect to the law on it, one case that we cited is *City of Los Angeles vs. Lyons*, Past wrongs do not in themselves amount to that real and immediate threat of an injury that's required for injunctive relief.

And *Dover vs. College of William and Mary* is another one. A plaintiff cannot overcome the imminent harm hurdle required under Article III, particularly given Coach Swanson's dismissal, without a sufficient likelihood that plaintiff will be wronged again in a similar way. Plaintiff's allegations of future harm are neither imminent nor concrete, and she does not have standing to seek injunctive relief under Title IX or Section 1983.

This is the law on injunctive relief, Judge, and that claim should be -- summary judgment should be granted for the defendants.

THE COURT: But what about an action that's capable of repetition even though by the time it gets to be adjudicated, the plaintiff doesn't have immediate injury themselves, that is, institutional repetition of the same kinds of acts that may have occasioned the lawsuit by the plaintiff, have you considered that?

MS. KANE: Your Honor, you know, that's not really an issue here. There was never a problem with the policies that

the Board had. The problem, which is what they were asking for in their injunctive relief, they -- their problem that has been alleged in the lawsuit is with implementation or following of those policies.

THE COURT: All right. I understand that. I am not sure -- not just the policies, but they are saying follow them, and I think that's actually the request. Anyway, I didn't hear you argue that. I didn't know whether you were addressing it or not.

MS. KANE: What they wanted -- here is their injunctive relief: To supervise student athletes in high school locker rooms; institute a program that prohibits a coach from coaching unless that coach has completed mandatory training on hazing, sexual harassment, and child abuse; and affording such other relief as the Court deems proper. So that injunctive relief claim, Your Honor, should be dismissed and summary judgment granted.

THE COURT: But you are saying it should be dismissed because these immediate plaintiffs will not suffer if those -- with those policy changes being implemented?

MS. KANE: That's correct.

THE COURT: Okay.

MS. KANE: That's correct.

THE COURT: All right. Is that it?

MS. KANE: Well, no, Your Honor. I just talked about

damages. I will go quickly --

THE COURT: Go ahead.

MS. KANE: -- because I want to talk about Title IX on the merits. Title IX on the merits requires if there -- to be a violation of Title IX, if there is a complaint of -- well, the statute says, No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance.

You have to determine whether or not there is any basis to impute liability to the institution if there is a student at the educational institution who is subjected to harassment based on sex. There has to be evidence that the harassment was sufficiently severe or pervasive, and there has to be a basis to impute that to the institution.

In assessing whether or not it can be imputed to the Board of Ed in this case, one must look at the standard, and the standard is: Is there actual notice to an appropriate person and did that appropriate person respond to that notice with deliberate indifference? So in determining who is an appropriate person, that is defined as one who has the authority to take corrective action to end the discrimination. Under Montgomery County Public Schools policies, that would be like a principal or an assistant principal. Receiving and

forwarding a report of sexual harassment is not enough to create -- be an appropriate person. It has to be someone who can correct the discrimination and end it.

Actual notice requires that the current sexual harassment regarding -- be involving the -- that there is current sexual harassment involving the parties, the plaintiff or the perpetrator or both, so you need to have that to create actual notice.

Actual notice occurs when an appropriate person receives a report alleging sexual harassment and a reasonable official would construe that report as alleging conduct prohibited by Title IX. The report must be either, one, plaintiff specific, or, two, identify the perpetrator to create actual notice.

The *Facchetti* Court, which is a Fourth Circuit decision, held that without notice that the victim was being harassed or that the specific perpetrator was currently harassing a student, actual notice is not established prior to the attacks at issue. Knowledge of five prior assaults did not establish actual notice because different perpetrators, different students.

An actual notice under Title IX is different than negligence or 1983 or even gross negligence. It says, The appropriate person must have actual -- not constructive -- actual notice, and the same people have to be involved.

The *Liberty* Court also cited and relied on *Facchetti*,

saying that, in the *Facchetti v. Bridgewater* case, in which the
Court acknowledged that the rampant prior sexual assaults on
its campus, of which Bridgewater was fully aware, could not be
used as evidence to establish actual notice.

The *Baynard* case, which is another Fourth Circuit case,
says that to create actual notice, it must be current
harassment, and that means something now, not past harassment.

Given this knowledge, then the person who receives the
actual notice and understands it to be a Title IX violation,
they must respond without deliberate indifference.  Now,
deliberate indifference can be determined by the Court as a
matter of law under the *Davis* case.

The fact that somebody failed to fill out a form, which
is in one of the allegations in this case, that Ms. Crouse
didn't fill out a form when she heard a prior rumor that did
not identify the name of the victim or the name of the
perpetrator, that does not equate to the deliberate
indifference, and that's under *Doe v. Board of Education of
Prince George's County* and *SV*.  Those cases are also in our
binder.

But the *Doe v. Prince George's County* says -- it was a
Fourth Circuit, 2015, unreported, says, The Court further
rejected any notion that the defendant's failure to follow the
procedures set forth in AP 4170 displays deliberate
indifference as the Supreme Court has held that the failure to

follow sexual harassment grievance procedures does not prove deliberate indifference under Title IX, and then it cites to *Gebser v. Lago Vista*, which is also in our --

THE COURT: That's a Fourth Circuit case?

MS. KANE: That one is Supreme Court. The *Doe v. Prince George's County* is Fourth Circuit, 2015. *Gebser v. Lago* is a Supreme Court case in 1998.

THE COURT: All right.

MS. KANE: And it says that just not filling out a form is not enough to --

THE COURT: Just a couple more minutes and then I need to hear from the other side.

MS. KANE: Further, there is also an allegation here, and I will try to do this very, very quickly, but there was a report to Colbert in 2017 from C.V. It was after the Doe 1 incident. And the report he received was -- from her was there is something going on in the locker room about somebody shoving a broom in somebody's pants. He said, Have the parent of that person -- she did not identify the victim, did not identify the perpetrators -- he said, Have the parent call me, and the parent did not call.

There was another allegation from the plaintiff that a second person had reported to Colbert, while he was coaching a scrimmage and she was on the sidelines, Hey, what's going on in the locker rooms? She admitted in discovery she doesn't know

if he heard her or not, but she was asking about activity in the locker room.

Then, in November of 2017, a parent said to Crouse that her son had heard from somebody else -- so we are in a rumor land -- had heard from somebody else that somebody was sodomized in the locker room. When Crouse got that information, the person did not identify the victim, did not identify the perpetrators.

Crouse told her supervisor, Brian Scriven, the director of school support and improvement, she referred -- she called SVID, Special Victims Investigative Division, from the police, and she also referred the matter to the school resource officer, a County employee, not a Board of Ed employee, under the memorandum of understanding with the schools and the County, and she referred it to him to find this son who heard this rumor, determine who it was, and find out what happened.

The school resource officer talked to the son. The son gave him the name of the victim. The school resource officer talked to the victim, who, and according to what the school resource officer told Crouse, denied that anything had happened.

THE COURT: I need for you to wind up. Just a couple more minutes.

MS. KANE: Okay. Almost done.

As a result of that, Crouse then -- she had responded.

She did not know who this individual was, so it's not actual notice under the framework that I gave you. Because she doesn't have the identity of a perpetrator or a victim, she did not respond with deliberate indifference because she notified her supervisor, she called SVID, who told her that they would not go on a witch hunt because they didn't have any -- all the information they needed, and she also, you know, had -- yeah, she had -- she had had these things done. So she was not deliberately indifferent.

THE COURT: All right.

MS. KANE: Thereafter, it was learned, after this lawsuit was filed in 2019, that the C.V. report, the one on the side of the scrimmage on the sidelines and what's called the Hayes report to Crouse in 2017, were all about the same incident, which was Doe 1, but the Board did not know that Doe 1 was the victim until this lawsuit was filed in 2019.

THE COURT: I need you to sit down now. I'm sorry. You got to stop.

MS. KANE: He never reported it.

THE COURT: I know you can go on for a while. It's an interesting issue. But I have got to hear from other counsel. So Mr. Maloney, you are up.

MS. KANE: Thank you, Your Honor.

MR. MALONEY: Thank you, Your Honor.

I'd like to address first the questions that the Court

was raising about the verdict sheet and what will happen with respect to emotional damages. And we agree with the premise of the Court's question. There is only one set of damages for each individual plaintiff, and the jury will only be told about one set. It wouldn't make any sense, for a whole variety of reasons, to have the jury go back and try to assess what damages are for 1983 as opposed to negligence as opposed to Title IX. That gets incredibly messy, and it's almost never done.

And the analogy I would give to the Court is this: What typically happens on the negligence claim, because there are statutory caps which apply to those, the jury is not told about the statutory caps even though they wouldn't -- just as they wouldn't be told about the damage limitation that may or may not apply in Title IX. Instead, they will be told everything, and the Court, posttrial, typically hears post-trial motions, and if, for instance, we exceeded the cap, there would be a motion to bring us under the cap. If the case law was clear at that point that Title IX couldn't allow emotional damages, that would be reduced as well.

But this is essentially -- the motion in Virginia was a motion in limine, but it's really a post-trial issue that ought to occur because, for instance, all of these damages are available in 1983. Punitive damages, the Fourth Circuit has said very clearly, are available for 1983 where there was

deliberate indifference. Emotional damages are available in 1983. They are available in negligence. And it remains -- the case law is all over the map on what the impact of the *Cummings* case will be here.

So, for that reason alone, this ought to be something -- and by the way, it's a rapidly moving landscape in terms of what the spending clause was going to be. None of this existed two years ago, and it may not exist -- we don't know what the Supreme Court is going to do a year or two from now. So I think it would be premature for the Court, for something that's really a post-trial motion, to make some rulings on it based upon the case law.

And when I say "rapidly moving landscape," the Fourth Circuit, by the way, has never ruled that there are not emotional damages in Title IX, nor has the United States Supreme Court, and, in fact, the current binding case law from the Fourth Circuit and Supreme Court is that it is binding in there.

And the -- and in a number of -- some Courts have applied *Cummings* to Title IX, but others have not. For instance, in Indiana, on July 20th last year, *Doe vs. Purdue University*, the Court said, *Cummings* was not a Title IX action. It does not make evidence of emotional distress or harm inadmissible in this case; therefore, such damages will not be precluded. And there are a number of cases around the country that say that.

One of the theories of *Cummings* was a rehabilitation case, and the Supreme Court has only applied it to ADA and Rehabilitation. One of the theories of this spending clause litigation is, well, the recipients of the federal funds were not on notice that they might have liability. Well, recipients like Montgomery County have long been on notice that there would be liability for emotional damages under Title IX.

The case law in the Fourth Circuit and around the country is replete with Title IX cases that have emotional damages. The Supreme Court said, in *Franklin*, Congress did not intend to limit in any way the remedies in a suit under Title IX. The Supreme Court has said, in *Gwinett*, that if you were to take some remedies out, there would be no remedy at all with respect to a victim of sexual harassment in this case. It would leave the potential remediless [sic].

And in 2009, the Supreme Court in *Fitzgerald*, said, quote, The Title IX petitioner can file directly with the Court and obtain the full range of remedies. Congress did not intend to limit the remedies available in suit under Title IX.

So the recipients have long been on notice that a full range of remedies would be available here, and I assume, ultimately, that's an issue that's going to find its way to the Supreme Court. If stere decisis means anything -- and, of course, these days, it means different things to different people -- that what the Supreme Court has said repeatedly in

the last 15 years ought to be sufficient notice to the recipients, the federal fund recipients.

THE COURT: While we are on this, what do you think about the possible distinction between the indignity of the impact versus the emotional sequelae under Title IX?

MR. MALONEY: Thank you for that. I was just getting to that question. It has long been recognized that separate and apart from emotional damages is the actionable -- is the right to bring an action for invasion of bodily integrity, and there is a rich body of case law throughout the country that treats that as a separate cause of action. Not a cause of action necessarily for emotional damages, although it may flow from it, but the cause of action is actually for the -- what the Court described as an impact and what the case law describes as invasion of bodily integrity. And one of the whole points -- and there is a lot of Title IX case law upholding actions where the bodily integrity occurred here.

In addition to the bodily integrity claims, one of the essence of Title IX claims, in fact, the essence of Title IX is the deprivation of educational opportunity. So the -- there is a claim here for loss of educational opportunity. In my case, my client completely lost their ability to attend a public school. It was impossible --

THE COURT: Who are you speaking for now?

MR. MALONEY: John Doe No. 4. I am speaking for 2,

3, and 4, but our client, No. 4, it became so bad at Damascus that he had to transfer to a private school just to survive, and he lost the educational opportunity that he was entitled to under Title IX, and that's separately compensable from the emotional damages.

And even if we were to provide or assume the *Cummings* framework here that was applied to the Rehabilitation Act, they said, Well, only damages which have traditionally been allowed in a contract setting. Well, a number of contract settings, particularly for claims like these, allow for emotional damages, and specifically -- I will give the Court an example -- these negligent security cases against apartment houses where someone has, for instance, been sexually attacked or raped because the apartment house fails -- the landlord fails to provide appropriate measures.

Well, those cases are typically brought in two counts. One would be the tort of negligence, but secondly, and importantly, the breach of contract for a breach of the lease, a breach of the provisions in the lease requiring that they provide security for the -- adequate security for the tenants. And the tenants, almost always in that case, bring a claim for contractual violation of the lease, and the Courts almost always in those cases allow for non-economic damages as well as invasion of bodily integrity and the other things flowing from the landlord's breach of contract by failing to provide

security.

That's one example. We can provide lots and lots of examples where, in the contract setting, these kind of damages are available.

But as I indicated, this is a very, very fast moving landscape, and where we are now may look differently. Just as where we are on the negligence claims, the General Assembly addressed the cap issue this year, and that's going to be heading to court soon. In fact, there is an interlocutory appeal provision in that law, so the Court -- just as the Court would not issue summary judgment on damage caps there, they should not -- the Court should not enter summary judgment now but wait and see what the case law is, wait and see what kind of evidence is developed in terms of what kind of damages are going to be offered, and then make a judgment, probably not in limine but posttrial, because all of these things, as the Court pointed out, would be admissible for the other counts.

So I don't think there is any reason for a premature grant in the middle of this burst of *Cummings* case law that we have around the country.

Now, Your Honor, we spent a lot of time this morning, almost all of our time, with the exception of the duty gross negligence, talking about John Doe No. 1, which was August the 1st of 2017. We spent virtually no time this morning talking about October the 31st, 2018. And an extraordinary number of

events occurred between August the 1st of 2017 and October 31, 2018, the date that John Does No. 2, 3, and 4 were anally raped with broom sticks in the locker room at Damascus.

First of all, they answered some of the Court's questions this morning about who was there and what the setting was. The John Doe No. 1 case in August was not during the school year. It was during the summertime where you had summer practices in the morning and afternoon. This was during the school year. These were after school practices, and that's important because the timing here is critically important. The school day at Damascus ended at 2:30 p.m. Then there would be practices beginning, but the JV practice did not begin until 3:30 p.m., so the JV football team had one hour of complete free time.

In terms of supervision, there was zero supervision in 2018, although there had been prior to 2017. The reason there was zero supervision are severalfold. First of all, Head Coach Wallich, the head coach of the varsity, would take the varsity team on the field at 2:50 p.m. That meant from 2:50 p.m. until JV started at 3:30, there would be 40 minutes of completely unsupervised time.

The JV football coach, Colbert, wasn't there at all. Why was he not there at all? Because he had employment outside the school. He was not a school employee, just a contractual JV coach. According to the testimony of school staff under oath, he typically would not arrive until about 3:40 or 3:45, and he

would go directly to the field where the JV practice was occurring.

And the athletic director was virtually never there. He had responsibilities for other sports. He had responsibilities inside and outside the building, and he was not there at all.

The assailants, themselves, testified under oath that they rarely, almost never saw a coach there in the locker room ever, and that includes whether -- except they might come in incidentally to walk through or something like that, and that was a rarity.

Now, what aggravated this are two things, and they were deliberate decisions by the principal, Casey Crouse, to remove safety guardrails to protect the safety of the team and the school building as well. One involved the JV football team after school and one involved the lead assailant, initials J.C.A.

She arrived in the summer of 2017. When she arrived in the summer of 2017, the JV football team, for that one hour of supervised time, was required by the previous principal to be in study hall. And they had study hall in a number of areas. The principal 's name was Jennifer Webster who had been there from 2013 to 2017. And they met under the supervision of an adult until the coach arrived, and they would be in a media center, a security office, or other place, and they had to be there under the supervision until the coach arrived and the

supervision could transfer. There were no problems necessarily reported with the JV conduct at all at that point.

Now, what happened was when Crouse arrived, she eliminated the study hall. She did so because the athletic director and the coaches didn't like it. And why didn't they like it? Because the kids didn't like it. And why didn't the kids like it? Because they are kids and kids don't like study hall.

So over the objections, the vociferous objections of her staff, including the assistant principal, the principal eliminated the study hall requirement, and made an affirmative, deliberate decision to allow the students to be unsupervised for the one hour from 2:30 to 3:30.

But it's worse than that. Once she did that --

THE COURT: Sorry. Then where would they be from 2:30 to --

MR. MALONEY: That's a very good question, Judge, and the answer is everywhere. Primarily the locker room, because that was sort of the boys club, the center of it, where they would hang out and do what they did in the boys club, if you will, but also they would run rampant throughout the school building and also across the street.

One student was involved in a theft, one JV football player, at the market right across the street. The police got involved. He was temporarily suspended by one of her

subordinates, I think Wallich, from the football team. So when it came to her desk, she was offered -- and the police got involved. When it came to her desk, she was offered a chance to see the video depicting the theft clearly that the store handed in, but she said, I don't want to see the video; I don't need to see the video; I don't believe that it happened, even though it was on film; and she reversed the suspension and allowed him to come back.

But it was so bad --

THE COURT: Is that person one of the perpetrators eventually, or not?

MR. MALONEY: I don't think that particular one was, no. But it became so bad that the JV football team began running rampant throughout the school, and there were reports of disorderly conduct, yelling, disruption, and so forth.

Finally, it got so bad that the vice principal, Ms. Jules, and the director of security, Michael Hancock, repeated month after month in the school operations meeting to bring back the study halls so that we could restore some order in terms of the JV conduct where they had been allowed, basically, to run wild for that entire one-hour period after that.

And it was so bad that other teachers began to get involved. TJ Johnson complained about it. Indeed, the week before this assault, October 31st, 2018, the week before,

another teacher complained bitterly and sent emails. Assistant Principal Jules said, I received repeated complaints about the JV during this hour. Destruction of school property --

THE COURT: This is all prior to October --

MR. MALONEY: This is all prior to October 31st.

Destruction of school property, theft on and off the property, lack of supervision, disrupting the building, vandalizing the building.

Kenneth Howard, the building service worker, complained to Mr. Doody that the students were vandalizing the locker room.

Alan Fischer, the building service manager, said he spoke directly with Principal Crouse about this lack of supervision and damages, but he felt his concerns were not taken seriously because football coaches at Damascus are, quote, untouchable. And keep in mind Damascus, at that point, was on the cusp of getting 61 consecutive wins, breaking a state record, and close to winning a national record of undefeated wins as well, and the team, they called themselves the Damascus football community, and no one, no one in this room is going to dispute that the Damascus school identity was entirely wrapped around the success of the football team, and that drove the decisionmaking of Principal Crouse and the fact that these players were considered untouchable, and what Coach Wallich and the AD wanted, they got.

And Coach Wallich, even though teachers and supervisors and her own vice principal and her own security director were begging to reinstate the study hall, she wouldn't do it because the football team didn't want it. And there is no real dispute about that, frankly.

Security team Hancock told investigators that the locker rooms and hallways became a huge security concern. He said he shared these concerns with Principal Crouse, Doody, and the assistant principals repeatedly at the 2017 and 2018 operations meetings, but nothing was done. He said he would then send emails to both Principal Crouse and Athletic Doody about the events that were occurring, the lack of supervision and behavior of the JV team, and his emails to them would go unanswered and they would not take action. TJ Johnson complained about the lack of supervision of the team after Crouse abolished study hall.

Teacher Judith Baggett-Stone, a teacher at Damascus, said on three occasions she contacted Doody, Hancock, and Colbert to report the misconduct of the JV students, and she reported to them about the behavior of the students in the building, that they were out of control, that no one was here to supervise them, and finally, she had to get the security desk involved because there was no one else supervising them.

Nine days before the October 31st attack, on October 22nd, she sent an email to Principal Colbert [sic] reporting,

quote, The JV football team really needs to be supervised after school because they were being so disruptive. Nine days before the assault here. She --

THE COURT: From whom to whom?

MR. MALONEY: This is from the teacher to principal -- to Colbert, the JV -- the JV coach.

She texted the athletic director on October 29th, two days before the attack, saying, The JV football team needs supervision. It's after 3:15. They are running around, yelling, et cetera, et cetera, outside my classroom.

THE COURT: Now, that's Doody?

MR. MALONEY: That's to Doody. Correct.

She testified that repeatedly her complaints were -- and they weren't alone. This was well known throughout the school, and it was -- the irony of it, Judge, it was a simple fix. The previous principal had basically had a study hall with adult supervision for that hour, and they had to be there, and they didn't have problems.

It was obvious to the entire building, especially her assistant principal and director of security, who repeatedly, in writing and in person and at monthly meetings, begged her to reinstate the study hall, but she didn't want to upset the football coach because football was king. So that sets the table for what was going on there with the JV football team.

Then we get to the brooming incidents which occurred

prior to October the 31st, 2018. And I am going to talk about the number of brooming incidents and then identify specifically those that we can show actual notice of to -- to the leadership of Damascus High School and to the coaches.

First of all, one of the assailants, October -- one of the assailants in this case, C.T., was broomed in 2017.

THE COURT: One of the assailants in October of 2018?

MR. MALONEY: Was broomed in 2017. He was one of the assailants of the October 31st, 2018. He testified that he, himself, the assailant, was broomed the previous year, in 2017, and he said he felt humiliated, scared, and ashamed.

Another player --

THE COURT: Did he complain?

MR. MALONEY: Pardon me?

THE COURT: Was a complaint made to anyone?

MR. MALONEY: No, not in that case, and I am going to identify which complaints were made as a result of these.

THE COURT: All right.

MR. MALONEY: Another player, S.D., recalled seeing that player being broomed.

Another one of the --

THE COURT: That second person was not himself a victim --

MR. MALONEY: Correct.

THE COURT: -- or a perpetrator?

MR. MALONEY: Well, no. He was a witness, not a perpetrator.

THE COURT: A witness to the October 2018?

MR. MALONEY: Yes. Yes.

THE COURT: All right.

MR. MALONEY: Now, another October 31st assailant, Assailant W.S., was attacked in the locker room before practice when he was a freshman approximately the last day before the last game of the season, which is about the same time when this happened, towards the end of the season, and that is apparently the tradition at Damascus. This is part of a season-end ritual that occurred involving the football team. He was on the way to the JV locker room to get changed, he was grabbed by two players, he was thrown face down on the ground, and attacked with a broom. Ironically, we see this -- the abused student then becoming the abuser, a pattern, which, of course, is not unknown.

In another incident, a freshman named D was -- let me pull this, page 17, if you would pull it -- was broomed, and he was specifically broomed there at that time. Can I have page 17?

In early 2017 season, John Doe No. 1 was inside the locker room, and you have heard a lot about that today, which happened on October the -- which happened on August the 1st, 2017.

And then in around September of 2018, members of the football team would be waving around a broom in the locker room, poke players with a broom. One plaintiff, M.T., testified that two players who broomed No. 1 would sometimes come in and tell the other JV players -- they would scare us -- that they would give us the broom. Others said that threats about the broom were almost every day, particularly student J.C.A.

Now, in addition to all of those, we additionally had reports of other brooming that were given to the administration as well as other sexual assaults in locker rooms in Montgomery County.

On February the 8th, 2018, before this assault, at Gaithersburg High School, there was a digital assault by a wrestler against a fellow wrestler in that locker room. The digital assault was captured by the other players -- the wrestlers on video. The video went viral. It was part of an overall similarly unsafe situation at Gaithersburg where the building had gotten out of control. Large number of statistics in Gaithersburg about what happened.

Just like what happened here, the principal tried to cover this up and not report it immediately to the Montgomery Police, as she is required to do under her agreement with the State's Attorney's Office and the police department, but that clearly occurred in an unsupervised locker room.

Similarly, on September 18th, 2018, this is just -- this is just six weeks before this particular assault, we have a situation here where at Seneca Valley, they took a -- a number of players took one player in the locker room, the locker room had been chronically unsupervised, and he was digitally assaulted in the locker room at Seneca Valley. The Board of Education became aware of this within about three days.

In addition to all of this notice, they received numerous notices from others complaining to them about what happened -- about other broomings.

THE COURT: Let me have you move off that. I want to hear you on J.C.A. A few more minutes.

MR. MALONEY: I will get to J.C.A.

THE COURT: Let's get to him right away.

MR. MALONEY: And Your Honor, briefly, those other reports, the Board has even acknowledged that they had one of those reports and did really almost nothing about it, and in one case admitted that the individual who had the files and prepared them threw them in the dumpster when he left his -- his -- his employment in Montgomery County, and the only reason we have them is one administrator in the central office was there and took detailed notes about the report of the brooming, the sexual assault, what he reported, and, of course, that nothing ever happened. And that's detailed extensively --

THE COURT: Somebody at the Board had -- had a report

on a brooming that was, what, discarded?

MR. MALONEY: And we have detailed that, Your Honor, beginning at pages 19 through 21 where that was -- and they were required to report these on a Form 235 and 236, which they, of course, did not do. And she admitted, Casey Crouse, the report was made directly to her, and she basically had no meaningful follow up. She called the police and said, Well, we don't know who it is. It was such a vague report, almost deliberately calculated to keep the police away, and then there was no meaningful follow up. Nobody called the athletic department. It was dealt with in great detail.

THE COURT: Let's get to J.C.A.

MR. MALONEY: Now J.C.A. J.C.A., Your Honor, is an extraordinary situation. J.C.A. has one of the longest records of disciplinary problems in the Montgomery County School system. We took the head of the -- head of student discipline's deposition here. Prior to coming to Damascus that fall, J.C.A. had ten suspensions. He had 61 formal disciplinary referrals. He had 189 disciplinary log entries. And those are just what were written down.

They included such things as sexual assaults on females, asking one female to grab his penis publicly, touching another young lady on the rear end, another on the shoulder. Once he kept trying to have sex, saying he wanted to have sex with a girl repeatedly, was told to stop, and didn't, and when the

boyfriend objected, he hurt the boyfriend so hard that he had to be hospitalized.

Another occasion, he took a young man, lured him out to the back of the school by promising a sexual encounter, and instead robbed him of his cell phone. The Montgomery County Police had to get involved.

Assaulted teachers, assaulted and harassed teachers and students. Was kicked out of summer school.

He then goes to Clarksburg, and the situation at Clarksburg is so bad they put him in aggressive monitoring. They try in-school suspension. They try out-of-school suspension. They try one-on-one counseling. None of that works. He has repeated disciplinary violent issues, disruptive issues, insubordinate issues.

So, finally, he is required to have a full-time adult escort, staff escort at all times, 100 percent of the time when he is in the Clarksburg building. And even that, even that didn't stop his misconduct.

Finally, Clarksburg threw up their hands and said to his mother, You need to be an in an alt two disciplinary environment, an alternative disciplinary school. She didn't want to do that. So, instead, she withdrew him and took him over to Damascus where he is in high demand. Why? He is an outstanding football player. Good question: Would this have been tolerated with someone without his football prowess? We

don't know.

But what we do know is that in 2018, the day he came to register at Damascus, Mr. Melott, the school resource officer from Clarksburg, had just been transferred to Damascus, and he sees J.C.A. walking in with his mother, and he goes, Oh, my gosh, this is terrible. So he goes in to talk to Principal Crouse, said, You need to be aware that these are serious problems; you need to be aware of the great level of supervision that we placed on him; you need to be aware that he needs to have somebody with him all the time, 100 percent of the time. And she ignored it, refused to do it.

But then it got worse. Then, Deborah Yakubik, who had been a member of J.C.A.'s educational management team at Clarksburg, then moved over and became a staff pupil personnel worker at Damascus. She was shocked when she saw J.C.A. there. She went directly in to Principal Crouse and said, You need to know how bad this is. One of the worst she had ever seen. A danger to people in the building.

Not only does she go to Principal Crouse, she takes the alt two disciplinary file, which shows his complete disciplinary file, gives it to Principal Crouse, and said, You need to review this, and you must put him on 100 percent all day supervision or people will be at danger or at risk.

Your Honor, I have seen this file, as have other counsel. It's about this high (indicating) from the desk.

THE COURT: You are making a, what, three feet? That looks to me like what you are suggesting.

MR. MALONEY: I would say about two-and-a-half to three feet, Judge. It's a big -- and I know the Court thinks I might be exaggerating. I am not. It's about two-and-a-half- to three-feet big. So what does Principal Crouse do? She refuses to read the file; admits she never looked at the file; never cared. Instead, she made an affirmative decision to remove all of these safety guardrails that had been put in place by Clarksburg.

THE COURT: I am going to need to wind up with you, Mr. Maloney, on any other points.

MR. MALONEY: I will simply say, in the end, Your Honor, that in the -- in the two months after he arrived at Damascus, he had two physical altercations with students --

THE COURT: This is all before the events of October --

MR. MALONEY: This is all before the event. This is after he showed up at Damascus, after Principal Crouse -- she says she wants to give him a fresh start. Okay? She has removed all supervision; doesn't even have a behavior improvement plan; doesn't have anything to monitor him. Everything they had done at Clarksburg, she made an affirmative, deliberate decision to remove.

In those two months, he had two physical altercations

with students. He assaulted a parent educator in the hallway just two weeks before October 31st. He attempted to broom other teammates prior to this. He attempted to broom two freshman football players in the locker room in August of 2018.

On September 27th, 2018, he attempted a head butt of a student during a fight. The parent educator, Melissa Ramsey, had been hit in the head in the hallway requiring a visit to the school nurse. And then the following day after that, he hit in the head a student on the bus.

What did Principal Crouse and the administration do with all of these events before October 31st? Nothing.

THE COURT: Were they all reported?

MR. MALONEY: All reported. I am not sure about the locker room incident, but they all -- all the rest were definitely reported. He received no discipline of any kind. He received no supervision intervention of any kind. And, again, just like what we saw before with the JV team as a whole, he's a football player, and so Principal Crouse and the leadership of the school did nothing, and the football team allowed him to continue to play even though the coaches had authority to suspend him, remove him from the team, and remove him from the locker room.

It turns out on October 31st, 2018, not surprisingly, he was the leader. He contrived, he came up with the idea of doing it that day. He led the other assailants in doing it.

He was, by all accounts, the major factor in making the brooming and the violent assault that day.

THE COURT: I have a question. Injunctive relief, are you going to address that?

MR. MALONEY: I will.

THE COURT: The claim is that you don't have that standing.

MR. MALONEY: Well, Your Honor, the problem is this is a classic case of capable of repetition, yet evading review. We have a situation now where we filed suit promptly back after 2018. We are now five years, almost four-and-a-half years later. We had COVID in the meantime. The case wound its way through the system. If this is not allowed to proceed and they lack standing, this means that no high school student will ever be able to seek injunctive relief because by the time the case gets to an issue, they are going to be graduating. It will be a permanent impossibility for high school students to bring standing, and they have the right to say, on behalf of themselves and others, We want a safe environment.

And all parties -- and finally, I will close with this. I would like to read to you what Wallich wrote to his staff on October 11th, 2018, the coach. This is 20 days before the assault. As most of you know, J.C. is not doing well with his transfer. I get an email or phone call almost every day about his behavior in class and bullying. I have made it clear if

there are other incidents, he's going to be suspended indefinitely if he doesn't get in line. He goes on to say he can't control himself.

Well, of course, he wasn't suspended. They wanted to win the title, which they did; they wanted to break the state record, which they did; and in the process, he was let loose in the locker room, and we see what happened.

THE COURT: All right. Mr. Ruff. Am I right, Mr. Ruff, are you up? I'm sorry. Briefly, yeah, you are up.

MR. RUFF: I will try and be as brief as possible.

On behalf of the Doe Plaintiff 1, we would obviously adopt the portions of that argument that would apply to us. And I know the Board is probably going to argue in rebuttal that, you know, anything that happened after the assault of Doe Plaintiff 1 shouldn't be attributed to whether or not he has a viable Title IX claim, but I think that's also a genuine dispute of fact.

It will -- you know, all of this course of conduct between when Doe Plaintiff 1 was assaulted, sexually assaulted and October 31st when J.C.A. and the rest of the goon squad came through and assaulted the rest of the plaintiffs shows the deliberate indifference that this -- this system, this school showed towards Doe Plaintiff 1 after having -- after having proper notice of his sexual assault back in October 1st -- excuse me, August of 2017.

I will say that an appropriate person had actual knowledge of his assault. Principal Crouse did, and the Board conceded that, just now in their argument, that Faith Hayes, when she reported to Principal Crouse that a freshman player had been sodomized, that was Doe Plaintiff No. 1, that was in November of 2017, and their response to it was deliberately indifferent, and there was -- there was notice. There may be an argument in rebuttal that there was no actual notice prior to --

THE COURT: Well, let me ask you this: Is there something like -- having heard the recitation by Mr. Maloney that this was a tradition, and even one of the perpetrators in late October of 2018 had been a victim before Doe 1, that's what I heard I think.

MR. RUFF: That is the -- that is the inference. Right? I don't think we have any specific direct evidence that says in '16, '15, '14, but we have the testimony of these young men that says we heard about it before it ever happened to us.

THE COURT: That's what I was going to ask, you know, whether -- maybe you don't have anybody on the defense side saying yes, we were aware of this tradition, but is there something like a willful blindness argument that can be made here? That's sort of analogous to the criminal situation where something is going on and you are not paying attention when you should be.

MR. RUFF: Absolutely. At least, you can say, from when Doe Plaintiff 1 was assaulted until October 31st, there was a rash of brooming that occurred --

THE COURT: Well, not actually occurring to your client before; that is, the tradition presumably predates?

MR. RUFF: I think there is an inference that can be made that there was a willful blindness about what was happening and that this young man is what actually started the ball rolling to expose it, and October 31st was what turned it on its head and actually blew it up and made sure that the public knew what was happening at Damascus High School.

But beyond that, Your Honor, the *Doe v. Fairfax* case provides actual notice simply from the fact that this was reported to an appropriate person, Principal Crouse, shortly after it happened in August, and there was a deliberate -- deliberately indifferent response to it that made --

THE COURT: This is the one without the names, you mean, without the specifics, according to Ms. Crouse?

MR. RUFF: Right. Even without an actual incident happening before Doe Plaintiff 1 was assaulted, before he was sexually assaulted, the *Doe v. Fairfax* case stands for the premise that notice is satisfied when a school official is alerted to the possibility -- even the possibility of sexual harassment or receives a report that can objectively be construed as alleging sexual harassment.

Further, it stands for the premise that a school system can be liable for pre-actual notice incidents of severe sexual harassment if the response to the single notice is deliberately indifferent and makes plaintiff more vulnerable to future harassment, or combines systemic effect of denying equal access to a scholastic program or activity.

THE COURT: Stay for a moment with the pre-August 2017 report --

MR. RUFF: Okay.

THE COURT: -- where the, apparently, ambiguous -- no name is given, apparently, of either the victim or the perpetrator. Correct? Is that a situation? Is that a factual -- is that the one where you are saying that the principal did not do any follow up on that?

MR. RUFF: So, that happened after Doe Plaintiff 1 was sexually assaulted.

THE COURT: Oh, after Doe Plaintiff 1?

MR. RUFF: Correct. And so that's why we are quoting the *Doe v. Fairfax* case because we are saying even if you don't have this actual notice before August, right, and I think you are right, there is an inference that this was happening, right, I think we would be able to --

THE COURT: Well, who is saying that it was happening? The players?

MR. RUFF: The players.

THE COURT: The victim perpetrator said --

MR. RUFF: Victims, perpetrators, witnesses.

THE COURT: So the question is how could these things be happening without somebody on the school side knowing about it; is that --

MR. RUFF: I think it's because it was -- it was meant to be kept a secret. My client, Doe Plaintiff 1, was told by his attackers, You better not tell anybody or we are coming back at you. So this was an insular thing that was a cycle that was insidious.

And because of the deliberate indifference, because of the willful blindness, it wasn't exposed until it just became so large and became so out of control that it was impossible for it not to come out. And luckily, Doe Plaintiff 3 was strong enough and courageous enough to finally tell an adult and the whole thing turned on its head, and it's probably good for the classes that came after them, but for these young men, they deserve compensation for it.

So the defendants talk about the fact that, you know, there was no actual notice to an appropriate person, that this is a rumor. The cases do not support that. Even in a case like this, the system -- when the system denies knowledge of harassment, we can still prove that there was a denial of equal access to a scholastic program or activity; that even if a school official subjectively don't believe that sexual

harassment happened like in this case, because Principal Crouse never even asked for the victim's name when it was -- when this incident was reported to her, did not complete the proper forms for reporting when she found out about the sexual assault that occurred to Doe Plaintiff 1, did not contact CPS, which Ms. Simmons -- what was her role?

THE COURT: Well, I understand. Some of what you are arguing may have a direct influence on Does 2, 3, and 4. I am still trying to sort out exactly how Doe 1 comes into the picture.

MR. RUFF: How Doe 1 comes into the picture --

THE COURT: Well, Doe 1 -- I am trying to understand your argument specifically as to what defendants knew or should have known before what happened to Doe 1.

MR. RUFF: What I am saying is that the cases state very clearly that even if there was no previous actual notice by the defendants being advised shortly thereafter and by them deliberately -- having a deliberately indifferent response to their advisement which then created a situation where he was -- was losing equal access to scholastic programs and activities, that serves as actual notice based on the *Doe v. Fairfax* case. That's what that holding says in that case is that there does not have to be a incident. Right?

That's what I was saying earlier is that we don't have to wait, under Title IX, for someone to get raped and then have --

and then the school has actual notice of the rape for the next person to actually be able to hold them accountable.

What the *Doe v. Fairfax* case says is that if they get wind of even the possibility, right, the possibility of a sexual assault, and they do not respond appropriately, and it's so severe and their response is so deliberately indifferent, that it creates a -- an inequity as far as their scholastic activity is concerned, and there is a whole criteria for that, then that is notice. That serves as notice.

THE COURT: Very good. That's as much as I need. Let me go back quickly and get a response.

MR. RUFF: Thank you.

THE COURT: Thank you.

MS. KANE: With respect to Doe 1, no actual notice prior to the happening of his incident on August 1, 2017.

With respect to his argument on *Doe v. Fairfax*, different case, different facts. In that case, students are on a band trip; a girl and a guy on the bus; blanket over them; allegation of inappropriate sexual touching. It was reported while they were on the band trip for five days. It was reported they knew the victim, they knew the perpetrator. Actual notice.

With respect to Doe 1, no actual notice. There was no indication of the name of the victim. There was no indication of the name of the perpetrator. And -- and it has to be actual

notice to an appropriate person who has the authority to end the discrimination. Then that person must respond with deliberate indifference.

To the extent the C.V. report to Ms. Crouse is construed to be notice to an appropriate person, it wasn't -- she's an appropriate person, yes, but it wasn't actual notice because she did not have the identity of the victim.

THE COURT: Suppose she didn't have the identity, what should she have done? I mean, how do you not have the identity? Someone reports this and says, Oh, can you give me the name, or --

MS. KANE: Well, she --

THE COURT: -- do you make some further effort to find out who, in fact, it was?

MS. KANE: Well, Your Honor, that may be a question for a negligence theory, but with respect to Title IX, under *Baynard*, under *Jennings*, under *Doe v. Fairfax*, you need actual notice.

Mr. Maloney made a lot of arguments that had nothing to do with notice of sexual harassment.

THE COURT: Can you willfully blind yourself -- you are told there is an incident and you don't get the name, what -- should you have to do something more? Does Title IX say you don't have to do anything more until somebody gives you the actual specifics?

MS. KANE: Two points to that, Your Honor, the first being willful blindness, I think, comes up in the 1983 cases, not Title IX; and the second being --

THE COURT: I don't know why that would be. I mean, maybe it's never been argued there before. But the idea is you are told -- there is actual notice of an event, without specifics, and I am hearing you say, notwithstanding that, it's not actual notice. Did she do anything?

MS. KANE: She did.

THE COURT: You got to tell me who these people are so I can get it --

MS. KANE: Well, she referred it -- because there was an allegation that it was sexual, she referred it to the school resource officer, who was a police officer, to talk to the son because what she's hearing is a rumor. She's hearing from a parent of another student who heard of another student, and that she had investigated by the school resource officer who found out the person, talked to that person. That person denied anything happened, and Officer Riddle reported back to Crouse that person denied anything happened.

Now, Mr. Maloney has also referenced somebody threw the notes away. It was that officer who retired, and when he retired -- he's a County employee, not a Board of Ed employee -- when he retired, all of his notes were put in the dumpster, including any notes he had about Doe 1. But Doe 1

has admitted, in his response to request for admissions of fact that are part of the record, he never told any MCPS employee, he never told that he was victimized or who his perpetrators were. No actual notice of Doe 1.

With respect to Does 2, 3, and 4, Mr. Maloney gave a lot of argument about a lot of things, but he did not address the standard, actual notice to an appropriate person who then responded to that notice with deliberate indifference. The Court asked him about prior events. He mentioned some prior people. There was no mention in his argument, because there is no mention in the record, that any prior alleged incident of brooming -- and when I say "prior," it's after Doe 1 on August 1, '17 and before Does 2, 3, and 4 -- no evidence that anything ever was brought to the attention of the principal, the coaches, the administrators.

THE COURT: I am not sure -- Mr. Maloney, I need you to engage with us.

Maybe I misunderstood his argument. I thought there was some reporting --

MS. KANE: There was.

THE COURT: -- after -- well, let me just understand what their position is. You are characterizing his position. I am not sure that's what I heard him say before you go any further.

MS. KANE: The report that I think that the Court was

confused about was in November of 2017, a report was made to Casey Crouse, Ms. Hayes' report. That was the one without the identity of the victim or the perpetrator.

THE COURT: Let me just hear his statement -- you made a statement there is no actual notice between either August 2017 or anything until October 31st, 2018. I didn't understand him to be arguing that or saying that. Is that a correct statement?

MR. MALONEY: It is not a correct statement, Judge, what the Board just said. And I will read directly into the record, because this is extremely important, On November 16th, 2017, the mother, F.H., met with the principal directly --

THE COURT: The mother of?

MR. MALONEY: The mother of a freshman, of a football player who had been injured by an illegal hit. And she said, I also want to complain because, quote, a freshman was forcibly taken down, pinned down, and sodomized with a broom handle. The Board says, At that point, it should have triggered a Form 230, but it didn't.

At some point, she got a school --

THE COURT: What are you reading from? I'm sorry.

MR. MALONEY: I am reading from our filing and also Exhibit 43 and the deposition of Mr. Scriven, who worked in the central office, at page 25, and the mother, herself's, affidavit, paragraph 4, Exhibit 42. That's what she told the

principal. So the principal --

THE COURT: She told the principal directly?

MR. MALONEY: Told her directly. She sat in the principal's office, and there was others there, and she signed an affidavit saying she did, and she said in her affidavit, The freshman was, quote, forcibly taken down, pinned down, and sodomized with a broom handle. And I don't think this is disputed by the Board, that she told the principal that.

Then she calls the police, and says, Well, I don't know the name, sort of trying to put the police off, like it's not really something to investigate.

Then she has -- she asks Riddle --

THE COURT: "She" being?

MR. MALONEY: The principal, Casey Crouse. Then she asked Riddle, the school resource officer, to pull out and begin interviewing people, including the alleged victim of the 2017 hazing, John Doe No. 1.

John Doe No. 1 testifies that when he got out -- when he was brought out -- he was pulled out of the classroom by the school resource officer. He then said that he gave a statement and he provided the school resource officer, who was acting at the direction of Ms. Crouse, with, quote, the name of the student who was allegedly sodomized, and that the student --

THE COURT: Is this before October 2000 --

MR. MALONEY: Oh, this is back in 2017. This is

November 2017.

And he also provided the name of the -- and that the student who was allegedly sodomized then, in turn, provided a written statement about what happened in the sodomy. All of those things happened. Okay? And we have an affidavit -- and not only that --

THE COURT: You don't need to go further. I just wanted to check --

MR. MALONEY: If I can just tell the Court two other things about that?

THE COURT: Go ahead.

MR. MALONEY: Mr. Scriven, the central office employee, documented all of this in his notes, and that's how we know that, in addition to the affidavits of the mom and John Doe No. 1. Scriven laid it out, but the Board has no record of this. Why? Because the principal kept no records. She didn't file the Form 235, which she is required by statute to do, and Mr. Riddle, when he left in the spring of 2018, took his whole file in his cabinet and put it in the dumpster.

THE COURT: Who was Riddle?

MR. MALONEY: He's the school resource officer acting at the direction of Ms. Crouse. But Ms. Crouse was told face-to-face about this, and she, even though she directed the school resource officer to go in and they took statements from both John Doe No. 1 and the other victim who had been sodomized

about what happened, and in response to that, they did nothing.

THE COURT: Stop. Stop. You have had your argument.

I just want to check you on that, Ms. Kane. When you keep saying no actual notice, it isn't what I understood the plaintiffs' position to be. Now, you still maintain no actual notice in the face -- look, I am not saying you have to concede the fact. The issue now is, is this triable? Is there a genuine issue of material fact here? Not do you agree, but if they put on that testimony, why doesn't it create a triable issue?

MS. KANE: Your Honor, a couple of points on that. Number one, with respect to Mr. Maloney saying that the Board had no notes, he's reading from Scriven's notes. Those same notes he referenced says that the school resource officer told him and Crouse that the kid denied anything had happened.

Now, with respect to actual notice, Your Honor, we are not looking for any disputes of fact, but we are looking for an accurate record without embellishment and liberties. Right? So with respect to that record, which is an exhibit the Court can look at, and the case law, the case law requires actual notice. Actual notice means not just that you are told about an incident that might involve sexual harassment, but that you are told the identity of the plaintiff.

THE COURT: I understand that. But you are saying that doesn't create a triable issue when you are told there is

an incident, and, arguably, you don't follow up on it, that's not enough? Arguably, that's not enough?

MS. KANE: No. That's enough for negligence. That's enough for negligence. He made a great argument on negligence.

But the law on Title IX, to impute liability to the institution for sexual harassment is actual notice, which requires, under a litany of cases, including *Jennings*, *Doe v. Fairfax*, *Baynard*, you must have actual notice. Most of the time, it's plaintiff specific, but they will allow if it's the same perpetrator.

What's important here is there is no actual notice that involves -- that -- to the Board as to the victim or alleged victim or as to the perpetrator.

THE COURT: Well, now, you have cases, then, that stand for the proposition that when an appropriate person is told that there has been an event and the specifics are not handed to that person, they don't have to do anything further because they don't have actual notice? Is that your read on Title IX?

MS. KANE: Your Honor, that's what those cases --

THE COURT: I am asking you if you think that's what the cases stand for. That's not what I heard Mr. Maloney say the evidence is, but that's your view of what it is. He said there were face-to-face meetings, there were statements made. Now, there is no record of it, he says, because some of the

records were dumped.

MS. KANE: The only records that were dumped, Your Honor, was the school resource officer who retired. He is a County employee. With respect to the other records, Mr. Maloney was reading from the Board's records which related what happened in that meeting. It was called because Ms. Hayes' son had other issues and concerns, and in the course of that communication and meeting, this incident -- her hearsay report about the assault of an unidentified student came up.

THE COURT: Well, I don't have to give you my full opinion now, but I don't think I agree with you that there is no evidence of actual notice and that it's enough to know about a good possibility, and I have heard that there is arguably more evidence than that that there has been an assault, and, arguably, nothing happens in consequence before the events of late October 2018.

MS. KANE: Well, that is the sum and substance of what notice the Board had to an appropriate person prior to -- between Doe 1's incident and 10/31 incident.

THE COURT: Well, it may be enough, arguably.

MS. KANE: That's what there is, Your Honor.

THE COURT: That's their theory.

MS. KANE: And we would submit to the Court that it's not sufficient under the case law.

I want to address some other things very quickly -- I

know Mr. Maloney -- I want my time back --

THE COURT: You went a little over on your first argument so I gave you another ten minutes beyond what was allowed, so we are kind of working within the limits.

MS. KANE: A couple of quick things. Let me just get to the notes here.

And the other thing, Your Honor, is in response to the notice for Title IX, whatever notice you have, then you have to respond without deliberate indifference. And that somewhat comes back to the Court's question, I think, of what do you have to do? You respond, when it's an actual notice, without deliberate indifference.

With respect to the incidents of other people, what's important for Title IX -- Mr. Maloney gave a lot of arguments about the football players being out of control and running around in the hallways. That goes to negligence. Nothing to do with Title IX. Title IX is basis of gender, sexual harassment. It has to do with actual notice of sexual harassment. And the other incidents are irrelevant for purposes of the Title IX count.

With respect to the argument on *Cummings* and damages, he cited one case, *Purdue*. That's the same case that the Court changed their mind and the jury instruction says you don't get emotional damages. That was --

THE COURT: But is it a fair statement that the read

on *Cummings* is not -- whether it applies to the Title IX cases is not clear, there is no --

MS. KANE: Oh, it's clear. It's clear.

THE COURT: You are saying the Fourth Circuit has clearly said that *Cummings* applies to Title IX and that there may not be any emotional damages in a Title IX claim?

MS. KANE: It's clear from the cases that have come after *Cummings* --

THE COURT: Fourth Circuit. Fourth Circuit.

MS. KANE: District court cases. And -- and the circuits -- put it this way: *Doe v. Fairfax*, relied on by plaintiffs, Mr. Ruff even mentioned it -- it's in both of our binders because it's a recent case -- when they were ruling on the motion in limine, I think they cited -- they have excluded evidence of emotional distress damages, and I forget how many cases they cited, but it was a litany of them, and they are all finding that *Cummings* means you cannot obtain emotional distress damages in Title IX.

THE COURT: Again, though, you heard -- you heard Mr. Maloney talk about the issue that I raised, which is there is going to be one line for emotional damages, which, if they find negligence and they -- even if they find Title IX, same number. Right?

MS. KANE: You know, it depends on where they find liability. Yes, it's one number --

THE COURT: Well, sure.

MS. KANE: -- but the reason it's important to have --

THE COURT: Well, Title IX is only against the Board of Education, isn't it? We are not talking about the other defendants.

MS. KANE: That's correct, but the Board of Ed is also in on negligence.

THE COURT: Yeah. So if they find against the Board for negligence and they find against the Board on Title IX, they still have only one line for emotional damages. Right?

MS. KANE: There is one line for damages. But let's say that they find against the Board on negligence and in favor of the Board on Title IX, then it's very important whether or not they get emotional distress.

THE COURT: Well, couldn't I take that up at the end of the case, which happens all the time? With regard to the -- the litigation caps by the State of Maryland, a jury comes back where it comes back, and virtually, by consent, you say, That exceeds the statutory cap, and it goes out over and above the statutory cap, I mean, that's something that can get sorted out afterwards.

MS. KANE: And the other cases, Your Honor, that have addressed it, it's being thrown out, emotional distress damages, in motions to dismiss, motions for summary judgment, and being excluded from evidence.

THE COURT: I think, though, in a number of the cases that you cited, that's the only damage that was sought. I make a distinction -- I heard the argument made as well -- there is a distinction between the invasion, or what I call the impact or whatever of bodily integrity, and then the emotional consequence of that.

MS. KANE: And that's compensatory damages. I am not saying they couldn't make a claim of compensatory damage if they have one.

THE COURT: Under Title IX?

MS. KANE: Under Title IX. But they cannot get emotional distress damages.

THE COURT: You don't know what a jury is going to do. You know, they come back all different ways, and you say you can't give them -- you may confuse them at this point if you say you can't give them emotional damages. The impact is enough, believe me, it's bad enough, and whatever number we want to give, we will give. That kind of thing happens.

MS. KANE: It has to be, like, a physical injury. There has to be something -- or a loss of an educational opportunity.

THE COURT: It's like being struck by an automobile. You get hit, you are damaged physically. I mean, you know, you are physically invaded. Whether you are bleeding or your bones are broken, that's one way of looking about being invaded

bodily. Another is, you know, the humiliation, whatever it is, the pain, the indignity. That's all part of what happened. That's as bad as what comes after, I suppose.

Well, look, I think we have got enough. Finish with one point. We need to take about a seven- or eight-minute break, then we will come back and do the rest of the cases.

MS. KANE: The Court's indulgence just one moment.

MR. RUFF: Your Honor, could I just make one point?

THE COURT: What are you talking about now?

MR. RUFF: I want to make it very clear about the notice issue as to John Doe 1.

THE COURT: Go ahead.

MR. RUFF: It's in our brief, in our --

MS. KANE: Your Honor, I have been interrupted.

THE COURT: Ms. Kane, I will give you a chance to answer. Look, I am trying to understand where people are, and there has been some issue on notice and notice as to Doe 1. Go ahead.

MR. RUFF: Right. So the *Doe v. Fairfax* case, and I'm sorry if I wasn't very clear --

THE COURT: I can read the case if that's what you are concerned about.

MR. RUFF: It's just this one quote is that a school system may be liable for pre-notice incidents of severe sexual harassment.

THE COURT: Right.

MR. RUFF: That's what I am trying to get across to the Court is that there --

MR. MALONEY: Pre-notice.

MR. RUFF: Yeah, pre-notice. There does not need to be a precedence for there to be actual --

THE COURT: An actual notice, some --

MS. KANE: But there is a follow up to that, Your Honor.

THE COURT: Okay.

MS. KANE: And the follow up is that they have to have -- when the incident occurs and they get the actual notice, they have to respond with deliberate indifference.

MR. RUFF: Correct.

MS. KANE: So it's a -- there is more to it.

THE COURT: But, again, this certainly is a case which merits special interrogatories. I mean, you have got to go through a lot of analysis on this. So there may be specific interrogatories, without committing myself to any one at the time, but it's about notice. With regard to Doe 1, what -- do you find that one or more of the defendants had notice prior to -- whatever the words are. We will look at those instructions when we get there. And the jury answers yes, no, yes, no, whatever they answer. If they answer no, no, no, and that's what's required, then there is no notice that has been given,

and that may be the end of the -- the end of the story for Doe 1.

But right now, you know, I am hearing evidence that there may be something that should be tried on this. I mean, you are certainly free to argue there is no notice.

MS. KANE: Yes, Your Honor. And -- and to the extent it's construed as notice, there is no deliberate indifference because something was done.

Which brings me to Mr. Maloney bringing up an incident that happened at Gaithersburg in February of 2018 and one in Seneca Valley, both of which were -- they are different victims, different perpetrators, different principals, but they were each reported promptly, police were involved, students were disciplined, so there is no deliberate indifference with respect to those incidents.

THE COURT: You are getting into a lot of different ways of which evidence would be presented in court, and right now, it's hard for me to make a ruling now until I see how it comes in. For example, there may have been a lot of publicity about what happened at the other high schools.

One of the questions I asked earlier was: How did this whole policy come into place? Why? Something must have happened that provoked a decent response by Montgomery County. It doesn't mean, because you make a decent response one time, that it doesn't apply thereafter. But it may be that these are

the kinds of things that got discussed at board meetings. I don't know. I don't have the whole record in front of me. But those are the kinds of things that may well have put these people on the alert one way or another. Until I see how it's packaged, it's hard for me to say it doesn't come in, it's out as a matter of law. I can't tell you that right now.

We do have to break, though, in a few minutes. If you gather your thoughts, I will give you a minute-and-a-half when we come back to finish this argument.

MS. KANE: Thank you, Your Honor.

THE COURT: Let's take about seven or eight minutes, and then we will come back.

MS. KANE: Thank you.

(Recess taken from 3:43 p.m. until 3:57 p.m.)

THE COURT: Be seated, please.

Are we ready to go with -- well, I wanted to give you a minute-and-a-half, Ms. Kane, to finish your thoughts on the earlier argument.

MS. KANE: I will go as fast as I can, Your Honor.

Very quickly, one thing the Court had asked earlier I just wanted to respond to, why did the Board of Ed have a policy on sexual harassment, intimidation, and bullying? Required by law. That's one thing that was a policy and for best practices.

Getting back to the Title IX argument, with respect to

J.C.A., I wanted to respond that there was no deliberate
indifference when he came.  Everybody gets a free and
appropriate public education.  When he came, there had been
problems in his past.  There were interventions that were put
into place -- these are in the record -- including he was
assigned to -- Ms. Tallapragada worked with him.  He was
enrolled in the alternative one class called Connections, which
is students with certain skills that provides a small group
setting.  He had weekly check-ins regarding his progress with
the school counselor.  Behavioral interventions were
implemented, like twice weekly grades to his parent, adjusted
schedule, and football coach and SRO mentoring and monitoring.
And Miss Crouse and other employees also addressed incidents
involving J.C.A. --  or Ms. Tallapragada, I think it was,
involving J.C.A. in the fall of 2008 [sic].  He had only been
--

            THE COURT:  2000 and?

            MS. KANE:  '18.  He came to Damascus in September of
2018, so he was only there two months prior to the occurrence,
and there had been no sexual harassment of him while he was at
Damascus.

            THE COURT:  But, again, the allegations are there
were reports of misbehavior, bullying, including, but not
limited to, sexual assaultive behavior in a report that was
received and arguably either not read or not acted upon.

That's what I hear from plaintiffs' side.

So I do hear you say there were special programs put in place for him. This is a question of security, I guess, as much as anything, of protecting other students against possible assaults, and not whether he was given alternative education opportunities.

I mean, I assume that kind of evidence may or may not come in at trial because it's not going to be enough for the jury to decide, well, they were trying hard to give him a free, appropriate public education, but meanwhile, he was battering his fellow students. I mean, we will see. I mean, I really -- some of this depends on how it gets packaged at trial.

MS. KANE: With respect to the -- the sexual harassment that was mentioned in middle school of the female, that was in middle school. He was at Damascus High School. So he had had no incident, no ongoing, current harassment at the time of this occurrence. Yes, he had a lot of problems, but, again, for Title IX standards, we are looking just at sexual harassment at that time.

With respect to the last item, Judge, and I know you want to move on, and that is with respect to actual notice to an appropriate person, Mr. Ruff, himself, said the student said this was a secret. That helps support why nobody knew.

THE COURT: Well, it's an interesting proposition, I suppose. That's as much as I need to say at this point.

Again, it depends, in part, about how it gets packaged.

Hard for me to comprehend the whole record until the evidence is in front of me and then say there is no basis on which a trier of fact could reasonably infer that there was an appropriate notice, appropriate -- and my view of actual notice may be such that it's more comprehensive than your view now, but we shall see. We shall see. All right. Thank you.

Let's go on to the next point. We are into 1983, I think, with Defendant Sullivan as the director of athletics, of system-wide athletics. Go ahead.

MS. KANE: Thank you, Your Honor.

With respect to the 1983 argument as to Sullivan, there is one theory against him in Does 2 through 4, and that is supervisory liability.

Under 1983, as the Court knows, that it's a claim -- imposes liability on state actors who cause the deprivation of any rights, privileges, or immunities secured by the Constitution, and the general rule is that state actors are not responsible for student-on-student harassment under *Doe v. Rosa*.

The supervisory liability requires that there be a -- a supervisor and a subordinate. So the supervisor has to supervise the subordinate, who then has to commit some wide and pervasive unconstitutional conduct about which the supervisor learns, and then the supervisor must respond with deliberate

indifference.

We don't have evidence here of that to support any claim against Mr. Sullivan. First of all, he wasn't a supervisor. He did not supervise the principal, the athletic coaches, and --

THE COURT: What do you mean "he wasn't a supervisor"? I mean, what do you say, he wasn't above them responsible for what went on below him, or he wasn't hands on looking at them each day? What do you mean?

MS. KANE: I mean he was not in their chain of command.

THE COURT: Well, by reason of what? By reason of some structural system that the County set up?

MS. KANE: By reason of the way that the hierarchy works. I mean, the JV coach and the coach are supervised by the athletic director and they also are supervised by the principal, and the principal reports to -- in this case, Crouse reported to Brian Scriven, who reported to the associate superintendent, versus Mr. Sullivan is over here. He's not in the chain of command.

THE COURT: Is the issue of supervisory liability limited to what the defendants say is the hierarchal structure, or is it sort of de facto common sense who should have been doing what, when, and where? You seem to be arguing that because there is a structure in the Board of Education, I

guess, that says someone here is responsible; below them, not responsible; below them, maybe responsible. I mean, that's what I am hearing you say. And you say, Well, is that the end of the inquiry?

MS. KANE: You have to have a -- in *Shaw v. Stroud*, supervisory liability requires that a -- you have a state actor supervisor and a state actor subordinate. Here, the tort feasors are third-party student assailants. They are not state actors. They are not in his chain of command. And so we have a problem with the supervisory liability claim in that --

THE COURT: Supervisor liability. Okay. Go ahead.

MS. KANE: Sir?

THE COURT: Go ahead.

MS. KANE: Yeah. I mean, the plaintiffs have not demonstrated either that he had a -- any subordinate employees or that the -- the students in any way had to report to him.

THE COURT: That the students have to report to him?

MS. KANE: Right. Because for supervisory liability, you have to -- in this case, the -- there has never been a case that recognizes 1983 liability for student-on-student harassment because --

THE COURT: What about physical assaults? I remember I made that point earlier. You are getting so refined that you can say it's so specific, this kind of assault, that there was no notice and that, but what about -- suppose you had my

example, she had gangs beating on people in the hallway, you just say, Well, that's nothing that we need to be concerned about because, what, bodily integrity, you have a constitutional right here, and if you are indifferent to that, why wouldn't there be liability?

MS. KANE: The standards are that the -- there must be knowledge of -- that a subordinate -- conduct engaged in by a subordinate which conduct poses a pervasive and unreasonable risk --

THE COURT: But the subordinate is the -- are the people in the defensive hierarchy, not the students. Right? Did I understand --

MS. KANE: Yes. But here, the people in the hierarchy were not the tort feasors. The students were. So where is the conduct coming from? The criminal conduct is coming from the students. When you are looking at supervisory liability, then he has to supervise somebody who creates -- who commits a wrong. So what is the wrong of his alleged subordinate? Number one, he didn't have subordinates, and number two, the tort feasor here were the students.

THE COURT: That's where you are losing me. Why are the students in the equation? These are supervisors -- these are people below Sullivan who were not on guard, so to speak, against possible physical assaults by students. The students aren't the people that they are -- well, they are supervising

them in a sense, but supervisory liability has to do with who is supposed to be overseeing the students, not the students themselves.

MS. KANE: Well --

THE COURT: You are confusing supervising the students with supervisory liability.

MS. KANE: But there has to be evidence that somebody he supervises is engaged in conduct --

THE COURT: Right.

MS. KANE: -- that poses a severe and --

THE COURT: Well, that's what I understand the law to be, and that's the way we will understand supervisory liability.

MS. KANE: Yes. So that's the standard. Applying it to our facts, he didn't supervise anybody, so he gets summary judgment on supervisory liability.

THE COURT: He didn't supervise the students is what you are saying?

MS. KANE: He did not supervise the students.

THE COURT: Okay.

MS. KANE: He did not supervise Wallich. He did not supervise Colbert.

THE COURT: Well, that's what your argument is. The argument contrary is that he did or should have done it.

MS. KANE: There is not evidence in the record that

he did or should have done.

THE COURT: I will hear argument on it, but I -- that's why I asked you is it all based on what the structure is that the Board of Education gives to each of these respective positions in the hierarchy, or is it based on de facto what they -- well, common sense or otherwise what they should be doing?

MS. KANE: Their theory against Sullivan is that supervisor is loosely defined, and they claim he is responsible for implementation of policies and procedures which govern MCPS athletics, including locker room supervision.

THE COURT: Right.

MS. KANE: In essence, they are trying to make a *Monell's* claim against him, and this is in his individual capacity. He is a State employee. The State has been dismissed on the 1983 claim. When I stay "the State," I mean the Board of Ed because it's not a person for purposes of 1983.

So their theory against him -- they are not saying he has subordinates. They are claiming some -- they cite to a case, *Camilo-Robles*, and they claim that it means a supervisor can be a person responsible for the implementations of policies and procedures which are relevant to the civil rights violations.

The case was not based on that holding. In that case, it involved a schizophrenic police officer with a history of violent behavior, including assaults and 18 disciplinary

concerns. The police officer was suspended and expelled. He moved for reinstatement, had a psych eval, was reinstated, and given his weapon.

Subsequent incident, he was wrongly assaulted -- oh, subsequently, he wrongly arrested and detained a plaintiff who filed suit against the psychiatrist who declared him fit for duty and various supervisors of the police officer. This is the case they rely on for this loose supervisor. They are people in the chain of command. They were above this police officer. It was a unit director of the police department, the commander, and the superintendent above him.

Compared to the facts in our case with Mr. Sullivan, he didn't supervise Wallich, Colbert, Crouse, or Doody. They were not under him. He was the system-wide director of athletics who would circulate policies. The other people would take those policies, the policies from the Board. The Board's policies, he'd disseminate, they would pass them down, and then it would be up to Doody and Crouse to supervise Colbert and Wallich.

THE COURT: No. I understand that's your theory. I understand that.

MS. KANE: There is no -- there is no -- invite them, Your Honor, to tell you where in the record it says something else because -- here we go. There is -- there is nothing there that puts him to be a supervisor.

THE COURT: And you are saying he's not a supervisor because that's the way the Board of Education structures his responsibility. Right? That's what you are --

MS. KANE: Yeah. That's true.

THE COURT: Okay.

MS. KANE: I mean, that's how it is. And he gets qualified immunity. Even -- I mean, first, there is no constitutional violation. Then, to the extent the Court finds somehow that he was a supervisor and he somehow violated the plaintiffs' rights because students underneath Colbert or Wallich criminally assaulted the plaintiffs, he's entitled to qualified immunity because it was not clearly established at the time of this incident that he could be constitutionally liable for non-subordinate conduct of -- of students, of third parties.

THE COURT: Including physical assaults? He could not be liable for physical assaults? Leave aside specific brooming incidents, even though I am sure the plaintiff may argue there was that, but there is no constitutional right to bodily integrity? Maybe -- depending on what issue you are talking about, maybe there isn't, but --

MS. KANE: He did not -- he did not -- excuse me, Your Honor. I didn't mean to interrupt you.

THE COURT: That's all right. Go ahead.

MS. KANE: He did not violate the bodily integrity of

the plaintiffs, nor did his alleged subordinate violate --

THE COURT: But it's a supervisory liability claim. In a supervisory liability claim, does he have to have been the one who directly did it, or is there -- is he in the chain of command where someone down the line did not act properly and he is responsible for them?

MS. KANE: There must be that employee/subordinate -- the supervisor/subordinate relationship. It's nonexistent here.

THE COURT: Okay.

MS. KANE: The Court's indulgence.

So that would be the first ground. It's never been recognized. It's, therefore, not clearly established that someone in his position --

THE COURT: I am allowing that this argument that you are making about qualified immunity is going to apply across the board to the next counts as well?

MS. KANE: Yes.

THE COURT: I don't know that you are going to need to repeat it. You are going a little over your time here, but I don't need to hear the same argument again on qualified immunity. We can engage on that now, and we will go back and forth and see where we are.

MS. KANE: Yeah. Well, it certainly applies to him a little differently because he was not a subordinate. He had no

subordinates. Crouse had subordinates. So that one argument applies just to him and not to Crouse. But as far as the analysis --

THE COURT: The others are concerned...

MS. KANE: -- and that there was, number one, no constitutional violation, two, if there was, it was not clearly established, and, therefore, there was no Fourth Circuit, Supreme Court, or Maryland Supreme Court case that said he could be liable for the violation of a student's right to bodily integrity when the violation occurred from a non-subordinate, third-party student.

THE COURT: All right. Understood. All right. Mr. Maloney.

MR. MALONEY: Your Honor, I am a little surprised by the Board's argument because Mr. Sullivan, in his deposition, testified to exactly the opposite as to his duties. In his deposition, at page 168 and 69, he testified that he had direct oversight over Montgomery County Public School athletic programs, including whether supervision -- supervision policies are being met and complied with. He said that the defendants were bound to follow his directives regarding supervising and training, supervising policies, and requirements to coach.

He said he has 12 other specific responsibilities that he has the ability to enforce, and I will just talk about a couple of them in a minute. He said he had the ability and the

authority to impose discipline. He gave as an example, in 2019, he found that Coach Wallich had conducted an illegal practice, so he decided as discipline that year that Coach Wallich would forfeit one game that year.

But it was more than just forfeiting games. He also, of one of his 12 responsibilities, had the ability to certify coaches or to decertify them, and if they -- and if they were not certified, then they could not coach, and he had the right to revoke or modify their certification and oversee them.

He also testified that there were basically sort of two dotted lines, sort of dual lines of authority were sort of the administrative principal and the administrative supervision of the building, but he had the direct supervision of the athletic program and everything that was involved in athletics, and in a sense, Coach Wallich, Mr. Doody, and Coach Colbert all reported to him.

He also was responsible for setting in and imposing the training requirement here. And, significantly, one of his 12 responsibilities was to establish safety protocols for student safety and to ensure the direct safety of all student participants, and also to integrate and ensure the compliance of all Montgomery County state, local, and national laws and training, and to make sure that there is compliance with procedures with respect to student safety.

Now, this is significant in terms of what our factual

allegations are, is that there were a number of breaches. First of all, he was aware, and admitted it, that he was well aware of the November 2017 report on the 17th, that on that day, Mrs. H went in and told the principal that there had been the anal attack of a freshman in the locker room. He knew that the Safe Schools Act, which is a legal requirement, required the filling out of a Form 2-35, and once that form is filled out and once that form is then sent, it triggers an investigation. It's actually Form 230-36.

That's an extremely significant form. It's required to be submitted both by regulation of Montgomery County and by the state statute. Everybody acknowledges it's there. It was never filed by Ms. Colbert [sic] ever even though she was legally required to do it, and Mr. Sullivan was required to ensure --

THE COURT: You said -- by Ms. Crouse, you mean?

MR. MALONEY: By Ms. Crouse. Thank you for that.

And Mr. Sullivan was aware that it wasn't filed because it's supposed to go up to him and others through the chain of command so that there can be accountability and an adequate investigation. But they violated the Safe Streets Act; they violated their own regulation; they violated the requirement to submit that form even though they had direct statements that this occurred and even though two of our -- two witnesses have now said that they gave statements to the resource officer

about the anal attack that occurred, and, of course, none of those records are there.

There is no Form 230-36, which state law requires. There is no file at all other than the surviving memo of the central office worker who confirms what our witnesses have said in affidavits as well. So, he clearly is a supervisor, and it would be hard to say he was not.

In addition to his breach there, he was well aware, as the supervisor, of what happened on February 8th, 2018 at Gaithersburg and on September 7th, 2018 at Seneca. All of these situations involved unsupervised locker rooms. Montgomery County had an absolute policy that there can be no unsupervised locker rooms at all. But it was clear in Seneca, it was 20 minutes. In -- at Damascus, it was never. Never. Never. And at Gaithersburg, there was a lengthy non-supervision period. It was his obligation as a supervisor to ensure people took action.

And finally, with respect to his supervisory liability, he had responsibility to ensure that his subordinate coaches, Wallich and Colbert, became -- should undergo training. They did not. There was a package training program that all coaches were required to take. In that package training, they talked about hazing. They talked about the risk of brooming attacks in other jurisdictions, citing New Mexico. They talked about the need for locker room supervision. It was an annual

requirement that they each take training. Neither Wallich nor Colbert had the training that year in 2018. And Mr. Sullivan acknowledged that on his computer, he could track whether they did or didn't, and he knew that they didn't, or had constructive knowledge, and did absolutely nothing about it.

THE COURT: Was this where the consequence being they could not coach if they had not completed?

MR. MALONEY: Correct. That turned out to be a paper tiger because -- and he kept right on his computer who had it and who didn't, and even though they didn't, both of them were allowed to go out and coach.

Ironically, the Montgomery County Board, in the investigation of this, reprimanded Wallich and removed Colbert, saying that they failed to develop and have an adequate supervisory program for the student athletes, especially in the locker room, and they detailed for some reasons why their failures were there and why they should be disciplined here. All of those subjects for which they were disciplined were matters to which they were subject to mandatory training and which they were not enforced. And those were also breaches of supervisory liability of Mr. Sullivan.

And finally, to close on the issue of qualified immunity, it is obviously an extraordinary assertion when a Board of Education comes into a federal court and says that the invasion of bodily integrity is not -- or was not in 2018 a known

constitutional right. That is legally incorrect and morally indefensible. Everyone knows that you cannot allow your student athletes or anybody to be raped, and that's what occurred here. And to suggest that this was not a known right in 2018, as they did in their papers, is quite extraordinary.

THE COURT: Are we through on that?

MS. KANE: I have rebuttal.

THE COURT: There is a rebuttal to that?

MS. KANE: Yes, Your Honor. Very briefly.

A couple of quick points to Mr. Maloney, and, that is, you know, he -- he takes liberties with the record, with things that are not there. The -- Sullivan was not responsible for compliance with the training. No evidence that --

THE COURT: Well, that's an easy enough thing to prove. Did he say on deposition that he was? If he said that, I mean, I am not sure why you are making a contrary representation?

MS. KANE: Well, I think that what Mr. -- I think Mr. Maloney was reading from his brief, not from the exhibits, and that -- the record says, Prior to July 2018, principals or their designees were tasked with ensuring that required training was completed by MCPS staff, and athletic directors were responsible for ensuring that coaches took the required additional training. That was Sullivan's testimony.

THE COURT: Okay.

MS. KANE: Now, he's not the athletic director. He's not the principal. He's not the coach.

THE COURT: Did he establish the policy, that he's the one who --

MS. KANE: He disseminated the policy.

THE COURT: No, disseminated. Where did the policy come from?

MS. KANE: The Board.

THE COURT: And he -- it had to do with supervision of potential hazing type activity. Correct?

MS. KANE: Yes. There were -- yes. There were -- there were plans on that, and then there was the State policy -- the State Department Board policy against sexual harassment, bullying, and intimidation that we have referenced.

And with respect to Mr. Maloney's claim that he disciplined -- that forfeiting a game was -- that's not discipline to Mr. Wallich. I mean, and with respect to --

THE COURT: Well, let's just take the physical attack, and you can say the subset of that is sexual attack or whatever. Did he not issue a policy to that effect, and then he said it's up to the principal to implement and so on down the line? Am I missing something?

MS. KANE: Yeah. That was not -- he gave the Board's policy --

THE COURT: Okay.

MS. KANE: He relays the policy of the Board to the chain -- to the principals to give to the athletic directors, to give to the coaches. He's over here. They are in a line here.

THE COURT: Okay.

MS. KANE: He doesn't supervise them.

THE COURT: What about the training program, is he the one who says that in order to be able to coach, you need to do these programs? Is he the one that says that?

MS. KANE: That would be a Board policy, but he passed out the memo saying people should be -- should have the training, yes.

THE COURT: He's got -- all right. And then he knows who has and has not completed it?

MS. KANE: There was a new system that came into place in 2018 in the late summer where people could get access -- it was still being implemented, so whether or not he actually had access prior to October 31, 2018 is unclear.

THE COURT: But would he have had at -- sometime in that time frame, even after it -- I am just trying to get an idea of when he -- look, the question is: Did he have the responsibility to say there should be training and to follow up and there wasn't? Yes or no?

MS. KANE: The Board had a policy that there should be training. To follow up and make sure that that was

implemented was done by the principal and the athletic director. There is about 23 high schools, and he's one athletic director not only for the high schools, but he's system wide. So it was within the individual school that they made sure that training was complied with.

THE COURT: Okay.

MS. KANE: So it wasn't --

THE COURT: I am hearing that argument. Let me -- there is one thing I am a little --

MS. KANE: But real quickly, Your Honor --

THE COURT: Before you leave that, you made an argument like what this really is is a *Monell* claim --

MS. KANE: Yes.

THE COURT: -- against the school board, I guess, and nobody should be individually liable because that's really what's going on here; is that a fair statement?

MS. KANE: Yes, because he was sued in his individual capacity here because the claim against the Board of Ed -- the Board is not a person for purposes of 1983.

THE COURT: The Board is not sued on Title --

MS. KANE: It was. It went out on a motion to dismiss in your order.

THE COURT: Oh, okay.

MS. KANE: So it's gone. So to the extent that they are trying to make a *Monell* claim against him, it should also

go out.

THE COURT: Well, I am not sure what you are saying. You know, it's a fiction. You go against individuals instead of the entity, and you basically say, They are doing what you would like to say against the entity but they are doing it in their individual capacity. You are saying, Well, he wasn't acting in his individual capacity; he was acting, I don't know, all these people were, I guess, in their official capacity?

MS. KANE: But their complaint is about policies and implementation of policies, so their complaint is about a policy, custom, practice, procedure, which would be like a *Monell* complaint.

THE COURT: But even if his policy was the same as the Board's policy, it's still his policy, isn't it? It's still a policy he's promulgating? You are saying he can't be sued because he's just passing on a Board policy? I need to be clear with you on your argument. I am not challenging you on it, at least not at this point. I am trying to understand. He has got qualified immunity because it's not his policy; he's just promulgating what the Board sets as policy. Is that a fair statement of where you are?

MS. KANE: He has -- he has qualified immunity for, you know, not being a supervisor as well.

THE COURT: Well, we have talked about that. You don't need to go back to it.

MS. KANE: But in answer -- I'm sorry. Could you repeat your question, Judge?

THE COURT: I think when you talk about he's -- he's really -- this is really a *Monell* claim and somehow the plaintiffs are trying to get around that, and they are really going after the Board in the person of Sullivan --

MS. KANE: Yes.

THE COURT: -- because he didn't make the policy, he just passed it along; is that a fair statement of what you are saying?

MS. KANE: Yes.

THE COURT: Okay. That's what I want to understand.

MS. KANE: Okay.

THE COURT: I will come back to Mr. Maloney on that because I am not sure how you are arguing that. I mean, I don't think that really is the law, just because he's -- they have a policy and he has a policy, that somehow you can't go after him because their policy is -- is protected. I don't know that his is. That's what I am hearing you say. His --

MS. KANE: I mean, he's disseminating the Board policy.

THE COURT: Well, all right. I am not sure that I have seen that argument before, that because somebody is sued individually, is relying on a policy that the County or whatever the municipality has, that somehow he can't be sued

because he's really transmitting their policy. I haven't quite seen that argument, and maybe you have got some merit to it.

I mean, I'd like to hear the response to it because I am not familiar with what you are saying, that you can get -- you get immunity because your employer has -- because your superior has immunity, because your municipality has immunity. I mean, that's the whole idea of the individual liability fiction.

But Mr. Maloney, do you want to answer that? I don't want to find myself arguing plaintiffs' case, but I need to understand clearly where defendants are coming from.

MR. MALONEY: Your Honor, I think Mr. Sullivan would be surprised to see how much he's been demoted by the Board in this courtroom today. He's being made out as sort of the mailman who is just delivering policies from the Board.

He is the training guy. He testified at some length, and he has written documents about his duties. It's his job to develop and implement the required system-wide training. He develops the safety -- that's item one.

Item No. 2: He is the one who establishes the safety protocols and procedures that require direct supervision.

No. 3: He sent out memos, including one that July, interpreting what they are and telling people what the requirements are.

No. 4: He is supposed to integrate all Montgomery policies and national laws about student safety and to make

sure the staff knows and complies with that.

Next: He is to certify individual coaches and athletic directors and set expectations for them, and he has the authority to revoke those certifications.

Next --

THE COURT: I have heard you on this before.

MR. MALONEY: There is more.

THE COURT: Stop. Stop. The issue really is what do you do with a *Monell* type claim? I have heard her make this argument somehow, that this is really a *Monell* claim against the Board, and, therefore, Mr. Sullivan should also be protected by it.

MR. MALONEY: Well, our position, of course, was that the Board may have *Monell* liability as well, but that doesn't preclude individual supervisory liability where an individual, quote, has responsibility for various -- for -- for administration and implementation and enforcement of policy and violates those duties that result in a constitutional breach.

THE COURT: I don't want to take any more time.

Let's finish quickly on this point, Ms. Kane, if you would.

MS. KANE: Just what Mr. Maloney was reading from was a job description not in effect at the time of the incident.

One other -- we had cited *Wilkins v. Montgomery* in defense of Mr. Sullivan on this motion under 1983. In that

case, the Court writes, Finally, appellee's job duties were patently administrative in nature, and they included providing direction to and oversight of the operations, assessing, developing, monitoring, and evaluating the clinical and forensic operations of the hospital, and providing administrative and operational supervision to medical or clinical departments. Nowhere is there a requirement that she have supervision over the security or monitoring of the patients in Ward 39-8.

THE COURT: Aren't you just saying that these are issues of fact that can be argued to a jury? Not that he's right, necessarily, but he's got an argument to make based on what, apparently, he says, Sullivan concedes that he has responsibility for, and you are saying, Well, he really doesn't. And you can make that argument. But right now, you want me to stop any case -- any claim against him based on your view.

MS. KANE: Well, assume, then, for purposes of this, if there is a dispute of fact, we go back to he's not a -- he's not a supervisor and he has qualified immunity.

THE COURT: I hear that argument. Don't need to go into it again. I understand your argument.

MS. KANE: And for those reasons, Your Honor, he should be granted summary judgment on 1983.

THE COURT: All right. Let's move on to Ms. Crouse,

1983.

MS. KANE: And Mr. Sullivan was only on Does 2, 3, and 4.

Now, Ms. Crouse is in on two different theories. She's under state-created danger on Does 2, 3, and 4 and supervisory liability, and on Doe 1, she's in just -- I'm sorry, she's not in on Doe 1.

MR. RUFF: That's correct.

MS. KANE: I'm sorry. It's Mr. Wallich that's in. My apologies, Your Honor. We are just on 2, 3, and 4.

THE COURT: Let me just ask you to shorten this a bit, though, because we are getting to a late time. Is your argument -- are you arguing that Ms. Crouse had no supervisory liability?

MS. KANE: She was a supervisor.

THE COURT: Okay. So you are not arguing that she didn't --

MS. KANE: I am arguing that there was -- she has -- she would have qualified immunity with respect to the supervisory liability claim because --

THE COURT: Okay. I just want to clarify that you are not arguing that she wasn't a supervisor?

MS. KANE: No.

THE COURT: Okay. And let me -- before you get -- I need to sort of keep track on all these different pending

motions.

Mr. Ruff, as I understood the 1983 as to Sullivan, you are not opposing that. Is that correct?

MR. RUFF: That's correct. We are only pursuing supervisory liability against Coach Wallich.

THE COURT: Okay. Well, whatever was said as to that. We are back on --

MR. RUFF: That's as to Doe 1.

THE COURT: All right. With regard to Count Nine, though, which is --

MR. RUFF: That's as to Ms. Crouse.

THE COURT: Ms. Crouse. You are not opposing that?

MR. MALONEY: No. Those are Does 2, 3, and 4.

THE COURT: And they are opposing as to state-created danger and supervisory liability. And what I asked you was: Are you arguing that she is not a supervisor? You are saying she's entitled to qualified immunity, I know, but...

MS. KANE: I am saying she is a supervisor of Wallich and -- Wallich and Colbert, but --

THE COURT: Not Doody?

MS. KANE: And Doody as well.

THE COURT: Okay.

MS. KANE: And Doody. But with respect to supervisory liability, you have to have a subordinate employee who then engages in conduct that poses a severe and --

THE COURT: Well, isn't that what we just talked about with Sullivan? Same analysis, isn't it?

MS. KANE: Yeah, severe and unreasonable risk of constitutional injury.

THE COURT: Okay.

MS. KANE: The thing here is that the constitutional injury was caused by third-party students, criminal assault. And there -- all the cases require, for supervisory liability, that there be an employment relationship, so, for example, if it's principal, assistant principal, or a teacher abuses -- you know, a principal supervises a teacher who abuses the plaintiff.

But here, we have Crouse supervising other subordinates who are supposed to supervise the locker room and then we have criminal activity undergoing under their watch, and there is no case that requires -- it wasn't clearly established at the time of this occurrence that she had a duty to detect and prevent her -- she had a duty to make sure that her subordinates detected and prevented third-party criminal assault.

THE COURT: There is no proposition that finds any authority -- there is no authority for that proposition? She had no, what, constitutional duty or --

MS. KANE: There is -- the cases say, for supervisory liability, you have a supervisor, you have a subordinate, the subordinate causes harm to the plaintiff. We don't have that

here. We have the supervisor. We have the subordinate. The subordinate is alleged -- is supposed to be supervising the locker room, and the student-on-student harassment or sexual assault occurred, but the cases -- the students are not in the chain of supervisory liability, so it doesn't fit into the framework.

THE COURT: You are really losing me on this argument, I got to tell you. The students are supervised by these people up the line, and if they create a risk of serious bodily harm to them, the argument is they would be liable. Not that the students are in the chain of anything. I mean, the risk is created, arguably, by the failure to act or the act -- the affirmative action taken by the people up the line. I am not sure I follow what you are saying about the students.

MS. KANE: Well, they are the tort feasors here. And I know that the Court is saying, Well, they have the -- the subordinates have a duty to supervise them, but the case law does not impose -- we are talking about state -- we are talking about 1983. You need misconduct by a state actor subordinate, not misconduct by the student.

THE COURT: The misconduct of the state subordinate is the failure to supervise the student, or the -- the --

MS. KANE: And that is --

THE COURT: -- the actions taken where that student -- which create the risk?

MS. KANE: And it's not clearly established in the Fourth Circuit that that is a constitutional violation.

THE COURT: Okay. I understand.

MS. KANE: It's not -- and I'm sorry, Your Honor, if I have not articulated that clearly. My apologies.

THE COURT: All right.

MS. KANE: That was our argument. And, again, with Crouse, she is with respect to Does 2, 3, and 4.

THE COURT: Let me hear from Mr. Maloney. We are moving along pretty well. Mr. Maloney, briefly.

MR. MALONEY: Your Honor, that's a pretty extraordinary argument. The Board is saying that it was not a known right, or -- or that principals were not on notice in 2018 in the State of Maryland or in the Fourth Circuit that they had to exercise supervisory responsibility and other duties in a way to prevent students from being assaulted or raped. That's pretty extraordinary.

It's also a proposition that has been repeatedly rejected by our Courts. The Fourth Circuit, in *Doe vs. Fairfax*, cited a long list of cases where principals and others have had responsibility with respect to making sure -- we are talking about student-on-student sexual assault. We have cited in our papers the Seventh Circuit *T.E. v. Grindle* where the principal covered up and did not engage in active investigation --

THE COURT: Are these 1983 cases?

MR. MALONEY: These are 1983 cases. This was 1983 liability.

And Your Honor, *Grindle* is not an outlier. There is dozens and dozens of these cases. There is no case that has ever heard, nor have they cited one, that said it was not a known right for a principal to exercise supervisory responsibility to make sure that their students didn't get raped. And, in fact, it has been the law in the State of Maryland for 50 years that the principal and the staff stand *in loco parentis*, must stand in the shoes of the parents to ensure student safety in all matters, in all respects.

So it's quite extraordinary to say a principal in Montgomery County in 2018 had no reason to know they were supposed to prevent kids from being raped, and, therefore, they should be immune.

This is student on -- and, again, this whole concept because they weren't supervising the student -- this is student-on-student rape where they had a supervisory responsibility.

With respect to Ms. Crouse, we are arguing not only supervisory responsibility, but also that she fostered and indeed was the moving force in state-created danger. And we argued that it happened in three different ways.

First of all, although she was under a legal -- although she was under a requirement from the Board and a regulation

that locker rooms must be supervised all the time and that students who would be in a locker room must be supervised, when she came to Damascus, she deliberately removed that supervision and made sure that for that one hour, from 2:30 to 3:30, that instead of the JV football team being safely supervised by an adult in a study hall, that they were allowed to be in the locker room by themselves and elsewhere in the building.

She made that affirmative decision to remove that guardrail and to create that state-created danger despite the strong opposition of her vice-principal, her director of security --

THE COURT: But has it ever been that -- has that concept ever been applied outside of, like, a prison custodial setting? Has it ever been applied to a school?

MR. MALONEY: Oh, all the time. There is a lot of state-created danger cases involving the schools that are out there. This is not an outlier in terms of that. Okay? And it's particularly so because what happens here is that they are created -- they are creating -- what happens here is they are creating the risk here.

I direct the Court's attention to the Sixth Circuit, just two years ago, in *Garza*, 972 here. Again, principal failed to investigate and allowed abuse that was going on that the principal should have known was happening.

And then with respect to Mr. Abedi --

THE COURT: That is considered state-created danger?

MR. MALONEY: That one was supervisory liability.

THE COURT: Well, I understand you are arguing that. I am asking about state-created danger.

MR. MALONEY: State-created danger would be Tenth Circuit, *Monell*, 186, where a plaintiff claims that a high school principal refused to take action to control a student's sexual harassment of another. That was a 1983 claim that was there.

And the problem here with Mr. Abedi is that she was on notice. She had a huge file saying that he --

THE COURT: J.C.?

MR. MALONEY: Yeah, J.C. My apologies.

-- that J.C. had a huge history; that he was a danger to everyone that came into the building in Clarksburg to the extent that he required full-time, 100 percent one-on-one supervision all day, and she made a deliberate decision to reject the recommendations of her SRO -- her new SRO who came there who had been at Clarksburg and the people -- the personnel person who came from Clarksburg who told her how bad this would be, and it was.

And as Mr. Wallich reported, they got complaints every single day, including assault on teacher, assaults on students, assaults on others. So this was something -- this was not a situation of her supervisory negligence. She was the moving

force who removed these safety guardrails that Clarksburg had put in, and very affirmatively made the very dangerous decision to say, We are going to give him a fresh start. That was a constitutional violation because it created a danger to the plaintiffs here, as well as, frankly, everybody else in the building.

So -- and with respect to the supervisory liability over Wallich and Colbert, they were responsible and had a duty under the Board regulations to, quote, supervise the students at all times and places. There had even been a memorandum which came out in July 2018 reminding all coaches and personnel that the coaches must directly supervise them at all times and all places.

She knew that wasn't happening because she got repeated complaints from her staff members that they weren't being supervised, but notwithstanding that, she decided not to take the action recommended by her staff and not to do anything about the fact that she knew that Wallich and Colbert, under her supervision and duty, were allowing the students to violate the Montgomery County regulation, to be unsupervised, to run wild in the building, in the locker room, and, yet, she did nothing either to change that herself or to direct those who were directly responsible for taking action here.

So for all those reasons, Your Honor, she is liable under 1983 for both theories.

THE COURT: All right. A couple minutes rebuttal, Ms. Kane.

MS. KANE: The Fourth Circuit has never upheld a case on state-created danger, Your Honor. And with respect to the state-created danger, *Burns-Fisher* recently -- and I think that's a district -- no, that one is a Fourth Circuit case, I think that's where it said it, just a recent case that said, In analyzing the state-created danger, it reversed the district court's allowance, and said that -- held that the principal's knowledge of a student's prior violent history, coupled with the principal's failure to prevent the student from attacking the teacher, did not constitute the reckless and affirmative acts needed to plead a viable claim that the principal created the risk that caused injury to the plaintiff under the state-created danger theory.

Here, Mr. Maloney references a study hall. There was a study hall intermittently in place under Jennifer Webster prior to Ms. Crouse. When she came in, she did not renew the study hall. That's an omission, not an affirmative act.

With respect to J.C.A., he talked --

THE COURT: You know, you are really philosophically splitting hairs on this one, they talk about an omission versus an affirmative act. There is a program in place, it stops being in place, and you are calling that an omission. I mean, is it an affirmative act? There are documents sent in about

J.C.S. [sic] delineating his history. She doesn't read them. Is that an omission or is that an affirmative act?

I mean, really, an omission is, well, you may hear something and you don't do anything about it at all, but here, where you sort of got a policy in place or you have got a warning in place and you do nothing, is that an omission? Is that not arguably an affirmative act? That's where we are getting into sort of -- we are stuck with a tyranny of words here.

I mean, clearly, it's a different situation from simply being told, Hey, by the way, there is harassment going on. You say, Oh, okay, and don't do anything about it. That's a different case. My recollection is the *Baynard* case is a little more like that, where somebody is told -- I may have the name wrong -- some sort of harassment is going on, and nothing is done about it. The college president or whomever -- am I wrong on this one? I may have the wrong case in mind.

Anyway, that's what I am saying here. When you talk about no affirmative act, what do you do with that? I mean, clearly, there is an --

MS. KANE: She's not increasing the danger with respect to --

THE COURT: Well, that's the issue. Is she? By not reading the report on J.C.S. [sic], is she not arguably increasing the risk? She's warned, Look, this guy is troubled,

do something.

MS. KANE: It was delegated to Ms. Tallapragada, who, in turn, took appropriate -- or took interventions with --

THE COURT: Is she not where the buck stops, though? She's the principal. I don't know who she delegates it to, but --

MS. KANE: Yes. But this is did she make an affirmative act to increase the danger? Not that there is already a known danger that exists, but that she created one or made one that already existed a whole lot worse, and we don't have that here.

THE COURT: Well, arguably, you may. I mean, that's where we are now. Not that it -- you know, you are asking me to stop the -- stop the suit right now with regard to that theory because you say she didn't do anything that can be characterized as an affirmative act. It's an action that's taken where she is not reading the report that's warning her. You say that's not an affirmative action.

MS. KANE: That's an omission. If anything, Your Honor, it's an omission. And the study hall was not mandatory before she came in. It was there intermittently. These were omissions. If you -- applying the case law of the other cases when -- and especially the *Burns-Fisher* that just came out, these are omissions, and for an affirmative -- for the state-created danger, she's got to create.

So she also gets qualified immunity. We have had no case in the Fourth Circuit that's upheld that -- where -- where this has happened to someone, so she should get qualified immunity because it was not clearly established that her failure to act or actions that did not directly create or increase the risk of danger to the plaintiffs could satisfy the state-created danger theory.

THE COURT: Okay. Understood. I know that's your argument. Anything further?

MS. KANE: And for those reasons, we would -- the Court's indulgence and make sure I didn't miss something.

THE COURT: Well, let's go on to Mr. Wallich and finish up, Ms. Kane.

MS. KANE: With respect to Mr. Wallich, again, the supervisory liability framework would apply, and Colbert --

THE COURT: I understand that Doe 1 is in on this claim. Right?

MR. RUFF: That's correct, Your Honor.

THE COURT: Not in on the prior claim. All right.

MS. KANE: So, starting with Doe 1, with respect to his supervision, alleged supervision of Colbert or any JV coach prior to Doe 1's assault, there is no evidence that there was wide and pervasive, unreasonable -- I mean that there was -- that one of his subordinates engaged in pervasive and unreasonable conduct that created a risk of constitutional

injury to the plaintiff.

Going back in time to August 1, 2017, nobody had any reports, notice, observations of sexual assault, sexual harassment, assaults in the locker room. So if that's not happening or not known to Colbert, then it can't be known to his supervisor, Wallich, and Wallich can't be held responsible on a supervisory liability theory which requires notice that there is an ongoing problem and deliberate indifference to that knowledge. It doesn't exist here. So with respect to Doe 1, clearly, supervisory liability, summary judgment for the Board should be granted.

And to the extent the Court -- he also has qualified immunity because it was not clearly established in August of 2017 that state actors could be liable under the supervisory liability theory when --

THE COURT: As to this count, it's only supervisory liability that's being disputed? No state-created danger theory?

MS. KANE: No. It's just supervisory liability.

THE COURT: Just trying to keep track of who is arguing what.

MS. KANE: I get it.

It was not clearly established that the right to bodily integrity or personal security required state actor supervisors to ensure that their subordinates detected and prevented

student-on-student sexual harassment --

THE COURT: All right. No. That -- you have said that as to each of the others, and I understand that argument.

MS. KANE: Yes. And then the same argument would apply to Does 2 to 4 on supervisory liability. Again, there was no notice to Wallich that there was unconstitutional, wide and pervasive misconduct of Colbert's teammates -- student football players and a response with deliberate indifference.

So what was reported, according to the record, when Baggett-Stone and others made complaints that there -- they were not about sexual harassment. They were about loud and disruptive football players in the hallway. Baggett-Stone's office was at the opposite side of the building from the locker room, and there is not evidence here with respect to Does 2, 3, and 4 that qualified immunity would still apply because --

THE COURT: I understand the argument on qualified immunity. It's same across the board?

MS. KANE: Yes.

THE COURT: No need to repeat it.

MS. KANE: Thank you, Your Honor.

THE COURT: All right. Let me hear from Mr. Maloney.

MR. MALONEY: Your Honor, our claim, as the Court has just heard, is for supervisory liability only for Mr. Wallich. Mr. Wallich was actually reprimanded by the Board for his failure to exercise appropriate supervision here. In its

letter of recommendation -- of reprimand, it said, While you delegated responsibilities to Mr. Colbert, the head JV coach, you had responsibility here to ensure the effective, appropriate supervision of JV football players in the locker room. You did not have --

THE COURT: When this did letter come out?

MR. MALONEY: This came out after the investigation into this incident. As a result of this incident, the Board conducted its own investigation, and as a result of that investigation, there was a formal reprimand that was placed in his file for, quote, failing to exercise appropriate oversight and supervision in your responsibilities as head varsity coach.

THE COURT: Does that come into evidence?

MR. MALONEY: That's in evidence and is --

THE COURT: Not what you put before me now. Does that come into evidence at the trial?

MR. MALONEY: Oh, I think so. It's the Board's formal position on his breach of supervisory liability. They can't come into the court and say he didn't do anything wrong as a supervisor when they had reprimanded him for a gross breach of supervisory liability.

THE COURT: All right.

MR. MALONEY: And with respect to the actual breaches, they said, You had failed to effectively ensure supervision of JV football players in the locker room. You had

no football player required guidelines for monitoring. The records show that Mr. Colbert, under your supervision, did not take mandatory training for coaches, training relating to hazing and harassment, child abuse, and other compliance training.

And then it went on to say, Your failure -- As head coach, it's incumbent upon you to ensure all these protocols are complied with, and your failure to exercise adequate oversight over JV coaches and programs to ensure Montgomery County Public Schools regulations, safety, and expectations were implemented violates our Code of Conduct. As a result, you are reprimanded, and I warn you that any further incident of this nature will result in more severe disciplinary action, up to and including dismissal.

In addition to all of this, he was aware, in 2017, of the report on November 17th, 2017 by the parent directly to Ms. Crouse about the anal rape of the freshman in the locker room. At that time, both Principal Crouse and Mr. Scriven, the central office worker, testified in their depositions, one at page 16-17, Crouse at 227, that Wallich was fully aware of the sodomization allegations made by Mrs. H in 2017. Although he was aware of those allegations in 2017, he did nothing to ensure the supervision of the locker room at that time.

To the contrary, it was Mr. Wallich who -- who avidly opposed putting the -- having the JV students supervised by

going to study hall knowing that there were repeated complaints about the student -- the JV students' behavior unsupervised in the locker room and elsewhere from 2:30 to 3:00.

So both of that knowledge, the knowledge of the sodomization complaint, as well as the others -- and there has to be an ostrich aspect to this, too, because when we have seven or eight other JV students saying there was brooming in the locker room and he claimed he knew nothing about it, but it was his direct opposition that led Ms. Crouse not to impose some form of adult supervision during the hours of 2:30 to 3:30 even though he was expressly responsible for making sure that both the student athletes were supervised and the locker rooms were supervised because there are Montgomery County regulations directly on point on both of theirs.

Finally, with respect to him, he is individually responsible for Mr. Abedi's conduct because he was the one who was, the testimony was, actively involved in complaints around Mr. Abedi. On October 11 --

THE COURT: J.C.?

MR. MALONEY: J.C., excuse me.

On October 11th, 2018, he reported in an email, J.C. is not doing well with his transfer to DAX, and that there is a -- he gets an email or phone call almost daily about his bullying behavior in class, et cetera. That's Exhibit No. 64.

He had the ability -- he threatened and he acknowledged

that he had the ability to suspend J.C. from the team, which would have kept him out of the locker room, presumably, but he chose not to exercise that authority and that responsibility for reasons that related to his desire for the success of the Damascus football team and not for the safety of the student athletes.

THE COURT: Let's wind up. Thank you.

Mr. Ruff.

MR. RUFF: Your Honor, I would adopt much of Mr. Maloney's arguments. And I would also just add that, you know, there is case law that we cited, the *Hills vs. Bridgeview* case, that cites that head coaches have a duty to supervise subordinate coaches. So, he certainly was a supervisor. He certainly -- there is an inference even as to John Doe 1, although he's first in time. Based on the -- the breadth of evidence that Mr. Maloney just talked about, the young men who were assaulted, the -- the large amount of evidence that the supervision just was not present, as well as the letter which does not have any time frame on it which talks about his lack of supervision, his lack of management, and his lack of oversight over the JV football program, and so we would ask to -- for the Court to also deny summary judgment for this count as well.

THE COURT: As to -- as to supervisory liability only?

MR. RUFF: As to supervisory.

THE COURT: Rebuttal, Ms. Kane?

MS. KANE: Briefly, Your Honor.

Maybe I wrote down the wrong number, but I looked up the exhibit I thought Mr. Maloney cited, and I don't find what he said there. I looked at Exhibit 64. I don't know if he gave a different number. But -- not Mr. Ruff, Mr. Maloney. I didn't find that evidence in the record, and it's my understanding --

THE COURT: Evidence, I'm sorry, of what? You didn't find the evidence of what?

MS. KANE: A couple of things he said.

MR. MALONEY: This was the email that Mr. Wallich sent saying I get complaints every day. I don't think the Board disputes that he sent that email.

THE COURT: Is that the one you are referring to, that email where he --

MS. KANE: He lumped a bunch of things together, Your Honor, so I looked to see where the cite was -- where -- because it was facts I didn't remember from the record. I do remember an email where he did say he got --

THE COURT: It's a problem every day or something like that?

MS. KANE: Well, I am not sure it said what Mr. Maloney said, but I was trying to -- I didn't want to misstate the record, so I was looking for the exhibit.

THE COURT: Okay.

MR. MALONEY: The exact quote was specifically -- this was on October 11, 2018 -- JC is not doing well with his transfer to --

THE COURT: A little louder and a little slower.

MR. MALONEY: J.C. is not doing well with his transfer to DHS, and that he gets an email or phone call almost daily about his behavior in class, bullying, et cetera. I don't think anybody is disputing he sent that email.

THE COURT: No. I think she just --

MS. KANE: The content. He was talking about in class, and I don't think that's --

MR. MALONEY: That's what he said in the email.

MS. KANE: I don't think that's what -- that's not what I heard Mr. Maloney --

THE COURT: Well, I understand that there was some statement by him to that effect, that J.C.A. was a problem with bullying and other things.

MS. KANE: There were some problems with the -- you know, in the -- in the classroom.

With respect to the reprimand and the Court's question also to Mr. Maloney, the reprimand of Mr. Wallich, it's evidence of -- and negligence, not evidence of deliberate indifference, what he read to the Court.

THE COURT: I am not sure what -- again, I don't have

the --

MS. KANE: And I agree with the Court, it may not be admissible, but --

THE COURT: I am not saying it's not admissible. It may well be admissible, number one. It may well be relevant beyond the cause of action for negligence. And it certainly establishes the fact that he was considered a supervisor with supervisory responsibility. That's what the Board says. You are not going to get up in trial and say that he wasn't.

MS. KANE: That's subject to interpretation also, Your Honor.

THE COURT: That's why, in a motion for summary judgment, it may not pass muster because it's subject to, at best, interpretation.

MS. KANE: Well, I am trying to give leeway to not create issues of fact here. But what I am trying to say is even given what he has represented to the Court, it's not evidence of deliberate indifference. So we have an alleged supervisor, an alleged subordinate, and what was that subordinate doing that posed a risk of -- wide and pervasive and unconstitutional risk of bodily harm to the plaintiffs?

THE COURT: All right.

MS. KANE: And yes, there were some issues with J.C.A., but Wallich did not know the past history of J.C.A. He knew he was disruptive in the classroom. He knew he made noise

in the hallway. He did not know about the prior sexual harassment of the female at the middle school.

THE COURT: Is that what he said or is that what you are saying?

MS. KANE: That's what the record shows. So with respect to, you know, the claim against Mr. Wallich, Your Honor, we would stand by he is entitled to qualified immunity because he did not have -- it was not clearly established at the time of this incident --

THE COURT: I understand your argument on that point. All right.

MS. KANE: All right. Thank you.

THE COURT: All right, folks. Here is what. I had hoped to give you an oral opinion at the end of this argument, but I am not able to do so because, among other things, the hour is late.

What I propose to do is, next Wednesday afternoon at 2:00, to render an oral opinion from the bench, so you are all invited back next Wednesday at two. Make arrangements with your other judges to be here. But that's what works for me, and I have simply got to do that that way. So Wednesday afternoon at two, I will give you a lengthy oral opinion. It may take an hour or more to give to try and address the various arguments.

Thank you very much for your presentations.

(The proceedings were concluded at 5:07 p.m.)

C E R T I F I C A T E

I, Renee A. Ewing, an Official Court Reporter for the United States District Court for the District of Maryland, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings taken on the date and time previously stated in the above matter; that the testimony of witnesses and statements of the parties were correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription to the best of my ability; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Renee A Ewing

Renee A. Ewing, RPR, RMR, CRR
Official Court Reporter
May 5, 2023

## '

**'14** [1] - 122:17
**'15** [1] - 122:17
**'16** [1] - 122:17
**'17** [6] - 42:7, 54:5, 67:20, 71:3, 71:4, 130:13
**'18** [1] - 145:18

## 1

**1** [127] - 1:4, 1:19, 3:5, 3:19, 5:10, 9:20, 9:25, 10:6, 10:24, 11:17, 12:16, 12:20, 13:3, 13:9, 13:15, 13:19, 14:5, 14:17, 15:5, 15:12, 15:16, 15:22, 15:25, 18:19, 18:20, 19:8, 19:11, 19:23, 20:13, 21:4, 21:5, 21:17, 21:22, 22:1, 22:2, 22:4, 22:9, 22:16, 22:24, 23:2, 23:25, 24:8, 26:15, 26:22, 27:11, 28:21, 32:18, 32:21, 33:11, 34:11, 34:19, 35:7, 35:21, 35:23, 41:8, 43:15, 48:20, 49:17, 54:3, 54:14, 64:15, 65:10, 66:10, 66:11, 66:15, 66:24, 67:9, 67:16, 68:4, 68:15, 71:16, 71:24, 71:25, 73:12, 73:25, 76:4, 80:6, 95:15, 97:15, 97:16, 103:23, 104:6, 112:22, 113:4, 121:11, 121:15, 121:19, 121:23, 122:5, 122:13, 123:2, 123:20, 124:15, 124:17, 125:7, 126:5, 126:9, 126:11, 126:12, 126:14, 127:14, 127:15, 127:23, 129:25, 130:4, 130:12, 130:13, 132:17, 132:18, 133:15, 133:25, 141:11, 141:17, 142:20, 143:2, 170:6, 170:7, 171:8, 182:16, 182:20, 183:2, 183:9, 188:14
**1's** [19] - 10:4, 10:17, 10:21, 11:16, 13:22, 14:18, 15:13, 18:2, 18:15, 19:2, 19:7, 20:22, 34:21, 66:18, 66:19, 71:17, 72:6, 136:19, 182:22
**10** [1] - 42:3
**10/31** [1] - 136:19
**100** [4] - 116:16, 117:10, 117:22, 177:16
**101** [1] - 2:12
**10:00** [1] - 3:14
**11** [5] - 18:18, 44:24, 187:18, 190:3
**111** [1] - 13:20
**11:01** [1] - 1:11
**11th** [2] - 120:22, 187:21
**12** [3] - 156:23, 157:6, 157:18
**120** [1] - 2:17
**123** [1] - 15:8
**12:30** [1] - 36:12
**12:50** [1] - 75:22
**13** [2] - 12:6, 68:2
**14** [1] - 13:10
**15** [3] - 14:9, 69:2, 101:1
**16** [1] - 14:9
**16-17** [1] - 186:20
**168** [1] - 156:17
**16th** [1] - 131:11
**17** [3] - 14:23, 112:19, 112:21
**175** [1] - 14:24
**177** [1] - 13:4
**178** [1] - 13:4
**17th** [2] - 158:3, 186:16
**18** [1] - 152:25
**1850** [1] - 2:17
**186** [1] - 177:6
**189** [1] - 115:19
**18th** [1] - 114:1
**19** [1] - 115:3
**197** [1] - 14:12
**1983** [30] - 83:21, 85:14, 85:15, 86:8, 86:20, 86:22, 90:14, 93:22, 98:7, 98:24, 98:25, 99:2, 129:2, 147:8, 147:12, 147:15, 149:20, 152:16, 152:17, 164:19, 168:25, 169:24, 170:1, 171:2, 173:19, 174:25, 175:1, 177:8, 178:25
**1998** [1] - 95:7
**1:59** [1] - 75:22
**1st** [11] - 25:1, 65:6, 65:7, 65:21, 66:15, 71:4, 103:24, 104:1, 112:24, 121:24

## 2

**2** [27] - 1:19, 3:19, 5:10, 10:9, 13:25, 19:2, 19:3, 21:14, 25:18, 56:21, 66:8, 76:4, 80:6, 101:25, 104:2, 126:8, 130:5, 130:13, 147:13, 167:19, 170:2, 170:5, 170:10, 171:13, 174:8, 184:5, 184:14
**2-35** [1] - 158:7
**20** [3] - 69:2, 120:22, 159:14
**2000** [2] - 132:24, 145:17
**2006** [5] - 13:7, 13:12, 18:17, 33:22, 44:24
**2008** [3] - 33:22, 44:25, 145:15
**2009** [1] - 100:16
**2013** [2] - 11:19, 105:22
**2014** [1] - 14:8
**2015** [3] - 14:11, 94:22, 95:6
**2017** [67] - 9:20, 10:24, 11:17, 11:19, 12:20, 13:3, 13:9, 13:15, 13:19, 14:5, 14:17, 15:12, 16:2, 19:12, 19:23, 21:5, 22:2, 22:4, 23:25, 24:16, 32:19, 46:6, 54:2, 54:14, 59:23, 62:1, 64:3, 65:22, 66:16, 67:9, 68:4, 71:16, 71:25, 73:25, 74:9, 95:15, 96:3, 97:14, 103:24, 104:1, 104:15, 105:17, 105:18, 105:22, 109:9, 111:6, 111:8, 111:10, 112:22, 112:25, 121:25, 122:6, 124:8, 127:15, 131:1, 131:6, 131:12, 132:17, 132:25, 133:1, 158:3, 183:2, 183:14, 186:15, 186:16, 186:21, 186:22
**2018** [45] - 14:8, 16:3, 21:13, 29:3, 54:5, 58:23, 59:23, 67:21, 103:25, 104:2, 104:15, 107:25, 109:9, 111:1, 111:7, 111:9, 112:3, 113:1, 113:13, 114:1, 117:2, 119:4, 119:5, 119:23, 120:11, 120:22, 122:13, 131:6, 133:18, 136:16, 143:10, 145:19, 159:9, 159:10, 160:2, 160:25, 161:5, 161:20, 163:16, 163:18, 174:14, 175:13, 178:11, 187:21, 190:3
**2019** [3] - 97:12, 97:16, 157:2
**202** [2] - 78:23, 79:10
**2022** [1] - 80:8
**2023** [2] - 1:11, 193:18
**20770** [1] - 1:17
**20850** [3] - 2:4, 2:7, 2:13
**20th** [1] - 99:21
**21** [1] - 115:3
**21202** [2] - 1:22, 2:18
**227** [3] - 14:1, 76:5, 186:20
**22nd** [1] - 109:25
**23** [2] - 58:8, 164:2
**230** [1] - 131:19
**230-36** [2] - 158:9, 159:3
**235** [2] - 115:4, 133:17
**236** [1] - 115:4
**240** [2] - 1:18, 2:14
**25** [4] - 69:3, 69:16, 69:18, 131:24
**26** [1] - 15:9
**263** [1] - 13:16
**27** [2] - 1:11, 2:7
**272-9955** [1] - 2:8
**27th** [1] - 119:5
**28** [1] - 14:9
**29** [1] - 12:6
**29th** [1] - 110:7
**2:00** [1] - 192:18
**2:30** [6] - 104:11, 106:13, 106:16, 176:4, 187:3, 187:10
**2:50** [2] - 104:18

## 3

**3** [26] - 2:2, 3:21, 4:3, 5:13, 10:9, 13:4, 19:2, 19:4, 21:14, 25:18, 66:8, 76:4, 80:6, 102:1, 104:2, 125:14, 126:8, 130:5, 130:13, 167:21, 170:2, 170:5, 170:10, 171:13, 174:8, 184:14
**30** [2] - 8:21, 69:18
**301** [3] - 1:24, 2:5, 2:8
**30th** [1] - 1:21
**31** [5] - 14:12, 21:13, 54:5, 104:1, 163:18
**31st** [18] - 29:3, 62:11, 63:12, 71:5, 103:25, 107:25, 108:5, 109:24, 111:1, 111:9, 112:6, 119:2, 119:11, 119:23, 121:20, 123:2, 123:9, 131:6
**33** [2] - 2:4, 13:25
**344-3227** [1] - 1:24
**351** [1] - 58:9
**352** [1] - 58:9
**36** [1] - 13:25
**368-69** [1] - 58:12
**39-8** [1] - 169:9
**3:00** [1] - 187:3
**3:15** [1] - 110:9
**3:30** [5] - 104:12, 104:19, 106:13, 176:4, 187:10
**3:40** [1] - 104:25
**3:43** [1] - 144:14
**3:45** [1] - 104:25
**3:57** [1] - 144:14
**3rd** [1] - 2:13

## 4

**4** [32] - 1:13, 4:2, 5:6, 10:9, 13:9, 19:2, 19:4, 21:14, 25:18, 56:21, 66:8, 76:4, 76:7, 80:6, 84:23, 101:25, 102:1, 104:2, 126:8, 130:5, 130:13, 131:25, 147:13, 167:24, 170:3, 170:5, 170:10, 171:13, 174:8, 184:5, 184:15
**40** [2] - 13:15, 104:19
**400** [1] - 1:17

**410** [2] - 1:22, 2:18
**4170** [1] - 94:24
**42** [1] - 131:25
**43** [1] - 131:23
**44** [1] - 21:7
**46** [1] - 59:10

## 5

**5** [3] - 15:4, 21:18, 193:18
**50** [1] - 175:9
**504** [2] - 78:23, 79:11
**51** [1] - 13:25
**553-1185** [1] - 1:18
**56** [1] - 9:22
**5:07** [1] - 193:1

## 6

**61** [2] - 108:17, 115:18
**63** [1] - 9:22
**64** [2] - 187:24, 189:6
**6404** [1] - 1:16
**68** [1] - 15:5
**69** [1] - 156:17

## 7

**7** [2] - 13:20, 42:2
**71** [1] - 12:6
**727-5000** [1] - 2:18
**762-1696** [1] - 2:5
**777-6746** [1] - 2:14
**7th** [1] - 159:10

## 8

**8** [1] - 70:11
**8th** [2] - 113:13, 159:9

## 9

**9/23/22** [1] - 82:21
**90** [1] - 14:12
**951-8744** [1] - 1:22
**96** [2] - 42:2, 59:5
**972** [1] - 176:22
**9:00** [1] - 70:11

## A

**A.M** [1] - 1:11
**Abedi** [3] - 176:25, 177:10, 187:18
**Abedi's** [1] - 187:16
**abeyance** [1] - 79:24
**ability** [7] - 101:22, 156:24, 156:25, 157:6, 187:25,

188:1, 193:12
**able** [11] - 7:23, 55:12, 68:24, 69:5, 69:6, 69:7, 120:15, 124:22, 127:2, 163:8, 192:15
**abolished** [1] - 109:16
**absence** [1] - 27:9
**absent** [1] - 89:18
**Absent** [1] - 78:7
**absolute** [1] - 159:12
**absolutely** [3] - 64:5, 123:1, 160:5
**absolving** [1] - 74:18
**abuse** [4] - 23:20, 91:14, 176:23, 186:4
**abused** [1] - 112:15
**abuser** [1] - 112:16
**abuses** [2] - 172:10, 172:11
**accept** [1] - 83:16
**acceptable** [2] - 23:23, 51:5
**accepting** [4] - 77:5, 79:1, 79:5, 81:2
**access** [5] - 124:5, 125:24, 126:20, 163:16, 163:18
**accommodations** [1] - 77:18
**according** [6] - 46:3, 84:8, 96:19, 104:24, 123:18, 184:9
**accountability** [1] - 158:20
**accountable** [1] - 127:2
**accounts** [1] - 120:1
**accurate** [2] - 70:10, 134:18
**acknowledged** [4] - 94:2, 114:16, 160:3, 187:25
**acknowledges** [1] - 158:12
**act** [14] - 30:18, 68:13, 155:5, 173:12, 179:19, 179:23, 179:25, 180:2, 180:7, 180:19, 181:8, 181:16, 182:4
**Act** [15] - 76:25, 77:1, 77:14, 77:19, 78:17, 78:24, 78:25, 79:11, 80:16, 82:13, 102:7, 158:6, 158:21
**acted** [2] - 37:19, 145:25
**acting** [4] - 132:21, 133:21, 165:7

**ACTION** [1] - 1:4
**action** [27] - 6:21, 16:14, 61:22, 62:24, 65:17, 73:5, 77:13, 78:9, 80:21, 90:18, 92:23, 99:22, 101:9, 101:11, 101:12, 101:13, 109:14, 159:17, 173:13, 177:7, 178:17, 178:23, 181:16, 181:18, 186:13, 191:6, 193:13
**Action** [1] - 3:5
**actionable** [1] - 101:8
**actions** [5] - 59:14, 80:1, 101:17, 173:24, 182:5
**active** [1] - 174:24
**actively** [1] - 187:17
**activities** [1] - 126:20
**activity** [7] - 92:9, 96:1, 124:6, 125:24, 127:8, 162:10, 172:15
**actor** [4] - 149:6, 149:7, 173:19, 183:24
**actors** [5] - 15:19, 147:16, 147:18, 149:9, 183:14
**acts** [6] - 37:14, 37:17, 77:15, 78:15, 90:22, 179:13
**actual** [62] - 27:3, 33:6, 35:4, 46:7, 58:20, 69:14, 75:4, 92:19, 93:4, 93:7, 93:9, 93:13, 93:17, 93:19, 93:21, 93:23, 93:24, 94:4, 94:6, 94:9, 97:1, 111:3, 122:1, 122:8, 123:13, 123:19, 124:2, 124:20, 125:20, 126:16, 126:21, 127:1, 127:14, 127:22, 127:23, 127:25, 128:6, 128:17, 128:25, 129:6, 129:8, 130:4, 130:7, 131:5, 134:4, 134:5, 134:16, 134:20, 134:21, 135:6, 135:8, 135:11, 135:18, 136:12, 137:11, 137:18, 142:6, 142:7, 142:12, 146:21,

147:5, 185:23
**acute** [1] - 55:25
**AD** [1] - 108:25
**ADA** [7] - 77:14, 77:19, 78:16, 78:17, 78:23, 79:11, 100:2
**add** [2] - 36:5, 188:10
**addition** [7] - 11:6, 101:18, 113:9, 114:8, 133:14, 159:8, 186:15
**additional** [2] - 29:4, 161:24
**additionally** [1] - 113:9
**address** [6] - 24:12, 97:25, 120:4, 130:6, 136:25, 192:23
**addressed** [6] - 6:19, 15:3, 56:21, 103:8, 139:23, 145:13
**addressing** [2] - 50:5, 91:8
**adequate** [5] - 27:9, 102:20, 158:20, 160:14, 186:8
**adjudicated** [1] - 90:20
**adjusted** [1] - 145:11
**administration** [5] - 31:16, 60:15, 113:10, 119:10, 168:17
**administrative** [4] - 157:12, 169:2, 169:6
**administrator** [1] - 114:21
**administrators** [5] - 41:23, 57:23, 59:22, 62:23, 130:15
**admissible** [5] - 7:18, 103:17, 191:3, 191:4, 191:5
**admissions** [1] - 130:1
**admit** [6] - 24:24, 46:15, 46:18, 47:20, 48:3, 48:13
**admits** [2] - 59:18, 118:7
**admitted** [20] - 15:5, 30:3, 32:25, 45:19, 45:23, 45:25, 46:10, 46:12, 47:1, 47:5, 47:9, 47:16, 47:18, 47:22, 48:11, 95:25, 114:18, 115:5, 130:1, 158:2
**admittedly** [1] - 43:18
**adopt** [3] - 21:3,

121:12, 188:9
**adult** [11] - 6:18, 7:20, 35:7, 35:9, 72:7, 105:23, 110:16, 116:15, 125:15, 176:6, 187:10
**adults** [4] - 6:25, 24:24, 54:6, 58:2
**advised** [3] - 68:8, 75:1, 126:17
**advisement** [1] - 126:19
**advocate** [1] - 45:14
**affecting** [1] - 37:11
**affidavit** [4] - 131:25, 132:5, 133:5
**affidavits** [2] - 133:14, 159:6
**affirmatively** [1] - 178:2
**affirmed** [1] - 80:19
**Affordable** [2] - 77:1, 80:16
**affording** [1] - 91:15
**afternoon** [5] - 70:7, 70:12, 104:8, 192:17, 192:22
**afterwards** [4] - 63:11, 67:18, 88:20, 139:21
**agenda** [1] - 9:13
**aggravated** [1] - 105:11
**aggressive** [1] - 116:10
**ago** [2] - 99:8, 176:22
**agree** [6] - 7:14, 84:11, 98:2, 134:8, 136:11, 191:2
**agreed** [2] - 52:3, 89:10
**agreement** [1] - 113:23
**ahead** [17] - 9:5, 21:15, 23:21, 52:15, 52:18, 52:20, 56:25, 88:8, 89:4, 92:2, 133:11, 141:12, 141:18, 147:10, 149:11, 149:13, 154:24
**aided** [1] - 193:11
**AIDED** [1] - 1:25
**al** [4] - 1:4, 1:7, 3:5, 3:6
**Alan** [1] - 108:12
**alert** [1] - 144:4
**alerted** [1] - 123:23
**alia** [1] - 79:22
**allegation** [7] - 33:23, 62:12, 76:3, 95:13,

95:22, 127:19, 129:13
**allegations** [16] - 11:10, 11:11, 11:12, 16:24, 17:14, 24:10, 54:15, 54:21, 55:14, 62:19, 90:11, 94:14, 145:22, 158:1, 186:21, 186:22
**allege** [3] - 17:7, 17:12, 17:21
**alleged** [15] - 9:9, 17:4, 17:6, 73:18, 77:9, 91:3, 130:11, 132:16, 135:12, 150:18, 155:1, 173:2, 182:21, 191:18, 191:19
**allegedly** [3] - 25:3, 132:23, 133:3
**alleges** [2] - 17:2, 17:22
**alleging** [3] - 93:10, 93:11, 123:25
**Allen** [1] - 4:12
**ALLEN** [1] - 2:11
**allow** [10] - 6:21, 67:18, 83:11, 83:24, 98:19, 102:10, 102:23, 106:12, 135:9, 161:2
**allowable** [2] - 85:21, 85:22
**allowance** [1] - 179:9
**allowed** [12] - 42:15, 82:12, 85:25, 102:8, 107:8, 107:20, 119:20, 120:13, 137:4, 160:11, 176:6, 176:23
**allowing** [3] - 56:3, 155:15, 178:19
**alluded** [1] - 22:8
**almost** [15] - 18:17, 55:16, 96:24, 98:8, 102:21, 102:22, 103:22, 105:7, 113:7, 114:17, 115:8, 120:11, 120:24, 187:23, 190:7
**alone** [5] - 62:20, 85:3, 85:4, 99:5, 110:14
**alt** [2] - 116:20, 117:20
**altercations** [2] - 118:15, 118:25
**alternative** [3] - 116:21, 145:7, 146:5
**Alyse** [1] - 4:1
**ALYSE** [1] - 1:16
**ambiguous** [1] - 124:10
**Amended** [1] - 9:21
**amended** [4] - 16:24, 17:2, 76:6, 82:8
**amount** [5] - 87:16, 87:19, 88:12, 90:5, 188:17
**anal** [3] - 158:5, 159:1, 186:17
**anally** [1] - 104:2
**analogous** [1] - 122:23
**analogy** [3] - 77:7, 82:7, 98:10
**analysis** [4] - 80:25, 142:18, 156:3, 172:2
**analyzing** [1] - 179:8
**AND** [1] - 1:19
**Angeles** [1] - 90:4
**annual** [2] - 15:3, 159:25
**answer** [10] - 23:9, 48:8, 74:1, 85:3, 106:18, 141:16, 142:24, 166:1, 167:8
**answered** [1] - 104:4
**answers** [1] - 142:23
**anti** [7] - 48:24, 76:19, 76:21, 76:24, 77:10, 80:15, 81:21
**anti-discrimination** [6] - 76:19, 76:21, 76:24, 77:10, 80:15, 81:21
**anti-hazing** [1] - 48:24
**anus** [4] - 26:18, 42:21, 56:2, 69:25
**anyway** [2] - 91:7, 180:18
**AP** [1] - 94:24
**apart** [1] - 101:8
**apartment** [2] - 102:12, 102:14
**apologies** [3] - 170:10, 174:5, 177:13
**apologize** [1] - 89:25
**appeal** [3] - 79:21, 79:24, 103:10
**appealed** [1] - 79:22
**appear** [2] - 10:10, 87:11
**APPEARANCES** [2] - 1:12, 2:1
**appellate** [2] - 7:2, 7:25
**appellee's** [1] - 169:1
**applied** [10] - 77:6, 79:14, 82:3, 82:7, 82:15, 99:19, 100:2, 102:7, 176:13, 176:14
**applies** [6] - 76:8, 81:20, 138:1, 138:5, 155:24, 156:2
**apply** [9] - 76:4, 98:12, 98:15, 121:12, 143:25, 155:16, 182:15, 184:5, 184:15
**applying** [4] - 10:17, 10:18, 151:14, 181:22
**appointments** [1] - 80:14
**appropriate** [32] - 37:4, 48:24, 54:4, 67:4, 78:8, 78:25, 89:23, 92:19, 92:20, 92:22, 93:2, 93:9, 93:23, 102:15, 122:1, 123:14, 125:20, 128:1, 128:5, 128:6, 130:7, 135:15, 136:18, 145:3, 146:10, 146:22, 147:5, 181:3, 184:25, 185:4, 185:11
**appropriately** [2] - 17:18, 127:5
**APRIL** [1] - 1:11
**areas** [2] - 72:25, 105:20
**arguable** [1] - 38:22
**arguably** [11] - 73:5, 135:1, 135:2, 136:13, 136:15, 136:20, 145:25, 173:12, 180:7, 180:24, 181:12
**argue** [11] - 8:23, 42:9, 44:13, 74:20, 76:8, 89:2, 89:15, 91:8, 121:13, 143:5, 154:19
**argued** [8] - 10:7, 41:10, 45:3, 76:8, 89:16, 129:5, 169:11, 175:23
**argues** [1] - 3:10
**arguing** [18] - 3:22, 10:2, 39:13, 79:22, 83:24, 126:8, 131:7, 148:24, 166:15, 167:9, 170:13, 170:16, 170:18, 170:22, 171:16, 175:20, 177:3, 183:21
**argument** [69] - 10:13, 10:16, 21:3, 36:12, 39:5, 39:19, 40:20, 44:6, 46:20, 48:9, 48:21, 49:2, 52:25, 64:3, 66:7, 66:9, 70:23, 72:21, 73:2, 76:3, 79:14, 85:6, 89:4, 121:12, 122:3, 122:8, 122:22, 126:13, 127:16, 130:6, 130:10, 130:18, 134:2, 135:4, 137:3, 137:21, 140:3, 144:9, 144:18, 144:25, 147:12, 151:23, 151:24, 152:2, 155:15, 155:21, 156:1, 156:15, 164:8, 164:12, 165:17, 166:23, 167:2, 168:10, 169:12, 169:15, 169:21, 169:22, 170:13, 173:8, 173:10, 174:7, 174:12, 182:9, 184:3, 184:4, 184:16, 192:10, 192:14
**arguments** [8] - 12:13, 21:3, 66:4, 80:10, 128:19, 137:14, 188:10, 192:24
**arise** [2] - 47:15, 88:6
**arises** [2] - 9:19, 10:21
**arising** [1] - 80:21
**arrangements** [1] - 192:19
**arrested** [2] - 77:17, 153:5
**arrive** [3] - 70:5, 70:9, 104:25
**arrived** [6] - 105:17, 105:23, 105:25, 106:3, 118:14
**Article** [1] - 90:9
**articulated** [1] - 174:5
**ashamed** [1] - 111:11
**aside** [4] - 83:4, 84:3, 86:24, 154:17
**aspect** [1] - 187:6
**assailant** [3] - 105:15, 111:10, 112:6
**Assailant** [1] - 112:7
**assailants** [12] - 15:19, 15:20, 16:3, 25:13, 105:6, 111:5, 111:6, 111:7, 111:9, 119:25, 149:8
**assault** [73] - 10:17, 10:25, 11:15, 11:16, 12:4, 12:24, 13:3, 13:8, 13:14, 13:18, 13:22, 13:23, 14:4, 14:13, 15:20, 18:3, 18:11, 19:7, 19:10, 19:15, 19:22, 20:22, 21:17, 25:18, 27:18, 41:8, 44:4, 44:19, 47:2, 51:3, 54:8, 55:22, 55:24, 56:3, 62:19, 66:18, 66:21, 66:25, 67:8, 67:9, 69:10, 71:20, 72:6, 73:14, 88:19, 107:25, 110:3, 113:13, 113:14, 113:16, 114:2, 114:23, 120:2, 120:23, 121:14, 121:24, 122:2, 126:4, 127:5, 136:9, 136:14, 149:24, 172:7, 172:19, 173:4, 174:22, 177:23, 182:22, 183:3
**assaulted** [25] - 10:22, 15:18, 26:16, 27:14, 35:8, 48:20, 65:10, 67:16, 82:6, 114:6, 116:7, 119:1, 121:19, 121:21, 123:2, 123:20, 123:21, 124:16, 153:4, 154:11, 174:16, 188:17
**assaulting** [2] - 25:16, 25:17
**assaultive** [1] - 145:24
**assaults** [22] - 21:21, 22:5, 29:11, 55:19, 55:21, 56:6, 56:11, 62:20, 64:9, 93:18, 94:2, 113:11, 115:21, 146:5, 149:22, 150:24, 152:25, 154:16, 154:17, 177:23, 177:24, 183:4
**Assembly** [1] - 103:7
**assert** [1] - 26:19
**asserted** [1] - 49:2
**assertion** [1] - 160:23
**assertions** [1] - 24:9
**asserts** [1] - 82:23
**assess** [1] - 98:6


**assessed** [1] - 83:2
**assessing** [2] - 92:17, 169:3
**assigned** [1] - 145:6
**assist** [1] - 20:8
**assistance** [2] - 69:6, 92:10
**assistant** [7] - 60:5, 92:25, 106:10, 108:1, 109:9, 110:20, 172:10
**associate** [1] - 148:18
**associated** [1] - 8:11
**assume** [11] - 5:4, 6:24, 16:17, 70:2, 70:11, 74:25, 85:2, 100:21, 102:6, 146:7, 169:18
**assuming** [1] - 85:21
**assumption** [1] - 70:14
**athletes** [8] - 15:4, 15:6, 28:13, 91:11, 160:15, 161:3, 187:12, 188:6
**athletic** [67] - 11:1, 11:8, 13:1, 17:12, 19:20, 19:25, 20:3, 20:4, 20:7, 21:6, 21:7, 23:5, 29:6, 30:17, 30:18, 30:19, 30:20, 31:2, 31:14, 31:15, 33:4, 35:1, 37:2, 39:9, 40:2, 40:19, 41:12, 41:22, 42:17, 44:23, 46:2, 46:7, 46:24, 46:25, 50:1, 51:11, 51:17, 52:22, 53:9, 57:10, 57:11, 57:17, 58:15, 58:17, 60:2, 64:7, 65:9, 68:17, 68:18, 105:3, 106:4, 110:7, 115:10, 148:4, 148:16, 156:18, 157:13, 161:22, 162:1, 163:2, 164:1, 164:3, 168:2
**Athletic** [4] - 17:15, 18:6, 30:1, 109:11
**athletics** [11] - 28:18, 38:9, 38:17, 41:14, 46:9, 53:9, 147:9, 147:10, 152:11, 153:14, 157:14
**attached** [1] - 59:9
**attack** [6] - 109:24, 110:8, 158:5, 159:1, 162:19
**attacked** [3] - 102:13, 112:7, 112:14
**attackers** [1] - 125:8
**attacking** [1] - 179:11
**attacks** [2] - 93:17, 159:23
**attained** [1] - 7:16
**attempted** [3] - 119:2, 119:3, 119:5
**attempts** [1] - 22:3
**attend** [1] - 101:22
**attending** [2] - 52:22, 52:23
**attention** [4] - 25:23, 122:24, 130:14, 176:21
**ATTORNEY** [1] - 2:10
**Attorney's** [1] - 113:24
**attributed** [1] - 121:15
**August** [56] - 9:20, 10:23, 11:17, 12:20, 13:3, 13:9, 13:15, 13:19, 14:5, 14:17, 15:12, 19:11, 19:23, 21:5, 21:17, 21:22, 22:1, 22:4, 22:16, 22:24, 23:2, 23:25, 24:16, 25:1, 32:18, 54:2, 54:5, 64:3, 65:6, 65:7, 65:21, 65:22, 66:15, 67:9, 68:4, 71:4, 71:16, 71:25, 73:25, 74:8, 103:23, 104:1, 104:6, 112:24, 119:4, 121:25, 123:15, 124:7, 124:20, 127:15, 130:12, 131:6, 183:2, 183:13
**authority** [9] - 92:23, 119:21, 128:1, 157:1, 157:11, 168:4, 172:21, 188:3
**automobile** [1] - 140:22
**available** [17] - 76:12, 78:20, 79:4, 79:23, 80:1, 80:5, 80:19, 80:25, 88:13, 89:15, 98:24, 98:25, 99:1, 99:2, 100:19, 100:21, 103:4
**avidly** [1] - 186:24
**avoid** [1] - 37:13
**award** [5] - 77:21, 77:25, 78:8, 80:4, 82:22
**awarded** [6] - 77:13, 77:20, 78:22, 79:8, 79:10, 79:18
**aware** [24] - 7:12, 9:8, 14:5, 22:5, 55:18, 56:6, 56:8, 56:9, 60:14, 61:19, 81:4, 94:3, 114:7, 117:7, 117:8, 117:9, 122:21, 158:2, 158:3, 158:18, 159:8, 186:15, 186:20, 186:22

## B

**background** [1] - 15:11
**backs** [1] - 68:5
**bad** [14] - 30:12, 30:15, 45:23, 75:8, 102:1, 107:9, 107:13, 107:16, 107:23, 116:10, 117:17, 140:17, 141:3, 177:20
**Baggett** [4] - 59:15, 109:17, 184:10, 184:12
**Baggett-Stone** [3] - 59:15, 109:17, 184:10
**Baggett-Stone's** [1] - 184:12
**ball** [1] - 123:9
**Baltimore** [3] - 1:22, 2:17, 2:18
**band** [2] - 127:17, 127:20
**Barbre** [1] - 38:6
**bare** [2] - 47:23, 48:1
**Barnes** [12] - 77:11, 77:16, 79:13, 79:14, 79:25, 80:3, 80:11, 80:22, 82:7, 82:14, 89:9
**based** [19] - 9:13, 16:23, 43:13, 67:13, 69:8, 76:14, 77:9, 80:25, 81:15, 83:8, 92:14, 99:11, 126:21, 152:3, 152:5, 152:23, 169:12, 169:16, 188:15
**basic** [1] - 88:21
**basis** [6] - 10:1, 92:7, 92:11, 92:15, 137:17, 147:3
**bathrooms** [1] - 61:1
**battering** [1] - 146:10
**Baynard** [4] - 94:5, 128:17, 135:8, 180:13
**beating** [2] - 56:1, 150:1
**became** [9] - 44:4, 102:1, 107:13, 109:7, 114:7, 117:14, 125:12, 125:13, 159:20
**becomes** [1] - 47:1
**becoming** [1] - 112:16
**BEFORE** [1] - 1:10
**began** [5] - 10:12, 21:18, 51:12, 107:13, 107:23
**begged** [1] - 110:21
**begging** [1] - 109:3
**begin** [3] - 76:3, 104:12, 132:16
**beginning** [3] - 23:19, 104:12, 115:3
**begins** [1] - 9:15
**begun** [1] - 21:19
**behalf** [13] - 3:13, 3:18, 3:21, 4:10, 4:16, 4:24, 10:3, 21:1, 24:8, 37:1, 66:3, 120:18, 121:11
**behavior** [13] - 23:22, 49:20, 54:25, 76:21, 109:13, 109:20, 118:21, 120:25, 145:24, 152:25, 187:2, 187:24, 190:8
**behavioral** [2] - 15:2, 145:10
**behaviors** [2] - 47:12, 47:13
**behind** [3] - 52:16, 69:1, 75:17
**belabor** [2] - 57:5, 69:9
**belong** [2] - 7:4
**below** [4] - 148:8, 149:1, 149:2, 150:23
**bench** [1] - 192:18
**benches** [1] - 60:21
**benefits** [1] - 92:8
**best** [8] - 16:5, 23:13, 30:7, 30:9, 33:17, 144:24, 191:14, 193:12
**better** [1] - 125:8
**between** [14] - 19:2, 27:16, 29:2, 31:23, 54:2, 54:4, 70:6, 71:4, 101:4, 104:1, 121:19, 131:5, 136:19, 140:4
**beyond** [6] - 33:16, 47:24, 84:6, 123:12, 137:3, 191:6
**big** [4] - 50:12, 53:15, 118:4, 118:6
**binder** [4] - 16:6, 77:11, 82:5, 94:20
**binders** [1] - 138:13
**binding** [2] - 99:16, 99:17
**birthed** [1] - 76:19
**bit** [3] - 39:21, 89:3, 170:12
**bitterly** [1] - 108:1
**blanket** [1] - 127:18
**bleeding** [1] - 140:24
**blew** [1] - 123:10
**blind** [2] - 80:13, 128:21
**blindness** [4] - 122:22, 123:7, 125:12, 129:2
**blocks** [1] - 87:22
**Board** [81] - 3:6, 4:7, 4:10, 4:21, 10:3, 11:1, 12:22, 14:2, 14:5, 15:1, 20:15, 20:17, 28:16, 34:17, 40:13, 40:18, 49:1, 57:19, 58:16, 59:2, 86:17, 86:21, 86:22, 87:5, 87:22, 91:1, 92:18, 94:18, 96:13, 97:15, 114:6, 114:16, 114:25, 121:13, 122:2, 129:23, 131:10, 131:18, 132:8, 133:15, 134:12, 135:12, 136:18, 139:3, 139:6, 139:8, 139:9, 139:12, 139:13, 144:21, 148:25, 152:4, 152:17, 153:16, 154:2, 160:12, 160:23, 162:8, 162:13, 163:1, 163:10, 163:24, 164:18, 164:19, 164:20, 165:16, 165:20, 166:6, 166:20, 167:12, 167:14, 168:11, 168:14, 174:12, 175:25, 178:9, 183:10, 184:24, 185:8, 189:14, 191:8
**board** [4] - 144:1, 155:17, 164:14, 184:17
**BOARD** [2] - 1:7, 2:9

**Board's** [7] - 14:24, 136:5, 153:16, 156:15, 162:23, 165:14, 185:17
**boat** [1] - 57:13
**bodily** [15] - 101:9, 101:15, 101:17, 101:18, 102:24, 140:5, 141:1, 150:3, 154:20, 154:25, 156:10, 160:25, 173:10, 183:23, 191:21
**body** [2] - 14:22, 101:10
**bones** [1] - 140:24
**bootstrap** [1] - 22:3
**bound** [1] - 156:21
**box** [2] - 9:2, 63:20
**boyfriend** [2] - 116:1
**boys** [4] - 29:10, 35:1, 106:19, 106:20
**breach** [17] - 18:1, 18:13, 27:4, 28:2, 35:20, 58:5, 73:18, 78:20, 79:4, 102:18, 102:19, 102:25, 159:8, 168:18, 185:18, 185:21
**breached** [6] - 17:5, 17:23, 17:25, 20:12, 27:3, 58:21
**breaches** [3] - 158:1, 160:20, 185:24
**breaching** [1] - 81:5
**breadth** [1] - 188:15
**break** [9] - 36:11, 36:12, 36:13, 53:13, 72:20, 75:19, 121:5, 141:5, 144:7
**breaking** [1] - 108:17
**Brian** [4] - 14:7, 54:21, 96:9, 148:18
**bridgeview** [1] - 188:11
**Bridgewater** [2] - 94:1, 94:3
**brief** [4] - 64:2, 121:10, 141:13, 161:19
**briefly** [7] - 64:1, 71:15, 114:15, 121:9, 161:9, 174:10, 189:3
**bring** [5] - 98:18, 101:9, 102:21, 107:19, 120:17
**bringing** [1] - 143:9
**brings** [1] - 143:9
**broke** [1] - 89:1
**broken** [3] - 53:19, 60:25, 140:25
**broom** [11] - 95:18, 104:3, 112:15, 113:2, 113:3, 113:6, 113:7, 119:2, 119:3, 131:17, 132:7
**broomed** [7] - 111:6, 111:8, 111:10, 111:20, 112:19, 112:20, 113:4
**brooming** [23] - 11:15, 14:3, 14:13, 24:25, 25:4, 29:15, 30:22, 33:10, 33:25, 34:10, 62:12, 71:6, 110:25, 111:2, 113:10, 114:22, 115:1, 120:2, 123:3, 130:12, 154:18, 159:23, 187:7
**broomings** [1] - 114:10
**broomstick** [1] - 26:19
**brought** [10] - 62:12, 77:19, 78:9, 78:23, 80:1, 81:21, 83:20, 102:16, 130:14, 132:19
**Bryant** [1] - 4:1
**BRYANT** [1] - 1:15
**buck** [1] - 181:4
**budgeting** [2] - 20:2, 38:10
**building** [19] - 60:10, 105:5, 105:14, 106:22, 108:7, 108:8, 108:9, 108:12, 109:20, 110:19, 113:19, 116:17, 117:18, 157:13, 176:7, 177:15, 178:6, 178:21, 184:13
**bullying** [20] - 14:22, 15:2, 15:10, 29:8, 33:14, 47:11, 47:12, 47:20, 50:5, 50:14, 55:8, 64:19, 120:25, 144:22, 145:23, 162:14, 187:23, 190:8, 190:18
**bunch** [1] - 189:17
**Burns** [2] - 179:5, 181:23
**Burns-Fisher** [2] - 179:5, 181:23
**burst** [1] - 103:19
**bus** [2] - 119:9, 127:18
**business** [1] - 26:24
**but..** [1] - 171:17
**Butler** [1] - 38:4
**butt** [1] - 119:5
**BY** [10] - 1:15, 1:15, 1:16, 1:20, 2:3, 2:6, 2:11, 2:11, 2:12, 2:16

## C

**C.T** [1] - 111:6
**C.V** [4] - 54:7, 95:15, 97:12, 128:4
**cabinet** [1] - 133:19
**calculated** [1] - 115:9
**Camilo** [1] - 152:20
**Camilo-Robles** [1] - 152:20
**camp** [2] - 29:14, 29:16
**campus** [1] - 94:3
**cannot** [10] - 42:23, 49:8, 77:13, 80:9, 81:11, 81:20, 90:8, 138:17, 140:11, 161:2
**cap** [5] - 98:17, 98:18, 103:8, 139:19, 139:20
**capable** [2] - 90:18, 120:9
**capacity** [6] - 24:20, 152:15, 164:18, 165:6, 165:7, 165:8
**caps** [4] - 98:12, 98:13, 103:11, 139:17
**captured** [1] - 113:16
**car** [1] - 53:19
**care** [14] - 16:21, 17:4, 18:1, 18:14, 20:12, 25:22, 31:6, 43:12, 57:6, 58:6, 58:22, 64:23, 73:19
**Care** [2] - 77:1, 80:16
**cared** [2] - 57:14, 118:8
**cares** [3] - 40:14, 40:15
**carried** [1] - 6:14
**carry** [1] - 26:11
**case** [115] - 6:4, 6:14, 6:19, 6:23, 7:19, 8:11, 16:6, 16:7, 16:11, 21:25, 24:24, 25:14, 26:12, 27:2, 38:4, 61:10, 61:21, 61:23, 63:8, 64:15, 71:1, 71:6, 72:23, 78:6, 78:15, 79:21, 80:7, 80:8, 81:16, 81:24, 82:1, 82:25, 84:20, 86:10, 86:12, 89:2, 90:3, 92:18, 94:1, 94:5, 94:12, 94:14, 95:4, 95:7, 98:18, 99:3, 99:4, 99:12, 99:16, 99:24, 100:2, 100:8, 100:14, 101:10, 101:14, 101:16, 101:21, 102:21, 103:13, 103:19, 104:6, 111:6, 111:16, 114:18, 120:9, 120:12, 120:15, 123:12, 123:21, 124:19, 125:21, 126:1, 126:21, 126:22, 127:3, 127:17, 134:20, 136:24, 137:22, 138:13, 139:16, 141:19, 141:21, 142:16, 148:17, 149:19, 152:19, 152:23, 153:8, 153:12, 156:8, 167:9, 169:1, 169:16, 172:16, 173:17, 175:4, 179:3, 179:6, 179:7, 180:13, 180:17, 181:22, 182:1, 188:11, 188:12
**cases** [34] - 26:1, 26:2, 26:8, 61:22, 89:9, 94:19, 99:25, 100:9, 102:12, 102:16, 102:23, 125:21, 126:15, 129:2, 135:7, 135:14, 135:20, 135:22, 138:1, 138:7, 138:10, 138:16, 139:22, 140:1, 141:6, 172:8, 172:23, 173:4, 174:20, 174:25, 175:1, 175:4, 176:16, 181:22
**CASEY** [1] - 2:9
**Casey** [8] - 4:11, 11:2, 18:4, 44:15, 105:12, 115:5, 131:2, 132:14
**causal** [1] - 27:15
**caused** [7] - 16:17, 18:2, 20:22, 27:4, 27:9, 172:7, 179:14
**causes** [2] - 6:21, 172:25
**caution** [1] - 25:22
**cautionary** [1] - 29:16
**ceiling** [2] - 60:20, 60:22
**cell** [1] - 116:5
**center** [2] - 105:24, 106:19
**central** [6] - 62:14, 114:21, 131:24, 133:12, 159:4, 186:19
**cert** [1] - 80:20
**certain** [7] - 27:12, 46:20, 47:23, 49:1, 54:6, 76:21, 145:8
**certainly** [15] - 23:4, 23:6, 40:14, 40:15, 55:19, 65:20, 73:18, 83:20, 88:10, 142:16, 143:5, 155:24, 188:13, 188:14, 191:6
**certification** [1] - 157:9
**certifications** [1] - 168:4
**certified** [1] - 157:8
**certify** [3] - 157:6, 168:2, 193:6
**cetera** [4] - 110:10, 187:24, 190:8
**chain** [9] - 148:10, 148:20, 149:9, 153:9, 155:4, 158:19, 163:2, 173:5, 173:11
**challenging** [1] - 165:17
**chance** [3] - 48:23, 107:3, 141:15
**change** [1] - 178:22
**changed** [3] - 82:18, 112:13, 137:23
**changes** [1] - 91:20
**characterized** [1] - 181:16
**characterizing** [1] - 130:22
**charge** [3] - 64:6, 65:8, 70:24
**charged** [2] - 29:15, 64:23
**chart** [2] - 9:10, 10:10
**check** [4] - 46:10, 133:8, 134:3, 145:9
**check-ins** [1] - 145:9
**checking** [1] - 46:24
**checks** [1] - 63:19
**child** [2] - 91:14, 186:4

**children** [2] - 16:8, 75:10
**chipping** [1] - 16:11
**chose** [1] - 188:3
**chronic** [2] - 59:11, 59:13
**chronically** [1] - 114:5
**Circuit** [32] - 77:22, 78:3, 79:12, 79:21, 79:22, 80:19, 81:16, 82:13, 82:16, 93:14, 94:5, 94:22, 95:4, 95:6, 98:24, 99:14, 99:17, 100:8, 138:4, 138:9, 156:7, 174:2, 174:14, 174:19, 174:23, 176:21, 177:6, 179:3, 179:6, 182:2
**circuits** [1] - 138:11
**circulate** [1] - 153:15
**circumstances** [2] - 10:16, 25:24
**citation** [1] - 11:22
**citations** [1] - 11:20
**cite** [4] - 12:2, 34:9, 152:19, 189:18
**cited** [19] - 7:3, 34:12, 77:11, 81:24, 82:4, 82:11, 82:17, 90:3, 93:25, 137:22, 138:14, 138:16, 140:2, 168:24, 174:19, 174:22, 175:5, 188:11, 189:5
**cites** [2] - 95:2, 188:12
**citing** [2] - 26:7, 159:24
**City** [1] - 90:4
**Civil** [3] - 3:5, 76:25, 78:25
**CIVIL** [1] - 1:4
**civil** [2] - 25:20, 152:22
**claim** [47] - 7:16, 10:4, 10:6, 10:7, 20:16, 20:18, 23:25, 49:21, 49:25, 53:13, 85:1, 85:13, 87:5, 90:1, 90:16, 91:16, 98:11, 101:21, 102:21, 120:6, 121:16, 138:6, 140:8, 147:15, 148:2, 149:10, 152:9, 152:14, 152:16, 152:20, 155:2, 155:3, 162:15, 164:12, 164:18, 164:25, 166:4, 168:9, 168:10, 169:16, 170:20, 177:8, 179:13, 182:17, 182:19, 184:22, 192:6
**claimed** [3] - 84:21, 85:1, 187:8
**claiming** [2] - 39:14, 152:19
**claims** [16] - 6:20, 7:4, 7:6, 9:18, 10:1, 10:9, 20:17, 54:4, 77:19, 81:20, 87:24, 101:18, 101:19, 102:10, 103:7, 177:6
**clarify** [1] - 170:21
**Clarksburg** [12] - 116:9, 116:10, 116:17, 116:19, 117:4, 117:14, 118:10, 118:23, 177:15, 177:19, 177:20, 178:1
**class** [6] - 14:22, 120:25, 145:7, 187:24, 190:8, 190:12
**classes** [3] - 24:20, 48:14, 125:17
**classic** [1] - 120:9
**classroom** [4] - 110:10, 132:19, 190:20, 191:25
**clause** [13] - 76:20, 76:24, 78:14, 78:18, 79:13, 80:22, 80:24, 81:5, 81:13, 81:22, 82:15, 99:7, 100:3
**clean** [2] - 8:5, 36:12
**clear** [31] - 6:1, 6:13, 6:15, 8:4, 10:12, 14:14, 28:9, 28:12, 28:14, 28:20, 34:16, 43:23, 62:15, 65:9, 66:5, 67:14, 68:2, 68:3, 70:17, 78:7, 88:10, 98:18, 120:25, 138:2, 138:3, 138:7, 141:10, 141:20, 159:13, 165:17
**clearly** [24] - 44:6, 45:3, 68:3, 77:3, 98:25, 107:4, 113:25, 126:16, 138:5, 154:12, 155:13, 156:6, 159:6, 167:10, 172:16, 174:1, 174:5, 180:10, 180:20, 182:4, 183:10, 183:13, 183:23, 192:8
**CLERK** [1] - 3:4
**client** [9] - 21:10, 23:4, 32:11, 43:2, 69:8, 101:22, 102:1, 123:5, 125:7
**clients** [4] - 4:17, 5:17, 7:23, 71:4
**clinical** [2] - 169:4, 169:7
**close** [8] - 8:18, 27:15, 60:24, 69:12, 69:13, 108:17, 120:20, 160:22
**club** [2] - 106:19, 106:20
**co** [2] - 4:2, 4:3
**co-counsel** [2] - 4:2, 4:3
**Coach** [27] - 17:4, 43:17, 47:18, 47:19, 58:10, 66:10, 66:16, 66:22, 67:4, 67:12, 68:6, 68:24, 69:22, 69:24, 70:18, 74:20, 74:24, 90:9, 104:16, 108:24, 109:1, 157:2, 157:3, 157:15, 171:5
**coach** [57] - 11:7, 13:5, 13:6, 13:11, 13:12, 15:24, 17:10, 18:9, 18:10, 18:17, 19:18, 21:23, 21:24, 30:23, 31:5, 38:17, 42:22, 42:24, 43:25, 44:24, 44:25, 49:25, 50:23, 53:24, 55:7, 65:4, 66:1, 66:5, 68:18, 70:15, 70:22, 71:14, 91:12, 91:13, 104:17, 104:21, 104:24, 105:7, 105:23, 105:25, 110:6, 110:23, 120:22, 145:12, 148:15, 156:22, 157:8, 160:7, 160:11, 162:2, 163:8, 182:21, 185:2, 185:12, 186:7
**coaches** [78] - 15:15, 15:16, 17:9, 20:5, 20:7, 20:8, 22:10, 26:14, 26:20, 28:6, 28:12, 29:6, 29:9, 29:17, 29:24, 30:11, 31:4, 31:18, 32:1, 33:21, 34:23, 39:10, 42:14, 42:16, 42:18, 43:9, 43:24, 47:17, 50:3, 50:7, 50:8, 50:13, 50:25, 51:6, 51:9, 51:12, 51:18, 51:23, 51:24, 52:5, 52:19, 53:7, 53:11, 53:20, 55:6, 57:10, 57:11, 57:23, 58:6, 58:23, 58:25, 61:8, 61:13, 63:13, 65:12, 65:15, 65:18, 73:9, 106:5, 108:15, 111:4, 119:20, 130:15, 148:4, 157:7, 159:19, 159:21, 161:23, 163:3, 168:2, 178:11, 178:12, 186:3, 186:9, 188:12, 188:13
**coaching** [4] - 33:22, 43:10, 91:13, 95:23
**Code** [2] - 52:1, 186:11
**coextensive** [1] - 78:13
**cognizable** [1] - 78:9
**coincidence** [1] - 65:19
**coincidently** [1] - 30:21
**Colbert** [55] - 4:11, 10:4, 11:8, 13:11, 13:15, 15:4, 15:9, 17:4, 18:10, 18:16, 19:9, 19:14, 19:19, 21:24, 29:25, 30:2, 33:22, 43:18, 44:24, 47:19, 50:8, 52:8, 54:10, 58:10, 58:13, 63:16, 70:23, 71:12, 71:13, 71:19, 72:4, 89:22, 95:15, 95:23, 104:21, 109:18, 109:25, 110:6, 151:22, 153:13, 153:18, 154:10, 157:15, 158:13, 159:20, 160:2, 160:13, 171:19, 178:8, 178:18, 182:15, 182:21, 183:5, 185:2, 186:2
**COLBERT** [1] - 2:9
**Colbert's** [4] - 53:19, 58:12, 63:20, 184:7
**colleague** [1] - 4:12
**college** [2] - 90:7, 180:16
**College** [1] - 82:5
**combines** [1] - 124:5
**coming** [6] - 11:21, 115:17, 125:9, 150:15, 150:16, 167:10
**command** [6] - 148:11, 148:20, 149:9, 153:9, 155:5, 158:20
**commander** [1] - 153:11
**comments** [2] - 56:20, 89:10
**commit** [1] - 147:23
**commits** [1] - 150:18
**committed** [1] - 15:20
**committing** [1] - 142:19
**common** [4] - 77:24, 85:10, 148:23, 152:6
**communication** [1] - 136:8
**community** [1] - 108:20
**compared** [1] - 153:12
**compelled** [1] - 80:3
**compelling** [1] - 6:9
**compensable** [8] - 81:9, 84:6, 84:7, 85:4, 85:8, 87:8, 88:11, 102:4
**compensation** [4] - 83:5, 83:15, 83:16, 125:18
**compensatory** [5] - 77:20, 79:19, 84:10, 140:7, 140:8
**complain** [2] - 111:13, 131:16
**complained** [6] - 59:15, 67:22, 107:24, 108:1, 108:9, 109:15
**complaining** [4] - 56:9, 67:25, 114:9
**complaint** [17] - 11:11, 14:3, 14:16, 16:24, 17:2, 17:22, 23:15, 23:16, 60:11, 76:6, 82:8, 92:5, 111:15, 165:9, 165:10, 165:12, 187:5
**Complaint** [1] - 9:22
**complaints** [19] - 18:7, 18:8, 18:9, 18:10, 19:10, 19:14, 19:15, 60:6, 71:21, 71:22, 108:2, 110:13,

111:17, 177:22, 178:15, 184:10, 187:1, 187:17, 189:13
**complete** [9] - 31:4, 57:7, 58:21, 59:14, 63:6, 63:7, 104:13, 117:20, 126:3
**completed** [8] - 17:22, 47:17, 47:19, 61:14, 91:13, 160:7, 161:22, 163:14
**completely** [9] - 28:12, 61:12, 61:16, 62:22, 63:9, 63:10, 74:18, 101:22, 104:19
**completing** [1] - 63:19
**compliance** [6] - 9:15, 65:16, 157:21, 157:23, 161:13, 186:4
**complied** [6] - 31:19, 31:22, 42:15, 156:20, 164:5, 186:8
**complies** [1] - 168:1
**comply** [2] - 33:5, 77:3
**component** [6] - 83:23, 84:7, 84:12, 87:14, 87:15, 88:25
**comprehend** [1] - 147:2
**comprehensive** [1] - 147:6
**computation** [1] - 86:9
**COMPUTER** [1] - 1:25
**computer** [3] - 160:3, 160:9, 193:11
**computer-aided** [1] - 193:11
**COMPUTER-AIDED** [1] - 1:25
**concede** [2] - 55:2, 134:6
**conceded** [2] - 22:9, 122:3
**concedes** [1] - 169:13
**concept** [2] - 175:16, 176:13
**concern** [2] - 60:6, 109:7
**concerned** [7] - 7:11, 8:13, 49:11, 65:8, 127:8, 141:22, 150:2
**concerned..** [1] - 156:4
**concerns** [5] - 59:25, 108:14, 109:8, 136:7, 153:1
**concluded** [2] - 81:10, 193:1
**concrete** [1] - 90:12
**conditioned** [1] - 76:21
**condone** [1] - 55:13
**conduct** [20] - 14:6, 27:12, 53:16, 71:7, 77:7, 93:11, 106:2, 107:15, 107:20, 121:18, 147:24, 150:7, 150:8, 150:15, 151:8, 154:14, 171:25, 182:25, 187:16
**Conduct** [2] - 52:1, 186:11
**conducted** [4] - 59:8, 65:11, 157:2, 185:9
**confine** [1] - 71:23
**confirms** [1] - 159:5
**conform** [1] - 27:12
**confuse** [1] - 140:15
**confused** [1] - 131:1
**confusing** [1] - 151:5
**confusion** [1] - 10:11
**Congress** [5] - 77:1, 77:24, 78:7, 100:10, 100:18
**connection** [1] - 27:15
**Connections** [1] - 145:7
**consecutive** [1] - 108:17
**consent** [2] - 80:25, 139:18
**consented** [2] - 79:6, 81:11
**consequence** [4] - 85:5, 136:15, 140:6, 160:6
**consequences** [9] - 15:8, 37:11, 37:12, 41:6, 44:1, 44:3, 44:5, 47:5, 65:1
**consider** [1] - 81:14
**consideration** [1] - 86:10
**considered** [5] - 76:23, 90:23, 108:24, 177:1, 191:7
**consist** [1] - 30:5
**consisted** [1] - 30:6
**consistent** [1] - 78:24
**consistently** [2] - 80:2, 82:3
**constitute** [1] - 179:12
**Constitution** [1] - 147:18
**constitutional** [12] - 150:4, 154:8, 154:19, 156:6, 161:1, 168:18, 172:4, 172:6, 172:22, 174:2, 178:4, 182:25
**constitutionally** [1] - 154:13
**constructive** [2] - 93:23, 160:5
**construe** [1] - 93:11
**construed** [3] - 123:25, 128:4, 143:7
**contact** [1] - 126:5
**contacted** [1] - 109:18
**contend** [1] - 34:3
**contends** [1] - 58:5
**content** [1] - 190:11
**contention** [1] - 37:18
**continue** [3] - 8:12, 71:1, 119:20
**Continued** [1] - 2:1
**continuous** [1] - 67:20
**contract** [15] - 52:2, 77:6, 78:14, 78:19, 78:20, 79:4, 81:5, 81:6, 81:10, 82:7, 102:9, 102:18, 102:25, 103:3
**contractual** [2] - 102:22, 104:23
**contrary** [5] - 65:13, 78:7, 151:24, 161:16, 186:24
**contrived** [1] - 119:24
**control** [6] - 109:21, 113:19, 121:3, 125:13, 137:15, 177:7
**convenience** [1] - 8:24
**conversation** [1] - 54:22
**conversely** [1] - 37:14
**convey** [1] - 52:5
**conveyed** [7] - 50:16, 50:20, 51:5, 51:6, 51:9, 52:4
**conveying** [1] - 53:10
**conveys** [1] - 53:9
**CORNBROOKS** [1] - 2:16
**corporate** [1] - 14:24
**correct** [30] - 6:12, 6:25, 7:8, 21:10, 21:11, 51:21, 51:24, 52:9, 72:13, 83:1, 83:6, 87:11, 91:21, 91:23, 93:3, 110:12, 111:24, 124:12, 124:18, 131:8, 131:9, 139:6, 142:14, 160:8, 162:10, 170:8, 171:3, 171:4, 182:18, 193:7
**corrective** [1] - 92:23
**correctly** [1] - 193:10
**costs** [1] - 14:19
**couched** [1] - 76:6
**counsel** [14] - 3:8, 3:9, 3:10, 3:16, 3:23, 4:2, 4:3, 4:11, 5:19, 6:3, 8:23, 97:22, 117:24, 193:13
**Counsel** [1] - 4:13
**counseling** [1] - 116:12
**counselor** [1] - 145:10
**Count** [12] - 8:20, 9:16, 21:4, 36:8, 36:18, 44:12, 56:18, 65:24, 66:4, 75:24, 76:2, 171:9
**count** [16] - 9:12, 9:19, 17:1, 18:15, 20:14, 24:2, 36:19, 36:22, 66:4, 76:2, 83:11, 84:15, 88:11, 137:20, 183:16, 188:22
**country** [5] - 55:17, 99:25, 100:8, 101:10, 103:20
**counts** [14] - 9:25, 19:6, 21:10, 21:13, 34:15, 71:25, 85:25, 86:18, 86:25, 88:13, 102:16, 103:17, 155:17
**county** [2] - 23:1, 28:24
**County** [43] - 3:6, 4:21, 5:19, 5:20, 8:2, 16:2, 16:4, 17:16, 19:25, 22:23, 24:25, 33:15, 43:19, 54:19, 57:19, 61:20, 89:20, 92:24, 94:19, 94:21, 95:6, 96:13, 96:15, 100:6, 113:12, 114:20, 115:15, 116:5, 129:23, 136:4, 143:23, 148:13, 156:18, 157:22, 158:11, 159:12, 160:12, 166:24, 175:13, 178:20, 186:10, 187:13
**COUNTY** [4] - 1:7, 2:9, 2:10
**couple** [11] - 6:1, 61:3, 61:17, 95:11, 96:22, 134:11, 137:5, 156:24, 161:10, 179:1, 189:11
**coupled** [1] - 179:10
**courageous** [1] - 125:15
**course** [12] - 26:24, 31:3, 71:7, 100:24, 112:16, 114:23, 115:5, 121:4, 121:18, 136:7, 159:1, 168:13
**COURT** [390] - 1:1, 1:23, 3:2, 3:8, 3:15, 3:23, 4:7, 4:15, 4:19, 4:22, 4:25, 5:3, 5:8, 5:12, 5:15, 5:22, 5:24, 6:11, 6:13, 6:17, 7:6, 7:12, 7:19, 8:1, 8:9, 8:24, 9:3, 9:5, 10:14, 11:23, 12:2, 12:8, 12:13, 12:18, 18:19, 18:21, 18:24, 19:3, 19:8, 20:24, 21:9, 21:15, 22:17, 22:20, 22:25, 23:3, 23:9, 24:5, 25:9, 26:2, 26:7, 27:21, 28:15, 28:23, 30:5, 30:16, 30:24, 31:10, 31:20, 32:3, 32:9, 32:12, 32:15, 32:20, 33:2, 34:3, 34:24, 35:23, 36:1, 36:4, 36:7, 36:11, 36:21, 36:25, 37:18, 38:14, 38:19, 38:22, 38:25, 39:5, 39:11, 39:16, 39:19, 39:21, 40:5, 40:8, 40:20, 41:1, 41:25, 42:4, 44:8, 44:10, 45:7, 45:9, 45:12, 45:16, 48:7, 48:21, 49:3, 49:12, 51:8, 51:14, 51:19, 51:22, 52:7, 52:10, 52:25, 55:20, 55:25, 56:13, 56:19, 56:22, 56:24, 61:3, 62:5, 62:7, 62:17, 63:3, 63:22, 64:1, 65:24, 66:12, 66:14, 67:5, 68:16, 69:2, 69:4, 69:11, 69:16, 70:1, 70:8, 70:14, 71:9, 72:10, 72:14,

72:16, 74:4, 74:7, 74:12, 75:15, 75:23, 82:24, 83:10, 83:22, 84:3, 85:2, 85:12, 85:15, 85:17, 86:3, 86:14, 86:16, 86:24, 87:3, 87:7, 87:10, 87:20, 87:25, 88:3, 88:7, 88:16, 89:11, 89:15, 90:18, 91:5, 91:18, 91:22, 91:24, 92:2, 95:4, 95:8, 95:11, 96:22, 97:10, 97:17, 97:20, 101:3, 101:24, 106:15, 107:10, 108:4, 110:4, 110:11, 111:7, 111:13, 111:15, 111:18, 111:22, 111:25, 112:3, 112:5, 114:11, 114:14, 114:25, 115:12, 118:1, 118:11, 118:16, 119:12, 120:3, 120:6, 121:8, 122:10, 122:19, 123:4, 123:17, 124:7, 124:10, 124:17, 124:23, 125:1, 125:3, 126:7, 126:12, 127:10, 127:13, 128:8, 128:13, 128:21, 129:4, 129:10, 130:16, 130:21, 131:4, 131:13, 131:21, 132:2, 132:13, 132:24, 133:7, 133:11, 133:20, 134:2, 134:24, 135:14, 135:21, 136:10, 136:20, 136:22, 137:2, 137:25, 138:4, 138:9, 138:19, 139:1, 139:3, 139:8, 139:15, 140:1, 140:10, 140:13, 140:22, 141:9, 141:12, 141:15, 141:21, 142:1, 142:7, 142:10, 142:16, 143:16, 144:11, 144:15, 145:17, 145:22, 146:24, 148:6, 148:12, 148:21, 149:11, 149:13, 149:17, 149:22,

150:10, 150:21, 151:5, 151:9, 151:11, 151:17, 151:20, 151:23, 152:2, 152:12, 153:20, 154:1, 154:5, 154:16, 154:24, 155:2, 155:10, 155:15, 155:19, 156:4, 156:12, 158:16, 160:6, 161:6, 161:8, 161:14, 161:25, 162:3, 162:6, 162:9, 162:18, 162:25, 163:5, 163:7, 163:13, 163:19, 164:6, 164:8, 164:11, 164:14, 164:20, 164:23, 165:2, 165:13, 165:24, 166:3, 166:8, 166:12, 166:14, 166:22, 168:6, 168:8, 168:19, 169:10, 169:21, 169:25, 170:11, 170:16, 170:21, 170:24, 171:6, 171:9, 171:12, 171:14, 171:20, 171:22, 172:1, 172:5, 172:20, 173:7, 173:21, 173:24, 174:3, 174:6, 174:9, 174:25, 176:12, 177:1, 177:3, 177:12, 179:1, 179:21, 180:23, 181:4, 181:12, 182:8, 182:12, 182:16, 182:19, 183:16, 183:20, 184:2, 184:16, 184:19, 184:21, 185:6, 185:13, 185:15, 185:22, 187:19, 188:7, 188:24, 189:2, 189:9, 189:15, 189:21, 190:1, 190:5, 190:10, 190:16, 190:25, 191:4, 191:12, 191:22, 192:3, 192:10, 192:13

**court** [9] - 7:2, 77:21, 80:18, 89:9, 103:9, 138:10, 143:17, 160:24, 185:19

**Court** [106] - 3:1, 3:5, 3:7, 8:12, 9:1, 9:7, 9:8, 9:12, 9:13, 9:14, 9:15, 10:11, 11:6, 11:19, 16:7, 16:11, 16:23, 20:21, 21:1, 24:3, 33:11, 45:11, 56:15, 57:2, 57:5, 59:4, 66:5, 66:6, 72:2, 73:15, 73:17, 76:11, 76:14, 77:6, 77:12, 78:2, 78:3, 78:11, 78:12, 79:9, 79:25, 80:8, 80:20, 80:22, 80:24, 81:4, 81:8, 81:10, 81:19, 88:15, 89:8, 89:24, 91:15, 93:14, 93:25, 94:2, 94:11, 94:22, 94:25, 95:5, 95:7, 97:25, 98:10, 98:16, 99:9, 99:10, 99:16, 99:17, 99:22, 100:2, 100:10, 100:12, 100:16, 100:17, 100:23, 100:25, 101:14, 102:11, 103:10, 103:12, 103:16, 118:4, 130:9, 130:25, 133:9, 134:19, 136:23, 137:22, 142:3, 144:20, 147:15, 154:8, 156:8, 169:1, 173:16, 183:12, 184:22, 188:22, 190:24, 191:2, 191:17, 193:4, 193:5, 193:18

**court's** [1] - 179:9

**Court's** [15] - 9:11, 10:10, 45:8, 67:6, 74:1, 79:24, 80:3, 98:3, 104:4, 137:10, 141:7, 155:11, 176:21, 182:11, 190:21

**courtroom** [2] - 4:13, 167:13

**courts** [2] - 78:8, 82:3

**Courts** [3] - 99:19, 102:22, 174:19

**cover** [2] - 36:10, 113:22

**covered** [1] - 174:24

**COVID** [1] - 120:12

**CPS** [1] - 126:5

**cracked** [1] - 60:21

**create** [13] - 68:12,

93:2, 93:7, 93:13, 94:6, 134:9, 134:25, 173:9, 173:25, 176:9, 181:25, 182:5, 191:16

**created** [24] - 58:8, 59:7, 126:19, 170:5, 171:14, 173:12, 175:22, 176:9, 176:16, 176:19, 177:1, 177:4, 177:5, 178:4, 179:4, 179:5, 179:8, 179:13, 179:15, 181:9, 181:25, 182:6, 182:25, 183:17

**creates** [4] - 40:18, 48:5, 127:7, 150:17

**creating** [4] - 43:20, 48:18, 176:19, 176:20

**creation** [1] - 41:22

**criminal** [15] - 6:7, 10:17, 10:25, 12:24, 18:2, 20:22, 66:21, 66:25, 73:14, 122:23, 150:15, 172:7, 172:15, 172:19

**criminally** [4] - 10:22, 15:17, 29:15, 154:11

**criteria** [1] - 127:8

**critically** [1] - 104:10

**CROUSE** [1] - 2:9

**Crouse** [79] - 4:11, 10:3, 11:2, 11:6, 13:21, 17:7, 18:4, 19:24, 30:13, 31:25, 41:19, 44:12, 44:15, 44:21, 45:19, 46:4, 54:13, 54:18, 60:1, 62:2, 62:5, 89:22, 94:14, 96:3, 96:6, 96:9, 96:20, 96:25, 97:14, 105:12, 106:3, 108:13, 108:23, 109:8, 109:11, 109:16, 115:5, 117:7, 117:16, 117:19, 117:21, 118:6, 118:19, 119:10, 119:18, 122:2, 122:4, 123:14, 123:18, 126:1, 128:4, 129:20, 131:2, 132:14, 132:22, 133:22, 134:15, 145:13, 148:17, 153:13,

153:18, 156:1, 156:2, 158:16, 158:17, 169:25, 170:4, 170:13, 171:11, 171:12, 172:13, 174:8, 175:20, 179:18, 186:17, 186:18, 186:20, 187:9

**CRR** [2] - 1:24, 193:17

**Cummings** [24] - 80:7, 80:8, 80:12, 81:15, 81:19, 81:25, 82:3, 82:8, 82:12, 83:24, 88:18, 89:9, 99:3, 99:20, 99:22, 100:1, 102:6, 103:19, 137:21, 138:1, 138:5, 138:8, 138:17

**current** [5] - 93:4, 93:5, 94:6, 99:16, 146:16

**cusp** [1] - 108:16

**custodial** [1] - 176:13

**custom** [1] - 165:11

**cycle** [1] - 125:10

## D

**dad** [1] - 66:19

**daily** [2] - 187:23, 190:8

**damage** [5] - 83:23, 98:14, 103:11, 140:2, 140:8

**damaged** [1] - 140:23

**damages** [99] - 76:3, 76:10, 76:12, 76:13, 76:14, 76:16, 76:17, 77:9, 77:12, 77:21, 77:22, 77:23, 78:1, 78:19, 78:21, 78:22, 79:3, 79:8, 79:14, 79:19, 79:23, 80:1, 80:4, 80:5, 80:9, 80:16, 80:19, 80:21, 81:12, 81:13, 81:18, 81:23, 82:1, 82:9, 82:12, 82:20, 82:22, 83:4, 83:6, 83:16, 83:17, 83:25, 84:1, 84:9, 84:11, 84:20, 84:21, 84:22, 84:25, 85:8, 85:13, 85:18, 85:21, 86:2, 86:4, 86:5, 86:6, 87:3, 87:8, 87:12, 87:16, 87:21, 87:22, 88:10, 92:1, 98:2, 98:3, 98:7, 98:19, 98:23,

98:24, 99:1, 99:15, 99:24, 100:7, 100:9, 101:8, 101:12, 102:5, 102:8, 102:11, 102:23, 103:3, 103:14, 108:14, 137:21, 137:24, 138:6, 138:15, 138:18, 138:21, 139:10, 139:11, 139:24, 140:7, 140:12, 140:16
**Damascus** [67] - 10:22, 11:15, 11:18, 12:5, 12:25, 13:5, 13:6, 13:8, 13:11, 13:14, 13:18, 13:24, 14:4, 14:10, 14:11, 14:18, 17:20, 19:23, 21:7, 22:6, 22:7, 22:10, 22:17, 22:25, 25:3, 25:6, 25:15, 32:20, 33:4, 33:6, 33:9, 42:16, 45:6, 47:7, 48:2, 48:4, 48:6, 50:2, 50:9, 64:9, 67:25, 102:1, 104:3, 104:11, 108:15, 108:16, 108:19, 108:21, 109:17, 111:4, 112:11, 115:17, 116:23, 117:3, 117:4, 117:15, 118:15, 118:19, 123:11, 145:18, 145:21, 146:15, 159:14, 176:3, 188:5
**danger** [25] - 61:20, 75:4, 117:18, 117:23, 170:5, 171:15, 175:22, 176:9, 176:16, 177:1, 177:4, 177:5, 177:14, 178:4, 179:4, 179:5, 179:8, 179:15, 180:21, 181:8, 181:9, 181:25, 182:6, 183:17
**dangerous** [3] - 47:13, 178:2
**date** [4] - 24:12, 24:14, 104:2, 193:8
**David** [2] - 6:2, 6:3
**Davis** [1] - 94:12
**DAX** [1] - 187:22
**day-to-day** [1] - 20:9
**days** [8] - 8:5, 100:24, 109:24, 110:2, 110:8, 114:7, 120:22, 127:20
**de** [2] - 148:23, 152:5
**deaf** [1] - 80:12
**deal** [1] - 89:3
**dealing** [1] - 66:10
**dealt** [1] - 115:11
**Deborah** [1] - 117:12
**decades** [2] - 13:2, 44:23
**decent** [2] - 143:23, 143:24
**decertify** [1] - 157:7
**decide** [1] - 146:9
**decided** [2] - 157:3, 178:16
**decision** [11] - 7:12, 7:25, 79:24, 80:3, 93:14, 106:12, 118:8, 118:24, 176:8, 177:17, 178:2
**decisionmaking** [1] - 108:23
**decisions** [2] - 7:3, 105:12
**decisis** [1] - 100:23
**declared** [1] - 153:6
**deems** [1] - 91:15
**Defendant** [17] - 4:24, 13:9, 13:19, 14:23, 28:19, 44:12, 46:4, 46:11, 46:16, 49:13, 49:21, 49:24, 51:5, 56:17, 65:14, 82:22, 147:9
**DEFENDANT** [2] - 2:9, 2:15
**defendant** [13] - 11:14, 17:24, 20:21, 27:2, 63:8, 80:14, 83:2, 83:3, 83:12, 84:15, 85:20, 86:18, 86:21
**defendant's** [1] - 94:23
**defendants** [35] - 4:7, 4:16, 4:22, 6:7, 7:10, 9:17, 9:18, 9:24, 10:19, 11:3, 12:21, 16:25, 17:3, 22:5, 24:1, 24:24, 26:19, 27:10, 29:24, 36:18, 42:9, 47:23, 57:12, 68:20, 68:22, 87:1, 90:17, 125:19, 126:13, 126:17, 139:5, 142:21, 148:22, 156:20, 167:10
**Defendants** [2] - 1:8, 49:17
**defendants'** [2] - 9:9, 59:10
**Defendants'** [6] - 12:5, 13:3, 13:15, 13:25, 14:9, 14:11
**defense** [3] - 85:23, 122:20, 168:25
**defensive** [1] - 150:11
**defined** [4] - 25:20, 57:18, 92:22, 152:9
**definitely** [1] - 119:15
**DeGonia** [21] - 2:3, 3:20, 3:21, 4:3, 5:13, 6:5, 6:12, 6:16, 41:19, 56:19, 56:20, 56:23, 57:1, 61:5, 62:6, 62:9, 62:18, 63:4, 63:23, 66:7
**degradation** [2] - 84:4, 85:4
**delegate** [2] - 46:19, 46:23
**delegated** [6] - 18:5, 46:9, 46:21, 48:13, 181:2, 185:2
**delegates** [2] - 40:2, 181:5
**delegating** [1] - 48:13
**deliberate** [29] - 64:22, 92:21, 94:10, 94:11, 94:17, 94:24, 95:2, 97:4, 99:1, 105:12, 106:12, 118:24, 121:22, 123:15, 125:11, 128:3, 130:8, 137:9, 137:12, 142:13, 143:7, 143:14, 145:1, 147:25, 177:17, 183:8, 184:8, 190:23, 191:18
**deliberately** [9] - 97:9, 115:9, 122:6, 123:16, 124:3, 126:18, 127:6, 176:3
**delineating** [1] - 180:1
**delivering** [1] - 167:14
**demand** [1] - 116:23
**demonstrated** [1] - 149:15
**demoted** [1] - 167:12
**denial** [1] - 125:23
**denied** [6] - 68:15, 92:7, 96:20, 129:19, 129:20, 134:15
**denies** [5] - 61:25, 62:18, 125:22
**deny** [2] - 62:17, 188:22
**denying** [1] - 124:5
**department** [7] - 30:20, 46:8, 46:18, 113:24, 115:11, 153:10
**Department** [2] - 54:19, 162:13
**departments** [1] - 169:7
**depicting** [1] - 107:4
**depo** [1] - 13:15
**deposed** [1] - 21:25
**deposition** [24] - 15:5, 30:14, 31:3, 42:2, 42:18, 44:2, 45:19, 47:4, 58:9, 58:12, 58:13, 58:24, 59:4, 59:5, 60:19, 62:24, 70:24, 115:17, 131:23, 156:15, 156:17, 161:15
**depositions** [1] - 186:19
**deprivation** [2] - 101:20, 147:16
**DEPUTY** [1] - 3:4
**derelict** [1] - 35:14
**described** [2] - 9:21, 101:14
**describes** [1] - 101:15
**description** [3] - 38:20, 39:1, 168:23
**deserve** [1] - 125:18
**designated** [1] - 39:22
**designation** [1] - 40:1
**designed** [1] - 47:14
**designee** [1] - 59:2
**designees** [2] - 14:25, 161:21
**desire** [1] - 188:4
**desk** [4] - 107:2, 107:3, 109:22, 117:25
**despite** [4] - 41:7, 45:25, 65:11, 176:9
**destruction** [2] - 108:3, 108:6
**detail** [1] - 115:11
**detailed** [4] - 114:22, 114:24, 115:2, 160:16
**detained** [1] - 153:5
**detect** [1] - 172:17
**detected** [2] - 172:19, 183:25
**determination** [1] - 83:19
**determine** [6] - 31:21, 43:6, 77:7, 80:20, 92:11, 96:16
**determined** [2] - 16:12, 94:11
**determining** [2] - 32:3, 92:21
**detriment** [1] - 75:10
**develop** [2] - 160:14, 167:17
**developed** [3] - 11:13, 23:6, 103:14
**developing** [1] - 169:4
**develops** [1] - 167:18
**devoid** [1] - 54:20
**DHS** [2] - 19:22, 190:7
**dictate** [1] - 77:2
**difference** [3] - 9:25, 31:23, 50:24
**different** [26] - 3:9, 6:20, 12:13, 19:2, 28:2, 57:2, 85:19, 87:12, 93:19, 93:21, 100:24, 127:16, 127:17, 140:14, 143:11, 143:12, 143:16, 170:4, 170:25, 175:23, 180:10, 180:13, 189:7
**differently** [2] - 103:6, 155:25
**digging** [1] - 11:24
**digital** [2] - 113:14, 113:16
**digitally** [1] - 114:5
**direct** [15] - 20:5, 25:1, 32:13, 32:25, 43:13, 122:16, 126:8, 156:17, 157:13, 157:20, 158:23, 167:20, 176:21, 178:22, 187:9
**directed** [2] - 74:6, 133:23
**direction** [4] - 78:7, 132:22, 133:22, 169:3
**directive** [7] - 23:11, 28:14, 28:15, 28:17, 46:5, 61:12, 68:3
**directives** [2] - 30:7, 156:21
**directly** [17] - 60:18, 100:17, 105:1, 108:13, 115:6, 117:16, 131:10, 131:12, 132:2, 132:3, 155:4, 178:12, 178:23, 182:5, 186:16,

187:14
**Director** [3] - 17:15, 18:6, 30:1
**director** [43] - 5:20, 11:1, 11:8, 13:1, 14:7, 17:13, 19:20, 21:6, 23:5, 31:2, 37:2, 38:8, 38:17, 40:3, 41:13, 42:17, 44:23, 46:2, 50:1, 51:19, 52:22, 57:10, 57:11, 57:18, 58:17, 59:24, 64:7, 68:18, 96:9, 105:3, 106:5, 107:17, 109:2, 110:7, 110:20, 147:9, 148:16, 153:10, 153:14, 162:1, 164:2, 164:3, 176:10
**director's** [1] - 58:15
**directors** [14] - 20:4, 20:5, 20:7, 29:6, 31:14, 31:15, 39:9, 40:19, 41:23, 51:11, 51:17, 161:22, 163:2, 168:3
**disability** [1] - 77:19
**disagree** [4] - 56:5, 67:8, 84:18, 87:13
**disagreement** [1] - 24:9
**discarded** [1] - 115:1
**disciplinary** [10] - 115:15, 115:19, 116:13, 116:20, 116:21, 117:20, 117:21, 152:25, 186:13
**discipline** [5] - 20:8, 119:15, 157:1, 157:3, 162:17
**discipline's** [1] - 115:17
**disciplined** [4] - 143:14, 160:17, 160:18, 162:16
**discourage** [1] - 23:19
**discovery** [1] - 95:25
**discrimination** [13] - 76:19, 76:21, 76:24, 77:10, 77:14, 77:20, 79:17, 80:15, 81:21, 92:8, 92:23, 93:3, 128:2
**discussed** [2] - 62:11, 144:1
**disingenuous** [2] - 42:11, 75:11
**dismiss** [2] - 139:24, 164:22
**dismissal** [2] - 90:10, 186:14
**dismissed** [4] - 80:18, 91:16, 91:18, 152:16
**disorderly** [1] - 107:15
**dispel** [1] - 26:13
**displays** [1] - 94:24
**dispose** [1] - 85:1
**disposes** [1] - 86:2
**dispute** [9] - 10:19, 41:4, 48:14, 65:23, 67:14, 108:20, 109:4, 121:17, 169:19
**disputed** [5] - 58:2, 58:5, 58:6, 132:8, 183:17
**disputes** [2] - 134:17, 189:14
**disputing** [1] - 190:9
**disregard** [15] - 37:10, 37:12, 38:2, 38:7, 40:24, 43:4, 45:4, 63:6, 66:23, 67:2, 72:3, 73:16, 73:19, 74:2
**disregarded** [10] - 31:18, 41:5, 41:6, 42:13, 44:9, 64:25, 65:13, 67:17, 68:4, 75:10
**disregarding** [1] - 65:1
**disrupting** [1] - 108:7
**disruption** [1] - 107:15
**disruptive** [4] - 110:2, 116:13, 184:12, 191:25
**disseminate** [2] - 37:24, 153:17
**disseminated** [4] - 50:7, 58:16, 162:5, 162:6
**disseminates** [1] - 40:18
**disseminating** [1] - 166:20
**distinct** [1] - 9:19
**distinction** [3] - 101:4, 140:3, 140:4
**distinguished** [1] - 81:20
**distress** [23] - 76:13, 80:9, 80:17, 80:18, 81:9, 81:12, 81:18, 81:23, 82:1, 82:9, 82:12, 84:1, 84:22, 84:24, 85:13, 86:2, 87:16, 99:23, 138:15, 138:18, 139:14, 139:23, 140:12
**distributes** [1] - 20:3
**DISTRICT** [3] - 1:1, 1:2, 1:10
**District** [3] - 81:18, 193:5
**district** [7] - 77:21, 80:18, 82:3, 89:9, 138:10, 179:6, 179:8
**disturb** [1] - 77:25
**Division** [1] - 96:11
**DIVISION** [1] - 1:3
**docket** [1] - 6:2
**docketed** [1] - 82:21
**documented** [1] - 133:13
**documents** [2] - 167:16, 179:25
**Doe** [153] - 3:5, 3:13, 3:19, 3:21, 4:2, 4:3, 5:4, 5:6, 5:8, 5:9, 5:10, 5:13, 6:23, 9:20, 9:25, 10:4, 10:6, 10:17, 10:21, 11:16, 12:16, 13:22, 14:18, 15:5, 15:13, 15:16, 15:22, 15:25, 18:2, 18:15, 18:19, 18:20, 19:2, 19:7, 19:8, 20:13, 20:22, 21:4, 21:17, 22:2, 22:9, 24:8, 25:17, 25:18, 26:15, 26:21, 27:10, 28:20, 32:21, 33:11, 34:11, 34:19, 34:21, 35:7, 35:21, 35:23, 41:8, 43:14, 48:20, 49:17, 49:23, 54:3, 54:14, 64:15, 65:9, 66:10, 66:11, 66:15, 66:18, 66:19, 66:24, 67:9, 67:15, 68:3, 68:14, 71:17, 71:24, 72:6, 73:12, 76:4, 76:7, 81:16, 81:22, 82:4, 82:11, 84:22, 94:18, 94:21, 95:5, 95:15, 97:15, 99:21, 101:25, 103:23, 104:6, 112:22, 121:11, 121:14, 121:19, 121:23, 122:5, 122:13, 123:2, 123:12, 123:20, 123:21, 124:15, 124:17, 124:19, 125:7, 125:14, 126:5, 126:9, 126:11, 126:12, 126:14, 126:21, 127:3, 127:14, 127:16, 127:23, 128:17, 129:25, 130:4, 130:12, 132:17, 132:18, 133:15, 133:25, 135:7, 136:19, 138:11, 141:11, 141:17, 141:19, 142:20, 143:1, 147:19, 170:6, 170:7, 171:8, 174:19, 182:16, 182:20, 182:22, 183:9, 188:14
**DOE** [4] - 1:4, 1:13, 1:19, 2:2
**dollar** [2] - 79:19, 88:22
**done** [22] - 32:4, 37:25, 38:23, 40:16, 47:21, 55:5, 57:22, 63:1, 63:2, 73:24, 77:24, 96:24, 97:8, 98:9, 109:10, 118:23, 128:9, 143:8, 151:24, 152:1, 164:1, 180:16
**Doody** [92] - 4:24, 10:6, 10:7, 11:8, 11:9, 12:7, 13:1, 15:9, 17:12, 18:6, 18:7, 21:2, 21:6, 21:24, 23:4, 30:1, 30:24, 31:1, 32:1, 44:22, 46:10, 46:11, 46:13, 46:16, 49:13, 49:21, 49:24, 50:7, 51:6, 51:15, 51:17, 51:19, 51:22, 52:5, 52:6, 52:12, 52:22, 53:10, 53:18, 54:10, 54:15, 54:20, 54:23, 54:25, 55:10, 55:13, 55:15, 56:6, 56:17, 57:3, 57:8, 57:15, 58:5, 58:7, 58:21, 59:3, 59:16, 59:18, 59:23, 60:1, 60:8, 60:9, 60:14, 61:6, 61:21, 61:23, 61:25, 62:10, 62:15, 62:17, 62:18, 63:2, 63:19, 64:4, 64:13, 64:25, 65:8, 65:12, 65:23, 89:22, 108:10, 109:8, 109:11, 109:18, 110:11, 110:12, 153:13, 153:18, 157:15, 171:20, 171:21, 171:23
**DOODY** [1] - 2:15
**Doody's** [1] - 59:14
**door** [3] - 41:16, 61:1, 69:20
**doors** [1] - 60:23
**dotted** [1] - 157:11
**Dover** [1] - 90:7
**down** [23] - 26:17, 26:18, 53:13, 53:19, 56:8, 59:18, 59:19, 60:20, 82:25, 83:12, 84:8, 84:9, 97:17, 112:14, 115:20, 131:17, 132:6, 153:17, 155:5, 162:21, 189:4
**dozens** [2] - 175:4
**Dr** [2] - 41:20, 62:14
**dressed** [2] - 66:20, 73:13
**dropped** [2] - 15:14, 66:20
**drove** [1] - 108:22
**dual** [1] - 157:11
**Duke** [7] - 79:12, 79:15, 79:16, 79:17, 79:22, 82:14
**dumped** [2] - 136:1, 136:2
**dumpster** [3] - 114:19, 129:25, 133:19
**during** [11] - 10:23, 24:16, 29:15, 45:25, 80:13, 104:6, 104:7, 104:8, 108:3, 119:6, 187:10
**duties** [13] - 17:23, 19:24, 35:14, 37:22, 45:6, 57:9, 63:12, 63:17, 156:16, 167:16, 168:18, 169:1, 174:16
**duty** [47] - 17:3, 17:5, 17:6, 17:8, 17:15, 17:21, 18:14, 20:12, 27:1, 27:3, 27:4, 27:7, 27:11, 27:14, 27:16, 29:24, 31:18, 31:25, 37:10, 41:5, 41:7, 41:18, 42:10, 42:13, 46:21, 46:23, 48:13, 57:17, 61:16, 65:5, 67:17, 68:3, 68:4, 68:13, 73:19, 74:18, 103:22,

153:7, 172:17, 172:18, 172:22, 173:17, 178:8, 178:19, 188:12

## E

**early** [3] - 8:7, 24:16, 112:22
**earshot** [4] - 35:16, 35:18, 69:5, 74:5
**East** [1] - 2:17
**Eastern** [1] - 81:18
**easy** [1] - 161:14
**ECF** [1] - 14:1
**economic** [2] - 7:4, 102:23
**Ed** [12] - 12:22, 14:5, 20:15, 20:17, 87:5, 92:18, 96:13, 129:23, 139:6, 144:21, 152:17, 164:18
**education** [3] - 145:3, 146:5, 146:10
**Education** [20] - 3:6, 4:8, 4:10, 4:21, 10:3, 11:1, 14:2, 15:1, 28:16, 59:2, 86:18, 86:21, 86:23, 94:18, 114:7, 139:4, 148:25, 152:4, 154:2, 160:24
**EDUCATION** [2] - 1:7, 2:9
**educational** [9] - 84:2, 84:24, 92:9, 92:13, 101:20, 101:21, 102:3, 117:13, 140:20
**educator** [2] - 119:1, 119:6
**effect** [4] - 124:5, 162:20, 168:23, 190:17
**effective** [2] - 23:16, 185:3
**effectively** [1] - 185:24
**effort** [3] - 37:13, 41:7, 128:13
**egregious** [1] - 29:23
**eight** [3] - 141:5, 144:11, 187:7
**eight-minute** [1] - 141:5
**Eighth** [3] - 77:22, 78:3
**either** [14] - 17:13, 23:7, 33:9, 64:19, 67:12, 70:18, 74:15, 89:16, 93:12, 124:11, 131:5, 145:25, 149:15, 178:22
**element** [1] - 86:2
**elements** [2] - 26:9, 27:1
**eligible** [1] - 31:4
**eliminated** [2] - 106:4, 106:11
**elsewhere** [3] - 45:14, 176:7, 187:3
**elucidate** [1] - 57:22
**email** [11] - 109:25, 120:24, 187:21, 187:23, 189:12, 189:14, 189:16, 189:20, 190:7, 190:9, 190:13
**emails** [3] - 108:1, 109:11, 109:13
**embellishment** [1] - 134:18
**emotional** [59] - 76:13, 80:9, 80:17, 80:18, 80:20, 81:9, 81:12, 81:17, 81:23, 82:1, 82:9, 82:11, 82:20, 82:23, 83:25, 84:1, 84:11, 84:22, 84:24, 85:8, 85:13, 85:17, 85:18, 85:21, 86:1, 86:5, 86:6, 87:3, 87:8, 87:12, 87:16, 87:21, 87:22, 88:10, 88:20, 88:24, 98:2, 98:19, 99:1, 99:15, 99:23, 100:7, 100:9, 101:5, 101:8, 101:12, 102:5, 102:10, 137:24, 138:6, 138:15, 138:17, 138:21, 139:10, 139:14, 139:23, 140:5, 140:12, 140:16
**emphasis** [1] - 50:10
**emphasized** [1] - 22:12
**employee** [14] - 16:2, 16:4, 18:16, 96:13, 104:23, 129:23, 129:24, 130:2, 133:13, 136:4, 152:15, 171:24
**employee/ subordinate** [1] - 155:7
**employees** [5] - 19:23, 27:7, 57:23, 145:13, 149:15
**employer** [1] - 167:5
**employment** [3] - 104:22, 114:20, 172:9
**encounter** [1] - 116:4
**end** [20] - 56:6, 69:23, 72:19, 83:1, 83:13, 83:15, 84:13, 84:16, 92:23, 93:3, 112:10, 112:11, 115:23, 118:13, 128:1, 139:15, 143:1, 149:3, 192:14
**ended** [2] - 25:16, 104:11
**enforce** [1] - 156:24
**enforced** [3] - 17:17, 40:11, 160:20
**enforcement** [3] - 31:17, 42:12, 168:17
**engage** [3] - 130:17, 155:22, 174:24
**engaged** [3] - 150:7, 151:8, 182:24
**engages** [1] - 171:25
**enrolled** [1] - 145:7
**ensure** [36] - 17:7, 17:8, 17:13, 17:15, 17:18, 27:8, 29:24, 30:1, 30:2, 32:1, 42:25, 43:1, 43:8, 43:22, 43:24, 46:13, 47:6, 49:8, 61:8, 61:13, 64:7, 64:13, 68:9, 68:11, 157:20, 157:21, 158:15, 159:17, 159:19, 175:10, 183:25, 185:3, 185:24, 186:7, 186:9, 186:23
**ensuring** [7] - 46:16, 47:16, 48:16, 58:22, 64:14, 161:21, 161:23
**enter** [3] - 52:13, 89:8, 103:12
**entire** [3] - 41:13, 107:21, 110:19
**entirely** [1] - 108:21
**entitled** [15] - 10:20, 16:25, 17:24, 18:14, 20:18, 24:1, 40:25, 45:11, 49:24, 56:17, 84:16, 102:3, 154:11, 171:17, 192:7
**entity** [3] - 86:23, 165:4, 165:5
**entries** [1] - 115:19
**environment** [2] - 116:21, 120:19
**equal** [3] - 124:5, 125:23, 126:20
**equally** [1] - 76:4
**equate** [1] - 94:17
**equation** [1] - 150:22
**equip** [1] - 47:14
**ERIC** [1] - 2:9
**Eric** [2] - 4:10, 11:7
**escort** [2] - 116:16
**especially** [4] - 25:25, 110:19, 160:15, 181:23
**espousing** [1] - 65:21
**ESQUIRE** [10] - 1:15, 1:15, 1:16, 1:20, 2:3, 2:6, 2:11, 2:11, 2:12, 2:16
**essence** [3] - 101:19, 152:13
**essentially** [2] - 34:25, 98:21
**establish** [4] - 93:18, 94:4, 157:19, 162:3
**established** [10] - 93:17, 154:12, 155:13, 156:7, 172:16, 174:1, 182:4, 183:13, 183:23, 192:8
**establishes** [2] - 167:19, 191:7
**Estate** [1] - 38:4
**et** [8] - 1:4, 1:7, 3:5, 3:6, 110:10, 187:24, 190:8
**ETHERIDGE** [1] - 2:3
**evading** [1] - 120:9
**eval** [1] - 153:2
**evaluate** [1] - 20:8
**evaluating** [1] - 169:4
**evaluation** [1] - 63:13
**event** [10] - 9:2, 28:1, 62:1, 62:10, 62:11, 63:14, 88:17, 118:18, 129:6, 135:16
**events** [8] - 10:1, 28:24, 104:1, 109:12, 118:16, 119:11, 130:9, 136:15
**eventually** [2] - 71:5, 107:11
**everywhere** [1] - 106:18
**evidence** [92] - 12:11, 12:15, 12:23, 14:15, 15:14, 15:19, 15:21, 15:23, 17:25, 18:7, 18:8, 18:9, 19:11, 19:16, 20:11, 20:20, 25:1, 26:3, 26:8, 26:11, 26:14, 26:20, 26:23, 31:2, 32:22, 32:23, 32:25, 33:8, 33:10, 34:1, 34:5, 35:9, 35:10, 35:20, 37:2, 37:7, 38:1, 38:13, 40:24, 44:18, 44:20, 44:21, 45:2, 45:5, 49:20, 54:24, 55:9, 56:17, 59:11, 66:16, 66:22, 67:1, 67:17, 68:5, 71:19, 72:2, 74:13, 74:21, 74:23, 81:17, 92:14, 94:4, 99:23, 103:14, 122:16, 130:13, 135:23, 136:12, 136:14, 138:15, 139:25, 143:3, 143:17, 146:7, 147:3, 148:2, 151:7, 151:25, 161:13, 182:22, 184:14, 185:13, 185:14, 185:16, 188:16, 188:17, 189:8, 189:9, 189:10, 190:23, 191:18
**Ewing** [4] - 1:24, 193:4, 193:16, 193:17
**exact** [3] - 72:8, 72:9, 190:2
**exactly** [6] - 25:15, 30:13, 57:14, 90:1, 126:9, 156:16
**exaggerating** [1] - 118:5
**example** [12] - 29:13, 30:21, 43:14, 61:10, 75:8, 83:17, 102:12, 103:2, 143:19, 150:1, 157:1, 172:9
**examples** [2] - 33:3, 103:3
**exceeded** [1] - 98:17
**exceeding** [1] - 79:7
**exceeds** [1] - 139:19
**except** [1] - 105:8
**exception** [2] - 84:22, 103:22
**exclude** [1] - 81:17
**excluded** [3] - 92:7, 138:14, 139:25
**excuse** [11] - 11:10, 13:5, 22:19, 29:17,

37:5, 46:19, 65:21, 71:4, 121:25, 154:22, 187:20
**exercise** [7] - 16:9, 174:15, 175:6, 184:25, 185:11, 186:8, 188:3
**exercised** [1] - 16:21
**exercises** [2] - 16:8, 16:14
**exertion** [1] - 37:13
**Exhibit** [17] - 12:6, 13:3, 13:9, 13:15, 13:20, 13:25, 14:9, 14:11, 14:23, 15:4, 15:9, 58:8, 59:9, 131:23, 131:25, 187:24, 189:6
**exhibit** [4] - 34:11, 134:19, 189:5, 189:25
**exhibits** [1] - 161:19
**exist** [4] - 14:17, 37:17, 99:8, 183:9
**existed** [4] - 10:16, 59:6, 99:7, 181:10
**existence** [1] - 14:15
**exists** [2] - 75:3, 181:9
**exonerated** [1] - 39:3
**expectation** [5] - 41:20, 41:24, 42:8, 46:15, 52:12
**expectations** [5] - 15:3, 52:1, 52:11, 168:3, 186:10
**expelled** [1] - 153:1
**expense** [2] - 14:19, 84:23
**expenses** [3] - 6:20, 7:17, 83:17
**experience** [1] - 73:21
**experienced** [1] - 46:12
**explaining** [1] - 58:1
**explanation** [2] - 63:1, 63:2
**expose** [1] - 123:9
**exposed** [1] - 125:12
**exposes** [1] - 79:2
**expressed** [2] - 59:25, 60:5
**expressly** [1] - 187:11
**extended** [1] - 35:11
**extensively** [1] - 114:24
**extent** [9] - 7:17, 76:17, 85:14, 128:4, 143:6, 154:8, 164:24, 177:16, 183:12
**extraordinary** [7] - 103:25, 115:14, 160:23, 161:5, 174:12, 174:17, 175:12
**extremely** [3] - 71:7, 131:11, 158:10

## F

**F.H** [2] - 54:13, 131:12
**Facchetti** [3] - 93:14, 93:25, 94:1
**face** [7] - 26:17, 112:14, 133:23, 134:6, 135:24
**face-to-face** [2] - 133:23, 135:24
**fact** [46] - 10:19, 17:20, 21:22, 24:18, 25:25, 35:6, 36:8, 41:4, 42:14, 43:6, 48:15, 50:3, 52:21, 53:11, 53:23, 53:25, 54:11, 54:20, 55:5, 61:6, 61:14, 64:11, 65:3, 65:23, 67:15, 72:2, 94:13, 99:16, 101:19, 103:9, 108:23, 121:17, 123:13, 125:19, 128:14, 130:1, 134:7, 134:8, 134:17, 147:4, 169:11, 169:19, 175:8, 178:18, 191:7, 191:16
**facto** [2] - 148:23, 152:5
**factor** [1] - 120:1
**facts** [14] - 10:16, 10:18, 11:13, 11:21, 11:22, 14:17, 16:5, 58:4, 73:7, 127:17, 151:15, 153:12, 189:19
**factual** [5] - 26:3, 26:8, 76:14, 124:12, 157:25
**fail** [1] - 24:1
**failed** [9] - 27:13, 43:17, 61:12, 61:16, 68:13, 94:13, 160:14, 176:22, 185:24
**failing** [3] - 68:11, 102:25, 185:11
**fails** [2] - 102:14, 102:15
**failure** [15] - 27:14, 27:16, 27:17, 37:10, 43:19, 48:3, 94:23, 94:25, 173:12, 173:22, 179:11, 182:4, 184:25, 186:6, 186:8
**failures** [1] - 160:17
**fair** [9] - 6:13, 12:18, 32:15, 40:11, 42:5, 137:25, 164:16, 165:21, 166:9
**Fairfax** [13] - 81:16, 81:22, 123:12, 123:21, 124:19, 126:21, 127:3, 127:16, 128:17, 135:8, 138:11, 141:19, 174:19
**fairly** [1] - 8:18
**Faith** [1] - 122:3
**FALCON** [1] - 1:20
**fall** [2] - 115:18, 145:15
**fallen** [1] - 61:23
**falls** [2] - 20:16, 75:4
**familiar** [1] - 167:4
**FAMILIES** [1] - 1:19
**FAMILY** [2] - 1:13, 2:2
**far** [5] - 49:10, 65:8, 86:9, 127:7, 156:2
**fast** [2] - 103:5, 144:19
**father** [1] - 15:14
**favor** [4] - 68:14, 79:18, 82:10, 139:12
**favorable** [1] - 58:4
**feasor** [1] - 150:20
**feasors** [3] - 149:8, 150:14, 173:15
**February** [3] - 113:13, 143:10, 159:9
**federal** [13] - 76:20, 77:2, 77:5, 78:7, 78:9, 79:2, 79:7, 81:6, 81:11, 92:9, 100:4, 101:2, 160:24
**Federation** [1] - 29:7
**feet** [6] - 69:2, 69:16, 69:18, 118:1, 118:4, 118:6
**fellow** [3] - 61:20, 113:15, 146:11
**Felsen** [1] - 6:2
**Felson** [1] - 6:3
**felt** [2] - 108:14, 111:11
**female** [4] - 79:16, 115:22, 146:14, 192:2
**females** [1] - 115:21
**few** [3] - 8:5, 114:12, 144:7
**fiction** [2] - 165:3, 167:7
**field** [6] - 72:17, 72:24, 73:10, 75:4, 104:18, 105:1
**Fifth** [1] - 80:19
**fight** [1] - 119:6
**file** [11] - 100:17, 117:20, 117:21, 117:24, 118:7, 133:17, 133:19, 159:4, 177:11, 185:11
**filed** [11] - 9:16, 9:17, 9:24, 18:25, 22:2, 97:12, 97:16, 120:10, 153:6, 158:13, 158:18
**files** [1] - 114:18
**filing** [1] - 131:22
**fill** [3] - 63:15, 94:13, 94:15
**filled** [1] - 158:7
**filling** [2] - 95:9, 158:7
**film** [1] - 107:7
**final** [1] - 82:19
**finally** [10] - 107:16, 109:22, 116:15, 116:19, 120:20, 125:15, 159:18, 160:22, 169:1, 187:15
**financial** [1] - 92:9
**fine** [6] - 7:24, 43:11, 45:9, 45:12, 45:13, 55:20
**finger** [1] - 71:1
**finish** [7] - 19:8, 89:4, 141:4, 144:9, 144:17, 168:20, 182:13
**finished** [2] - 42:19, 42:24
**fire** [1] - 20:8
**first** [31] - 3:8, 3:11, 6:2, 8:20, 8:21, 9:20, 11:13, 22:21, 23:9, 24:12, 26:17, 32:22, 33:1, 36:20, 41:11, 45:2, 46:1, 66:3, 75:25, 97:25, 104:4, 104:16, 111:5, 129:1, 137:2, 148:3, 154:7, 155:12, 158:2, 175:24, 188:15
**Fischer** [1] - 108:12
**Fisher** [2] - 179:5, 181:23
**fit** [2] - 153:6, 173:5
**Fitzgerald** [1] - 100:16
**Five** [1] - 65:24
**five** [5] - 29:14, 71:3, 93:18, 120:11, 127:20
**fix** [1] - 110:15
**Flies** [1] - 62:21
**floating** [1] - 22:22
**Floor** [2] - 1:21, 2:13
**floor** [2] - 60:21, 60:22
**flow** [1] - 101:12
**flowing** [1] - 102:24
**focus** [1] - 66:9
**focused** [1] - 78:16
**folks** [3] - 3:2, 75:21, 192:13
**follow** [22] - 30:12, 31:21, 31:22, 39:5, 43:7, 43:20, 48:5, 57:24, 64:21, 91:6, 94:23, 95:1, 115:7, 115:10, 124:14, 135:1, 142:8, 142:11, 156:21, 163:22, 163:25, 173:14
**followed** [6] - 17:9, 41:18, 43:22, 48:17, 58:14, 89:10
**following** [3] - 78:12, 91:3, 119:8
**follows** [3] - 68:5, 79:10, 81:12
**Food** [1] - 26:5
**football** [69] - 10:22, 12:5, 13:5, 13:9, 13:11, 13:14, 13:19, 13:24, 14:4, 14:17, 14:18, 15:3, 15:18, 18:5, 18:12, 19:15, 19:22, 20:23, 25:5, 26:24, 29:14, 29:15, 30:15, 30:21, 33:4, 44:18, 46:17, 50:8, 50:15, 50:21, 53:5, 60:8, 66:1, 70:3, 79:16, 104:13, 104:21, 105:14, 105:18, 106:23, 107:1, 107:13, 108:15, 108:19, 108:22, 109:4, 110:1, 110:8, 110:23, 110:24, 112:12, 113:2, 116:24, 116:25, 119:4, 119:18, 119:19, 131:14, 137:15, 145:12,

176:5, 184:8, 184:12, 185:4, 185:25, 186:1, 188:5, 188:21
**FOR** [6] - 1:2, 1:13, 1:19, 2:2, 2:9, 2:15
**force** [2] - 175:22, 178:1
**forcibly** [2] - 131:16, 132:6
**foregoing** [1] - 193:6
**forensic** [1] - 169:5
**foreseeability** [1] - 75:3
**foreseeable** [7] - 27:8, 47:10, 47:15, 66:25, 67:10, 74:11, 75:3
**forfeit** [2] - 20:6, 157:4
**forfeiting** [2] - 157:5, 162:16
**forget** [2] - 47:11, 138:15
**form** [11] - 63:15, 83:9, 84:9, 94:13, 94:15, 95:10, 158:7, 158:8, 158:10, 158:23, 187:10
**Form** [6] - 115:4, 131:18, 133:17, 158:7, 158:9, 159:3
**formal** [3] - 115:18, 185:10, 185:18
**former** [2] - 7:15, 21:22
**forms** [1] - 126:3
**forth** [8] - 6:8, 16:5, 24:10, 24:11, 38:4, 94:24, 107:15, 155:23
**forwarding** [1] - 93:1
**fostered** [1] - 175:21
**four** [9] - 9:8, 9:17, 49:16, 56:18, 76:18, 76:23, 77:15, 78:15, 120:11
**Four** [1] - 56:18
**four-and-a-half** [1] - 120:11
**Fourth** [25] - 79:12, 79:21, 81:16, 82:13, 82:16, 93:14, 94:5, 94:22, 95:4, 95:6, 98:24, 99:13, 99:17, 100:8, 138:4, 138:9, 156:7, 174:2, 174:14, 174:19, 179:3, 179:6, 182:2
**frame** [3] - 88:9, 163:20, 188:19
**framework** [7] - 10:18, 78:14, 97:2, 102:7, 173:6, 182:15
**Frank** [2] - 3:18, 63:20
**Franklin** [5] - 78:4, 78:5, 78:6, 78:12, 100:10
**frankly** [3] - 22:3, 109:5, 178:5
**free** [4] - 104:13, 143:5, 145:2, 146:9
**frequently** [1] - 25:24
**fresh** [2] - 118:20, 178:3
**freshman** [9] - 112:8, 112:18, 119:4, 122:4, 131:14, 131:16, 132:6, 158:5, 186:17
**front** [2] - 144:2, 147:3
**frustration** [1] - 80:17
**fulfilling** [1] - 61:16
**fulfills** [1] - 26:9
**full** [6] - 54:21, 100:18, 100:20, 116:15, 136:10, 177:16
**full-time** [2] - 116:15, 177:16
**fully** [2] - 94:3, 186:20
**fund** [1] - 101:2
**funding** [8] - 76:20, 76:22, 77:5, 77:8, 79:5, 79:8, 81:4, 81:11
**funds** [4] - 77:2, 79:2, 79:6, 100:4
**furthermore** [1] - 71:2
**future** [4] - 84:6, 85:5, 90:12, 124:4

## G

**Gaithersburg** [6] - 113:14, 113:18, 113:20, 143:10, 159:10, 159:15
**gallery** [4] - 3:24, 3:25, 4:14, 5:7
**galley** [1] - 43:12
**Gambrill** [3] - 27:2, 27:6, 57:17
**game** [4] - 20:6, 112:9, 157:4, 162:16
**games** [4] - 28:11, 28:14, 29:21, 157:5
**gangs** [1] - 150:1
**Garza** [1] - 176:22
**gather** [1] - 144:8
**Gebser** [2] - 95:3, 95:6
**gender** [1] - 137:17
**general** [7] - 5:19, 19:24, 75:4, 78:4, 78:5, 78:6, 147:18
**General** [1] - 103:7
**generally** [5] - 23:1, 51:10, 78:19, 79:4, 81:9
**genuine** [5] - 48:14, 65:23, 67:14, 121:16, 134:8
**George's** [3] - 94:19, 94:21, 95:6
**Giant** [1] - 26:5
**girl** [2] - 115:25, 127:18
**given** [13] - 18:13, 52:24, 63:1, 63:2, 84:14, 90:9, 94:8, 113:10, 124:11, 142:25, 146:5, 153:3, 191:17
**goals** [1] - 76:24
**goon** [1] - 121:20
**Gorman** [1] - 79:25
**gosh** [1] - 117:6
**govern** [1] - 152:10
**government** [2] - 76:20, 81:6
**grab** [2] - 9:2, 115:22
**grabbed** [1] - 112:13
**grades** [1] - 145:11
**graduated** [1] - 89:20
**graduating** [1] - 120:16
**grand** [1] - 50:19
**grant** [1] - 103:19
**granted** [11] - 20:14, 76:17, 80:6, 80:20, 82:10, 88:5, 88:14, 90:16, 91:17, 169:24, 183:11
**granting** [1] - 86:1
**grants** [1] - 76:20
**great** [4] - 57:13, 115:11, 117:8, 135:4
**GREENBELT** [1] - 1:11
**Greenbelt** [1] - 1:17
**GREENWALD** [1] - 1:14
**grievance** [1] - 95:1
**Grindle** [2] - 174:23, 175:3
**gross** [32] - 36:10, 36:14, 36:18, 37:2, 37:6, 37:8, 37:14, 45:3, 49:21, 53:14, 53:15, 55:9, 56:17, 57:4, 57:6, 63:24, 65:22, 65:24, 71:8, 71:24, 83:21, 85:9, 85:14, 85:15, 86:8, 86:19, 86:25, 87:4, 87:5, 93:22, 103:22, 185:20
**grossly** [3] - 45:5, 48:10, 73:5
**ground** [6] - 49:10, 60:13, 80:18, 112:14, 155:12
**group** [1] - 145:8
**guard** [1] - 150:23
**guardrail** [1] - 176:9
**guardrails** [3] - 105:13, 118:9, 178:1
**guess** [8] - 18:18, 20:17, 46:12, 56:25, 146:3, 149:1, 164:14, 165:8
**guidance** [2] - 20:3, 20:4
**guidelines** [2] - 17:16, 186:1
**guilty** [1] - 37:14
**guy** [4] - 53:6, 127:18, 167:15, 180:25
**Gwinett** [1] - 100:12

## H

**hairs** [1] - 179:22
**half** [5] - 118:3, 118:5, 120:11, 144:8, 144:17
**halfway** [1] - 70:19
**hall** [15] - 105:20, 106:4, 106:8, 106:11, 109:3, 109:16, 110:16, 110:22, 176:6, 179:16, 179:17, 179:19, 181:20, 187:1
**halls** [1] - 107:19
**hallway** [5] - 119:1, 119:7, 150:1, 184:12, 192:1
**hallways** [4] - 55:15, 56:9, 109:7, 137:16
**Hancock** [5] - 14:10, 59:21, 107:17, 109:6, 109:18
**handed** [2] - 107:5, 135:17
**handle** [2] - 131:17, 132:7
**handles** [1] - 60:25
**handling** [1] - 38:3
**hands** [3] - 70:20, 116:19, 148:8
**handy** [2] - 11:23, 12:1
**hang** [1] - 106:20
**harassed** [2] - 93:15, 116:7
**harassing** [1] - 93:16
**harassment** [60] - 12:4, 13:2, 13:8, 13:13, 13:18, 13:23, 14:3, 14:13, 14:22, 15:2, 19:21, 22:15, 23:15, 23:16, 33:19, 33:20, 34:18, 44:19, 55:8, 55:22, 91:14, 92:13, 92:14, 93:1, 93:4, 93:6, 93:10, 94:7, 95:1, 100:14, 123:24, 123:25, 124:3, 124:5, 125:23, 126:1, 128:20, 134:22, 135:6, 137:18, 137:19, 141:25, 144:22, 145:20, 146:14, 146:16, 146:19, 147:19, 149:21, 162:14, 173:3, 177:8, 180:11, 180:15, 183:4, 184:1, 184:11, 186:4, 192:2
**hard** [6] - 116:1, 143:18, 144:5, 146:9, 147:2, 159:7
**harm** [11] - 48:6, 67:11, 68:12, 75:4, 82:23, 90:8, 90:12, 99:23, 172:25, 173:10, 191:21
**harms** [1] - 64:20
**HARTINGER** [1] - 2:3
**Hayes** [3] - 82:23, 97:14, 122:3
**Hayes'** [2] - 131:2, 136:7
**hazing** [41] - 11:15, 12:4, 12:24, 13:2, 13:7, 13:13, 13:17, 13:23, 14:3, 14:12, 15:2, 15:6, 15:7, 18:11, 19:10, 19:15, 19:21, 22:12, 22:15, 23:11, 23:20, 29:8, 33:14, 35:2, 44:19, 45:22, 47:11, 47:12, 48:24, 50:6, 50:14, 51:1, 52:3, 64:19, 66:17, 71:20, 91:14, 132:17, 159:23, 162:10, 186:4
**hazings** [1] - 21:21
**Head** [1] - 104:16

**head** [17] - 11:7, 16:10, 21:23, 65:25, 104:17, 115:16, 119:5, 119:7, 119:9, 123:10, 125:16, 185:2, 185:12, 186:6, 188:12
**heading** [1] - 103:9
**health** [1] - 14:21
**hear** [27] - 8:18, 24:5, 26:8, 32:16, 32:17, 44:12, 53:25, 56:24, 63:6, 69:22, 85:3, 88:7, 89:5, 91:7, 95:12, 97:21, 114:12, 131:4, 146:1, 146:2, 152:2, 155:21, 167:3, 169:21, 174:9, 180:3, 184:21
**heard** [32] - 24:25, 25:6, 57:2, 57:10, 57:12, 57:20, 57:21, 59:4, 66:17, 88:3, 89:10, 94:15, 96:1, 96:4, 96:5, 96:15, 112:23, 122:11, 122:14, 122:18, 129:16, 130:23, 135:22, 136:13, 138:19, 140:3, 168:6, 168:9, 175:5, 184:23, 190:15
**hearing** [12] - 3:7, 9:12, 9:15, 9:23, 53:1, 129:7, 129:15, 143:3, 149:3, 164:8, 166:19
**HEARING** [1] - 1:9
**hears** [1] - 98:16
**hearsay** [3] - 34:10, 34:13, 136:8
**heartedly** [1] - 24:9
**heavily** [1] - 80:10
**held** [12] - 11:4, 16:20, 22:10, 77:8, 77:12, 78:12, 79:23, 79:25, 93:15, 94:25, 179:9, 183:6
**helm** [1] - 49:5
**helped** [1] - 37:23
**helps** [1] - 146:23
**hereby** [1] - 193:6
**herring** [1] - 74:19
**herrings** [1] - 24:17
**herself** [1] - 178:22
**herself's** [1] - 131:24
**hierarchal** [1] - 148:22
**hierarchy** [5] - 40:16, 148:14, 150:11, 150:14, 152:5
**high** [16] - 22:22, 28:24, 29:10, 29:13, 37:6, 55:16, 67:1, 91:11, 116:23, 117:25, 120:14, 120:17, 143:20, 164:2, 164:3, 177:6
**High** [35] - 10:23, 11:15, 11:18, 12:5, 12:25, 13:5, 13:6, 13:8, 13:11, 13:14, 13:18, 13:24, 14:4, 14:10, 14:18, 17:20, 19:24, 21:8, 25:3, 29:7, 42:16, 45:6, 47:7, 48:2, 48:4, 48:6, 61:7, 64:10, 89:20, 111:4, 113:14, 123:11, 146:15
**highly** [1] - 50:24
**Hills** [1] - 188:11
**himself** [5] - 41:12, 111:10, 111:22, 121:3, 146:22
**hire** [1] - 20:7
**history** [5] - 152:24, 177:14, 179:10, 180:1, 191:24
**hit** [5] - 16:10, 119:7, 119:9, 131:15, 140:23
**hold** [1] - 127:2
**holding** [3] - 81:20, 126:22, 152:23
**holds** [2] - 80:7, 80:8
**home** [1] - 28:14
**Honor** [139] - 3:12, 3:17, 3:18, 3:20, 3:25, 4:4, 4:5, 4:9, 4:23, 5:9, 5:14, 5:23, 6:5, 6:6, 6:16, 7:1, 8:8, 8:22, 9:6, 10:2, 11:3, 12:20, 14:15, 15:11, 19:1, 20:25, 21:1, 21:11, 22:3, 22:24, 23:2, 23:24, 24:6, 26:10, 28:3, 29:3, 29:16, 31:9, 32:6, 32:14, 32:17, 34:6, 35:5, 36:17, 37:7, 38:5, 40:13, 40:23, 41:3, 43:16, 44:14, 45:15, 45:18, 49:15, 49:23, 49:25, 51:25, 53:15, 54:6, 55:14, 56:5, 56:20, 61:5, 61:18, 62:6, 63:4, 63:25, 66:2, 67:6, 68:22, 70:16, 71:13, 73:6, 74:8, 74:15, 76:1, 81:15, 83:7, 83:18, 84:19, 85:24, 86:12, 86:22, 87:15, 87:24, 89:7, 89:14, 89:18, 90:24, 91:16, 91:25, 97:23, 97:24, 103:21, 114:15, 115:2, 115:13, 117:24, 118:14, 120:8, 123:12, 128:15, 129:1, 134:11, 134:16, 135:20, 136:3, 136:21, 137:7, 139:22, 141:8, 141:14, 142:9, 143:6, 144:10, 144:19, 147:11, 153:23, 154:23, 156:14, 161:9, 164:10, 167:11, 169:23, 170:10, 174:4, 174:11, 175:3, 178:24, 179:4, 181:20, 182:18, 184:20, 184:22, 188:9, 189:3, 189:18, 191:11, 192:7
**HONORABLE** [1] - 1:10
**hook** [2] - 39:24, 53:3
**hoped** [1] - 192:14
**hornbook** [1] - 81:8
**horseplay** [2] - 55:15, 59:12
**hospital** [1] - 169:5
**hospitalized** [1] - 116:2
**hot** [1] - 72:25
**hour** [10] - 75:19, 104:13, 105:18, 106:13, 107:21, 108:3, 110:17, 176:4, 192:16, 192:23
**hours** [2] - 70:4, 187:10
**house** [1] - 102:14
**houses** [1] - 102:13
**Howard** [4] - 60:10, 60:19, 67:23, 108:9
**huge** [3] - 109:7, 177:11, 177:14
**humiliated** [1] - 111:11
**humiliation** [2] - 80:17, 141:1
**hunt** [1] - 97:6
**hurdle** [1] - 90:8
**hurt** [1] - 116:1
**HYATT** [2] - 2:6, 2:6
**Hyatt** [2] - 3:21, 4:4

## I

**idea** [6] - 46:6, 47:18, 119:24, 129:5, 163:21, 167:7
**identified** [3] - 3:24, 9:10, 25:13
**identify** [14] - 3:8, 3:16, 4:17, 5:1, 5:16, 16:3, 93:13, 94:16, 95:19, 96:7, 96:8, 111:2, 111:17
**identity** [8] - 54:16, 97:3, 108:21, 128:7, 128:8, 128:10, 131:3, 134:23
**ignorant** [1] - 40:8
**ignored** [4] - 60:8, 60:9, 62:22, 117:11
**II** [1] - 2:3
**III** [1] - 90:9
**illegal** [2] - 131:15, 157:2
**immediate** [4] - 89:19, 90:5, 90:20, 91:19
**immediately** [1] - 113:22
**imminent** [2] - 90:8, 90:12
**immune** [1] - 175:15
**immunities** [1] - 147:17
**immunity** [19] - 154:7, 154:12, 155:16, 155:22, 160:22, 165:19, 165:22, 167:5, 167:6, 169:20, 170:19, 171:17, 182:1, 182:3, 183:13, 184:15, 184:17, 192:7
**impact** [12] - 34:14, 83:24, 84:4, 85:3, 86:13, 88:17, 88:19, 99:3, 101:5, 101:14, 140:4, 140:16
**impacts** [1] - 87:18
**implement** [13] - 37:24, 39:2, 39:17, 39:23, 39:24, 40:10, 53:2, 57:18, 58:15, 58:18, 61:12, 162:21, 167:17
**implementation** [9] - 37:23, 38:15, 40:14, 42:10, 43:8, 91:3, 152:10, 165:10, 168:17
**implementation..** [1] - 58:20
**implementations** [1] - 152:21
**implemented** [9] - 17:17, 39:15, 40:9, 42:9, 91:20, 145:11, 163:17, 164:1, 186:11
**implementing** [2] - 32:7, 41:11
**implements** [1] - 39:12
**implicitly** [1] - 79:6
**implied** [1] - 78:20
**implies** [1] - 37:12
**important** [12] - 7:22, 9:23, 49:5, 73:8, 76:11, 104:9, 104:10, 131:11, 135:11, 137:14, 139:2, 139:13
**importantly** [3] - 54:6, 61:13, 102:18
**impose** [3] - 157:1, 173:18, 187:9
**imposes** [1] - 147:16
**imposing** [1] - 157:17
**impossibility** [1] - 120:17
**impossible** [2] - 101:23, 125:13
**impression** [1] - 65:14
**improvement** [3] - 14:8, 96:10, 118:22
**impute** [3] - 92:12, 92:16, 135:5
**imputed** [1] - 92:17
**IN** [1] - 1:1
**in-school** [1] - 116:11
**inadmissible** [1] - 99:23
**inappropriate** [2] - 54:24, 127:19
**Inc** [1] - 26:5
**incident** [70] - 10:21, 12:3, 13:2, 13:7, 13:13, 13:17, 13:22, 15:12, 15:25, 16:1, 16:12, 16:18, 19:2, 19:21, 21:5, 21:13, 21:18, 22:21, 23:25, 24:13, 29:2, 29:3, 32:18, 32:20, 32:22,

33:6, 33:25, 34:21, 41:14, 42:6, 42:7, 50:11, 53:18, 54:8, 55:11, 60:11, 64:4, 65:22, 66:8, 66:18, 67:20, 71:5, 71:17, 71:23, 84:5, 95:16, 97:15, 112:18, 119:14, 123:19, 126:3, 126:23, 127:15, 128:22, 130:11, 134:22, 135:1, 136:8, 136:19, 142:12, 143:9, 146:16, 153:4, 154:13, 168:23, 185:8, 186:12, 192:9
**incidentally** [1] - 105:9
**incidents** [32] - 9:19, 19:1, 21:16, 21:21, 22:1, 22:3, 22:16, 22:17, 22:21, 23:1, 23:7, 27:22, 28:23, 29:1, 29:2, 32:24, 33:12, 54:1, 70:2, 71:16, 72:11, 73:22, 110:25, 111:2, 121:1, 124:2, 137:13, 137:19, 141:24, 143:15, 145:13, 154:18
**include** [2] - 15:1, 26:1
**included** [4] - 33:25, 34:11, 115:21, 169:2
**includes** [2] - 82:21, 105:8
**including** [16] - 31:15, 59:23, 71:3, 106:10, 129:25, 132:16, 135:7, 145:5, 145:23, 152:11, 152:25, 154:16, 156:19, 167:21, 177:23, 186:14
**incorporate** [4] - 36:20, 49:17, 66:3, 70:22
**incorrect** [3] - 11:12, 24:11, 161:1
**incorrectly** [1] - 16:9
**increase** [3] - 62:25, 181:8, 182:5
**increasing** [2] - 180:21, 180:25
**incredibly** [1] - 98:8
**incumbent** [1] - 186:7
**indeed** [2] - 107:24, 175:22
**indefensible** [1] - 161:2
**indefinitely** [1] - 121:2
**indeterminant** [1] - 79:6
**Indiana** [1] - 99:21
**indicated** [1] - 103:5
**indicates** [1] - 76:11
**indicating** [1] - 117:25
**indication** [4] - 45:1, 72:1, 127:24
**indifference** [29] - 57:7, 58:21, 59:14, 63:7, 63:24, 64:22, 92:21, 94:10, 94:11, 94:18, 94:25, 95:2, 97:4, 99:1, 121:22, 125:11, 128:3, 130:8, 137:9, 137:12, 142:13, 143:7, 143:14, 145:2, 148:1, 183:8, 184:8, 190:24, 191:18
**indifferent** [10] - 37:16, 63:9, 63:10, 97:9, 122:7, 123:16, 124:4, 126:18, 127:6, 150:4
**indignity** [2] - 101:4, 141:2
**individual** [16] - 6:21, 11:3, 42:7, 54:12, 97:1, 98:4, 114:18, 152:14, 164:4, 164:17, 165:6, 165:7, 167:7, 168:2, 168:15
**individualized** [1] - 47:6
**individually** [3] - 164:15, 166:24, 187:15
**individuals** [8] - 5:17, 8:11, 20:17, 21:25, 41:22, 53:21, 89:21, 165:3
**indulgence** [5] - 45:8, 67:6, 141:7, 155:11, 182:11
**inequity** [1] - 127:7
**infer** [2] - 67:18, 147:4
**inference** [4] - 122:15, 123:6, 124:21, 188:14
**inferences** [2] - 58:4, 68:14
**inflicts** [1] - 37:15
**influence** [1] - 126:8
**information** [11] - 50:6, 50:16, 50:19, 51:5, 51:6, 52:4, 52:6, 53:17, 57:22, 96:7, 97:7
**informed** [3] - 54:15, 58:11, 74:18
**initials** [5] - 8:10, 8:12, 54:7, 54:13, 105:15
**injunctive** [14] - 76:10, 76:13, 89:11, 89:12, 89:16, 89:17, 90:6, 90:13, 90:15, 91:2, 91:11, 91:16, 120:3, 120:15
**injured** [2] - 72:24, 131:15
**injuries** [4] - 27:5, 27:9, 27:16, 77:17
**injury** [12] - 16:18, 17:23, 27:2, 27:4, 37:15, 90:6, 90:20, 140:19, 172:4, 172:7, 179:14, 183:1
**inquiry** [1] - 149:4
**inside** [3] - 56:10, 105:5, 112:22
**insidious** [1] - 125:10
**insofar** [1] - 6:20
**instance** [4] - 98:17, 98:23, 99:20, 102:13
**instead** [8] - 10:25, 56:2, 98:15, 116:5, 116:22, 118:8, 165:3, 176:5
**institute** [1] - 91:12
**institution** [4] - 92:12, 92:13, 92:16, 135:6
**institutional** [1] - 90:21
**instructed** [2] - 16:15, 29:8
**instruction** [5] - 25:21, 26:6, 43:5, 82:20, 137:23
**instructions** [1] - 142:22
**insubordinate** [1] - 116:14
**insufficient** [1] - 56:16
**insular** [1] - 125:9
**insurer** [1] - 16:19
**integral** [1] - 77:24
**integrate** [2] - 157:21, 167:24
**integrity** [12] - 101:9, 101:15, 101:17, 101:18, 102:24, 140:5, 150:3, 154:20, 154:25, 156:10, 160:25, 183:24
**intend** [2] - 100:10, 100:18
**intentional** [1] - 37:9
**intentionally** [2] - 37:16, 37:19
**inter** [1] - 79:22
**interested** [2] - 26:3, 193:13
**interesting** [2] - 97:21, 146:24
**interestingly** [1] - 82:17
**interfere** [1] - 89:24
**interlocutory** [1] - 103:9
**intermittent** [1] - 29:2
**intermittently** [2] - 179:17, 181:21
**internal** [2] - 59:8, 61:15
**interpretation** [2] - 191:10, 191:14
**interpreted** [2] - 79:12, 80:2
**interpreter** [1] - 80:13
**interpreting** [1] - 167:22
**interrogatories** [2] - 142:17, 142:19
**interrupt** [1] - 154:23
**interrupted** [1] - 141:14
**intervening** [1] - 16:13
**intervention** [1] - 119:16
**interventions** [3] - 145:4, 145:10, 181:3
**interviewing** [1] - 132:16
**intimidate** [1] - 51:2
**intimidation** [8] - 14:23, 15:2, 23:20, 33:14, 33:15, 55:8, 144:22, 162:14
**invaded** [2] - 140:24, 140:25
**invasion** [5] - 101:9, 101:15, 102:24, 140:4, 160:24
**investigate** [2] - 132:11, 176:23
**investigated** [1] - 129:17
**investigation** [9] - 59:8, 61:15, 158:9, 158:21, 160:13, 174:24, 185:7, 185:9, 185:10
**Investigative** [1] - 96:11
**investigators** [1] - 109:6
**invite** [1] - 153:22
**invited** [1] - 192:19
**involve** [2] - 57:20, 134:22
**involved** [23] - 9:20, 12:7, 13:1, 23:5, 24:24, 25:17, 31:17, 42:12, 73:21, 93:24, 105:14, 105:15, 106:23, 106:25, 107:3, 107:24, 109:22, 116:6, 143:13, 152:24, 157:14, 159:11, 187:17
**involves** [2] - 9:8, 135:12
**involving** [9] - 21:10, 21:13, 21:17, 93:5, 93:6, 112:12, 145:14, 145:15, 176:16
**ironically** [2] - 112:15, 160:12
**irony** [1] - 110:15
**irrelevant** [1] - 137:19
**isolated** [2] - 60:11
**issue** [33] - 6:17, 7:8, 7:25, 8:9, 22:22, 47:10, 55:4, 56:3, 73:8, 84:14, 85:7, 88:6, 90:25, 93:18, 97:21, 98:22, 100:22, 103:8, 103:11, 120:16, 134:7, 134:8, 134:10, 134:25, 138:20, 141:11, 141:17, 148:21, 154:20, 160:22, 162:20, 168:8, 180:23
**issued** [2] - 28:19, 46:6
**issues** [9] - 23:6, 55:18, 116:13, 116:14, 136:7, 169:11, 191:16, 191:23
**item** [5] - 8:20, 83:14, 146:20, 167:18, 167:19
**itself** [4] - 60:23, 60:24, 79:2, 88:17
**Ivy** [1] - 1:16
**IX** [69] - 75:25, 76:2,

76:12, 76:18, 77:1, 79:15, 79:17, 79:23, 80:2, 80:10, 81:21, 82:7, 82:14, 82:16, 83:21, 85:1, 85:22, 86:9, 87:13, 88:1, 88:14, 90:13, 92:3, 92:4, 92:5, 93:12, 93:21, 94:9, 95:2, 98:8, 98:15, 98:19, 99:15, 99:20, 99:22, 100:7, 100:9, 100:11, 100:17, 100:19, 101:5, 101:16, 101:19, 102:4, 121:16, 126:25, 128:16, 128:23, 129:3, 135:5, 135:19, 137:8, 137:14, 137:17, 137:20, 138:1, 138:5, 138:6, 138:18, 138:22, 139:3, 139:9, 139:13, 140:10, 140:11, 144:25, 146:18

## J

**J.C** [9] - 120:23, 177:12, 177:13, 177:14, 187:19, 187:20, 187:21, 188:1, 190:6
**J.C.A** [22] - 25:14, 34:9, 61:19, 105:16, 113:8, 114:12, 114:13, 115:12, 115:13, 115:14, 115:18, 117:5, 117:15, 121:20, 145:1, 145:14, 145:15, 179:20, 190:17, 191:24
**J.C.A.'s** [1] - 117:13
**J.C.S** [2] - 180:1, 180:24
**J.V** [1] - 54:8
**JACQUELYN** [1] - 2:11
**Jacquelyn** [1] - 4:12
**jammed** [1] - 61:2
**JC** [1] - 190:3
**Jeffrey** [2] - 4:10, 11:2
**JEFFREY** [1] - 2:9
**Jennifer** [5] - 11:18, 12:3, 44:16, 105:21, 179:17
**Jennings** [2] - 128:17, 135:7
**JERRY** [2] - 2:6, 2:6
**Jerry** [2] - 3:21, 4:4
**job** [15] - 31:13, 37:22, 38:19, 38:25, 46:11, 47:21, 48:9, 48:11, 64:6, 65:13, 75:8, 167:16, 168:23, 169:1
**Jody** [1] - 5:19
**JOHN** [1] - 1:4
**John** [24] - 3:13, 3:19, 3:21, 4:2, 4:3, 5:6, 5:8, 5:9, 5:10, 5:13, 27:10, 48:19, 101:25, 103:23, 104:2, 104:6, 112:22, 132:17, 132:18, 133:14, 133:25, 141:11, 188:14
**Johnson** [2] - 107:24, 109:14
**Joint** [1] - 9:21
**joint** [2] - 9:10, 84:17
**Jones** [1] - 16:7
**Joseph** [3] - 4:24, 11:8, 21:1
**JOSEPH** [2] - 1:14, 2:15
**Judge** [8] - 89:25, 90:15, 106:17, 110:15, 118:4, 131:9, 146:20, 166:2
**JUDGE** [1] - 1:10
**judges** [1] - 192:20
**judgment** [44] - 9:25, 10:9, 10:20, 17:1, 17:25, 18:15, 20:13, 20:18, 21:12, 24:1, 34:14, 36:19, 37:3, 37:8, 40:25, 45:11, 49:16, 49:24, 53:12, 54:3, 55:3, 56:18, 58:3, 59:10, 67:3, 68:15, 76:16, 80:6, 82:10, 83:15, 88:14, 88:16, 89:8, 90:16, 91:17, 103:11, 103:12, 103:15, 139:24, 151:16, 169:24, 183:10, 188:22, 191:13
**Judith** [2] - 59:15, 109:17
**Jules** [4] - 60:5, 62:24, 107:17, 108:2
**July** [6] - 14:8, 46:6, 99:21, 161:20, 167:21, 178:11
**jump** [2] - 8:16, 40:21
**June** [1] - 14:8
**junior** [1] - 72:11
**jurisdictions** [2] - 23:14, 159:24
**juror** [3] - 41:4, 44:6, 67:18
**jury** [21] - 25:20, 25:25, 26:6, 26:12, 35:12, 43:5, 43:6, 77:20, 79:17, 79:18, 82:19, 82:25, 98:4, 98:6, 98:12, 137:23, 139:17, 140:13, 142:23, 146:9, 169:11
**juvenile** [1] - 6:7
**JV** [53] - 11:7, 13:11, 17:4, 18:10, 21:24, 22:11, 44:25, 46:17, 50:7, 60:8, 68:1, 68:10, 68:25, 69:19, 69:20, 70:21, 70:22, 71:6, 71:14, 104:12, 104:13, 104:19, 104:21, 104:23, 105:1, 105:14, 105:18, 106:2, 106:23, 107:13, 107:20, 108:3, 109:13, 109:19, 110:1, 110:6, 110:8, 110:24, 112:13, 113:5, 119:17, 148:15, 176:5, 182:21, 185:2, 185:4, 185:25, 186:9, 186:25, 187:2, 187:7, 188:21

## K

**KANE** [230] - 2:12, 4:9, 4:16, 4:20, 5:2, 5:18, 5:23, 7:14, 8:22, 9:1, 9:4, 9:6, 10:15, 12:1, 12:3, 12:10, 12:17, 12:19, 18:20, 18:23, 18:25, 19:5, 19:9, 32:17, 32:21, 33:8, 34:5, 35:5, 35:25, 36:3, 36:17, 36:24, 37:1, 37:21, 38:16, 38:21, 38:24, 39:4, 39:8, 39:13, 39:18, 39:20, 40:1, 40:7, 40:13, 40:23, 44:14, 45:8, 45:10, 45:14, 66:2, 66:13, 66:15, 71:13, 72:15, 73:6, 74:5, 76:1, 83:7, 83:18, 84:1, 84:19, 85:11, 85:13, 85:16, 85:23, 86:12, 86:15, 86:22, 87:2, 87:4, 87:9, 87:15, 87:23, 88:2, 88:5, 88:12, 89:7, 89:14, 89:17, 90:24, 91:10, 91:21, 91:23, 91:25, 92:3, 95:5, 95:9, 95:13, 96:24, 97:11, 97:19, 97:23, 127:14, 128:12, 128:15, 129:1, 129:9, 129:12, 130:20, 130:25, 134:11, 135:3, 135:20, 136:2, 136:17, 136:21, 136:23, 137:5, 138:3, 138:7, 138:10, 138:24, 139:2, 139:6, 139:11, 139:22, 140:7, 140:11, 140:19, 141:7, 141:14, 142:8, 142:11, 142:15, 143:6, 144:10, 144:13, 144:19, 145:18, 146:13, 147:11, 148:10, 148:14, 149:5, 149:12, 149:14, 149:18, 150:6, 150:13, 151:4, 151:7, 151:10, 151:14, 151:19, 151:21, 151:25, 152:8, 152:13, 153:22, 154:4, 154:6, 154:22, 154:25, 155:7, 155:11, 155:18, 155:24, 156:5, 161:7, 161:9, 161:18, 162:1, 162:5, 162:8, 162:11, 162:23, 163:1, 163:6, 163:10, 163:15, 163:24, 164:7, 164:10, 164:13, 164:17, 164:21, 164:24, 165:9, 165:22, 166:1, 166:7, 166:11, 166:13, 166:20, 168:22, 169:18, 169:23, 170:2, 170:9, 170:15, 170:18, 170:23, 171:18, 171:21, 171:23, 172:3, 172:6, 172:23, 173:15, 173:23, 174:1, 174:4, 174:7, 179:3, 180:21, 181:2, 181:7, 181:19, 182:10, 182:14, 182:20, 183:19, 183:22, 184:4, 184:18, 184:20, 189:3, 189:11, 189:17, 189:23, 190:11, 190:14, 190:19, 191:2, 191:10, 191:15, 191:23, 192:5, 192:12
**Kane** [24] - 4:9, 4:25, 5:16, 7:13, 8:2, 8:21, 21:20, 22:9, 31:6, 31:13, 32:16, 36:15, 36:16, 44:13, 71:12, 75:25, 134:3, 141:15, 144:17, 168:20, 179:2, 182:13, 189:2
**Kane's** [1] - 21:3
**KARP** [1] - 2:16
**Karpinski** [7] - 4:24, 10:8, 20:24, 21:1, 30:8, 36:4, 49:14
**KARPINSKI** [23] - 2:16, 2:16, 4:23, 20:25, 21:11, 21:16, 22:19, 22:24, 23:2, 23:4, 23:13, 36:6, 49:15, 51:10, 51:16, 51:21, 51:24, 52:9, 52:11, 53:8, 55:24, 56:5, 56:15
**Karpinski's** [1] - 10:8
**keep** [7] - 60:14, 71:10, 108:16, 115:9, 134:4, 170:25, 183:20
**KEMP** [1] - 2:3
**Ken** [2] - 60:10, 67:23
**Kenneth** [1] - 108:9
**kept** [5] - 115:24, 125:7, 133:16, 160:9, 188:2
**Kevin** [2] - 4:23, 21:1
**KEVIN** [1] - 2:16
**key** [3] - 72:22, 72:25, 73:4
**kicked** [2] - 22:13, 116:8
**kicker** [1] - 79:16

**kid** [2] - 35:17, 134:15
**kids** [6] - 56:8, 106:6, 106:7, 175:14
**kin** [1] - 193:13
**kind** [16] - 28:2, 33:7, 47:12, 47:13, 56:14, 68:23, 70:22, 103:3, 103:13, 103:14, 119:15, 119:16, 137:4, 140:18, 146:7, 149:24
**kinds** [3] - 90:21, 144:1, 144:3
**king** [1] - 110:23
**knocked** [1] - 60:20
**knocking** [1] - 60:13
**knowing** [2] - 125:4, 187:1
**knowledge** [21] - 12:23, 14:9, 14:12, 14:16, 18:13, 19:21, 23:7, 45:25, 54:24, 62:1, 62:18, 93:18, 94:8, 122:2, 125:22, 150:7, 160:5, 179:10, 183:9, 187:4
**known** [20] - 33:5, 36:1, 36:2, 64:21, 67:12, 68:11, 70:19, 73:20, 74:19, 110:14, 126:14, 160:25, 161:4, 174:13, 175:6, 176:24, 181:9, 183:5
**knows** [6] - 57:5, 66:5, 147:15, 161:2, 163:13, 168:1

## L

**LAAKE** [1] - 1:14
**lack** [21] - 14:16, 16:17, 22:8, 50:10, 57:8, 59:11, 59:13, 59:16, 60:7, 67:19, 67:23, 68:1, 74:17, 108:7, 108:13, 109:12, 109:15, 120:14, 188:19, 188:20
**lady** [1] - 115:23
**Lago** [2] - 95:3, 95:6
**laid** [2] - 52:1, 133:15
**land** [1] - 96:5
**landlord** [1] - 102:14
**landlord's** [1] - 102:25
**landscape** [5] - 19:1, 73:20, 99:6, 99:13, 103:6
**Lane** [3] - 1:16, 2:4, 2:7
**language** [1] - 80:13
**large** [3] - 113:19, 125:13, 188:17
**larger** [1] - 50:19
**last** [7] - 15:24, 71:16, 99:21, 101:1, 112:8, 112:9, 146:20
**late** [7] - 15:16, 53:20, 122:13, 136:16, 163:16, 170:12, 192:16
**latest** [1] - 70:12
**law** [44] - 10:18, 10:20, 16:5, 26:4, 27:11, 41:17, 57:5, 76:4, 76:11, 77:6, 77:24, 78:14, 81:9, 82:7, 83:8, 85:10, 88:21, 90:3, 90:15, 94:12, 98:18, 99:3, 99:12, 99:16, 100:8, 101:10, 101:14, 101:16, 103:10, 103:13, 103:19, 134:20, 135:5, 136:24, 144:6, 144:23, 151:11, 159:3, 166:16, 173:17, 175:8, 181:22, 188:11
**LAW** [1] - 2:6
**laws** [2] - 157:22, 167:25
**lawsuit** [5] - 77:8, 90:22, 91:3, 97:12, 97:16
**lead** [3] - 14:11, 75:1, 105:15
**leader** [1] - 119:24
**leadership** [3] - 49:5, 111:3, 119:19
**learned** [1] - 97:11
**learns** [1] - 147:25
**lease** [3] - 102:18, 102:19, 102:22
**least** [13] - 48:14, 49:9, 59:18, 59:19, 65:23, 67:14, 71:2, 74:22, 83:23, 84:8, 88:11, 123:1, 165:18
**leave** [9] - 16:16, 52:14, 83:4, 84:3, 85:5, 86:24, 100:14, 154:17, 164:11
**leaving** [2] - 16:13, 60:12
**led** [3] - 41:8, 119:25, 187:9
**leeway** [1] - 191:15
**left** [6] - 16:7, 41:21, 42:7, 61:11, 114:19, 133:18
**legal** [8] - 5:20, 9:10, 33:16, 57:16, 87:17, 87:18, 158:6, 175:24
**legally** [3] - 80:12, 158:14, 161:1
**legislation** [7] - 76:19, 76:24, 78:15, 78:18, 79:13, 80:24, 82:15
**length** [1] - 167:15
**lengthy** [2] - 159:15, 192:22
**less** [1] - 83:3
**letter** [4] - 8:5, 185:1, 185:6, 188:18
**level** [11] - 37:25, 38:12, 39:2, 39:6, 39:23, 40:3, 42:17, 62:21, 66:23, 79:7, 117:8
**liability** [56] - 9:10, 20:16, 79:2, 79:7, 83:3, 87:23, 92:12, 100:5, 100:7, 135:5, 138:25, 147:14, 147:16, 147:21, 148:21, 149:6, 149:10, 149:11, 149:18, 149:20, 150:5, 150:17, 151:1, 151:6, 151:13, 151:16, 155:2, 155:3, 159:18, 160:21, 167:7, 168:14, 168:15, 170:6, 170:14, 170:20, 171:5, 171:15, 171:24, 172:8, 172:24, 173:5, 175:2, 177:2, 178:7, 182:15, 183:7, 183:10, 183:15, 183:17, 183:19, 184:5, 184:23, 185:18, 185:21, 188:24
**liable** [13] - 27:8, 77:8, 83:12, 87:22, 124:2, 141:24, 154:14, 154:17, 156:9, 164:15, 173:10, 178:24, 183:14
**liberties** [2] - 134:18, 161:11
**Liberty** [1] - 93:25
**liberty** [1] - 82:4
**life** [1] - 37:11
**likelihood** [1] - 90:10
**likely** [4] - 47:3, 47:15, 74:16, 75:7
**likewise** [2] - 58:10, 61:25
**limine** [4] - 81:17, 98:22, 103:16, 138:14
**limit** [2] - 100:11, 100:19
**limitation** [1] - 98:14
**limited** [3] - 21:4, 145:24, 148:22
**limits** [3] - 87:23, 87:25, 137:4
**line** [10] - 42:2, 121:2, 138:21, 139:10, 139:11, 155:5, 162:22, 163:3, 173:9, 173:13
**lines** [2] - 157:11
**list** [3] - 12:21, 83:12, 174:20
**listed** [1] - 82:9
**listen** [1] - 51:1
**litany** [2] - 135:7, 138:16
**litigation** [2] - 100:4, 139:17
**local** [1] - 157:22
**located** [1] - 68:21
**lock** [1] - 52:16
**locked** [1] - 52:21
**locker** [117] - 10:23, 11:16, 12:25, 15:17, 15:18, 15:22, 15:24, 17:5, 17:6, 17:10, 17:13, 19:19, 20:10, 22:6, 25:7, 26:17, 28:7, 28:10, 29:19, 29:20, 32:10, 35:6, 35:9, 35:16, 35:17, 44:20, 45:20, 46:3, 50:3, 50:4, 52:13, 52:15, 52:18, 52:20, 52:24, 53:5, 53:21, 53:23, 54:25, 55:10, 55:17, 56:10, 58:11, 60:14, 60:22, 62:13, 62:19, 62:22, 63:12, 64:5, 65:10, 66:18, 68:1, 68:18, 68:21, 68:23, 68:25, 69:15, 69:19, 69:20, 69:23, 71:7, 71:20, 72:5, 72:7, 72:18, 72:19, 72:22, 73:14, 91:12, 95:17, 95:25, 96:2, 96:6, 104:3, 105:7, 106:18, 108:10, 109:6, 112:7, 112:13, 112:23, 113:2, 113:11, 113:15, 113:25, 114:4, 114:6, 119:4, 119:14, 119:22, 121:7, 152:11, 158:5, 159:11, 159:13, 159:25, 160:16, 172:14, 173:3, 176:1, 176:2, 176:7, 178:21, 183:4, 184:13, 185:4, 185:25, 186:17, 186:23, 187:3, 187:8, 187:12, 188:2
**lockers** [3] - 60:23, 60:24, 60:25
**locks** [1] - 60:25
**loco** [3] - 17:3, 43:10, 175:10
**log** [1] - 115:19
**logistical** [2] - 20:2, 38:9
**long-standing** [1] - 55:6
**long-term** [1] - 33:21
**longest** [1] - 115:14
**look** [18] - 11:11, 16:24, 50:11, 50:12, 73:7, 73:20, 88:1, 89:25, 92:18, 103:6, 134:6, 134:20, 141:4, 141:16, 142:22, 163:21
**Look** [1] - 180:25
**looked** [6] - 34:6, 82:7, 118:7, 189:4, 189:6, 189:18
**looking** [9] - 65:19, 86:5, 134:17, 140:25, 146:18, 148:9, 150:16, 189:25
**looks** [1] - 118:2
**loose** [2] - 121:6, 153:8
**loosely** [1] - 152:9
**Lord** [1] - 62:21
**Los** [1] - 90:4
**losing** [4] - 39:21, 126:20, 150:21, 173:7
**loss** [5] - 27:3, 84:2, 84:23, 101:21, 140:20
**lost** [2] - 101:22, 102:3
**loud** [1] - 184:11
**louder** [1] - 190:5

**low** [1] - 25:20
**lower** [1] - 39:2
**lower-level** [1] - 39:2
**luckily** [1] - 125:14
**lumped** [1] - 189:17
**lunch** [1] - 36:13
**lured** [1] - 116:3
**Lyons** [1] - 90:4

**M**

**M.T** [1] - 113:3
**machine** [1] - 193:10
**magnitude** [1] - 79:6
**mailman** [1] - 167:14
**main** [1] - 60:22
**maintain** [1] - 134:5
**major** [1] - 120:1
**majority** [4] - 7:3, 7:4, 7:16
**makeup** [1] - 69:15
**MALCOLM** [1] - 1:20
**Malcolm** [2] - 3:18, 24:6
**Malmstrom** [1] - 5:20
**Maloney** [32] - 3:13, 89:5, 97:22, 118:12, 122:11, 128:19, 129:21, 130:5, 130:16, 134:12, 135:22, 136:5, 137:1, 137:14, 138:20, 143:9, 156:13, 161:10, 161:19, 166:14, 167:8, 168:22, 174:9, 174:10, 179:16, 184:21, 188:16, 189:5, 189:7, 189:24, 190:15, 190:22
**MALONEY** [69] - 1:15, 3:12, 3:25, 5:6, 7:1, 7:8, 7:21, 8:7, 72:13, 89:13, 97:24, 101:6, 101:25, 106:17, 107:12, 108:5, 110:5, 110:12, 111:8, 111:14, 111:16, 111:19, 111:24, 112:1, 112:4, 112:6, 114:13, 114:15, 115:2, 115:13, 118:3, 118:13, 118:18, 119:13, 120:5, 120:8, 131:9, 131:14, 131:22, 132:3, 132:14, 132:25, 133:9, 133:12, 133:21, 142:4, 156:14, 158:17, 160:8, 167:11, 168:7, 168:13, 171:13, 174:11, 175:1, 176:15, 177:2, 177:5, 177:13, 184:22, 185:7, 185:14, 185:17, 185:23, 187:20, 189:12, 190:2, 190:6, 190:13
**Maloney's** [2] - 162:15, 188:10
**man** [7] - 24:22, 27:18, 28:7, 43:14, 69:25, 116:3, 123:8
**manage** [1] - 57:18
**management** [2] - 117:13, 188:20
**manager** [1] - 108:12
**mandatory** [13] - 31:19, 42:19, 42:24, 42:25, 43:9, 47:17, 64:13, 65:16, 91:13, 160:19, 181:20, 186:3
**manifest** [1] - 37:10
**Maniya** [2] - 60:5, 62:24
**map** [1] - 99:3
**Margaret** [1] - 4:13
**MARGARET** [1] - 2:11
**market** [1] - 106:24
**Mary** [1] - 90:7
**Maryland** [15] - 1:17, 1:22, 2:4, 2:7, 2:13, 2:18, 7:2, 25:20, 25:25, 84:9, 139:17, 156:8, 174:14, 175:9, 193:6
**MARYLAND** [2] - 1:2, 1:11
**material** [5] - 10:19, 41:3, 65:23, 67:15, 134:8
**matter** [12] - 3:4, 3:6, 6:8, 6:10, 8:5, 10:20, 41:17, 54:17, 94:12, 96:12, 144:6, 193:9
**matters** [5] - 6:1, 8:16, 34:8, 160:19, 175:11
**MATTHEW** [1] - 1:15
**Matthew** [1] - 4:1
**MCPS** [16] - 17:9, 24:18, 28:8, 28:16, 29:17, 31:18, 41:21, 42:14, 47:22, 50:5, 50:6, 53:10, 55:7, 130:2, 152:10, 161:22
**meager** [1] - 26:11
**mean** [45] - 7:9, 23:14, 24:18, 35:8, 38:19, 62:21, 72:23, 85:18, 88:23, 123:18, 128:9, 129:4, 139:20, 140:23, 142:17, 143:4, 143:24, 146:7, 146:11, 148:6, 148:7, 148:9, 148:10, 148:15, 149:2, 149:14, 152:16, 154:6, 154:7, 154:23, 158:16, 161:16, 162:17, 166:15, 166:20, 167:3, 167:6, 173:11, 179:24, 180:3, 180:10, 180:19, 181:12, 182:23
**meaningful** [2] - 115:7, 115:10
**means** [10] - 35:16, 74:25, 84:11, 94:7, 100:23, 100:24, 120:14, 134:21, 138:17, 152:20
**meant** [3] - 26:1, 104:18, 125:7
**meantime** [1] - 120:12
**meanwhile** [1] - 146:10
**measures** [1] - 102:15
**media** [1] - 105:23
**medical** [6] - 6:20, 7:17, 16:1, 83:17, 169:6
**meet** [4] - 27:13, 27:16, 67:1, 67:16
**meeting** [16] - 15:4, 15:10, 22:10, 34:19, 50:25, 51:11, 51:14, 51:22, 59:22, 62:4, 62:9, 62:10, 107:18, 136:6, 136:8
**meetings** [6] - 51:25, 60:1, 109:10, 110:21, 135:24, 144:1
**meets** [1] - 51:19
**Melissa** [1] - 119:6
**Melott** [1] - 117:3
**member** [3] - 25:3, 48:5, 117:13
**members** [5] - 47:14, 64:14, 67:22, 113:1, 178:15
**memo** [4] - 28:19, 46:5, 159:4, 163:11
**memorandum** [2] - 96:14, 178:10
**memos** [1] - 167:21
**men** [20] - 25:5, 26:23, 27:18, 28:22, 29:9, 29:14, 30:15, 30:18, 41:6, 42:20, 43:10, 43:12, 48:18, 61:10, 64:15, 65:1, 65:19, 122:18, 125:17, 188:16
**mention** [5] - 62:3, 71:15, 78:4, 130:10, 130:11
**mentioned** [11] - 15:9, 33:24, 33:25, 34:9, 67:10, 71:22, 77:15, 89:11, 130:9, 138:12, 146:14
**mentions** [1] - 79:3
**mentoring** [1] - 145:12
**Mercer** [5] - 79:12, 79:15, 79:18, 82:14
**Mercer's** [1] - 80:4
**mere** [1] - 35:6
**merely** [1] - 79:5
**merit** [1] - 167:2
**merits** [3] - 92:4, 142:17
**MESSITTE** [1] - 1:10
**messy** [1] - 98:8
**met** [5] - 51:16, 51:17, 105:22, 131:12, 156:20
**methods** [1] - 47:14
**Mexico** [4] - 29:14, 34:1, 61:10, 159:24
**Michael** [2] - 14:10, 107:17
**midday** [1] - 70:12
**middle** [5] - 36:13, 103:19, 146:14, 146:15, 192:2
**might** [7] - 30:18, 81:2, 87:11, 100:5, 105:8, 118:5, 134:22
**million** [1] - 79:19
**mind** [6] - 60:15, 83:2, 89:5, 108:16, 137:23, 180:17
**minimize** [2] - 47:14, 48:1
**minimum** [2] - 47:23, 48:1
**minor** [2] - 7:15, 76:7
**minors** [1] - 6:24
**minute** [6] - 30:16, 40:22, 141:5, 144:8, 144:17, 156:25
**minute-and-a-half** [2] - 144:8, 144:17
**minutes** [16] - 8:21, 15:22, 15:23, 35:10, 45:13, 61:3, 72:7, 95:11, 96:23, 104:19, 114:12, 137:3, 144:7, 144:11, 159:14, 179:1
**misbehavior** [1] - 145:23
**misconduct** [6] - 109:19, 116:18, 173:19, 173:20, 173:21, 184:7
**miss** [2] - 34:22, 182:11
**Miss** [1] - 145:13
**missed** [3] - 33:23, 34:7, 39:4
**missing** [2] - 60:23, 162:22
**misstate** [1] - 189:25
**misunderstood** [1] - 130:18
**mixed** [1] - 49:11
**modify** [1] - 157:9
**module** [1] - 29:5
**modules** [1] - 47:20
**mom** [1] - 133:14
**moment** [11] - 35:7, 46:1, 82:24, 83:5, 83:19, 84:3, 87:7, 88:19, 90:1, 124:7, 141:7
**Monell** [8] - 164:12, 164:25, 165:12, 166:4, 168:9, 168:10, 168:14, 177:6
**Monell's** [1] - 152:14
**monetary** [3] - 76:9, 83:5, 83:16
**money** [1] - 77:9
**monitor** [4] - 46:24, 48:12, 64:7, 118:22
**monitored** [3] - 31:24, 38:11, 38:18
**monitoring** [7] - 48:16, 48:24, 116:10, 145:12, 169:4, 169:8, 186:1
**Monroe** [1] - 2:12
**MONTGOMERY** [3] - 1:7, 2:9, 2:10
**Montgomery** [34] -

3:6, 4:21, 5:19, 5:20, 16:2, 16:3, 16:4, 17:16, 19:25, 22:23, 24:25, 33:15, 43:19, 54:18, 89:20, 92:24, 100:6, 113:11, 113:22, 114:20, 115:15, 116:5, 143:23, 156:18, 157:22, 158:11, 159:12, 160:12, 167:24, 168:24, 175:13, 178:20, 186:9, 187:13
**month** [11] - 13:21, 17:8, 18:5, 18:6, 44:16, 44:21, 48:9, 48:10, 68:2, 107:18
**monthly** [1] - 110:21
**months** [3] - 118:14, 118:25, 145:19
**morally** [1] - 161:1
**Moravian** [1] - 82:5
**morning** [13] - 3:2, 3:12, 3:17, 3:20, 4:9, 4:23, 24:6, 70:7, 70:8, 103:21, 103:24, 104:5, 104:8
**Morris** [2] - 14:23, 14:24
**most** [4] - 54:6, 58:4, 120:23, 135:8
**mostly** [1] - 26:2
**mother** [8] - 5:10, 15:8, 116:20, 117:5, 131:12, 131:13, 131:14, 131:24
**motion** [23] - 9:24, 10:2, 10:8, 18:21, 19:3, 21:9, 21:12, 55:3, 58:3, 59:10, 66:10, 68:15, 81:17, 86:1, 88:5, 98:18, 98:21, 98:22, 99:11, 138:14, 164:21, 168:25, 191:12
**MOTIONS** [1] - 1:9
**motions** [8] - 3:7, 6:8, 18:25, 76:5, 98:16, 139:24, 171:1
**mouth** [4] - 46:20, 46:22, 47:25, 48:16
**move** [7] - 36:8, 36:18, 48:8, 53:12, 114:11, 146:21, 169:25
**moved** [3] - 49:16, 117:14, 153:2
**moves** [1] - 36:19
**moving** [7] - 56:14, 99:6, 99:13, 103:5, 174:10, 175:22, 177:25
**MPS** [1] - 29:17
**MR** [172] - 3:12, 3:17, 3:20, 3:25, 4:3, 4:5, 4:23, 5:6, 5:9, 5:13, 6:5, 6:12, 6:16, 7:1, 7:8, 7:21, 8:7, 20:25, 21:11, 21:16, 22:19, 22:24, 23:2, 23:4, 23:13, 24:6, 25:12, 26:5, 26:10, 28:3, 28:16, 28:25, 30:6, 30:19, 31:1, 31:12, 31:23, 32:6, 32:10, 32:13, 36:6, 36:10, 41:3, 42:1, 42:5, 44:9, 45:18, 48:10, 49:1, 49:4, 49:15, 51:10, 51:16, 51:21, 51:24, 52:9, 52:11, 53:8, 55:24, 56:5, 56:15, 56:20, 56:23, 57:1, 61:5, 62:6, 62:9, 62:18, 63:4, 63:23, 64:2, 67:6, 68:22, 69:3, 69:5, 69:14, 69:18, 70:6, 70:10, 70:16, 72:13, 74:8, 74:14, 89:13, 97:24, 101:6, 101:25, 106:17, 107:12, 108:5, 110:5, 110:12, 111:8, 111:14, 111:16, 111:19, 111:24, 112:1, 112:4, 112:6, 114:13, 114:15, 115:2, 115:13, 118:3, 118:13, 118:18, 119:13, 120:5, 120:8, 121:10, 122:15, 123:1, 123:6, 123:19, 124:9, 124:15, 124:18, 124:25, 125:2, 125:6, 126:11, 126:15, 127:12, 131:9, 131:14, 131:22, 132:3, 132:14, 132:25, 133:9, 133:12, 133:21, 141:8, 141:10, 141:13, 141:19, 141:23, 142:2, 142:4, 142:5, 142:14, 156:14, 158:17, 160:8, 167:11, 168:7, 168:13, 170:8, 171:4, 171:8, 171:11, 171:13, 174:11, 175:1, 176:15, 177:2, 177:5, 177:13, 182:18, 184:22, 185:7, 185:14, 185:17, 185:23, 187:20, 188:9, 189:1, 189:12, 190:2, 190:6, 190:13
**MS** [229] - 4:9, 4:16, 4:20, 5:2, 5:18, 5:23, 7:14, 8:22, 9:1, 9:4, 9:6, 10:15, 12:1, 12:3, 12:10, 12:17, 12:19, 18:20, 18:23, 18:25, 19:5, 19:9, 32:17, 32:21, 33:8, 34:5, 35:5, 35:25, 36:3, 36:17, 36:24, 37:1, 37:21, 38:16, 38:21, 38:24, 39:4, 39:8, 39:13, 39:18, 39:20, 40:1, 40:7, 40:13, 40:23, 44:14, 45:8, 45:10, 45:14, 66:2, 66:13, 66:15, 71:13, 72:15, 73:6, 74:5, 76:1, 83:7, 83:18, 84:1, 84:19, 85:11, 85:13, 85:16, 85:23, 86:12, 86:15, 86:22, 87:2, 87:4, 87:9, 87:15, 87:23, 88:2, 88:5, 88:12, 89:7, 89:14, 89:17, 90:24, 91:10, 91:21, 91:23, 91:25, 92:3, 95:5, 95:9, 95:13, 96:24, 97:11, 97:19, 97:23, 127:14, 128:12, 128:15, 129:1, 129:9, 129:12, 130:20, 130:25, 134:11, 135:3, 135:20, 136:2, 136:17, 136:21, 136:23, 137:5, 138:3, 138:7, 138:10, 138:24, 139:2, 139:6, 139:11, 139:22, 140:7, 140:11, 140:19, 141:7, 141:14, 142:8, 142:11, 142:15, 143:6, 144:10, 144:13, 144:19, 145:18, 146:13, 147:11, 148:10, 148:14, 149:5, 149:12, 149:14, 149:18, 150:6, 150:13, 151:4, 151:7, 151:10, 151:14, 151:19, 151:21, 151:25, 152:8, 152:13, 153:22, 154:4, 154:6, 154:22, 154:25, 155:7, 155:11, 155:18, 155:24, 156:5, 161:7, 161:9, 161:18, 162:1, 162:5, 162:8, 162:11, 162:23, 163:1, 163:6, 163:10, 163:15, 163:24, 164:7, 164:10, 164:13, 164:17, 164:21, 164:24, 165:9, 165:22, 166:1, 166:7, 166:11, 166:13, 166:20, 168:22, 169:18, 169:23, 170:2, 170:9, 170:15, 170:18, 170:23, 171:18, 171:21, 171:23, 172:3, 172:6, 172:23, 173:15, 173:23, 174:1, 174:4, 174:7, 179:3, 180:21, 181:2, 181:7, 181:19, 182:10, 182:14, 182:20, 183:19, 183:22, 184:4, 184:18, 184:20, 189:3, 189:11, 189:17, 189:23, 190:11, 190:14, 190:19, 191:2, 191:10, 191:15, 191:23, 192:5, 192:12
**multiple** [3] - 59:16, 62:23, 83:20
**municipality** [3] - 77:13, 166:25, 167:6
**MURPHY** [2] - 1:20
**Murphy** [1] - 4:5
**must** [20] - 28:12, 76:16, 77:3, 92:18, 93:12, 93:23, 94:6, 94:10, 117:22, 128:2, 135:8, 143:22, 147:25, 150:6, 155:7, 175:10, 176:1, 176:2, 178:12
**muster** [1] - 191:13

## N

**name** [15] - 54:13, 94:16, 96:18, 105:21, 124:11, 126:2, 127:24, 127:25, 128:11, 128:22, 132:10, 132:22, 133:2, 180:15
**named** [1] - 112:18
**names** [1] - 123:17
**National** [2] - 29:7, 61:7
**national** [3] - 108:18, 157:22, 167:25
**nature** [5] - 28:23, 55:18, 78:19, 169:2, 186:13
**nearby** [1] - 69:5
**nearly** [1] - 26:18
**necessarily** [5] - 23:14, 52:23, 101:12, 106:1, 169:12
**need** [62] - 6:1, 6:22, 6:23, 7:19, 8:3, 8:14, 9:2, 11:22, 20:6, 23:14, 26:2, 26:7, 26:8, 29:19, 29:20, 29:21, 31:21, 33:6, 35:4, 40:20, 45:12, 48:7, 52:15, 56:13, 56:24, 58:7, 59:17, 63:3, 63:22, 67:7, 71:23, 93:7, 95:12, 96:22, 97:17, 107:6, 116:20, 117:7, 117:8, 117:9, 117:16, 117:22, 118:11, 127:10, 128:17, 130:16, 133:7, 141:5, 142:5, 146:25, 150:2, 155:19, 155:21, 159:25, 163:8, 165:16, 165:25, 167:9, 169:21, 170:25, 173:19, 184:19
**needed** [4] - 42:20, 72:23, 97:7, 179:13
**needs** [4] - 85:24, 110:1, 110:8, 117:10

**negative** [1] - 47:4
**negligence** [91] - 8:20, 9:16, 9:18, 10:4, 10:7, 10:9, 18:15, 18:23, 19:5, 20:13, 20:18, 20:20, 21:12, 23:25, 25:19, 26:11, 27:1, 34:15, 34:16, 35:12, 36:7, 36:10, 36:14, 36:18, 37:3, 37:6, 37:8, 37:9, 37:14, 45:2, 45:3, 49:22, 49:25, 53:13, 53:14, 53:15, 55:4, 55:9, 56:17, 57:4, 57:6, 57:7, 65:22, 65:25, 66:4, 71:8, 71:24, 73:17, 83:21, 85:8, 85:9, 85:14, 85:15, 86:8, 86:19, 86:20, 86:25, 87:4, 87:5, 87:6, 87:7, 87:12, 87:21, 93:22, 98:7, 98:11, 99:2, 102:17, 103:7, 103:23, 128:16, 135:3, 135:4, 137:16, 138:22, 139:7, 139:9, 139:12, 177:25, 190:23, 191:6
**negligent** [7] - 16:16, 35:8, 45:6, 48:11, 73:4, 73:5, 102:12
**nervousness** [1] - 7:1
**never** [26] - 27:19, 28:21, 46:1, 46:5, 58:7, 58:10, 68:8, 90:25, 97:19, 98:8, 99:14, 105:3, 105:7, 118:7, 118:8, 126:2, 129:5, 130:2, 130:3, 149:19, 155:12, 158:13, 159:14, 159:15, 179:3
**new** [2] - 163:15, 177:18
**New** [4] - 29:14, 34:1, 61:10, 159:24
**next** [11] - 8:7, 49:13, 75:14, 80:7, 127:1, 147:8, 155:17, 168:2, 168:5, 192:17, 192:19
**nine** [3] - 44:25, 109:24, 110:2
**Nine** [1] - 171:9
**NO** [1] - 1:4
**nobody** [11] - 12:22, 19:16, 19:17, 35:9, 57:13, 57:14, 115:10, 146:23, 164:15, 183:2
**noise** [1] - 191:25
**nominal** [2] - 88:23, 88:24
**non** [4] - 102:23, 154:14, 156:11, 159:16
**non-economic** [1] - 102:23
**non-subordinate** [2] - 154:14, 156:11
**non-supervision** [1] - 159:16
**none** [8] - 24:23, 45:3, 51:4, 56:11, 58:8, 99:7, 116:12, 159:1
**nonexistent** [1] - 155:8
**normal** [1] - 26:24
**normally** [1] - 25:24
**notes** [9] - 114:22, 129:22, 129:24, 129:25, 133:13, 134:13, 134:14, 137:6
**NOTES** [1] - 1:25
**nothing** [32] - 28:25, 33:8, 33:12, 34:7, 35:13, 35:21, 54:2, 54:8, 61:24, 65:2, 71:18, 72:1, 73:23, 77:25, 109:10, 114:17, 114:24, 119:11, 119:19, 128:19, 134:1, 136:15, 137:16, 150:2, 153:24, 160:5, 178:22, 180:6, 180:15, 186:22, 187:8
**notice** [119] - 11:14, 12:8, 12:10, 12:15, 22:4, 22:15, 22:17, 23:22, 23:24, 27:22, 27:25, 29:4, 29:23, 30:10, 30:11, 30:12, 33:3, 33:6, 33:7, 34:20, 35:4, 38:6, 49:18, 62:16, 64:19, 65:12, 73:8, 73:23, 74:16, 75:11, 77:4, 79:1, 81:1, 92:19, 92:20, 93:4, 93:8, 93:9, 93:13, 93:15, 93:17, 93:19, 93:21, 93:24, 94:4, 94:6, 94:9, 97:2, 100:5, 100:6, 100:20, 101:1, 111:3, 114:8, 121:24, 122:7, 122:8, 123:13, 123:22, 124:2, 124:3, 124:20, 125:20, 126:16, 126:21, 127:1, 127:9, 127:14, 127:22, 127:23, 128:1, 128:5, 128:6, 128:18, 128:20, 129:6, 129:8, 130:4, 130:7, 130:8, 131:5, 134:4, 134:6, 134:16, 134:21, 135:6, 135:8, 135:11, 135:18, 136:12, 136:18, 137:8, 137:11, 137:18, 141:11, 141:17, 141:24, 142:4, 142:5, 142:7, 142:13, 142:20, 142:21, 142:25, 143:5, 143:7, 146:21, 147:5, 149:25, 174:13, 177:11, 183:3, 183:7, 184:6
**notices** [1] - 114:9
**notified** [2] - 10:11, 97:4
**notify** [1] - 23:21
**notion** [2] - 26:13, 94:23
**notwithstanding** [4] - 53:23, 55:5, 129:7, 178:16
**November** [8] - 54:14, 96:3, 122:6, 131:1, 131:11, 133:1, 158:3, 186:16
**nowhere** [1] - 169:7
**number** [32] - 21:24, 34:10, 49:7, 49:8, 49:9, 50:5, 50:9, 84:10, 84:16, 84:20, 85:21, 86:7, 99:19, 99:25, 102:9, 103:25, 105:20, 111:2, 113:19, 114:3, 134:12, 138:23, 138:25, 140:1, 140:17, 150:19, 150:20, 156:5, 158:1, 189:4, 189:7, 191:5
**numbers** [1] - 85:19
**numerous** [1] - 114:8
**nurse** [1] - 119:8

## O

**oath** [2] - 104:24, 105:6
**objected** [1] - 116:1
**objections** [2] - 106:9
**objectively** [1] - 123:24
**obligation** [7] - 38:16, 47:6, 57:17, 64:25, 68:9, 73:9, 159:16
**obligations** [3] - 57:9, 77:3, 77:5
**observations** [1] - 183:3
**observe** [3] - 46:23, 48:12, 64:7
**observed** [1] - 19:18
**observing** [1] - 48:16
**obtain** [2] - 100:18, 138:17
**obtained** [1] - 82:2
**obvious** [1] - 110:19
**obviously** [4] - 23:18, 53:13, 121:11, 160:23
**occasion** [2] - 28:1, 116:3
**occasioned** [1] - 90:22
**occasions** [1] - 109:18
**occur** [10] - 29:11, 29:12, 44:2, 52:4, 53:11, 56:3, 63:11, 64:9, 75:9, 98:23
**occurred** [27] - 9:20, 19:17, 21:17, 22:4, 22:16, 24:13, 29:2, 32:18, 54:1, 54:11, 63:15, 67:12, 72:6, 72:11, 73:14, 101:17, 104:1, 110:25, 112:12, 113:25, 123:3, 126:5, 156:10, 158:24, 159:1, 161:4, 173:4
**occurrence** [5] - 44:16, 67:20, 145:19, 146:17, 172:17
**occurrences** [1] - 11:5
**occurring** [14] - 12:4, 13:18, 13:23, 19:22, 22:6, 23:8, 54:25, 56:7, 56:10, 64:8, 67:15, 105:2, 109:12, 123:4
**occurs** [4] - 63:11, 88:19, 93:9, 142:12
**October** [39] - 21:13, 29:3, 54:5, 62:11, 63:12, 67:21, 71:5, 103:25, 104:1, 107:25, 108:4, 108:5, 109:24, 110:7, 111:1, 111:5, 111:7, 111:9, 112:3, 112:6, 112:24, 118:16, 119:2, 119:11, 119:23, 120:22, 121:20, 121:24, 122:13, 123:2, 123:9, 131:6, 132:24, 136:16, 163:18, 187:18, 187:21, 190:3
**OF** [7] - 1:2, 1:7, 1:9, 1:25, 2:6, 2:9, 2:10
**offensive** [1] - 56:1
**offered** [4] - 21:7, 103:15, 107:2, 107:3
**offers** [1] - 20:4
**Office** [1] - 113:24
**OFFICE** [2] - 2:6, 2:10
**office** [17] - 62:14, 68:24, 68:25, 69:11, 69:13, 69:14, 69:18, 69:22, 69:25, 105:24, 114:21, 131:24, 132:4, 133:12, 159:5, 184:13, 186:19
**officer** [22] - 60:4, 96:13, 96:17, 96:18, 96:20, 117:3, 129:14, 129:17, 129:22, 132:15, 132:20, 132:21, 133:21, 133:24, 134:14, 136:3, 152:24, 153:1, 153:7, 153:10, 158:25
**Officer** [1] - 129:19
**officers** [1] - 54:18
**offices** [1] - 68:19
**official** [6] - 25:2, 93:10, 123:22, 125:25, 165:8, 193:18
**Official** [1] - 193:4
**OFFICIAL** [1] - 1:23
**often** [2] - 63:5, 68:17
**omission** [10] - 32:3, 32:4, 179:19, 179:22, 179:24, 180:2, 180:3, 180:6, 181:19, 181:20

**omissions** [3] - 63:19, 181:22, 181:24
**once** [5] - 48:23, 106:14, 115:23, 158:7, 158:8
**one** [177] - 6:6, 8:11, 9:19, 13:21, 14:24, 15:1, 16:10, 17:8, 18:5, 25:5, 25:12, 25:13, 27:23, 31:9, 32:17, 33:18, 33:25, 34:10, 34:22, 34:23, 34:24, 36:13, 37:5, 37:6, 37:24, 38:5, 39:11, 43:16, 44:16, 44:21, 46:15, 48:7, 49:7, 49:8, 49:9, 50:2, 50:11, 50:23, 52:21, 53:6, 54:6, 58:14, 59:18, 59:19, 60:11, 61:19, 63:12, 67:7, 73:7, 75:14, 75:18, 75:19, 76:15, 76:18, 79:19, 82:4, 83:1, 83:4, 83:14, 83:15, 84:15, 84:16, 84:19, 85:19, 85:20, 86:7, 86:10, 86:20, 87:16, 88:11, 88:12, 90:3, 90:7, 92:18, 92:22, 93:12, 94:14, 95:5, 97:12, 98:3, 98:5, 100:1, 100:3, 101:15, 101:18, 102:17, 103:2, 104:13, 105:14, 105:15, 105:18, 106:13, 106:23, 106:25, 107:10, 107:12, 107:21, 108:20, 109:21, 109:23, 111:5, 111:7, 111:8, 111:21, 113:3, 114:4, 114:16, 114:18, 114:21, 115:14, 115:22, 116:12, 117:17, 122:12, 123:17, 124:13, 131:2, 134:12, 137:22, 138:21, 138:25, 139:10, 139:11, 140:9, 140:25, 141:4, 141:7, 141:8, 141:23, 142:19, 142:21, 143:10, 143:21, 143:24, 144:4, 144:20, 144:23, 145:7, 147:13, 150:19, 155:4, 156:1, 156:5, 157:4, 157:6, 157:18, 162:4, 163:8, 163:9, 164:2, 164:9, 167:18, 167:19, 167:21, 168:24, 175:5, 176:4, 177:2, 177:16, 179:6, 179:22, 180:17, 181:9, 181:10, 182:24, 186:19, 187:16, 189:15, 191:5
**One** [5] - 1:21, 8:20, 9:16, 21:4, 66:4
**one-hour** [1] - 107:21
**one-on-one** [2] - 116:12, 177:16
**ongoing** [3] - 67:20, 146:16, 183:8
**open** [2] - 60:25, 61:1
**opens** [1] - 70:3
**operates** [1] - 80:25
**operating** [2] - 24:19
**operation** [2] - 59:21, 60:1
**operational** [1] - 169:6
**operations** [11] - 20:1, 20:2, 20:9, 31:15, 38:10, 41:12, 59:21, 107:18, 109:9, 169:3, 169:5
**opinion** [7] - 6:19, 14:18, 82:19, 136:11, 192:14, 192:18, 192:22
**opportunities** [1] - 146:6
**opportunity** [6] - 84:2, 84:24, 101:20, 101:21, 102:3, 140:21
**opposed** [5] - 7:6, 85:4, 98:7, 186:25
**opposing** [3] - 171:3, 171:12, 171:14
**opposite** [2] - 156:16, 184:13
**opposition** [4] - 22:2, 34:11, 176:10, 187:9
**oral** [3] - 192:14, 192:18, 192:22
**order** [9] - 3:1, 9:14, 9:15, 43:25, 65:17, 75:13, 107:19, 163:8, 164:22
**ordered** [1] - 9:12
**ordinary** [1] - 16:21
**organization** [1] - 33:5
**original** [1] - 6:7
**ostrich** [1] - 187:6
**others'** [1] - 84:24
**otherwise** [4] - 7:9, 14:5, 88:20, 152:6
**ought** [3] - 98:22, 99:5, 101:1
**out-of-school** [1] - 116:11
**outcome** [1] - 193:14
**outlier** [2] - 175:3, 176:17
**outside** [4] - 104:22, 105:5, 110:10, 176:13
**outstanding** [1] - 116:24
**overall** [5] - 38:15, 39:1, 39:7, 50:13, 113:18
**overcome** [1] - 90:8
**overruled** [1] - 78:11
**oversaw** [4] - 21:6, 31:14, 41:12, 46:17
**oversee** [3] - 19:25, 42:10, 157:9
**overseeing** [1] - 151:2
**oversees** [1] - 50:1
**oversight** [6] - 53:1, 156:18, 169:3, 185:11, 186:9, 188:21
**owed** [3] - 17:3, 27:10, 57:17
**own** [13] - 26:22, 42:8, 46:7, 46:20, 46:22, 47:25, 48:16, 61:15, 69:19, 109:2, 158:22, 185:9

**P**

**P.A** [3] - 1:14, 1:20, 2:16
**p.m** [9] - 75:22, 104:11, 104:12, 104:18, 144:14, 193:1
**package** [2] - 159:21, 159:22
**packaged** [3] - 144:5, 146:12, 147:1
**page** [13] - 13:10, 13:15, 13:20, 14:24, 15:5, 15:8, 42:2, 59:5, 112:19, 112:20, 131:24, 156:17, 186:20
**pages** [6] - 12:6, 13:4, 13:25, 14:9, 14:12, 115:3
**paid** [1] - 50:4
**pain** [2] - 84:10, 141:2
**panel** [1] - 61:1
**pants** [2] - 26:17, 95:18
**paper** [1] - 160:8
**papers** [2] - 161:5, 174:23
**paragraph** [2] - 76:5, 131:25
**paragraphs** [1] - 9:22
**paraplegic** [1] - 77:16
**pardon** [1] - 111:14
**parent** [11] - 15:10, 34:19, 95:18, 95:20, 95:21, 96:3, 119:1, 119:6, 129:16, 145:11, 186:16
**parentis** [3] - 17:3, 43:10, 175:10
**parents** [11] - 5:6, 5:11, 6:18, 6:24, 7:4, 24:8, 24:21, 34:19, 49:6, 52:2, 175:10
**part** [11] - 18:14, 32:4, 34:17, 37:3, 45:21, 77:24, 112:11, 113:17, 130:2, 141:2, 147:1
**participants** [1] - 157:21
**participate** [1] - 60:17
**participation** [1] - 92:7
**particular** [13] - 24:14, 28:1, 30:17, 34:24, 50:18, 61:19, 63:8, 73:7, 75:5, 75:6, 107:12, 114:2
**particularly** [4] - 90:9, 102:10, 113:7, 176:18
**particulars** [1] - 54:17
**parties** [13] - 3:14, 4:19, 5:1, 7:7, 8:10, 8:13, 9:11, 9:13, 81:24, 93:6, 120:20, 154:15, 193:10
**party** [9] - 3:22, 6:3, 6:11, 6:14, 149:8, 156:11, 172:7, 172:19, 193:13
**pass** [2] - 153:17, 191:13
**passed** [3] - 53:17, 163:11, 166:9
**passes** [1] - 40:19
**passing** [1] - 165:16
**Past** [1] - 90:4
**past** [3] - 94:7, 145:4, 191:24
**patently** [1] - 169:2
**patients** [1] - 169:9
**PATRICIA** [1] - 2:12
**pattern** [3] - 25:20, 43:5, 112:16
**Patty** [1] - 4:9
**paying** [1] - 122:24
**payment** [3] - 86:13, 86:15, 86:16
**pedestal** [1] - 60:21
**penalties** [1] - 81:2
**pending** [4] - 3:4, 19:3, 79:24, 170:25
**penis** [1] - 115:22
**people** [31] - 12:22, 17:22, 30:10, 33:4, 43:11, 74:5, 93:24, 100:25, 117:18, 117:23, 129:10, 130:10, 132:16, 137:13, 141:16, 144:4, 150:1, 150:11, 150:13, 150:23, 150:25, 153:9, 153:15, 159:17, 163:11, 163:16, 165:8, 167:22, 173:9, 173:13, 177:19
**people's** [1] - 75:10
**per** [5] - 29:18, 40:17, 44:5, 83:15, 86:7
**percent** [4] - 116:16, 117:10, 117:22, 177:16
**perform** [4] - 37:10, 63:13, 63:17, 63:18
**performance** [3] - 57:8, 63:14, 63:16
**performed** [1] - 57:8
**perhaps** [3] - 7:10, 88:7, 89:5
**period** [3] - 35:11, 107:21, 159:16
**permanent** [1] - 120:17
**permit** [1] - 31:18
**permitted** [4] - 52:4, 53:22, 82:22, 88:21
**perpetrator** [14] - 93:7, 93:13, 93:16, 94:17, 97:3, 111:25, 112:2, 124:12, 125:1, 127:21, 127:25, 131:3, 135:10, 135:13
**perpetrators** [10] - 10:24, 50:21, 93:19,

95:20, 96:8, 107:10, 122:12, 125:2, 130:3, 143:12
**person** [41] - 16:21, 25:21, 25:23, 39:2, 86:23, 92:6, 92:20, 92:22, 93:2, 93:9, 93:23, 94:8, 95:19, 95:23, 96:7, 107:10, 110:21, 111:22, 122:1, 123:14, 125:20, 127:2, 128:1, 128:2, 128:5, 128:6, 129:18, 129:20, 130:7, 135:15, 135:17, 136:18, 146:22, 152:17, 152:21, 164:19, 166:6, 177:20
**personal** [1] - 183:24
**personally** [1] - 59:20
**personnel** [3] - 117:14, 177:20, 178:11
**perspective** [2] - 20:1, 85:24
**pertinent** [1] - 68:19
**pervasive** [7] - 92:15, 147:24, 150:8, 182:23, 182:24, 184:7, 191:20
**PETER** [1] - 1:10
**petitioner** [1] - 100:17
**philosophically** [1] - 179:21
**phone** [4] - 116:5, 120:24, 187:23, 190:7
**physical** [14] - 55:22, 55:24, 56:6, 56:11, 64:9, 80:14, 118:15, 118:25, 140:19, 149:22, 150:24, 154:16, 154:17, 162:18
**physically** [4] - 51:3, 68:21, 140:23, 140:24
**picture** [3] - 50:13, 126:10, 126:11
**piece** [1] - 67:7
**pinned** [3] - 26:17, 131:17, 132:6
**PJM-21-356** [2] - 1:4, 3:5
**place** [27] - 17:10, 22:14, 22:18, 22:20, 23:21, 33:3, 33:17, 34:17, 34:18, 37:22, 38:8, 41:9, 49:19, 50:5, 59:4, 67:11, 105:24, 118:10, 143:22, 145:5, 146:3, 163:16, 179:17, 179:23, 179:24, 180:5, 180:6
**placed** [2] - 117:9, 185:10
**places** [2] - 178:10, 178:13
**plaintiff** [33] - 17:4, 22:8, 27:2, 27:3, 76:7, 77:16, 80:12, 80:15, 81:22, 82:6, 83:15, 84:14, 85:19, 86:7, 90:8, 90:10, 90:20, 90:22, 93:6, 93:12, 95:22, 98:4, 113:3, 124:4, 134:23, 135:9, 153:5, 154:18, 172:12, 172:25, 177:6, 179:14, 183:1
**Plaintiff** [27] - 5:9, 5:10, 5:13, 24:8, 26:15, 26:22, 27:10, 28:21, 64:15, 65:9, 67:9, 67:16, 68:4, 68:14, 82:23, 121:11, 121:15, 121:19, 121:23, 122:5, 123:2, 123:20, 124:15, 124:17, 125:7, 125:14, 126:5
**plaintiff's** [2] - 27:5, 90:11
**plaintiffs** [37] - 6:7, 6:18, 6:22, 7:15, 7:20, 8:4, 9:16, 9:17, 17:23, 25:10, 50:20, 55:2, 55:12, 56:18, 76:5, 76:17, 78:5, 80:9, 82:11, 82:18, 83:20, 84:21, 89:12, 89:19, 91:19, 121:21, 138:12, 149:14, 154:11, 155:1, 166:5, 178:5, 182:6, 191:21
**Plaintiffs** [10] - 1:5, 3:13, 3:19, 4:2, 5:5, 5:8, 6:23, 25:17, 25:18, 49:23
**PLAINTIFFS** [3] - 1:13, 1:19, 2:2
**plaintiffs'** [10] - 3:9, 3:16, 3:23, 5:4, 9:9, 89:2, 134:5, 146:1, 154:10, 167:9
**Plaintiffs'** [1] - 9:21
**plan** [16] - 40:9, 40:10, 41:21, 41:22, 42:8, 42:9, 47:7, 58:8, 58:11, 58:14, 58:24, 58:25, 59:3, 59:6, 118:22
**plans** [1] - 162:12
**plate** [1] - 48:22
**plausible** [2] - 72:21, 73:2
**play** [1] - 119:20
**played** [1] - 70:11
**player** [13] - 29:15, 61:19, 75:5, 106:24, 111:12, 111:19, 111:20, 114:4, 116:24, 119:18, 122:4, 131:15, 186:1
**players** [33] - 14:17, 29:18, 29:20, 30:15, 46:14, 46:17, 50:16, 51:7, 51:9, 52:2, 53:5, 53:22, 70:4, 71:3, 72:14, 72:16, 75:2, 75:6, 108:24, 112:14, 113:3, 113:4, 113:5, 113:16, 114:4, 119:4, 124:24, 124:25, 137:15, 184:8, 184:12, 185:4, 185:25
**plead** [1] - 179:13
**pleadings** [2] - 59:9, 77:12
**pleases** [1] - 9:1
**pled** [2] - 76:5, 84:25
**plenty** [5] - 25:8, 26:23, 29:1, 29:23, 41:3
**plus** [1] - 57:7
**podium** [1] - 8:23
**point** [29] - 26:3, 28:11, 32:24, 43:14, 55:12, 55:21, 57:4, 69:9, 72:11, 72:16, 72:17, 74:14, 85:2, 86:17, 98:19, 106:2, 108:16, 131:18, 131:20, 140:15, 141:5, 141:8, 146:25, 147:8, 149:23, 165:18, 168:20, 187:14, 192:10
**pointed** [3] - 21:20, 22:9, 103:17
**pointing** [1] - 71:1
**points** [8] - 61:17, 61:20, 61:21, 101:16, 118:12, 129:1, 134:11, 161:10
**poke** [1] - 113:3
**Police** [3] - 54:19, 113:23, 116:6
**police** [16] - 77:18, 96:11, 106:24, 107:2, 113:24, 115:7, 115:9, 129:14, 132:9, 132:10, 143:13, 152:24, 153:1, 153:7, 153:9, 153:10
**policies** [42] - 17:16, 20:3, 22:14, 24:19, 31:11, 31:12, 33:19, 34:17, 37:22, 37:23, 37:24, 38:3, 38:8, 40:14, 41:9, 41:11, 43:8, 49:11, 49:19, 50:5, 57:19, 57:24, 58:15, 58:18, 58:19, 67:11, 90:25, 91:4, 91:6, 92:24, 152:10, 152:21, 153:15, 153:16, 153:17, 156:19, 156:22, 165:9, 165:10, 167:14, 167:25
**policy** [84] - 22:12, 22:18, 22:20, 23:10, 23:16, 23:21, 28:5, 28:8, 28:20, 29:4, 29:5, 29:18, 30:9, 30:12, 30:17, 31:10, 32:7, 32:14, 33:3, 33:14, 33:16, 33:18, 34:21, 34:25, 38:15, 39:11, 39:12, 39:14, 39:24, 40:17, 40:18, 41:15, 41:18, 43:1, 43:20, 43:22, 46:7, 47:22, 47:25, 48:5, 48:17, 48:25, 50:3, 51:2, 53:10, 57:20, 64:21, 67:13, 70:17, 74:9, 91:20, 143:22, 144:22, 144:23, 159:12, 162:3, 162:5, 162:6, 162:13, 162:20, 162:24, 163:1, 163:10, 163:24, 165:11, 165:13, 165:14, 165:15, 165:16, 165:19, 165:20, 166:8, 166:17, 166:18, 166:21, 166:24, 167:1, 168:17, 180:5
**Pope** [1] - 38:6
**portions** [1] - 121:12
**posed** [1] - 191:20
**poses** [3] - 150:8, 151:10, 171:25
**position** [10] - 11:4, 18:4, 38:1, 49:5, 130:22, 134:5, 155:14, 168:13, 185:18
**positions** [2] - 89:21, 152:5
**possibility** [5] - 123:23, 127:4, 136:13
**possible** [7] - 64:20, 83:14, 88:4, 101:4, 121:10, 146:4, 150:24
**post** [4] - 7:4, 98:16, 98:22, 99:11
**post-trial** [3] - 98:16, 98:22, 99:11
**posttrial** [2] - 98:16, 103:16
**potential** [3] - 48:1, 100:15, 162:10
**potentially** [3] - 26:15, 72:25, 73:4
**power** [2] - 77:2, 78:8
**PowerPoint** [1] - 22:11
**PowerPoints** [1] - 30:6
**practice** [20] - 15:13, 15:14, 15:17, 15:25, 28:11, 53:5, 60:2, 66:20, 70:7, 70:13, 72:18, 72:19, 73:11, 73:12, 104:12, 105:1, 112:7, 157:3, 165:11
**practices** [9] - 23:13, 23:17, 28:13, 30:7, 30:9, 104:7, 104:9, 104:11, 144:24
**practicing** [2] - 70:4, 72:17
**Prawde** [1] - 4:1
**PRAWDE** [1] - 1:16
**pre** [7] - 7:3, 7:16, 124:2, 124:7, 141:24, 142:4, 142:5
**pre-actual** [1] - 124:2
**pre-August** [1] - 124:7
**pre-majority** [2] - 7:3, 7:16

**pre-notice** [3] - 141:24, 142:4, 142:5
**preceded** [1] - 22:1
**precedence** [1] - 142:6
**precisely** [1] - 57:3
**preclude** [1] - 168:15
**precluded** [3] - 81:23, 85:9, 99:24
**predates** [2] - 54:3, 123:5
**preliminary** [2] - 6:1, 8:15
**premature** [3] - 83:18, 99:10, 103:18
**premise** [3] - 98:2, 123:22, 124:1
**prepared** [2] - 9:13, 114:19
**preposterous** [1] - 26:19
**preseason** [11] - 10:23, 15:4, 15:12, 22:10, 24:16, 50:25, 51:13, 51:25, 66:19, 72:8, 73:12
**present** [13] - 5:7, 5:14, 17:10, 26:14, 26:15, 26:20, 26:21, 27:17, 27:24, 53:24, 62:9, 62:10, 188:18
**presentation** [1] - 22:11
**presentations** [1] - 192:25
**presented** [2] - 22:11, 143:17
**president** [1] - 180:16
**presumably** [5] - 70:14, 84:5, 85:17, 123:5, 188:2
**presumed** [1] - 81:4
**presumption** [1] - 70:16
**pretty** [5] - 8:3, 73:3, 174:10, 174:11, 174:17
**prevail** [2] - 86:8, 86:11
**prevails** [1] - 84:14
**prevent** [8] - 22:15, 47:15, 67:11, 77:25, 172:17, 174:16, 175:14, 179:11
**prevented** [3] - 16:18, 172:19, 183:25
**previous** [4] - 105:19, 110:16, 111:10, 126:16
**previously** [3] - 9:11, 77:15, 193:8
**primarily** [2] - 60:16, 106:18
**Prince** [3] - 94:19, 94:21, 95:6
**Principal** [20] - 30:13, 108:2, 108:13, 108:23, 109:8, 109:11, 109:25, 117:6, 117:16, 117:19, 117:21, 118:6, 118:19, 119:10, 119:18, 122:2, 122:4, 123:14, 126:1, 186:18
**principal** [60] - 11:2, 11:18, 12:15, 13:21, 17:8, 18:4, 21:23, 31:25, 40:2, 44:15, 44:17, 45:6, 46:1, 47:24, 59:23, 60:5, 62:6, 92:25, 105:12, 105:19, 105:21, 106:10, 107:16, 109:2, 110:5, 110:16, 110:20, 113:21, 124:13, 130:14, 131:12, 132:1, 132:2, 132:8, 132:14, 133:16, 148:4, 148:17, 157:12, 158:4, 162:2, 162:21, 164:1, 172:10, 172:11, 174:23, 175:6, 175:9, 175:12, 176:10, 176:22, 176:24, 177:7, 179:13, 181:5
**principal's** [4] - 58:18, 132:4, 179:9, 179:11
**principals** [10] - 20:4, 20:5, 20:7, 39:8, 109:9, 143:12, 161:20, 163:2, 174:13, 174:20
**priorities** [1] - 49:11
**prioritize** [1] - 49:6
**priority** [2] - 49:7, 49:8
**prison** [1] - 176:13
**private** [9] - 77:8, 77:13, 78:22, 79:9, 80:1, 80:21, 81:7, 84:23, 102:2
**privileges** [1] - 147:17
**probable** [1] - 16:12
**problem** [14] - 33:7, 39:14, 65:6, 73:9, 73:23, 90:25, 91:1, 91:2, 120:8, 149:10, 177:10, 183:8, 189:21, 190:17
**problems** [11] - 19:18, 44:18, 45:1, 49:18, 106:1, 110:18, 115:15, 117:8, 145:4, 146:17, 190:19
**procedure** [1] - 165:11
**procedures** [7] - 49:19, 94:24, 95:1, 152:10, 152:22, 157:24, 167:20
**proceed** [2] - 9:12, 120:13
**proceedings** [2] - 193:1, 193:7
**PROCEEDINGS** [1] - 1:9
**process** [1] - 121:6
**produce** [1] - 79:7
**progeny** [1] - 81:19
**program** [27] - 12:5, 13:24, 14:4, 18:6, 18:12, 19:16, 31:16, 31:18, 44:18, 45:1, 46:24, 46:25, 57:13, 65:9, 70:25, 73:22, 74:6, 91:12, 92:9, 124:6, 125:24, 157:14, 159:21, 160:15, 163:7, 179:23, 188:21
**programs** [13] - 17:17, 20:1, 21:7, 31:15, 41:12, 50:1, 60:16, 60:17, 126:20, 146:2, 156:19, 163:9, 186:9
**progress** [2] - 46:24, 145:9
**prohibited** [1] - 93:11
**prohibits** [1] - 91:12
**promising** [1] - 116:4
**promote** [1] - 20:8
**promptly** [2] - 120:10, 143:13
**promulgated** [2] - 41:15, 58:16
**promulgating** [2] - 165:15, 165:20
**proper** [3] - 91:15, 121:24, 126:3
**properly** [4] - 39:14, 46:16, 88:5, 155:5
**property** [4] - 37:11, 108:3, 108:6, 108:7
**propose** [1] - 192:17
**proposition** [6] - 84:18, 135:15, 146:24, 172:20, 172:21, 174:18
**protect** [2] - 27:1, 105:13
**protected** [3] - 85:24, 166:18, 168:12
**protecting** [1] - 146:4
**protection** [1] - 27:12
**protocols** [5] - 17:9, 157:19, 167:20, 186:7
**prove** [3] - 95:1, 125:23, 161:15
**proved** [1] - 87:3
**provide** [11] - 11:20, 20:2, 27:7, 31:13, 69:6, 89:24, 102:6, 102:15, 102:20, 102:25, 103:2
**provided** [4] - 16:6, 132:21, 133:2, 133:3
**provides** [3] - 59:11, 123:13, 145:8
**providing** [3] - 68:6, 169:2, 169:5
**provision** [2] - 78:21, 103:10
**provisions** [2] - 80:15, 102:19
**provoked** [1] - 143:23
**prowess** [1] - 116:25
**proximate** [1] - 34:22
**proximately** [4] - 18:2, 20:22, 27:4, 27:9
**prudence** [1] - 16:22
**psych** [1] - 153:2
**psychiatrist** [1] - 153:6
**public** [5] - 27:6, 101:22, 123:11, 145:3, 146:10
**Public** [13] - 4:21, 5:19, 5:21, 16:2, 16:4, 17:16, 19:25, 33:15, 43:19, 89:20, 92:24, 156:18, 186:10
**publicity** [1] - 143:19
**publicly** [1] - 115:22
**pull** [3] - 112:19, 132:15
**pulled** [2] - 26:18, 132:19
**punitive** [24] - 76:10, 76:12, 76:16, 76:17, 77:12, 77:20, 77:21, 77:23, 78:1, 78:19, 78:20, 78:22, 79:3, 79:8, 79:14, 79:23, 80:1, 80:4, 80:5, 83:4, 83:22, 86:2, 86:3, 98:24
**punitives** [1] - 79:20
**pupil** [2] - 16:14, 117:14
**Purdue** [5] - 82:11, 82:17, 82:22, 99:21, 137:22
**purpose** [1] - 45:20
**purposely** [1] - 14:19
**purposes** [7] - 7:22, 9:23, 10:15, 137:20, 152:17, 164:19, 169:18
**pursuant** [2] - 78:9, 89:8
**pursuing** [1] - 171:4
**push** [2] - 16:9, 71:9
**push-ups** [1] - 16:9
**put** [23] - 24:10, 30:10, 30:11, 50:10, 55:20, 65:12, 70:1, 73:23, 84:9, 116:10, 117:22, 118:9, 129:24, 132:10, 133:19, 134:9, 138:11, 144:3, 145:4, 146:2, 178:2, 185:15
**puts** [1] - 153:25
**putting** [2] - 56:2, 186:25

## Q

**qualified** [16] - 154:7, 154:12, 155:16, 155:21, 160:22, 165:19, 165:22, 169:20, 170:19, 171:17, 182:1, 182:3, 183:12, 184:15, 184:16, 192:7
**quality** [1] - 46:24
**questioning** [1] - 62:1
**questions** [6] - 24:3, 45:10, 56:16, 97:25, 104:4, 143:21
**quick** [3] - 31:20, 137:5, 161:10
**quickly** [9] - 8:3, 36:4, 92:1, 95:14, 127:11, 136:25, 144:20, 164:10, 168:20
**QUINN** [1] - 2:3
**quite** [5] - 22:2, 86:17, 161:5, 167:1, 175:12
**quote** [17] - 30:8,

52:12, 74:22, 78:4, 78:5, 81:10, 100:17, 108:15, 110:1, 131:16, 132:6, 132:22, 141:23, 168:16, 178:9, 185:11, 190:2
**quoted** [2] - 29:13, 67:24
**quoting** [1] - 124:18

## R

**R-U-F-"F** [1] - 3:18
**R-U-F-F** [1] - 24:7
**raise** [1] - 35:11
**raised** [1] - 138:20
**raising** [1] - 98:1
**rammed** [3] - 26:18, 42:21, 69:25
**rampant** [3] - 94:2, 106:21, 107:14
**Ramsey** [1] - 119:6
**range** [2] - 100:18, 100:21
**rape** [5] - 63:11, 63:14, 127:1, 175:18, 186:17
**raped** [8] - 75:12, 102:14, 104:2, 126:25, 161:3, 174:17, 175:8, 175:14
**rapes** [1] - 63:11
**rapidly** [2] - 99:6, 99:13
**rarely** [1] - 105:7
**rarity** [1] - 105:10
**rash** [1] - 123:3
**rates** [1] - 63:15
**rather** [1] - 16:20
**read** [12] - 38:5, 46:5, 73:13, 118:7, 120:21, 131:10, 135:18, 137:25, 141:21, 145:25, 180:1, 190:24
**reading** [8] - 131:21, 131:22, 134:13, 136:5, 161:19, 168:22, 180:24, 181:17
**ready** [5] - 8:16, 15:17, 52:14, 72:18, 144:16
**real** [4] - 89:18, 90:5, 109:4, 164:10
**realistic** [1] - 55:14
**reality** [1] - 28:6
**really** [27] - 29:4, 34:8, 55:23, 57:14, 83:13, 84:22, 85:7, 90:24, 98:22, 99:11, 110:1, 114:17, 132:11, 146:11, 164:12, 164:15, 166:4, 166:5, 166:16, 167:1, 168:8, 168:10, 169:14, 173:7, 179:21, 180:3
**rear** [1] - 115:23
**reason** [15] - 30:9, 46:4, 55:10, 64:4, 64:5, 67:11, 99:5, 103:18, 104:15, 114:20, 139:2, 148:12, 148:14, 175:13
**reasonable** [11] - 16:21, 17:3, 25:22, 25:23, 41:4, 44:6, 67:18, 69:6, 73:19, 93:10
**reasonably** [5] - 27:15, 74:10, 75:3, 78:21, 147:4
**reasoned** [1] - 80:24
**reasons** [11] - 20:11, 40:23, 67:1, 80:5, 89:7, 98:6, 160:16, 169:23, 178:24, 182:10, 188:4
**rebuttal** [10] - 32:16, 36:5, 54:1, 90:2, 121:13, 122:8, 161:7, 161:8, 179:1, 189:2
**recalled** [1] - 111:19
**received** [18] - 14:2, 18:10, 19:10, 19:13, 19:14, 19:18, 43:24, 50:14, 55:7, 60:6, 61:12, 61:23, 95:16, 108:2, 114:8, 119:15, 119:16, 145:25
**receives** [3] - 93:9, 94:8, 123:24
**receiving** [2] - 92:9, 92:25
**recent** [3] - 80:8, 138:13, 179:7
**recently** [2] - 81:16, 179:5
**Recess** [2] - 75:22, 144:14
**recipient** [7] - 76:20, 76:22, 77:4, 77:8, 79:1, 81:1, 81:4
**recipients** [8] - 77:3, 79:5, 81:11, 100:4, 100:5, 100:20, 101:2
**recitation** [1] - 122:11
**reckless** [11] - 37:10, 37:20, 37:21, 38:7, 43:4, 45:4, 63:24, 67:2, 73:16, 74:2, 179:12
**recklessly** [2] - 41:5, 44:5
**recognized** [3] - 27:11, 101:7, 155:13
**recognizes** [1] - 149:20
**recollection** [2] - 62:15, 180:13
**recommendation** [1] - 185:1
**recommendations** [1] - 177:18
**recommended** [1] - 178:17
**reconvene** [1] - 75:18
**record** [63] - 8:4, 11:13, 11:20, 14:14, 15:15, 16:23, 19:6, 23:6, 24:14, 24:15, 25:2, 25:4, 26:23, 28:12, 28:25, 29:1, 29:25, 32:22, 33:12, 34:2, 34:6, 34:16, 35:13, 35:21, 37:7, 47:21, 54:9, 54:20, 62:20, 63:18, 68:17, 68:20, 71:24, 72:9, 73:13, 74:21, 74:23, 76:14, 82:19, 85:23, 85:24, 108:17, 108:18, 121:6, 130:2, 130:11, 131:11, 133:15, 134:18, 134:19, 135:25, 144:2, 145:5, 147:2, 151:25, 153:23, 161:11, 161:20, 184:9, 189:8, 189:19, 189:25, 192:5
**recorded** [1] - 193:10
**records** [8] - 115:14, 133:16, 136:1, 136:2, 136:4, 136:5, 159:2, 186:2
**recover** [3] - 80:9, 87:19, 88:12
**recoverable** [2] - 76:18, 81:13
**recovered** [2] - 6:21, 80:21
**recovery** [2] - 83:25, 87:22
**red** [2] - 24:17, 74:19
**reduced** [1] - 98:20
**refer** [2] - 11:3, 11:4
**reference** [3] - 11:23, 30:17, 71:16
**referenced** [7] - 9:14, 32:24, 34:10, 34:12, 129:21, 134:14, 162:14
**references** [1] - 179:16
**referencing** [1] - 66:7
**referrals** [2] - 60:7, 115:19
**referred** [5] - 96:10, 96:12, 96:15, 129:12, 129:13
**referring** [1] - 189:15
**refined** [1] - 149:23
**refused** [3] - 80:14, 117:11, 177:7
**refuses** [1] - 118:7
**regard** [14] - 6:17, 8:13, 23:25, 49:13, 50:14, 50:15, 52:1, 55:18, 70:2, 86:19, 139:16, 142:20, 171:9, 181:14
**regarding** [8] - 14:16, 15:23, 19:10, 34:18, 60:7, 93:5, 145:9, 156:21
**regards** [1] - 4:6
**register** [1] - 117:3
**regularly** [1] - 77:6
**regulation** [4] - 158:11, 158:22, 175:25, 178:20
**regulations** [4] - 15:1, 178:9, 186:10, 187:13
**Rehab** [4] - 77:19, 78:16, 79:11, 82:13
**rehabilitation** [1] - 100:1
**Rehabilitation** [7] - 76:25, 77:14, 78:17, 78:24, 80:16, 100:3, 102:7
**reinstate** [2] - 109:3, 110:22
**reinstated** [1] - 153:2
**reinstatement** [1] - 153:2
**reject** [1] - 177:18
**rejected** [2] - 94:23, 174:18
**related** [3] - 21:13, 136:5, 188:4
**relates** [3] - 21:4, 50:15, 55:13
**relating** [1] - 186:3
**relationship** [2] - 155:8, 172:9
**relative** [1] - 68:21
**relays** [1] - 163:1
**relevant** [5] - 7:17, 10:15, 81:3, 152:22, 191:5
**relied** [3] - 78:5, 93:25, 138:11
**relief** [18] - 76:9, 76:10, 76:14, 78:8, 79:1, 89:11, 89:12, 89:16, 89:18, 90:6, 90:13, 90:15, 91:2, 91:11, 91:15, 91:16, 120:3, 120:15
**relies** [1] - 80:10
**rely** [1] - 153:8
**relying** [3] - 78:3, 80:22, 166:24
**remain** [3] - 42:16, 53:22, 65:17
**remains** [1] - 99:2
**remand** [2] - 81:25
**remedies** [10] - 78:13, 78:24, 79:3, 80:25, 81:7, 100:11, 100:13, 100:18, 100:19, 100:21
**remediless** [1] - 100:15
**remedy** [2] - 78:25, 100:13
**remember** [8] - 30:4, 31:8, 62:3, 69:23, 74:21, 149:22, 189:19, 189:20
**remembering** [1] - 70:11
**reminding** [1] - 178:11
**remove** [6] - 105:12, 118:9, 118:24, 119:21, 176:8
**removed** [4] - 118:21, 160:13, 176:3, 178:1
**render** [1] - 192:18
**Renee** [4] - 1:24, 193:4, 193:16, 193:17
**renew** [1] - 179:18
**repeat** [3] - 155:20, 166:2, 184:19
**repeated** [5] - 107:18, 108:2, 116:13, 178:14, 187:1
**repeatedly** [7] - 59:25, 100:25, 109:9,

110:13, 110:20, 115:25, 174:18
**repetition** [3] - 90:19, 90:21, 120:9
**replete** [4] - 25:4, 62:20, 63:18, 100:9
**report** [32] - 16:1, 35:21, 54:12, 93:1, 93:10, 93:11, 93:12, 95:15, 95:16, 97:12, 97:14, 109:19, 113:22, 114:22, 114:25, 115:4, 115:6, 115:8, 123:24, 124:8, 128:4, 130:25, 131:1, 131:2, 136:9, 145:24, 149:16, 149:17, 158:3, 180:24, 181:17, 186:16
**reported** [29] - 35:23, 54:8, 54:9, 54:10, 54:13, 54:17, 60:8, 95:23, 97:19, 106:2, 109:19, 114:23, 119:12, 119:13, 119:15, 122:4, 123:14, 126:3, 127:19, 127:21, 129:19, 143:13, 148:18, 157:15, 177:22, 184:9, 187:21, 193:7
**REPORTER** [1] - 1:23
**Reporter** [2] - 193:4, 193:18
**reporting** [4] - 14:15, 109:25, 126:4, 130:19
**reports** [11] - 19:17, 54:5, 54:7, 107:14, 113:10, 114:16, 114:17, 128:10, 145:23, 148:17, 183:3
**representation** [1] - 161:17
**representatives** [1] - 4:20
**represented** [4] - 6:6, 6:9, 6:24, 191:17
**reprimand** [4] - 185:1, 185:10, 190:21, 190:22
**reprimanded** [4] - 160:13, 184:24, 185:20, 186:12
**request** [4] - 9:11, 89:8, 91:7, 130:1
**requested** [1] - 80:13
**require** [5] - 8:10, 37:23, 73:1, 167:20, 172:8
**required** [36] - 29:6, 31:4, 42:15, 43:24, 46:18, 46:22, 47:19, 50:3, 59:3, 61:8, 63:15, 64:24, 67:2, 68:9, 74:10, 75:5, 90:6, 90:8, 105:19, 113:23, 115:4, 116:15, 133:17, 142:25, 144:23, 158:6, 158:10, 158:14, 159:22, 161:21, 161:23, 167:17, 177:16, 183:24, 186:1
**requirement** [7] - 106:11, 157:18, 158:6, 158:22, 160:1, 169:7, 175:25
**requirements** [5] - 33:16, 47:23, 48:1, 156:22, 167:23
**requires** [11] - 37:8, 37:9, 92:4, 93:4, 134:20, 135:7, 147:21, 149:6, 159:3, 172:16, 183:7
**requiring** [4] - 27:11, 45:20, 102:19, 119:7
**researched** [1] - 82:18
**resource** [16] - 54:18, 96:12, 96:17, 96:18, 96:20, 117:3, 129:14, 129:17, 132:15, 132:20, 132:21, 133:21, 133:24, 134:14, 136:3, 158:25
**respect** [72] - 10:4, 11:10, 17:24, 18:16, 18:22, 19:9, 19:13, 20:1, 20:12, 20:15, 33:13, 33:24, 34:8, 35:15, 38:2, 38:11, 44:15, 44:18, 66:15, 71:13, 71:19, 71:23, 73:18, 76:2, 76:9, 82:20, 86:1, 87:17, 87:24, 89:22, 90:3, 98:2, 100:13, 127:14, 127:16, 127:23, 128:16, 130:5, 134:12, 134:16, 134:19, 136:4, 137:13, 137:21, 143:15, 144:25, 146:13, 146:20, 146:21, 147:12, 157:24, 159:18, 162:15, 162:17, 170:19, 171:23, 174:8, 174:21, 175:20, 176:25, 178:7, 179:4, 179:20, 180:22, 182:14, 182:20, 183:9, 184:14, 185:23, 187:15, 190:21, 192:6
**respectfully** [2] - 24:4, 56:16
**respective** [1] - 152:4
**respects** [1] - 175:11
**respond** [11] - 92:20, 94:10, 97:4, 127:5, 128:2, 137:9, 137:11, 142:13, 144:21, 145:1, 147:25
**responded** [2] - 96:25, 130:8
**responds** [1] - 62:25
**response** [14] - 88:7, 122:6, 123:16, 124:3, 126:18, 127:6, 127:11, 130:1, 134:1, 137:7, 143:23, 143:24, 167:3, 184:8
**responsibilities** [9] - 60:15, 63:13, 105:4, 156:23, 157:6, 157:19, 185:2, 185:12
**responsibility** [22] - 39:3, 39:17, 43:23, 52:18, 52:19, 58:15, 58:17, 58:18, 75:13, 154:3, 159:19, 163:22, 168:16, 169:14, 174:15, 174:21, 175:7, 175:19, 175:21, 185:3, 188:3, 191:8
**responsible** [28] - 38:9, 38:14, 39:6, 40:4, 40:5, 40:17, 46:16, 47:16, 53:7, 53:10, 58:2, 147:19, 148:8, 149:1, 149:2, 152:9, 152:21, 155:6, 157:17, 161:12, 161:23, 178:8, 178:23, 183:6, 187:11, 187:16
**rest** [4] - 119:14, 121:20, 121:21, 141:6
**restore** [1] - 107:19
**result** [14] - 15:7, 22:13, 27:14, 47:5, 65:20, 66:8, 74:16, 96:25, 111:17, 168:18, 185:8, 185:9, 186:11, 186:13
**resulted** [1] - 16:11
**retired** [4] - 129:22, 129:23, 129:24, 136:3
**return** [1] - 81:2
**returned** [1] - 79:18
**reversed** [5] - 77:22, 77:23, 78:11, 107:7, 179:8
**review** [2] - 117:22, 120:9
**reviewed** [1] - 81:19
**revised** [1] - 3:14
**revoke** [2] - 157:9, 168:4
**rich** [1] - 101:10
**Riddle** [5] - 129:19, 132:12, 132:15, 133:18, 133:20
**ridicule** [1] - 51:3
**Rights** [2] - 76:25, 78:25
**rights** [5] - 37:16, 37:17, 147:17, 152:22, 154:10
**ripped** [2] - 60:21, 61:2
**rise** [2] - 49:21, 56:11
**rises** [1] - 20:16
**risk** [18] - 43:21, 48:6, 48:18, 68:12, 117:23, 150:9, 159:23, 172:3, 173:9, 173:12, 173:25, 176:20, 179:14, 180:25, 182:5, 182:25, 191:20, 191:21
**risks** [3] - 27:13, 47:15, 48:2
**ritual** [1] - 112:11
**RMR** [2] - 1:24, 193:17
**road** [1] - 82:25
**robbed** [1] - 116:5
**Robles** [1] - 152:20
**robust** [2] - 57:19, 58:19
**rock** [1] - 57:13
**Rockville** [3] - 2:4, 2:7, 2:13
**role** [3] - 57:15, 57:18, 126:6
**rolling** [1] - 123:9
**room** [109] - 10:23, 11:16, 12:25, 15:17, 15:18, 15:22, 15:24, 16:8, 16:13, 16:16, 17:5, 17:7, 17:10, 17:13, 19:19, 20:10, 22:6, 22:7, 28:7, 28:10, 29:19, 29:20, 32:10, 35:6, 35:10, 35:16, 35:17, 44:20, 45:20, 46:3, 52:13, 52:15, 52:18, 52:20, 52:24, 53:5, 53:21, 53:23, 54:25, 55:10, 56:10, 58:11, 60:14, 60:22, 62:13, 62:19, 62:22, 63:12, 63:17, 64:5, 65:10, 66:18, 68:2, 68:21, 68:23, 68:25, 69:15, 69:19, 69:20, 69:23, 71:7, 71:20, 72:5, 72:7, 72:18, 72:20, 72:22, 73:14, 95:17, 96:2, 96:6, 104:3, 105:7, 106:18, 108:11, 108:20, 112:7, 112:13, 112:23, 113:3, 113:15, 113:25, 114:4, 114:6, 119:4, 119:14, 119:22, 121:7, 152:11, 158:5, 159:25, 160:16, 172:14, 173:3, 176:2, 176:7, 178:21, 183:4, 184:14, 185:5, 185:25, 186:18, 186:23, 187:3, 187:8, 188:2
**rooms** [13] - 25:7, 50:3, 50:4, 55:17, 68:18, 91:12, 95:25, 109:7, 113:11, 159:11, 159:13, 176:1, 187:12
**Rosa** [1] - 147:20
**rose** [1] - 66:23
**rounds** [1] - 35:19
**ROWAN** [1] - 2:3
**RPR** [2] - 1:24, 193:17
**Ruff** [23] - 3:18, 24:5, 24:7, 32:18, 32:23, 33:24, 40:21, 41:2,

45:17, 56:25, 64:1, 66:9, 67:5, 71:11, 74:7, 89:6, 121:8, 121:9, 138:12, 146:22, 171:2, 188:8, 189:7
**RUFF** [69] - 1:20, 3:17, 4:5, 5:9, 24:6, 25:12, 26:5, 26:10, 28:3, 28:16, 28:25, 30:6, 30:19, 31:1, 31:12, 31:23, 32:6, 32:10, 32:13, 36:10, 41:3, 42:1, 42:5, 44:9, 45:18, 48:10, 49:1, 49:4, 64:2, 67:6, 68:22, 69:3, 69:5, 69:14, 69:18, 70:6, 70:10, 70:16, 74:8, 74:14, 121:10, 122:15, 123:1, 123:6, 123:19, 124:9, 124:15, 124:18, 124:25, 125:2, 125:6, 126:11, 126:15, 127:12, 141:8, 141:10, 141:13, 141:19, 141:23, 142:2, 142:5, 142:14, 170:8, 171:4, 171:8, 171:11, 182:18, 188:9, 189:1
**Ruff's** [1] - 71:15
**rule** [5] - 78:4, 78:5, 78:6, 78:12, 147:18
**ruled** [1] - 99:14
**rules** [2] - 31:17, 42:13
**ruling** [5] - 79:14, 81:16, 82:1, 138:13, 143:18
**rulings** [1] - 99:11
**rumor** [5] - 94:15, 96:4, 96:16, 125:21, 129:15
**rumors** [1] - 27:23
**run** [3] - 106:21, 107:21, 178:20
**running** [5] - 53:20, 56:8, 107:14, 110:9, 137:15

**S**

**S.D** [1] - 111:19
**Safe** [2] - 158:6, 158:21
**safe** [1] - 120:19
**safely** [1] - 176:5
**safety** [37] - 14:20, 14:22, 16:19, 27:8, 38:2, 38:7, 40:24, 43:21, 45:4, 45:22, 47:10, 47:17, 49:7, 49:8, 49:10, 60:16, 63:7, 64:14, 66:23, 67:3, 72:3, 73:16, 74:2, 105:13, 118:9, 157:19, 157:20, 157:24, 167:18, 167:19, 167:25, 175:11, 178:1, 186:10, 188:5
**sanctioned** [1] - 65:18
**sat** [1] - 132:3
**satisfactory** [2] - 63:16, 63:21
**satisfied** [1] - 123:22
**satisfy** [1] - 182:6
**saw** [3] - 105:7, 117:15, 119:17
**scare** [1] - 113:5
**scared** [1] - 111:11
**schedule** [3] - 3:14, 8:17, 145:12
**scheduling** [2] - 20:2, 38:10
**scheme** [1] - 50:19
**Scherry** [1] - 26:5
**schizophrenic** [1] - 152:24
**scholastic** [4] - 124:6, 125:24, 126:20, 127:7
**School** [38] - 10:23, 11:16, 11:19, 12:5, 12:25, 13:5, 13:6, 13:8, 13:12, 13:14, 13:19, 13:24, 14:4, 14:10, 14:18, 17:16, 17:21, 19:24, 21:8, 25:3, 29:7, 42:16, 43:19, 45:6, 47:8, 48:2, 48:4, 48:6, 61:7, 64:10, 89:21, 111:4, 113:14, 115:15, 123:11, 146:15, 156:18
**school** [98] - 14:7, 15:12, 15:13, 17:17, 21:17, 21:19, 22:7, 23:18, 23:19, 24:18, 27:7, 29:10, 29:13, 33:9, 33:10, 34:20, 37:25, 38:11, 39:6, 39:23, 40:3, 41:21, 42:7, 47:25, 49:7, 49:19, 51:11, 53:19, 55:16, 59:9, 59:15, 59:22, 60:3, 66:19, 70:3, 75:13, 84:23, 88:21, 91:12, 96:10, 96:12, 96:17, 96:18, 96:19, 101:23, 102:2, 104:6, 104:8, 104:9, 104:10, 104:23, 104:24, 105:14, 105:15, 106:21, 107:14, 107:18, 108:3, 108:6, 108:21, 110:2, 110:14, 116:4, 116:8, 116:11, 116:21, 117:3, 119:8, 119:19, 120:14, 120:17, 121:22, 123:22, 124:1, 125:4, 125:25, 127:1, 129:13, 129:17, 131:20, 132:15, 132:20, 132:21, 133:21, 133:24, 134:14, 136:3, 141:23, 145:10, 146:14, 146:15, 164:4, 164:14, 176:14, 177:7, 192:2
**school's** [1] - 61:15
**Schools** [11] - 4:21, 5:19, 5:21, 16:2, 16:4, 19:25, 29:7, 33:15, 92:24, 158:6, 186:10
**schools** [8] - 20:9, 22:22, 28:24, 96:14, 143:20, 164:2, 164:3, 176:16
**scope** [2] - 54:21, 77:7
**scrimmage** [2] - 95:24, 97:13
**Scriven** [9] - 14:7, 54:22, 62:14, 96:9, 131:23, 133:12, 133:15, 148:18, 186:18
**Scriven's** [1] - 134:13
**se** [1] - 40:17
**season** [4] - 112:9, 112:10, 112:11, 112:22
**season-end** [1] - 112:11
**seat** [2] - 3:2, 5:25
**seated** [2] - 75:23, 144:15
**Second** [1] - 9:21
**second** [12] - 17:2, 31:9, 35:17, 37:5, 43:16, 66:8, 71:23, 76:6, 82:8, 95:23, 111:22, 129:3
**secondly** [1] - 102:17
**seconds** [5] - 15:21, 15:23, 35:10, 69:9, 72:6
**secret** [2] - 125:7, 146:23
**Section** [4] - 78:23, 79:10, 79:11, 90:14
**secured** [1] - 147:17
**security** [19] - 14:10, 59:24, 59:25, 60:3, 102:12, 102:20, 103:1, 105:24, 107:17, 109:2, 109:6, 109:7, 109:22, 110:20, 146:3, 169:8, 176:11, 183:24
**see** [26] - 36:21, 38:17, 44:6, 46:10, 54:23, 68:24, 69:21, 85:2, 86:6, 88:8, 90:1, 103:13, 107:4, 107:5, 107:6, 112:15, 121:7, 143:18, 144:4, 146:11, 147:7, 155:23, 167:12, 189:18
**seeing** [2] - 38:14, 111:19
**seek** [6] - 16:1, 76:9, 76:17, 89:23, 90:13, 120:15
**seeking** [4] - 77:9, 80:16, 81:23, 89:12
**seem** [2] - 76:8, 148:24
**sees** [1] - 117:5
**Segerman** [4] - 16:6, 16:7, 16:23, 18:13
**segments** [1] - 73:4
**seldom** [1] - 27:21
**send** [1] - 109:10
**sends** [1] - 4:5
**Seneca** [5] - 114:3, 114:6, 143:11, 159:10, 159:13
**sense** [5] - 98:5, 148:23, 151:1, 152:6, 157:15
**sent** [9] - 46:7, 108:1, 109:25, 158:8, 167:21, 179:25, 189:13, 189:14, 190:9
**sentence** [1] - 82:21
**separate** [9] - 6:18, 6:22, 9:19, 9:24, 18:25, 54:12, 84:11, 101:7, 101:11
**separately** [1] - 102:4
**September** [6] - 21:18, 113:1, 114:1, 119:5, 145:18, 159:10
**sequelae** [2] - 88:20, 101:5
**serious** [5] - 15:7, 47:4, 77:17, 117:7, 173:9
**seriously** [2] - 60:3, 108:14
**serves** [2] - 126:21, 127:9
**service** [2] - 108:9, 108:12
**services** [1] - 60:10
**session** [4] - 15:13, 24:18, 24:21, 48:14
**set** [7] - 12:19, 16:5, 94:24, 98:3, 98:5, 148:13, 168:3
**sets** [3] - 38:4, 110:23, 165:20
**setting** [7] - 35:1, 102:9, 103:3, 104:5, 145:9, 157:17, 176:14
**settings** [1] - 102:9
**seven** [3] - 141:5, 144:11, 187:7
**Seven** [2] - 75:25, 76:2
**Seventh** [1] - 174:23
**several** [1] - 84:17
**severalfold** [1] - 104:16
**severe** [8] - 92:15, 124:2, 127:6, 141:24, 151:10, 171:25, 172:3, 186:13
**sex** [4] - 92:7, 92:14, 115:24
**sexual** [91] - 11:15, 12:4, 12:24, 13:2, 13:3, 13:7, 13:8, 13:13, 13:17, 13:18, 13:23, 14:3, 14:13, 14:22, 15:20, 18:11, 19:10, 19:15, 19:21, 19:22, 23:15, 23:16, 25:18, 27:18, 29:11, 33:19, 33:20, 34:18, 41:8, 44:4, 44:19, 47:2, 55:19, 55:21,

55:22, 56:1, 62:19, 64:8, 66:18, 66:25, 67:8, 69:10, 71:20, 91:14, 93:1, 93:4, 93:5, 93:10, 94:2, 95:1, 100:14, 113:11, 114:23, 115:21, 116:4, 121:24, 123:23, 123:25, 124:2, 125:25, 126:4, 127:5, 127:19, 128:20, 129:13, 134:22, 135:6, 137:17, 137:18, 141:24, 144:22, 145:20, 145:24, 146:13, 146:18, 162:13, 162:19, 173:3, 174:22, 177:8, 183:3, 184:1, 184:11, 192:1
**sexually** [10] - 25:17, 26:16, 27:14, 48:20, 65:10, 82:6, 102:13, 121:19, 123:21, 124:16
**shall** [3] - 92:6, 147:7
**shared** [2] - 41:20, 109:8
**Shaw** [1] - 149:5
**sheet** [3] - 86:6, 88:9, 98:1
**shocked** [1] - 117:15
**shoes** [3] - 24:21, 49:6, 175:10
**short** [2] - 31:25, 61:23
**shorten** [1] - 170:11
**shorthand** [1] - 193:10
**shortly** [2] - 123:14, 126:17
**shoulder** [1] - 115:23
**shoving** [1] - 95:17
**show** [4] - 34:7, 38:6, 111:3, 186:2
**showed** [2] - 118:19, 121:23
**shower** [2] - 60:18, 60:20
**showing** [1] - 89:18
**shows** [5] - 30:1, 43:11, 117:20, 121:21, 192:5
**sic** [4] - 109:25, 158:13, 180:1, 180:24
**sic]** [2] - 100:15, 145:15
**side** [8] - 5:4, 69:1, 95:12, 97:13, 122:20, 125:4, 146:1, 184:13
**sidelines** [2] - 95:24, 97:13
**sign** [2] - 31:10, 80:13
**signed** [2] - 52:2, 132:4
**significant** [2] - 157:25, 158:10
**significantly** [1] - 157:18
**similar** [3] - 25:23, 28:23, 90:11
**similarly** [2] - 113:18, 114:1
**Simmons** [1] - 126:6
**simple** [2] - 59:12, 110:15
**simply** [10] - 14:20, 22:4, 23:24, 38:6, 40:18, 75:11, 118:13, 123:13, 180:10, 192:21
**single** [5] - 14:2, 30:23, 85:20, 124:3, 177:23
**sit** [1] - 97:17
**site** [2] - 35:3, 70:15
**sites** [1] - 29:22
**situation** [12] - 29:10, 63:5, 113:18, 114:3, 115:14, 116:9, 120:10, 122:23, 124:12, 126:19, 177:25, 180:10
**situations** [2] - 30:18, 159:11
**six** [2] - 9:9, 114:2
**Sixth** [1] - 176:21
**skill** [1] - 25:23
**skills** [1] - 145:8
**slide** [2] - 33:25, 50:23
**slightly** [1] - 57:1
**slower** [1] - 190:5
**small** [1] - 145:8
**smashed** [1] - 60:24
**sodomization** [3] - 75:2, 186:21, 187:5
**sodomized** [9] - 61:11, 75:6, 96:6, 122:5, 131:17, 132:7, 132:23, 133:3, 133:25
**sodomizing** [1] - 47:9
**sodomy** [1] - 133:4
**solid** [1] - 49:10
**solidified** [1] - 24:14
**solidifies** [1] - 68:5
**someone** [13] - 31:22, 53:2, 63:6, 75:12, 93:2, 102:13, 116:25, 126:25, 128:10, 149:1, 155:5, 155:14, 182:3
**sometime** [1] - 163:19
**sometimes** [1] - 113:4
**somewhat** [1] - 137:9
**son** [6] - 96:4, 96:15, 96:17, 129:14, 136:7
**soon** [1] - 103:9
**sorry** [22] - 6:5, 12:8, 36:19, 39:4, 56:13, 61:5, 62:5, 62:7, 63:22, 71:9, 75:24, 76:15, 97:17, 106:15, 121:9, 131:21, 141:20, 166:1, 170:6, 170:9, 174:4, 189:9
**sort** [17] - 23:20, 81:1, 89:2, 89:12, 106:19, 122:23, 126:9, 132:10, 148:23, 157:10, 157:11, 167:13, 170:25, 180:5, 180:8, 180:15
**sorted** [1] - 139:20
**sought** [3] - 76:9, 82:2, 140:2
**sounds** [1] - 52:25
**South** [1] - 1:21
**SOUTHERN** [1] - 1:3
**speaking** [5] - 3:14, 8:2, 8:21, 101:24, 101:25
**special** [5] - 83:9, 83:11, 88:9, 142:17, 146:2
**Special** [2] - 54:19, 96:11
**specific** [13] - 33:4, 38:17, 38:18, 61:10, 62:4, 93:12, 93:16, 122:16, 135:9, 142:18, 149:24, 154:17, 156:23
**specifically** [10] - 29:13, 42:23, 47:20, 62:12, 64:15, 102:11, 111:2, 112:20, 126:13, 190:2
**specifics** [4] - 123:18, 128:25, 129:7, 135:16
**speculating** [1] - 89:3
**speculation** [1] - 16:19
**speculative** [2] - 16:17, 50:25
**spend** [3] - 8:14, 11:24, 26:7
**spending** [13] - 76:19, 76:23, 78:14, 78:18, 79:13, 80:22, 80:24, 81:5, 81:13, 81:21, 82:15, 99:7, 100:3
**spent** [2] - 103:21, 103:24
**splitting** [1] - 179:22
**sports** [1] - 105:4
**Sports** [1] - 29:7
**spring** [1] - 133:18
**squad** [1] - 121:20
**SRO** [3] - 145:12, 177:18
**staff** [21] - 17:18, 25:2, 33:20, 43:20, 47:14, 48:4, 60:6, 62:23, 64:14, 67:22, 104:24, 106:10, 116:16, 117:14, 120:21, 161:22, 168:1, 175:9, 178:15, 178:17
**stage** [1] - 12:20
**stall** [1] - 61:1
**stand** [5] - 135:15, 135:22, 175:9, 175:10, 192:7
**standard** [15] - 16:21, 18:1, 25:19, 27:12, 31:6, 37:6, 38:5, 57:6, 58:6, 58:22, 67:2, 92:18, 92:19, 130:7, 151:14
**standards** [2] - 146:18, 150:6
**standing** [13] - 7:9, 7:11, 7:25, 24:21, 43:11, 46:14, 49:6, 55:6, 89:17, 90:13, 120:7, 120:14, 120:18
**stands** [2] - 123:21, 124:1
**start** [5] - 3:9, 36:15, 75:20, 118:20, 178:3
**started** [7] - 15:13, 28:18, 41:14, 46:6, 66:19, 104:19, 123:8
**starting** [3] - 4:7, 76:16, 182:20
**State** [9] - 84:8, 139:17, 152:15, 152:16, 162:12, 162:13, 174:14, 175:8
**state** [34] - 15:19, 27:6, 86:23, 108:17, 121:5, 126:15, 147:16, 147:18, 149:6, 149:7, 149:8, 157:22, 158:12, 159:3, 170:5, 171:14, 173:18, 173:19, 173:21, 175:22, 176:9, 176:16, 177:1, 177:4, 177:5, 179:4, 179:5, 179:8, 179:15, 181:25, 182:6, 183:14, 183:17, 183:24
**State's** [1] - 113:24
**state-created** [15] - 170:5, 171:14, 175:22, 176:9, 176:16, 177:1, 177:4, 177:5, 179:4, 179:5, 179:8, 179:15, 181:25, 182:6, 183:17
**statement** [13] - 40:12, 42:5, 131:4, 131:5, 131:8, 131:9, 132:20, 133:4, 137:25, 164:16, 165:21, 166:9, 190:17
**statements** [5] - 133:24, 135:24, 158:23, 158:25, 193:9
**States** [3] - 92:6, 99:15, 193:5
**STATES** [2] - 1:1, 1:10
**states** [2] - 59:3, 59:24
**statistics** [1] - 113:19
**status** [1] - 83:8
**statute** [6] - 77:10, 78:10, 81:22, 92:6, 133:17, 158:12
**statutes** [2] - 76:23, 81:14
**statutory** [4] - 98:12, 98:13, 139:19, 139:20
**stay** [5] - 8:18, 9:1, 87:7, 124:7, 152:16
**stead** [1] - 65:2
**stenographically** [1] - 193:7
**STENOTYPE** [1] - 1:25
**step** [1] - 7:24
**Stephanie** [1] - 5:18
**stere** [1] - 100:23

**stick** [1] - 56:2
**sticks** [1] - 104:3
**still** [17] - 18:19, 24:20, 40:3, 42:22, 83:5, 84:15, 85:20, 86:10, 87:13, 125:23, 126:9, 134:5, 139:10, 163:17, 165:14, 165:15, 184:15
**stipend** [3] - 13:12, 18:17, 50:4
**stipulation** [2] - 7:9, 8:1
**Stone** [3] - 59:15, 109:17, 184:10
**Stone's** [1] - 184:12
**stop** [14] - 27:18, 27:21, 75:13, 82:24, 97:18, 115:25, 116:18, 134:2, 168:8, 169:16, 181:14
**stops** [2] - 179:23, 181:4
**store** [1] - 107:4
**story** [1] - 143:1
**Stracke** [2] - 38:4, 61:21
**straight** [3] - 26:6, 43:5, 47:3
**Street** [3] - 1:21, 2:12, 2:17
**street** [2] - 106:22, 106:24
**Streets** [1] - 158:21
**strong** [2] - 125:15, 176:10
**strongly** [1] - 67:8
**Stroud** [1] - 149:5
**strove** [1] - 14:19
**struck** [1] - 140:22
**structural** [1] - 148:13
**structure** [3] - 148:22, 148:25, 152:3
**structures** [1] - 154:2
**stuck** [1] - 180:8
**student** [67] - 14:20, 15:4, 15:19, 16:9, 16:10, 28:13, 44:1, 44:4, 45:22, 47:1, 47:2, 47:17, 54:16, 54:18, 57:21, 72:3, 91:11, 92:12, 93:17, 106:23, 112:15, 113:7, 115:16, 119:6, 119:9, 120:14, 129:16, 132:23, 133:3, 136:9, 146:22, 147:19, 149:8, 149:20, 156:11, 157:19, 157:20, 157:24, 160:15, 161:3, 167:25, 173:3, 173:20, 173:22, 173:24, 174:22, 175:11, 175:16, 175:17, 175:18, 179:11, 184:1, 184:7, 187:2, 187:12, 188:5
**student's** [3] - 156:9, 177:7, 179:10
**student-on-student** [7] - 47:2, 147:19, 149:20, 173:3, 174:22, 175:18, 184:1
**students** [80] - 14:21, 16:20, 17:17, 18:11, 23:12, 23:20, 23:21, 25:11, 27:8, 28:9, 34:18, 38:7, 40:15, 43:21, 45:5, 45:21, 45:23, 46:2, 47:9, 48:2, 48:6, 50:6, 52:6, 52:14, 53:4, 58:1, 60:7, 60:16, 61:20, 64:9, 64:16, 66:24, 73:10, 73:16, 74:3, 75:1, 93:20, 106:12, 108:10, 109:19, 109:20, 116:8, 118:15, 119:1, 120:17, 127:17, 143:13, 145:8, 146:4, 146:11, 149:16, 149:17, 150:11, 150:14, 150:16, 150:20, 150:22, 150:24, 151:2, 151:6, 151:17, 151:19, 154:10, 154:14, 172:7, 173:4, 173:8, 173:11, 173:14, 174:16, 175:7, 176:2, 177:23, 178:9, 178:19, 186:25, 187:7
**students'** [1] - 187:2
**study** [16] - 105:20, 106:4, 106:7, 106:11, 107:19, 109:3, 109:16, 110:16, 110:22, 176:6, 179:16, 179:17, 179:18, 181:20, 187:1
**subject** [6] - 11:5, 81:6, 81:12, 160:19, 191:10, 191:13
**subjected** [2] - 92:8, 92:13
**subjectively** [1] - 125:25
**subjects** [1] - 160:18
**submit** [5] - 3:14, 24:4, 56:16, 136:23, 158:23
**submitted** [3] - 9:11, 43:9, 158:11
**subordinate** [24] - 19:23, 147:22, 147:23, 149:7, 149:15, 150:7, 150:8, 150:10, 150:19, 154:14, 155:1, 155:25, 156:11, 159:19, 171:24, 172:24, 172:25, 173:1, 173:2, 173:19, 173:21, 188:13, 191:19, 191:20
**subordinates** [10] - 107:1, 150:19, 152:19, 156:1, 172:13, 172:18, 173:17, 182:24, 183:25
**subpoenaing** [1] - 6:8
**subsequent** [1] - 153:4
**subsequently** [1] - 153:5
**subset** [1] - 162:19
**substance** [2] - 27:22, 136:17
**success** [2] - 108:22, 188:4
**sue** [1] - 10:24
**sued** [11] - 10:25, 11:6, 11:7, 80:15, 82:6, 164:17, 164:20, 165:16, 166:23, 166:25
**suffer** [3] - 47:3, 47:4, 91:19
**suffered** [2] - 27:3, 77:16
**suffering** [2] - 84:10, 85:4
**sufficient** [5] - 26:11, 35:2, 90:10, 101:1, 136:24
**sufficiently** [1] - 92:15
**suggest** [2] - 23:6, 161:4
**suggesting** [1] - 118:2
**suggests** [1] - 54:9
**suit** [9] - 9:8, 10:21, 79:17, 81:7, 100:11, 100:19, 120:10, 153:6, 181:14
**Suite** [2] - 1:17, 2:17
**suits** [3] - 78:22, 79:9, 79:10
**SULLIVAN** [1] - 2:9
**Sullivan** [56] - 4:10, 10:3, 11:2, 11:6, 13:17, 17:15, 19:20, 20:12, 28:19, 31:5, 31:7, 36:19, 36:22, 37:1, 37:19, 41:5, 41:10, 41:20, 41:25, 42:1, 42:10, 42:23, 43:7, 44:11, 46:5, 51:10, 51:16, 51:20, 53:1, 53:8, 59:3, 59:5, 147:9, 147:12, 148:3, 148:19, 150:23, 152:8, 153:12, 156:15, 158:14, 158:18, 160:2, 160:21, 161:12, 166:6, 167:11, 168:11, 168:25, 169:13, 170:2, 171:2, 172:2
**Sullivan's** [3] - 31:3, 65:14, 161:24
**sum** [2] - 23:24, 136:17
**summary** [42] - 9:24, 10:8, 16:25, 17:25, 18:14, 20:13, 20:18, 21:12, 24:1, 34:14, 36:19, 37:3, 37:8, 40:25, 45:11, 49:16, 49:24, 53:12, 54:3, 55:3, 56:18, 58:3, 59:10, 67:3, 68:15, 76:16, 80:6, 82:9, 88:14, 88:16, 89:8, 90:16, 91:17, 103:11, 103:12, 139:24, 151:15, 169:24, 183:10, 188:22, 191:12
**summer** [7] - 28:18, 104:7, 105:17, 105:18, 116:8, 163:16
**summertime** [1] - 104:7
**superintendent** [2] - 148:19, 153:11
**superior** [1] - 167:5
**supervise** [44] - 17:5, 17:6, 17:13, 17:19, 17:20, 19:24, 20:6, 27:17, 28:12, 29:9, 29:18, 31:7, 34:25, 39:8, 39:9, 39:10, 42:20, 50:4, 52:13, 52:18, 52:20, 59:20, 65:5, 67:13, 70:20, 91:11, 109:21, 147:23, 148:4, 150:17, 151:15, 151:17, 151:19, 151:21, 151:22, 153:13, 153:18, 163:6, 172:14, 173:17, 173:22, 178:9, 178:12, 188:12
**supervised** [24] - 17:11, 17:12, 17:18, 20:10, 28:9, 28:22, 43:2, 45:23, 46:3, 55:11, 64:16, 72:25, 105:19, 110:1, 148:15, 148:16, 173:8, 176:1, 176:2, 176:5, 178:16, 186:25, 187:12, 187:13
**supervises** [2] - 151:8, 172:11
**supervising** [14] - 29:21, 29:22, 35:15, 50:2, 58:23, 65:3, 109:23, 150:25, 151:5, 156:21, 156:22, 172:13, 173:2, 175:17
**supervision** [98] - 14:16, 16:17, 18:5, 19:19, 27:7, 27:10, 28:5, 32:7, 41:21, 42:8, 43:1, 43:20, 43:22, 44:1, 45:20, 46:9, 46:14, 46:17, 46:23, 47:7, 47:22, 47:25, 48:5, 48:17, 52:19, 52:24, 53:14, 58:8, 58:11, 58:22, 59:11, 59:13, 59:16, 59:24, 59:25, 60:7, 62:25, 63:20, 64:8, 65:11, 67:13, 67:15, 67:19, 67:23, 68:1, 68:7, 68:10, 68:11, 71:22, 72:23, 73:1, 73:10, 74:17, 75:1, 104:14, 104:16,

105:22, 105:25, 106:1, 108:7, 108:13, 109:12, 109:15, 110:9, 110:17, 117:9, 117:23, 118:21, 119:16, 152:11, 156:19, 157:12, 157:13, 159:16, 159:25, 162:9, 167:20, 169:6, 169:8, 176:3, 177:17, 178:19, 182:21, 184:25, 185:4, 185:12, 185:25, 186:2, 186:23, 187:10, 188:18, 188:20, 193:11

**supervisor** [36] - 39:1, 39:7, 53:9, 68:1, 96:9, 97:5, 147:22, 147:24, 147:25, 148:3, 148:7, 149:7, 149:11, 152:9, 152:20, 153:8, 153:25, 154:1, 154:9, 159:6, 159:9, 159:16, 165:23, 169:20, 170:15, 170:22, 171:16, 171:18, 172:24, 173:1, 183:6, 185:20, 188:13, 191:7, 191:19

**supervisor/ subordinate** [1] - 155:8

**supervisors** [5] - 68:9, 109:1, 150:22, 153:7, 183:24

**supervisory** [46] - 147:14, 147:21, 148:21, 149:6, 149:10, 149:18, 150:16, 151:1, 151:6, 151:12, 151:16, 155:2, 155:3, 159:18, 160:15, 160:21, 168:15, 170:5, 170:13, 170:20, 171:5, 171:15, 171:24, 172:8, 172:23, 173:5, 174:15, 175:6, 175:18, 175:21, 177:2, 177:25, 178:7, 182:15, 183:7, 183:10,

183:14, 183:16, 183:19, 184:5, 184:23, 185:18, 185:21, 188:24, 189:1, 191:8

**support** [9] - 14:7, 14:18, 35:13, 37:8, 45:22, 96:10, 125:21, 146:23, 148:2

**suppose** [5] - 55:22, 128:8, 141:3, 146:25, 149:25

**supposed** [19] - 30:22, 41:11, 41:17, 51:4, 53:2, 53:4, 64:14, 68:6, 70:4, 70:9, 70:17, 70:20, 75:12, 151:2, 158:19, 167:24, 172:14, 173:2, 175:14

**supposedly** [2] - 51:22, 72:25

**Supreme** [30] - 76:11, 77:6, 77:12, 78:2, 78:3, 78:11, 78:12, 79:9, 79:24, 79:25, 80:3, 80:8, 80:20, 81:4, 81:8, 88:15, 94:25, 95:5, 95:7, 99:9, 99:16, 99:17, 100:2, 100:10, 100:12, 100:16, 100:23, 100:25, 156:8

**surprise** [2] - 48:19

**surprised** [2] - 156:14, 167:12

**surprisingly** [2] - 24:23, 119:23

**survive** [1] - 102:2

**surviving** [1] - 159:4

**suspect** [1] - 7:21

**suspend** [2] - 119:21, 188:1

**suspended** [4] - 106:25, 121:1, 121:4, 153:1

**suspension** [3] - 107:7, 116:11, 116:12

**suspensions** [1] - 115:18

**SV** [1] - 94:19

**SVID** [2] - 96:11, 97:5

**Swanson's** [1] - 90:9

**sweep** [2] - 52:15, 53:5

**sworn** [1] - 21:22

**system** [39] - 11:1,

17:14, 19:20, 23:18, 28:17, 29:17, 30:20, 30:23, 37:2, 38:8, 38:16, 41:13, 42:14, 42:24, 43:20, 43:25, 46:19, 46:22, 47:7, 47:10, 58:17, 59:9, 65:17, 65:19, 75:13, 115:16, 120:13, 121:22, 124:1, 125:22, 141:24, 147:10, 148:13, 153:14, 163:15, 164:4, 167:17

**system-wide** [13] - 11:1, 17:14, 19:20, 28:17, 30:20, 37:2, 38:8, 38:16, 41:13, 58:17, 147:10, 153:14, 167:17

**systemic** [1] - 124:5

**systems** [1] - 23:19

## T

**T.E** [1] - 174:23

**table** [3] - 4:12, 81:2, 110:24

**tale** [1] - 29:16

**talks** [2] - 76:7, 188:19

**Tallapragada** [3] - 145:6, 145:14, 181:2

**tasked** [2] - 50:2, 161:21

**taught** [1] - 42:20

**teacher** [16] - 16:7, 16:13, 16:16, 16:19, 25:2, 55:6, 55:8, 59:15, 108:1, 109:17, 110:5, 172:10, 172:11, 177:23, 179:12

**teachers** [8] - 23:22, 30:10, 30:11, 56:9, 107:23, 109:1, 116:7

**team** [46] - 13:9, 13:14, 13:19, 13:24, 14:10, 14:19, 19:22, 20:5, 22:11, 22:14, 25:5, 26:25, 47:7, 50:15, 50:22, 59:22, 60:8, 68:10, 70:3, 79:16, 104:13, 104:18, 105:13, 105:14, 105:18, 107:1, 107:13, 108:19, 108:22, 109:4, 109:6, 109:13, 109:15, 110:1, 110:8,

110:24, 112:12, 113:2, 117:13, 119:17, 119:19, 119:21, 176:5, 188:1, 188:5

**team's** [1] - 15:3

**teammate** [1] - 10:24

**teammates** [9] - 10:22, 15:18, 18:3, 20:23, 26:16, 26:22, 47:10, 119:3, 184:7

**teams** [1] - 50:8

**teeth** [1] - 16:11

**temporarily** [1] - 106:25

**ten** [6] - 71:2, 75:18, 75:19, 115:18, 137:3

**tenants** [2] - 102:20, 102:21

**Tennessee** [1] - 34:1

**Tenth** [1] - 177:5

**tenure** [1] - 13:24

**term** [1] - 33:21

**terms** [11] - 52:11, 53:14, 55:4, 76:7, 77:2, 99:6, 103:14, 104:14, 107:20, 157:25, 176:17

**terrible** [1] - 117:6

**testified** [26] - 11:19, 14:8, 14:11, 15:8, 15:16, 22:1, 25:14, 31:3, 42:18, 52:12, 52:17, 58:7, 58:10, 65:4, 68:8, 71:5, 105:6, 110:13, 111:9, 113:4, 156:16, 156:17, 157:10, 167:15, 186:19

**testifies** [1] - 132:18

**testimony** [14] - 6:9, 21:20, 21:22, 25:4, 31:8, 35:15, 65:14, 71:2, 104:24, 122:17, 134:9, 161:24, 187:17, 193:9

**texted** [1] - 110:7

**THE** [397] - 1:1, 1:2, 1:10, 1:13, 1:19, 2:2, 2:9, 2:10, 2:15, 3:4, 3:8, 3:15, 3:23, 4:7, 4:15, 4:19, 4:22, 4:25, 5:3, 5:8, 5:12, 5:15, 5:22, 5:24, 6:11, 6:13, 6:17, 7:6, 7:12, 7:19, 8:1, 8:9, 8:24, 9:3, 9:5, 10:14, 11:23, 12:2, 12:8,

12:13, 12:18, 18:19, 18:21, 18:24, 19:3, 19:8, 20:24, 21:9, 21:15, 22:17, 22:20, 22:25, 23:3, 23:9, 24:5, 25:9, 26:2, 26:7, 27:21, 28:15, 28:23, 30:5, 30:16, 30:24, 31:10, 31:20, 32:3, 32:9, 32:12, 32:15, 32:20, 33:2, 34:3, 34:24, 35:23, 36:1, 36:4, 36:7, 36:11, 36:21, 36:25, 37:18, 38:14, 38:19, 38:22, 38:25, 39:5, 39:11, 39:16, 39:19, 39:21, 40:5, 40:8, 40:20, 41:1, 41:25, 42:4, 44:8, 44:10, 45:7, 45:9, 45:12, 45:16, 48:7, 48:21, 49:3, 49:12, 51:8, 51:14, 51:19, 51:22, 52:7, 52:10, 52:25, 55:20, 55:25, 56:13, 56:19, 56:22, 56:24, 61:3, 62:5, 62:7, 62:17, 63:3, 63:22, 64:1, 65:24, 66:12, 66:14, 67:5, 68:16, 69:2, 69:4, 69:11, 69:16, 70:1, 70:8, 70:14, 71:9, 72:10, 72:14, 72:16, 74:4, 74:7, 74:12, 75:15, 75:23, 82:24, 83:10, 83:22, 84:3, 85:2, 85:12, 85:15, 85:17, 86:3, 86:14, 86:16, 86:24, 87:3, 87:7, 87:10, 87:20, 87:25, 88:3, 88:7, 88:16, 89:11, 89:15, 90:18, 91:5, 91:18, 91:22, 91:24, 92:2, 95:4, 95:8, 95:11, 96:22, 97:10, 97:17, 97:20, 101:3, 101:24, 106:15, 107:10, 108:4, 110:4, 110:11, 111:7, 111:13, 111:15, 111:18, 111:22, 111:25, 112:3, 112:5, 114:11, 114:14, 114:25, 115:12, 118:1, 118:11, 118:16, 119:12, 120:3, 120:6, 121:8,

122:10, 122:19, 123:4, 123:17, 124:7, 124:10, 124:17, 124:23, 125:1, 125:3, 126:7, 126:12, 127:10, 127:13, 128:8, 128:13, 128:21, 129:4, 129:10, 130:16, 130:21, 131:4, 131:13, 131:21, 132:2, 132:13, 132:24, 133:7, 133:11, 133:20, 134:2, 134:24, 135:14, 135:21, 136:10, 136:20, 136:22, 137:2, 137:25, 138:4, 138:9, 138:19, 139:1, 139:3, 139:8, 139:15, 140:1, 140:10, 140:13, 140:22, 141:9, 141:12, 141:15, 141:21, 142:1, 142:7, 142:10, 142:16, 143:16, 144:11, 144:15, 145:17, 145:22, 146:24, 148:6, 148:12, 148:21, 149:11, 149:13, 149:17, 149:22, 150:10, 150:21, 151:5, 151:9, 151:11, 151:17, 151:20, 151:23, 152:2, 152:12, 153:20, 154:1, 154:5, 154:16, 154:24, 155:2, 155:10, 155:15, 155:19, 156:4, 156:12, 158:16, 160:6, 161:6, 161:8, 161:14, 161:25, 162:3, 162:6, 162:9, 162:18, 162:25, 163:5, 163:7, 163:13, 163:19, 164:6, 164:8, 164:11, 164:14, 164:20, 164:23, 165:2, 165:13, 165:24, 166:3, 166:8, 166:12, 166:14, 166:22, 168:6, 168:8, 168:19, 169:10,

169:21, 169:25, 170:11, 170:16, 170:21, 170:24, 171:6, 171:9, 171:12, 171:14, 171:20, 171:22, 172:1, 172:5, 172:20, 173:7, 173:21, 173:24, 174:3, 174:6, 174:9, 174:25, 176:12, 177:1, 177:3, 177:12, 179:1, 179:21, 180:23, 181:4, 181:12, 182:8, 182:12, 182:16, 182:19, 183:16, 183:20, 184:2, 184:16, 184:19, 184:21, 185:6, 185:13, 185:15, 185:22, 187:19, 188:7, 188:24, 189:2, 189:9, 189:15, 189:21, 190:1, 190:5, 190:10, 190:16, 190:25, 191:4, 191:12, 191:22, 192:3, 192:10, 192:13
**theft** [3] - 106:23, 107:4, 108:6
**theirs** [1] - 187:14
**themselves** [8] - 51:12, 90:5, 90:21, 105:6, 108:19, 120:19, 151:3, 176:7
**theories** [8] - 9:9, 16:24, 83:20, 85:10, 100:1, 100:3, 170:4, 178:25
**theory** [16] - 83:4, 85:9, 87:17, 87:18, 128:16, 136:22, 147:13, 152:8, 152:18, 153:20, 179:15, 181:15, 182:7, 183:7, 183:15, 183:18
**therapy** [1] - 80:14
**thereafter** [4] - 97:11, 126:17, 143:25, 193:11
**therefore** [9] - 14:14, 67:3, 81:10, 82:15, 99:24, 155:13, 156:7, 168:11, 175:14
**therefrom** [1] - 58:4

**thereof** [1] - 193:14
**thinking** [2] - 62:7, 86:5
**thinks** [1] - 118:4
**third** [5] - 149:8, 154:14, 156:11, 172:7, 172:19
**third-party** [4] - 149:8, 156:11, 172:7, 172:19
**THOMAS** [1] - 2:3
**thoughtless** [1] - 37:12
**thoughtlessly** [6] - 31:17, 46:9, 64:25, 65:13, 68:12, 75:9
**thoughts** [2] - 144:8, 144:17
**threat** [2] - 89:19, 90:5
**threatened** [1] - 187:25
**threats** [1] - 113:6
**Three** [1] - 44:12
**three** [7] - 86:20, 109:18, 114:7, 118:1, 118:4, 118:6, 175:23
**three-feet** [1] - 118:6
**threw** [4] - 70:20, 114:19, 116:19, 129:21
**throughout** [4] - 101:10, 106:21, 107:14, 110:14
**thrown** [4] - 24:17, 26:17, 112:14, 139:23
**THURSDAY** [1] - 1:11
**tied** [1] - 56:11
**tiger** [1] - 160:9
**tile** [1] - 60:20
**tiles** [1] - 60:22
**timeline** [2] - 51:8, 71:10
**timing** [2] - 34:13, 104:10
**Timothy** [1] - 3:12
**TIMOTHY** [1] - 1:15
**title** [1] - 121:5
**Title** [81] - 75:24, 75:25, 76:2, 76:12, 76:18, 76:25, 77:1, 78:17, 78:18, 78:21, 78:25, 79:3, 79:5, 79:9, 79:15, 79:16, 79:23, 80:2, 80:3, 80:10, 81:21, 82:6, 82:14, 82:16, 83:21, 85:1, 85:22, 86:9, 87:13, 87:25, 88:14,

90:13, 92:3, 92:4, 92:5, 93:12, 93:21, 94:9, 95:2, 98:8, 98:15, 98:19, 99:15, 99:20, 99:22, 100:7, 100:9, 100:11, 100:17, 100:19, 101:5, 101:16, 101:19, 102:4, 121:16, 126:25, 128:16, 128:23, 129:3, 135:5, 135:19, 137:8, 137:14, 137:17, 137:20, 138:1, 138:5, 138:6, 138:18, 138:22, 139:3, 139:9, 139:13, 140:10, 140:11, 144:25, 146:18, 164:20
**TJ** [2] - 107:24, 109:14
**today** [7] - 3:22, 8:4, 9:12, 24:10, 24:23, 112:23, 167:13
**today's** [1] - 7:22
**together** [1] - 189:17
**toilets** [1] - 61:2
**tolerance** [2] - 15:6, 51:2
**tolerated** [4] - 15:7, 22:13, 51:1, 116:25
**Tom** [2] - 3:20, 6:5
**took** [21] - 30:2, 30:3, 30:24, 38:12, 38:17, 61:9, 64:18, 74:20, 74:25, 114:3, 114:4, 114:22, 115:16, 116:3, 116:22, 133:18, 133:24, 159:17, 161:23, 181:3
**tort** [5] - 102:17, 149:7, 150:14, 150:20, 173:15
**touching** [3] - 88:21, 115:22, 127:19
**towards** [2] - 112:10, 121:23
**track** [4] - 43:17, 160:3, 170:25, 183:20
**tradition** [6] - 11:14, 77:25, 112:11, 122:12, 122:21, 123:5
**traditionally** [1] - 102:8
**trained** [1] - 14:21
**training** [77] - 17:22,

22:8, 22:14, 29:5, 29:8, 29:25, 30:3, 30:5, 30:21, 33:13, 33:20, 33:24, 34:2, 34:7, 34:18, 34:22, 38:11, 38:12, 38:18, 42:19, 42:25, 43:9, 43:13, 47:20, 50:11, 50:14, 50:17, 50:18, 50:19, 55:5, 55:7, 61:7, 61:9, 61:14, 63:18, 64:12, 64:18, 64:19, 70:5, 74:9, 74:13, 74:17, 74:20, 74:24, 74:25, 75:9, 91:14, 156:22, 157:18, 157:23, 159:20, 159:21, 159:22, 160:1, 160:2, 160:19, 161:13, 161:22, 161:24, 163:7, 163:12, 163:22, 163:25, 164:5, 167:15, 167:17, 186:3, 186:5
**trainings** [11] - 31:13, 31:19, 32:2, 42:15, 43:8, 43:18, 43:24, 47:11, 47:17, 65:11, 65:16
**transcribed** [1] - 193:11
**TRANSCRIPT** [1] - 1:9
**transcript** [1] - 193:7
**TRANSCRIPTION** [1] - 1:25
**transcription** [1] - 193:12
**transfer** [6] - 102:2, 106:1, 120:24, 187:22, 190:4, 190:7
**transferred** [1] - 117:4
**transmitting** [1] - 167:1
**transported** [1] - 77:17
**trash** [1] - 60:12
**treat** [1] - 81:11
**treaties** [1] - 62:23
**treatment** [1] - 16:1
**treats** [1] - 101:11
**triable** [3] - 134:7, 134:9, 134:25
**trial** [8] - 79:17, 98:16, 98:22, 99:11, 146:8, 146:12, 185:16, 191:9
**tried** [3] - 82:25, 113:21, 143:4

**trier** [1] - 147:4
**triggered** [1] - 131:18
**triggers** [1] - 158:8
**trip** [2] - 127:18, 127:20
**troubled** [1] - 180:25
**true** [3] - 14:20, 154:4, 193:6
**try** [12] - 8:18, 36:8, 36:11, 64:2, 74:22, 95:14, 98:6, 116:11, 116:12, 121:10, 192:23
**trying** [23] - 12:19, 48:22, 71:9, 77:7, 88:8, 89:24, 89:25, 115:24, 126:9, 126:12, 132:10, 141:16, 142:2, 146:9, 152:13, 163:20, 164:25, 165:18, 166:5, 183:20, 189:24, 191:15, 191:16
**TURLINGTON** [1] - 2:11
**Turlington** [1] - 4:13
**turn** [2] - 133:3, 181:3
**turned** [3] - 123:9, 125:16, 160:8
**turns** [2] - 81:1, 119:23
**twice** [2] - 68:2, 145:11
**twisted** [1] - 60:24
**Two** [2] - 36:8, 36:18
**two** [42] - 9:19, 16:11, 19:1, 36:5, 59:18, 59:19, 70:6, 73:4, 75:20, 77:14, 79:19, 88:11, 93:13, 99:8, 99:9, 102:16, 105:11, 110:7, 112:13, 113:4, 116:20, 117:20, 118:3, 118:5, 118:14, 118:15, 118:25, 119:2, 119:3, 129:1, 133:9, 145:19, 150:20, 156:6, 157:10, 158:24, 170:4, 176:22, 192:19, 192:22
**two-and-a-half** [2] - 118:3, 118:5
**type** [5] - 23:22, 29:10, 29:11, 162:10, 168:9
**typically** [5] - 84:19, 98:11, 98:16, 102:16, 104:25
**tyranny** [1] - 180:8

## U

**ultimately** [4] - 25:16, 48:3, 48:19, 100:22
**un-permitted** [1] - 88:21
**unable** [1] - 30:12
**unacceptable** [1] - 43:21
**unambiguous** [1] - 77:4
**unanswered** [1] - 109:14
**unclear** [1] - 163:18
**unconstitutional** [3] - 147:24, 184:6, 191:21
**uncontested** [1] - 59:6
**undefeated** [1] - 108:18
**under** [78] - 24:19, 25:23, 36:10, 57:17, 65:2, 65:14, 76:12, 77:11, 77:14, 78:15, 78:23, 79:9, 79:10, 79:14, 79:23, 80:2, 80:9, 80:15, 81:13, 81:21, 82:6, 82:12, 82:14, 85:8, 85:10, 85:14, 85:22, 87:12, 87:21, 87:25, 88:11, 88:13, 88:14, 90:9, 90:13, 92:8, 92:24, 93:21, 94:12, 94:18, 95:2, 96:13, 97:2, 98:18, 100:7, 100:11, 100:19, 101:5, 102:4, 104:24, 105:6, 105:22, 105:25, 113:23, 126:25, 128:16, 128:17, 135:7, 136:24, 140:10, 140:11, 147:15, 147:19, 153:14, 168:25, 170:5, 172:15, 175:24, 175:25, 178:8, 178:18, 178:24, 179:14, 179:17, 183:14, 186:2, 193:11
**undergo** [1] - 159:20
**undergoing** [1] - 172:15
**underneath** [1] - 154:10
**understood** [6] - 44:5, 75:15, 134:4, 156:12, 171:2, 182:8
**undertaken** [1] - 43:18
**undisputed** [3] - 14:14, 50:18, 51:25
**unexpected** [1] - 10:25
**unforeseeable** [4] - 10:25, 18:2, 20:22, 73:14
**unforeseen** [1] - 16:13
**unfortunately** [1] - 55:16
**unidentified** [1] - 136:9
**unit** [1] - 153:10
**Unit** [1] - 54:19
**United** [3] - 92:6, 99:15, 193:5
**UNITED** [2] - 1:1, 1:10
**University** [2] - 82:23, 99:21
**unknown** [1] - 112:17
**unless** [7] - 6:24, 8:16, 24:3, 45:10, 56:15, 58:19, 91:13
**unlock** [1] - 52:13
**unreasonable** [8] - 27:13, 48:5, 48:18, 68:12, 150:8, 172:3, 182:23, 182:25
**unreported** [1] - 94:22
**unsafe** [1] - 113:18
**unsatisfactory** [1] - 63:16
**unsupervised** [14] - 30:15, 47:9, 59:17, 60:2, 61:11, 64:5, 104:20, 106:12, 113:25, 114:5, 159:11, 159:13, 178:20, 187:2
**untouchable** [2] - 108:15, 108:24
**up** [57] - 6:2, 8:6, 8:20, 19:6, 19:8, 25:16, 31:21, 31:22, 33:23, 40:21, 42:7, 49:11, 49:13, 56:2, 56:8, 56:13, 60:21, 61:3, 62:12, 63:3, 68:5, 70:20, 75:25, 96:22, 97:22, 113:22, 115:7, 115:10, 116:19, 118:11, 118:19, 119:24, 121:9, 123:10, 124:14, 129:2, 135:1, 136:9, 139:15, 142:8, 142:11, 143:9, 148:13, 153:18, 158:19, 162:21, 163:22, 163:25, 173:9, 173:13, 174:24, 182:13, 186:14, 188:7, 189:4, 191:9
**upheld** [2] - 179:3, 182:2
**upholding** [1] - 101:17
**ups** [1] - 16:9
**upset** [1] - 110:22
**usual** [1] - 81:6
**utter** [12] - 38:2, 40:24, 45:4, 57:7, 59:14, 63:6, 66:23, 67:2, 72:3, 73:15, 73:19, 74:2
**utterly** [2] - 37:16, 38:1

## V

**vacate** [1] - 80:4
**vacated** [1] - 77:21
**vague** [2] - 37:9, 115:8
**validated** [1] - 31:12
**Valley** [3] - 114:3, 114:6, 143:11
**van** [1] - 77:18
**vandalism** [3] - 55:17, 56:10, 59:13
**vandalizing** [2] - 108:8, 108:10
**variety** [3] - 50:1, 52:23, 98:5
**various** [4] - 9:9, 153:7, 168:16, 192:23
**varsity** [17] - 11:7, 18:8, 19:18, 22:11, 44:24, 50:7, 50:21, 65:4, 65:5, 66:5, 68:10, 70:20, 72:12, 72:14, 104:17, 185:12
**verdict** [7] - 79:18, 83:1, 83:9, 83:11, 86:6, 88:9, 98:1
**verify** [1] - 48:23
**veritable** [1] - 62:21
**versus** [5] - 66:9, 87:12, 101:5, 148:19, 179:22
**VI** [10] - 76:25, 78:17, 78:18, 78:21, 78:25, 79:3, 79:5, 79:9, 80:2, 80:3
**viable** [2] - 121:16, 179:13
**vicarious** [1] - 20:16
**vice** [3] - 107:16, 109:2, 176:10
**vice-principal** [1] - 176:10
**victim** [24] - 41:8, 44:4, 47:2, 93:15, 94:16, 95:19, 96:7, 96:18, 96:19, 97:3, 97:16, 100:14, 111:23, 122:13, 124:11, 125:1, 127:21, 127:24, 128:7, 131:3, 132:16, 133:25, 135:12, 135:13
**victim's** [1] - 126:2
**victimization** [1] - 29:11
**victimized** [5] - 26:22, 27:19, 28:7, 32:11, 130:3
**victims** [3] - 71:6, 125:2, 143:12
**Victims** [2] - 54:19, 96:11
**video** [6] - 30:7, 107:4, 107:5, 107:6, 113:17
**view** [5] - 7:25, 135:23, 147:5, 147:6, 169:17
**VINCENT** [1] - 2:9
**Vinny** [2] - 4:11, 11:8
**violate** [3] - 154:25, 155:1, 178:19
**violated** [6] - 31:5, 43:3, 154:9, 158:21, 158:22
**violates** [2] - 168:18, 186:11
**violation** [12] - 28:8, 32:13, 77:9, 92:5, 94:9, 102:22, 154:8, 156:6, 156:9, 156:10, 174:2, 178:4
**violations** [2] - 34:20, 152:22
**violent** [4] - 116:13, 120:2, 152:25, 179:10
**viral** [1] - 113:17
**Virginia** [2] - 81:18, 98:21
**virtually** [3] - 103:24, 105:3, 139:18
**visit** [2] - 68:23, 119:7
**visiting** [1] - 69:23
**Vista** [1] - 95:3

**Voc** [1] - 78:16
**Vocational** [1] - 76:25
**vociferous** [1] - 106:9
**vs** [8] - 16:7, 26:5, 38:4, 90:4, 90:7, 99:21, 174:19, 188:11
**vulnerable** [2] - 43:12, 124:4

**W**

**W.S** [1] - 112:7
**wait** [5] - 75:12, 78:2, 103:13, 126:25
**walk** [1] - 105:9
**walking** [1] - 117:5
**wall** [1] - 69:1
**Wallich** [80] - 4:11, 10:4, 11:7, 13:5, 13:6, 15:8, 17:6, 18:8, 19:13, 19:17, 21:23, 29:25, 30:2, 33:21, 34:2, 34:7, 43:17, 44:23, 47:19, 50:8, 52:7, 52:17, 54:23, 55:6, 58:6, 58:9, 65:3, 65:25, 66:3, 66:10, 66:17, 66:22, 67:4, 67:12, 68:6, 69:16, 69:24, 70:18, 70:24, 74:12, 74:20, 74:24, 89:22, 104:17, 107:1, 108:24, 109:1, 120:21, 151:21, 153:13, 153:19, 154:11, 157:2, 157:4, 157:15, 159:20, 160:1, 160:13, 162:17, 170:9, 171:5, 171:18, 171:19, 177:22, 178:8, 178:18, 182:12, 182:14, 183:6, 184:6, 184:23, 184:24, 186:20, 186:24, 189:12, 190:22, 191:24, 192:6
**WALLICH** [1] - 2:9
**Wallich's** [5] - 68:24, 69:11, 69:13, 69:14, 69:22
**wanton** [7] - 37:20, 37:21, 38:7, 40:24, 49:20, 53:16, 63:24
**wantonly** [1] - 37:15
**wants** [2] - 11:20, 118:20
**Ward** [1] - 169:9
**warn** [1] - 186:12
**warned** [1] - 180:25
**warning** [2] - 180:6, 181:17
**watch** [2] - 35:17, 172:15
**waterproof** [1] - 60:20
**waving** [1] - 113:2
**ways** [3] - 140:14, 143:17, 175:23
**weapon** [1] - 153:3
**Webster** [6] - 11:18, 12:3, 21:23, 44:16, 105:21, 179:17
**Wednesday** [3] - 192:17, 192:19, 192:21
**week** [3] - 8:7, 107:24, 107:25
**weekly** [2] - 145:9, 145:11
**weeks** [3] - 63:14, 114:2, 119:2
**whatsoever** [1] - 45:5
**whole** [15] - 24:9, 31:16, 70:24, 98:5, 101:16, 119:18, 125:16, 127:8, 133:18, 143:22, 144:2, 147:2, 167:7, 175:16, 181:10
**whole-heartedly** [1] - 24:9
**wide** [18] - 11:1, 17:14, 19:20, 28:17, 30:20, 37:2, 38:8, 38:16, 41:13, 58:17, 147:10, 147:23, 153:14, 164:4, 167:17, 182:23, 184:6, 191:20
**wild** [2] - 107:21, 178:21
**Wilkins** [1] - 168:24
**willful** [8] - 40:24, 49:20, 53:16, 73:19, 122:22, 123:7, 125:12, 129:2
**willfully** [2] - 37:15, 128:21
**William** [1] - 90:7
**Williams** [1] - 5:18
**win** [2] - 14:19, 121:4
**wind** [9] - 31:21, 40:21, 56:13, 61:3, 63:3, 96:22, 118:11, 127:4, 188:7
**window** [1] - 69:21
**winning** [2] - 57:13, 108:18
**wins** [2] - 108:17, 108:18
**witch** [1] - 97:6
**withdrawn** [2] - 10:10, 21:12
**withdrew** [2] - 55:3, 116:22
**witness** [4] - 6:9, 6:10, 112:1, 112:3
**witnesses** [4] - 125:2, 158:24, 159:5, 193:9
**wonder** [1] - 88:3
**Wood** [2] - 2:4, 2:7
**word** [1] - 36:5
**words** [2] - 142:22, 180:8
**worker** [5] - 60:10, 108:9, 117:15, 159:5, 186:19
**workplace** [2] - 23:15, 55:9
**works** [4] - 8:24, 116:13, 148:15, 192:20
**worse** [3] - 106:14, 117:12, 181:10
**worst** [2] - 25:13, 117:17
**wound** [1] - 120:12
**wrapped** [1] - 108:21
**wrestler** [2] - 113:15
**wrestlers** [1] - 113:17
**write** [1] - 84:8
**writes** [1] - 169:1
**writing** [1] - 110:21
**written** [5] - 38:19, 38:25, 115:20, 133:4, 167:16
**wrongdoer** [1] - 37:14
**wronged** [2] - 89:19, 90:11
**wrongly** [2] - 153:4, 153:5
**wrongs** [1] - 90:4
**wrote** [5] - 79:22, 81:8, 81:18, 120:21, 189:4

**Y**

**Yakubik** [1] - 117:12
**year** [16] - 21:17, 21:19, 51:12, 62:13, 67:24, 70:3, 99:9, 99:21, 103:8, 104:6, 104:8, 111:10, 157:3, 157:4, 160:2
**years** [14] - 18:18, 31:1, 31:24, 33:17, 44:24, 44:25, 50:9, 68:2, 99:8, 101:1, 120:11, 175:9, 176:22
**yelling** [2] - 107:15, 110:10
**young** [30] - 16:8, 24:21, 25:5, 26:23, 27:18, 28:7, 28:21, 29:9, 29:10, 29:14, 30:14, 30:18, 41:6, 42:20, 43:10, 43:12, 43:14, 48:18, 61:10, 64:15, 65:1, 65:19, 69:25, 115:23, 116:3, 122:17, 123:8, 125:17, 188:16
**yourself** [1] - 128:21

**Z**

**zero** [5] - 15:6, 34:24, 51:2, 104:14, 104:16
**zippo** [1] - 33:12